## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Paula Bird, Clare Coetzer, Lauren Rose,   )
Danielle Snider, Erika Wesley, "B.A.",   )
"D.A.", "S.B.", "D.C.", "P.E.", "B.G.",   )
"L.M.","W.M.", "C.S.", "L.S.", "G.T.",   )
   )
Plaintiffs, on behalf of themselves   )     No. 1:19-CV-1581
And a class of those similarly situated   )     JURY DEMANDED
   )
v.   )
   )
William Barr   )
U.S. Department of Justice   )
950 Pennsylvania Avenue, NW   )
Washington, D.C.  20530-0001   )
Attorney General of the United States,   )
named in his official Capacity, and   )
head of the Department of Justice,   )
   )
Defendant.   )
_____)

## CLASS COMPLAINT FOR VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AMERICANS WITH DISABILITIES ACT, AND REHABILITATION ACT

COME NOW, the Plaintiffs, Paula Bird, Clare Coetzer, Lauren Rose, Danielle Snider, Erika Wesley, "B.A.", "D.A.", "S.B.", D.C.", "P.E.", "B.G.", "L.M.", "W.M.", "C.S.", "L.S.", "G.T.", individually and on behalf of a class of others similarly situated, for their complaint, allege as follows:

## NATURE OF ACTION

1.      Plaintiffs bring this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), the Americans with Disabilities Act 104 Stat. 328 (1990), as amended and the Rehabilitation Act of 1973 29 U.S.C. § 701 et seq.; Plaintiffs bring this action

individually and on behalf of a class of female New Agent Trainees (Job Series 1811) and Intelligence Analyst trainees (Job Series 0132) at the FBI's Training Academy in Quantico, Virginia who have been sexually harassed, subjected to a hostile work environment, and outdated gender stereotypes, terminated, constructively discharged, forced to resign under pressure or who perceived that continuing in the training would be a futile gesture, suffered retaliation, and/or suffered other types of harassment in whole or in part because of their gender since April 10, 2015. In many cases, the harassment and discrimination take the form of gender-plus discrimination in that women of color or who have disabilities are excessively singled out for adverse treatment. Those female trainees who were offered other FBI employment were forced to take positions several grades lower than their previous grade or experience justified.

## JURISDICTION AND VENUE

2.      Jurisdiction is proper in this court in that the district courts have original jurisdiction over Title VII, ADA and Rehabilitation Act claims under 28 U.S.C. § 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3), because they arise under the laws of the United States and are brought to recover damages for deprivation of civil rights.

3.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3), that the defendant's headquarters is located in this district, the personnel records relevant to this case are in this district, and the personnel practices challenged herein were directed or supervised by defendants in this district.

4.      Plaintiffs have exhausted their administrative remedies prior to bringing this suit in that each plaintiff has filed timely charges of discrimination and filed a class complaint before the Equal Employment Commission on October 23, 2018.  More than 180 days have passed since the filing of the class complaint and the EEOC has taken no action on this case since that filing.

## PARTIES

5.      Defendant William Barr is the Attorney General of the United States, and is sued herein in his official capacity as head of the Federal Bureau of Investigation.

6.      Plaintiff Paula Bird, an Asian female, is a resident of the state of Florida, and is currently employed by the FBI as an Operational Support Technician.  She was discharged from the FBI Academy as a New Agent Trainee [hereinafter "NAT"] on May 1, 2018, gave first notice of discrimination to the EEOC on May 10, 2018, and filed a timely charge of discrimination on May 29, 2018.

7.      Plaintiff Clare Coetzer, a Caucasian female, is a resident of the state of Washington, and is currently employed as a clinical social worker at an in-patient medical and psychiatric unit in the greater Seattle-Tacoma area.  She was discharged from the FBI Academy as a NAT on June 29, 2018, gave first notice of discrimination to the EEOC on August 7, 2018, and filed a timely charge of discrimination on September 17, 2018.

8.      Plaintiff Lauren Rose, a Hispanic female, is a resident of the state of Florida, and is currently employed by the FBI.  She was discharged from the FBI Academy as a NAT on May 20, 2015, gave first notice of discrimination to the EEOC on June 1, 2015, and filed timely charges of discrimination on August 3, 2015 and December 10, 2018.

9.      Plaintiff Danielle Snider, a Hispanic female, is a resident of Washington, D.C. She was discharged from the FBI Academy as a NAT on January 31, 2018, gave first notice of discrimination to the EEOC on February 8, 2018, and filed a timely charge of discrimination on February 10, 2018.

10.      Plaintiff Erika Wesley, a Caucasian and Native American female with a disability, is a resident of the state of Arizona.  During her training to become an IA she was deprived of

approved reasonable accommodations, sexually harassed, and publicly humiliated for her disability, beginning in January 2018. She gave first notice of discrimination to the EEOC on February 8, 2018, and filed a timely charge of discrimination on May 18, 2018.

11.     Plaintiff "B.A." is a Hispanic female.  She was discharged from the FBI Academy as a New Intelligence Analyst Trainee [hereinafter "NIAT"] on July 31, 2018, gave first notice of discrimination to the EEOC on November 26, 2018, and filed a timely charge of discrimination on December 13, 2018.

12.     Plaintiff "D.A.", an African-American female, is a resident of the state of Maryland, and is currently employed by the FBI.  She was discharged from the FBI Academy as a NAT on June 29, 2018, gave first notice of discrimination to the EEOC on July 2, 2018, and filed a timely charge of discrimination on September 21, 2018.

13.     Plaintiff "S.B.", a Caucasian female, is a resident of the state of Maryland, and is currently employed by the FBI.  She was discharged from the FBI Academy as a NAT on September 20, 2017, gave first notice of discrimination to the EEOC on February 13, 2018, and filed a timely charge of discrimination on March 12, 2018.

14.     Plaintiff "D.C.", a Caucasian female, is a resident of the Commonwealth of Virginia, and is currently employed by the FBI.  She was discharged from the FBI Academy as a NAT on February 1, 2018, gave first notice of discrimination to the EEOC on March 2, 2018, and filed a timely charge of discrimination on April 5, 2018.


15.     Plaintiff "P.E." a Hispanic female, is a resident of the state of New York. She was dismissed from the FBI Academy as a NAT on October 25, 2016, gave first notice of

discrimination to the EEOC on April 24, 2019, and formally filed a charge of discrimination on April 24, 2019.

16. Plaintiff "B.G.", a Hispanic female, is a resident of the state of New York, and is currently employed by the FBI. She was discharged from the FBI Academy as a NAT on October 24, 2018, gave first notice of discrimination to the EEOC on October 31, 2018, and filed a timely charge of discrimination on November 28, 2018.

17. Plaintiff "L.M.", a mixed-race female with a disability, is a resident of the state of Florida. She was discharged from the FBI Academy as a NIAT on March 9, 2018, gave first notice of discrimination to the EEOC on February 9, 2018 (prior to her dismissal), and filed a timely charge of discrimination on February 14, 2018.

18. Plaintiff "W.M.", a Caucasian female, is a resident of the state of North Carolina, and is currently employed by the FBI. She was dismissed from the FBI Academy as a NAT on June 29, 2018, gave first notice of discrimination to the EEOC on July 17, 2018, and filed a timely charge of discrimination on August 10, 2018.

19. Plaintiff "C.S.", a Caucasian female, is a resident of the state of Arizona, and, gave first notice of discrimination to the EEOC on December 3, 2018, and filed a timely charge of discrimination on February 6, 2019.

20. Plaintiff "L.S.", a Caucasian female, is a resident of the state of California. She was dismissed from the FBI Academy as a NAT on October 2, 2015, and filed timely charges of discrimination on January 16, 2016 and May 8, 2019.

21. Plaintiff "G.T.", a Caucasian female, is a resident of the Commonwealth of Virginia. She was discharged from the FBI Academy as a NAT on February 1, 2018, gave first

notice of discrimination to the EEOC on February 14, 2018, and filed a timely charge of discrimination on March 15, 2018.

**FACTUAL BACKGROUND**

**I.    BACKGROUND ON THE FBI'S TRAINING ACADEMY**

22.     NATs and NIATs begin their training at the FBI Academy in the Basic Field Training Course [hereinafter "BFTC"].  The BFTC is designed to integrate students in the twenty (20) week NAT course and the students in the twelve (12) week NIAT course where possible. During the first approximately six (6) to eight (8) weeks, NATs and NIATs attend academic courses together, including curriculum covering the law, interviewing and report writing, investigative authorities and techniques, human intelligence, etc.  Thereafter, NIATs continue with additional academic and intelligence curriculum, while NATs concentrate on law enforcement skills, to include defensive tactics, firearms, physical training, and operational skills.

23.     Per the BFTC Requirements Document, each Trainee is to be evaluated on the necessary basic proficiencies in specialized knowledge, skills, and abilities needed to perform their assigned duties in both an individual and team environment.  Additionally, per the BFTC Requirements Document, each Trainee is to be assessed on six (6) suitability dimensions: conscientiousness, cooperativeness, emotional maturity, initiative, integrity, and judgment.

24.     These six (6) suitability dimensions are defined and specific examples of suitable and unsuitable behavior are described in the BFTC Requirements Document as follows:

A.     Conscientiousness

1.     Conscientiousness includes behavior that is dependable, responsible, organized, careful, and thoughtful, with a great attention to detail and follow-through.  It is the ability to

systematically plan, anticipate problems, and develop contingencies to avoid these problems.

2.      Unsuitable behavior in this category includes excessively sloppy and careless work, being irresponsible when asked for something, losing important documents, materials, equipment, etc., and the failure to ask for assistance when appropriate and necessary.

3.      Anticipation and assessment of problems as described in this category includes the ability to self-monitor and seek help in overcoming potential difficulties and obstacles.

B.      Cooperativeness

1.      Cooperativeness includes behavior that involves following the chain of command and being willing to collaborate with fellow classmates, instructors, and other individuals in the FBI; the Intelligence Community; other law enforcement agencies; and the government. It is closely associated with the ability to relate effectively with others and being sensitive to others' needs.

2.      Unsuitable behavior in this category includes being rude, antagonistic and/or impatient with instructors, fellow classmates, other FBI personnel; unnecessarily questioning the performance of fellow workers in front of others; being disrespectful to employees; and using abusive language. It also includes failure to communicate critical information to others.

C.      Emotional Maturity

1.      Emotional maturity includes behaviors that involve maintaining self-control and approaching potentially volatile situations, events, and people in a calm, professional manner.  It is the ability to be flexible, adapt to changing situations, and remain level-headed and effective under stress. It is contrasted with behavior that is immature, irrational, and shows a lack of control over one's behavior.

2.      Unsuitable behavior includes reacting angrily or violently to comments made by individuals, acting inappropriately outside of work, (e.g., excessive drinking) using excessive force, or not reacting at all when it is appropriate to react. Unsuitable behavior also includes engaging in any form of harassment or discrimination.

D.      Initiative

1.      Initiative includes behavior that involves perseverance and dedication in performing the duties of the job, going above and beyond expectations to accomplish the job, making suggestions to improve work processes, performing duties without having to be told, and a willingness to put in long hours the job requires.

2.      This is correlated with motivation and includes exhibiting a commendable work ethic. It can be contrasted with behavior that involves failing to do what it takes to perform the job successfully because of laziness or lack of interest.

3.      Unsuitable behavior in this category includes refusing to put in additional time during training, failing to follow through with others because of inconvenience, and deliberately wasting time by taking a number of breaks while on duty.

E.      Integrity

1.      Integrity includes behavior that shows the person to be honest, trustworthy, disciplined, and respectful of laws and regulations; behaviors that display high standards of ethical conduct, and actions that are taken without jeopardizing or compromising these standards, even when there are no ramifications for not doing so. Behaviors involve following agency policy and the letter and spirit of the law, and avoiding even the appearance of impropriety.

2.      This is related to a person's professionalism, ability to maintain a positive image, ability to serve as a role model and represent the FBI positively to others. It can be contrasted with behavior that involves breaking the law and deviating from agency policy.

3.      Unsuitable behavior in this category includes accepting favors and gratuities, showing favoritism to friends or relatives, failing to report conflict of interest situations, lying, cheating, stealing (e.g., voucher fraud), lack of candor, failure to cooperate in an administrative inquiry, abuse of sick leave, and using government property for inappropriate personal reasons.

F.      Judgment

1.      Judgment includes the ability to evaluate information, think critically, question assumptions, discern merits and deficiencies in logic, and self-assess one's own skills. Behaviors

indicate the ability to decide on and commit to a responsible course of action, as well as the ability to accept constructive criticism and evaluate it appropriately.

2.     Unsuitable behavior in this category includes taking actions without thinking of the consequences, acting in a way that jeopardizes the reputation of the office and/or the FBI, or adamantly denying feedback on performance and refusing to improve one's deficiencies noted by a superior.

25.     Throughout the entirety of the BFTC, Trainees are continuously evaluated by staff and instructors to determine if they are demonstrating an acceptable level of proficiency in job related skills and are suitable to assume the duties of their position, as set forth in the BFTC Requirements Document.  When an instructor feels that a Trainee has failed to demonstrate an acceptable level of proficiency in any job-related skill or has failed to maintain required suitability standards, the instructor will notate said failure in a Suitability Notation [hereinafter "SN"].  Id. Upon receipt of the SN, Trainees are required to sign the SN as an acknowledgment of its receipt. The Requirements Document does not articulate how many SNs result in the recommendation for dismissal, which results in a lack of uniformity in how SNs are used to determine who is dismissed and who may be allowed to graduate.

26.     Tactical Training is different from other BFTC blocks for several reasons.  First, NATs are simultaneously trained and evaluated in new competencies.  This does not occur in any other segment of New Agents' Training.  In firearms, defensive tactics, and academics, a significant amount of training is provided before NATs are assessed and evaluated.  In the other blocks of training, NATs have a clear transition from training to evaluation, with proficiency being tested on a clearly articulated date, with a clearly articulated criteria for passing.

27.     Additionally, SNs stemming from errors made at the Tactical Training Unit [hereinafter "TTU"] are not issued uniformly, which creates a lack of equality amongst trainees.

For example, "Don't Shoot" scenarios in which different groups of NATs apply the exact same measure of deadly force are routinely met with different criticisms, and more importantly, different consequences. Some NATs receive SNs, some receive Tactical Feedback, and some receive no consequences whatsoever. In some instances, the issuance of a subjective SN from TTU makes the difference between trainees graduating on time and others being dismissed.

28. Finally, NATs are not allowed to practice tactical scenarios at Hogan's Alley after hours, which prohibits NATs from taking the initiative to improve skills outside of formal instruction. Whereas a NAT who requires additional firearms practice is offered remediation, a NAT who makes a mistake during tactical training – even during the very first instructional block of tactical training – is offered no option for remediation. This creates a training environment that is adverse to learning, and instead, encourages trainees to avoid consequences instead of developing skills.

29. Although the foregoing suitability dimensions appear neutral on their face, in practice, the suitability dimensions are often, and easily, used as pretext to induce failure in female trainees. Observation of suitability dimensions is highly subjective, and the uneven power dynamic at the FBI Academy puts female trainees at a distinct disadvantage. This subjectivity permits instructors to induce failure by misrepresenting scenarios, and create the appearance of a deficiency at will. For example, female trainees are admonished for lacking integrity and/or emotional maturity when they attempt to defend decisions made or actions taken found to be unfavorable with an instructor. However, when male trainees do the same, they are praised for having a "command presence." Further, female trainees are excessively targeted for correction and dismissal in tactical situations for perceived lack of judgment. Any tactical error can, and in the case of female trainees, is often characterized as an error in judgment and results in the issuance

of an SN.  In contrast, male trainees who engage in identical or similar actions and behaviors are not issued SNs.

30.     If the Training Management Unit [hereinafter "TMU"] determines that any NAT or NIAT is deficient in some aspect of their respective training, TMU initiates a Suitability Review, during which the Training Division determines if the trainee should appear before the Trainee Review Board [hereinafter "TRB"].  The TRB is convened by the Training Division Deputy Assistant Director [hereinafter "DAD"] and consists of the following individuals: the DAD who serves as chair and voting member; three Training Division Section Chiefs, who serve as board members; an Office of General Counsel [hereinafter "OGC"] representative, who serves as legal advisor; the TMU Unit Chief, who serves as a board member; and one minority representative at the GS-15 level, who serves as a board member.  The DAD determines the attendees of the TRB, which may or may not include the trainee's classmates, instructors, the TMU Unit Chief, TMU supervisor(s) and counselor(s), and any other individuals the DAD deems relevant.  The trainee is given an opportunity to appear before the board and provide a complete statement for the record, but does not have the opportunity to hear the statements of witnesses brought before the board, nor does the trainee have any opportunity to present witnesses on her behalf.  While TMU has the benefit of legal representation from the Office of General Counsel present at the TRB, trainees before the TRB are not afforded with the opportunity to have legal counsel or any other representative present, further highlighting the uneven power dynamic.  TRBs are neither independent nor fair, depriving trainees of fundamental procedural safeguards.  This results in a fundamental denial of due process, since the TRB is, in reality, conducting a hearing on the trainee's termination without the opportunity to confront witnesses against them, to be represented by counsel or an advocate, lack of notice of the underlying allegations prior to the hearing, and the

denial of a fair and impartial decisionmaker, all in violation of the stated procedures for the TRB, further demonstrating that these facially neutral policies are, in fact, a pretext for discrimination.

## II. THE UNLAWFUL EMPLOYMENT PRACTICES

31.     The FBI's Training Division has a number of unlawful employment practices that have an adverse impact upon female trainees.

32.     The entire training process is highly subjective and subversive of the purpose of a training academy. Instead of training NATs and NIATs for their jobs, the FBI Academy's purpose has been perverted into one of eliminating trainees who do not fit an arbitrarily subjective mold the FBI's Training Division believes necessary for a Special Agent or Intelligence Analyst, in direct contrast to stated FBI hiring policies and guidance.

33.     Through passive tolerance, the FBI has intentionally allowed the Good Old Boy Network to flourish unrestrained at the FBI Academy. TTU instructors, almost exclusively male, are provided no objective guidance and allowed to target for dismissal any agent they choose. Because of the FBI's history of tolerating the Good Old Boy Network, the subjective evaluations by these male instructors result in female trainees being written up and subsequently dismissed at a rate significantly and disproportionately higher than their male counterparts. Plaintiffs are informed and believe and thereon allege that only one female defensive tactics instructor has been on staff at the Academy since at least 2015.

34.     The first manner in which the FBI targets female trainees for inequitable treatment is the implementation of the Training Division's "Requirements Document." This document, while setting forth the ethical standards for FBI NATs and NIATs required for successful graduation from the FBI Academy collectively known as "suitability standards," is not in itself discriminatory on its face; it is the manner in which it is used that gives rise to the adverse impact of the document.

When a student is deemed deficient in a certain area of performance, the student is issued an SN. The vague language used to define suitability standards such as candor, professionalism, emotional maturity, and insubordination, is unethically contorted to allow female trainees to aggregate SNs for minor training mistakes or fabricated incidents, and subsequently be deemed "unsuitable" as FBI agents or analysts.

35.     Training Division instructors, supervisors, and field counselors are authorized to subjectively issue SNs to document trainee deficiencies.  According to the aforementioned Requirements Document distributed at the beginning of training, certain trainee errors and deficiencies result in the issuance of a mandatory suitability notation, including errors such as pointing a weapon at a fellow agent.  However, in practice, these mandatory citations are only mandatory when citing female trainees.  Identical errors made by male trainees are regularly ignored and undocumented.  Moreover, the subjective citations, resulting from vaguely defined standards such as "candor," "insubordination," and "lack of emotional maturity," are disproportionately issued to female trainees.  For example, any effort to seek clarification, or better understanding of course curriculum or training scenarios by female trainees consistently resulted in female trainees being labeled as "argumentative" and written up for "lack of candor." Additionally, a significant portion of the SNs issued to female trainees are not for offenses which should even constitute a SN, but rather for mistakes which the official policy only prescribes instructors provide "tactical feedback."  Rather than allowing female trainees to learn from their mistakes, as outlined by FBI Training Division policy, they are unduly targeted for citations to facilitate their ultimate dismissal.

36.     Training Division instructors, supervisors, and field counselors use sexual and gender-based stereotypes.   For example, female trainees who demonstrated any sort of

situationally appropriate emotion were cited for lacking "emotional maturity"; female trainees who attempted to address perceived bias within the chain of command were cited as "lacking professionalism"; female trainees who stood by their ethical duties prescribed in the Requirement Documents were cited as being "insubordinate"; female trainees who attempted to explain their actions after being asked by superiors to do so, were cited as "lacking accountability." Where female trainees are cited for demonstrating these behaviors, male trainees are praised by the same instructors for demonstrating a "command presence." Additionally, a number of female NATs received criticism for "not being aggressive enough" yet were ultimately dismissed for "being too aggressive."

37. Training Division staff, including instructors, supervisors, field counselors, managers, and review board members, frequently dismiss mistakes made by male trainees as isolated incidents, determine male trainees to be retrainable, and retain them at the Academy at a disproportionately higher rate than their female trainee counterparts. When a female trainee makes the exact same mistake, the female trainee is considered to be prima facie tactically incompetent, and is subjectively determined to be unable to improve and unworthy of additional remedial training.

38. Female trainees are often pre-selected for unnecessary and inappropriate "special attention" by Training Division staff at the beginning of training and heavily scrutinized while male trainees, especially those with prior law enforcement and/or military experience, are allowed to operate with little to no supervision, as Training Division staff assume these male trainees know what they are doing. However, those with prior law enforcement or military experience often demonstrate tactical skills that are not in line with FBI policies and procedures.

39.     Female trainees are singled out in group tactical exercises because they are perceived as being weak and prone to failure.  By singling out female trainees, they are put in situations far more frequently that result in suitability notations.

40.     The TRB operates without objectivity and violates established policies when evaluating female trainees for dismissal.  The review process requires that trainees be informed why they received SNs and be given a chance to respond.  However, female trainees are often ambushed with newly issued Suitability Notations at their TRBs, and are not given appropriate notice or time to prepare.

41.     Male trainees are provided multiple avenues for success, in spite of their errors. Male trainees are often permitted to retake tactical exams when female trainees are denied the same opportunity to do so.  Male trainees brought before the review board are statistically far more likely to be retained or recycled than female trainees, who are almost always recommended for dismissal.

42.     Female trainees are not given the opportunity to review or contest all of their SNs before their review board because they are provided with them at the same time as the Board, in violation of the Board's procedures.

43. TMU management and instructors actively seek out derogatory information, or "gossip," about female trainees from other instructors and counselors in order to levy additional SNs against female trainees.  However, readily observed violations of the Requirements Document committed by males are ignored.

44. Female trainees are subjected to a hostile work environment, pervasive sexual harassment and sexual jokes made by numerous members of Training Division instructors, managers and field counselors, including harassment about pregnancy, false allegations of infidelity, use of birth control, physical appearance, manner of dress, parental status, and refusal

to train certain skills because of a female trainee's breast size.

45.　　The FBI's internal Equal Employment Office [hereinafter "EEO"] fails to demonstrate due diligence as required by law to investigate the claims made by female trainees. Female trainees' claims are almost never investigated within the required time frames, and the internal EEO staff consistently depend on extensions to perform even minimal inquiry. EEO investigators fail to interview direct witnesses to claims made by female trainees, and conclusions are made without good faith effort. The Responsible Management Officials (RMOs) who are alleged to have engaged in discriminatory conduct are not required to respond to the inquiries from EEO staff, and no investigation into or disciplinary proceedings are initiated against RMOs who are alleged to have engaged in sexual harassment or discrimination. Moreover, female trainees are subjected to intense retaliation for bringing EEO protected activity to the attention of Training Division management.

46.　　Training Division management, particularly Unit Chief Kellie Holland, engaged in retaliation against female trainees who appropriately advocated for themselves and others when subjected to discriminatory actions by Training Division staff. Retaliatory actions taken against female trainees include issuing additional SNs in direct violation of Training Division policy and the FBI Core Values; intentional interference of female trainees' efforts to improve and succeed; precluding female trainees from taking exams required for graduation; singling female trainees out for additional and unwarranted scrutiny; publicly disparaging female trainees; and intimidating female trainees.

47.　　Training Division instructors, managers and field counselors consistently lack candor, embellish, fabricate, and/or exaggerate the characterization of the female trainees' behavior when issuing SNs to intentionally misconstrue the alleged offending behavior in a more

egregious manner. Training Division management also coerce female trainees to sign the SNs, and threaten them with additional adverse action if they are unwilling to do so. Upon termination, the FBI's practice is to misinform the NATs and IAs that there is no appeal or challenge possible to the decision, and terminated employees are not informed, however, that they may challenge the action under Title VII, affirmatively misleading the terminated employee about their civil rights.

## CLASS ALLEGATIONS

48.     This case meets the class requirements of Fed. R. Civ. P. 23(b)(1), (b) (and (b)(3) and 28 C.F.R. 1614.204(b), in that:

   a.     the class is so numerous that joinder of all members is impracticable;

   b.     there are questions of law or fact common to the class;

   c.     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

   d.     the representative parties will fairly and adequately protect the interests of the class.

49.     Plaintiffs are informed and believe that over 100 potential members of the class exist that were subjected to sexual harassment, hostile work environment, outdated gender stereotypes, terminated or left training because of their gender, which is magnified when the trainee is a woman of color or has a disability, and were isolated and subjected to excess scrutiny by the almost exclusively male training instructors.

50.     The members of the class were all subjected to the common practices set forth below, were in the same classes, were evaluated and dismissed by the same group of largely male

training agents, and were brought before the same Trainee Review Board through the use of suitability notations, denoting they were "unsuitable" for employment as a Special Agent or Intelligence Analyst. They were subjected to similar harassment because of their gender and, for those who were retained by the Bureau, were placed in grades lower than their previous employment and qualifications.

51.     The claims of each Plaintiff are typical of the claims of the members of the class because each was subjected to the same subjective evaluation procedures, were more frequently written up than their male counterparts and were dismissed by review boards using the same subjective practices. Each was exposed to similar harassment and isolation and were subject to the same gender stereotypes and harassment.

52.     The representatives of the class will adequately represent the members of the class because they have received a grant for attorney's fees and expenses from the Time's Up Legal Defense Fund of the National Women's Law Center, and are capable of funding any other expense of this case, have all indicated their dedication to eradicating the discriminatory practices by filing individual EEO complaints, and they have retained experienced class action counsel who has experience in litigating class actions against the FBI and other law enforcement agencies.

## THE PLAINTIFFS' CLAIMS MEET THE REQUIRMENTS OF FRCP 23

### I.     PAULA BIRD

53.     Plaintiff Paula Bird, an Asian female, graduated high school at the age of fifteen (15). She went on to graduate summa cum laude from the University of Central Florida at the age of nineteen (19), with a Bachelor of Science in Psychology and a Certificate in Behavioral Forensics. While she was at the University of Central Florida, Ms. Bird interned over the summer with the FBI in Washington, D.C. She subsequently continued her internship with the FBI in the

Maitland Resident Agency of the Tampa Division for a year prior to attending law school. At twenty-two (22), Ms. Bird graduated in the top 10% of her class from Barry University Dwayne O'Andreas School of Law, where she served as an editor of the Law Review and was specially selected to be published by the Law Review. Thereafter, Ms. Bird practiced law for over six (6) years prior to attending BFTC 18-01 as a NAT.

54.     Despite having successfully passed the Physical Fitness Test (PFT), all academic tests, the pistol and carbine qualifications, the defensive tactics test, and other performance tests and evaluations, she was dismissed three (3) weeks before graduation on May 1, 2018, after being brought before the TRB. Ms. Bird was given seven (7) SNs, all of which were from the Tactical Training Unit. Of the seven (7) SNs, four (4) were for tactical mistakes and three (3) were wholly unrelated to tactical performance. There were at least three (3) instances where Ms. Bird received a SN regarding a tactical mistake for acting in the same manner as other NATs in her section who did not receive a SN. For example, Ms. Bird was issued a SN from the former TTU UC, Randal Glass,[1] for applying deadly force to a paper target holding a firearm during a training exercise because neither she, nor her male partner, had a flashlight out. Ms. Bird and her partner had been told that for the purpose of the scenario they had already "knocked and announced" (i.e. official knock followed by "FBI. Search Warrant. Open up."). UC Glass specifically selected Ms. Bird to be no. 1, meaning that she would be responsible for first entry. When Ms. Bird's partner opened the door, she and her partner discovered that the room did not have its lights turned on. Relying on the ambient lighting from the area outside the room, Ms. Bird observed the paper target standing in a shooting position with both hands out holding what she correctly perceived to be a gun. UC

---

[1] UC Glass, who was responsible for recommending NATs for dismissal to the TRB, was subsequently removed from TTU and assigned to the Defensive Systems Unit (DSU) – a unit having little to no contact with trainees – in September 2018.

Glass chastised Ms. Bird (but not her male partner) for not using a flashlight before entering the room and stated that "for all [she] knew, the paper target could have been holding a remote control." At least one male NAT made the same "mistake" in front of UC Glass during the same exercise on the same day and was not issued a SN.

55.     Additionally, after receiving a SN from UC Glass containing false and misleading allegations, Ms. Bird spoke to one of her class counselors to inquire as to whether she could contest the SN. Ms. Bird was advised that although she could draft an electronic communication (EC) regarding the matter, it would be best if she refrained from doing so given the high level of scrutiny she was already under at TTU.

56.     Of the three NATs sent before the TRB from her section, Ms. Bird and another Asian female NAT were dismissed without being allowed to take the tactics test, while the male NAT was permitted to take the test and graduate. The male NAT who was permitted to graduate was later told by their supervisor, Supervisory Special Agent [hereinafter "SSA"] Christopher Neuguth, that he was only sent to the TRB because the board was concerned that it would appear that the Academy was targeting females if they did not have at least one male NAT appear before the TRB. The male NAT was never in danger of being dismissed and was only required to appear in front of the TRB in order to create a false appearance of fairness.

57.     Ms. Bird was not offered any sort of remedial tactical training, as is the standard with other units in the BFTC curriculum. Additionally, prior to her dismissal, Ms. Bird was advised that the Human Resources Department would offer her one support staff position (after reviewing her resume) which she could either accept or reject. Despite her credentials and experience, the only position offered to Ms. Bird was an entry-level Operational Support Technician which falls three (3) pay level grades below the Special Agent position.

## II. CLARE COETZER

58. Clare Coetzer, a Caucasian female, earned a Bachelor of Arts in Psychology and a Master of Arts in Social Work by age 23. She went on to obtain a clinical license to practice independently. Ms. Coetzer successfully helped pilot a new program in Monterey County, CA where mental health professionals partnered with law enforcement in order to address mental health crises in the field. She currently works as a Licensed Clinical Social Worker in both a local emergency department and an inpatient psychiatric hospital for adolescents in the state of Washington. Ms. Coetzer was enrolled in BFTC 18-03. She successfully passed the PFT on numerous occasions, all academic tests, the pistol and carbine firearms qualifications, the defensive tactics test, and other performance tests and evaluations.

59. Ms. Coetzer was brought before the TRB and dismissed, three (3) weeks prior to graduation, on June 29, 2018. Ms. Coetzer received a total of four (4) SNs for tactical deficiencies noted during tactical training scenarios. Two (2) SNs received by Ms. Coetzer on June 5, 2018, were for scenarios that the majority of the class failed. Ms. Coetzer voluntarily met with her primary tactical instructor [hereafter "PTI"], and asked for feedback on how to improve. Ms. Coetzer was told there was nothing she could do to improve. During this same meeting, Ms. Coetzer and her class counselor were both present when the PTI told a male classmate with four (4) SNs that he would "be fine" and "to keep working hard, and not worry about it." Only minutes after, the same instructor told Ms. Coetzer that her four (4) SNs were "a lot" and that "people don't typically graduate with four (4) SNs." This same male classmate later failed his tactics exam twice; and instead of following protocol for an automatic dismissal from BFTC, the PTI recommended him for a TRB in an effort to retain him despite his failures.

60. On June 12, 2018, Ms. Coetzer overheard two (2) male colleagues question their

SNs to the PTI and their SNs were rescinded. No such reconsideration was afforded to female trainees. If anything, questioning their SNs resulted in being issued additional SNs. Also, on June 12, 2018, despite receiving her two (2) final SNs, the only female TTU instructor told Ms. Coetzer that a drastic improvement in her performance had been noticed and she should keep up the good work. She also provided this feedback to the class counselor. Three other practical exercises followed, increasing in both difficulty and complexity, and Ms. Coetzer did not receive any more SNs, where others in the class did.

61. Four (4) of the nine (9) females in Alpha section were recommended by TTU for a TRB, whereas only two (2) of the thirty (30) males in her section were recommended by TTU for a TRB (only one of which actually had to appear before the TRB). Despite Ms. Coetzer's demonstrated improvement, Ms. Coetzer was sent before the TRB, without a chance to take the tactics exam. Ms. Coetzer was not offered any sort of remedial tactical training, as is the standard with other units in the BFTC curriculum.

## III.    LAUREN ROSE

62. Plaintiff Lauren Rose, a Hispanic female, graduated from Liberty University in 2007 with a Bachelor of Science in Psychology and Communications. Ms. Rose entered on duty with the FBI in September 2009 and held various professional staff positions with increasing responsibilities until she was given a New Agents Training class date. Ms. Rose was enrolled in the New Agents Training Program (hereinafter "NAC"] Class 15-03, BFTC's predecessor, where she successfully completed all academic exams, the PFT, pistol and carbine firearms qualifications, and defensive tactics tests without incident. Ms. Rose received three (3) SNs for mistakes made during the Tactical Training portion of the curriculum, even though several male trainees made the same, and more egregious mistakes, but were not written up or counseled

accordingly.  Ms. Rose was dismissed from training just one week prior to graduation on May 20, 2015, after being brought before the TRB.  When asked if she could be recycled, Ms. Rose was informed the Academy did not recycle for tactics.  However, within that same fiscal year, another male trainee in NAC 14-02 had in fact been recycled for issues arising from the tactical portion of the training and was subsequently allowed to graduate.  Despite being an employee of the FBI for nearly 6 years, Ms. Rose was forced to use 160 hours of annual leave before being reassigned.

63.    On May 25, 2015, Ms. Rose wrote an email to then-Director James Comey informing him of the prejudicial and discriminatory practices running rampant at the FBI Academy. In his response, Director Comey denied such discrimination was occurring and instead suggested she use her "pain" to reflect on her strengths and weaknesses.  On June 5, 2015, Ms. Rose sent letters to then-Assistant Directors Owen Harris (Training Division) and James Turgal (Human Resources Division) notifying them of the unequitable treatment of female trainees at the FBI Academy.  No response was received.  Ms. Rose filed a timely charge of discrimination on August 3, 2015.  In her initial complaint, Ms. Rose named several members of Training Division's Executive Management as RMOs, to include: Section Chief Catherine Fletcher, Section Chief James E. Jewell, Section Chief Zachary T. Lowe, Jr., and Deputy Assistant Director Mark A. Morgan.  As DAD, Mr. Morgan facilitated and/or approved the exclusive dismissal of female new agent trainees for tactical suitability during fiscal year 2015.  With respect to Ms. Rose specifically, Mr. Morgan stated that he took issue with her "attitude" during her oral presentation to the review board.  However, Mr. Morgan provided no additional substantiation to support why he felt that way.  It should be noted that despite Mr. Morgan's description of Ms. Rose's demeanor, Ms. Rose had an exemplary history of performance reviews prior her training at the Academy, and continues to receive excellent performance reviews after her removal from New Agents' Training.

Additionally, in her sworn statement, Section Chief Catherine Fletcher admitted that she was not a special agent, and therefore needed to ask the three male members of the review board if Ms. Rose could improve with additional training. Ms. Fletcher was in no way qualified to be a sufficient minority representative for Ms. Rose since she herself did not have an understanding or background in tactics and the application of deadly force. The three male special agents told Ms. Fletcher there was not enough time to train Ms. Rose, and Ms. Fletcher subsequently voted in solidarity with them, undermining any notional sense of independence a review board is supposed to offer a trainee.

64.     On July 27, 2015, Ms. Rose applied for Reinstatement pursuant to FBI Special Agent Reinstatement Policy 0323D 8.8. Included in her request for reinstatement was notification of the uneven distribution of suitability notations. Although her request was formally taken under advisement, no decision was made.

65.     On August 15, 2016, Ms. Rose again requested consideration for reinstatement via FBI Corporate policy by sending a formal letter to then-Assistant Director of Training Division David Resch. Even though Ms. Rose's Reinstatement request was entirely independent of her EEO complaint, Mr. Resch notified Ms. Rose he was referring her file to the FBI's Office of General Counsel and would let her know if he was in a position to discuss. No decision was ever made.

66.     Ms. Rose has communicated with Human Resources Division and Training Division, in writing, several times over the course of more than three (3) years. Ms. Rose spoke on the telephone with Assistant Section Chief Ken Sena at HRD regarding her reinstatement. After first being told he had already responded to her reinstatement, and later realizing he in fact had not, he quickly provided another excuse, offering that he had recently spoken to Section Chief Jim Jewell at Training Division, who

was denying her "appeal." Ms. Rose explained again that she was not *appealing* a decision. She was applying for Reinstatement according HRD's own policy. Mr. Sena then requested Ms. Rose email him, and cautioned her "it's probably not going to go the way you want it." Ms. Rose emailed Mr. Sena on July 19, 2018, and included information about the disparate treatment of female new agent trainees in her message. Mr. Sena never responded. On October 5, 2018, Ms. Rose was effectively denied her request for reinstatement by Training Division Counsel Amy Armstrong, contradicting 3 years of Ms. Armstrong's own correspondence. Ms. Rose subsequently filed a timely charge of retaliation and discrimination on December 10, 2018.

## IV.     DANIELLE SNIDER

67.     Plaintiff Danielle Snider, a Hispanic female, is a graduate of the United States Air Force Academy where she received a Bachelor of Science degree in Behavioral Science and Arabic. She commissioned in the United States Air Force, where she served on active duty for four (4) years. Ms. Snider also received a full scholarship to pursue her Master of Arts from the University of Kansas in Political Psychology and African Studies. Ms. Snider is currently an Air Force Reserve Captain and serves in the prestigious ranks of the Defense Attaché Service. Immediately prior to starting at the FBI she worked at the National Counterterrorism Center (NCTC) as an Intelligence Analyst and is a graduate of the Central Intelligence Agency Sherman Kent Career Intelligence Analyst Course and honor graduate of the U.S. John F. Kennedy School of Special Warfare Psychological Operations Qualification Course.

68.     Ms. Snider was enrolled in BFTC 17-05. She successfully passed the PFT on numerous occasions, all academic tests, the pistol and carbine firearms qualifications, and other performance tests and evaluations. On January 31, 2018, Ms. Snider was brought before the TRB and dismissed two (2) weeks prior to graduation for failure to demonstrate tactical judgement

during the tactical skills portion of her training.  Ms. Snider was given a total of five (5) SNs for tactical deficiencies noted during tactical training scenarios.  Only one of those SNs warranted an explicit SN according to the official rubric Ms. Snider received at the beginning of TTU instruction.  Ms. Snider had no previous marks on her record during the BFTC, and was told by her SSA that she was in the top 25 out of her class of 150 students before being submitted to the TRB.

69.     A total of six (6) NATs, five (5) female and one (1) male, were brought before the TRB for SNs at TTU. All five (5) females were dismissed. The errors made by the one male submitted to the review board were considered "so egregious," and outside the norm of lawful law enforcement behavior, according to direct observations by other students and instructors, but he was ultimately the only student retained by the board and allowed to graduate.   Several other male NATs had received an equal or greater number of SNs as the dismissed female NATs, but were not brought before the TRB and were allowed to graduate from the BFTC.

70.     No offer of remedial training was provided to Ms. Snider because she and other females were told by the TRB that there was not enough time before graduation.  However, when several male NATs failed the TTU final exam, they were given the opportunity for additional training and a retest less than two weeks before graduation. Ms. Snider noted that several males made the same mistakes that earned Ms. Snider her SNs for tactics, but for which they were not written up or given SNs.  Ms. Snider is also aware of one male in her class that failed the PFT, an academic test, and the TTU test, who was not submitted a to review board and allowed to graduate after giving instructors what they deemed a satisfactory explanation for his failures.

V.     ERIKA WESLEY

71.     Plaintiff Erika Wesley, a Native American and Caucasian female with disabilities, graduated from the College of William and Mary in just three (3) years with a Bachelor of Business

Administration and a Minor in Sociology at the age of 20. Ms. Wesley served as the Student President of her Business School, sat on the Honor Council and worked in the College's Equal Employment Office. Ms. Wesley earned a Master's Degree in Criminology from the University of Essex in England at age 21, where she also worked for the Disabled Students Services Department. Ms. Wesley completed one year of Law School at Pepperdine University prior to accepting a position with the FBI. Ms. Wesley worked for the FBI for six (6) years, earning several performance awards and promotions, serving on numerous advisory panels, and completing a Temporary Duty Assignment to Baghdad, Iraq. Ms. Wesley voluntarily separated from the FBI in 2010, just prior to the birth of her first child. Ms. Wesley applied for reinstatement approximately three years prior to being offered a spot in BFTC 1801.

72. Ms. Wesley attended BFTC 18-01 as a NIAT. Although Ms. Wesley graduated from the Academy, she was subjected to pervasive harassment, discrimination and retaliation. Ms. Wesley was issued SNs based upon untruthful allegations made by Training Division field counselors and managers, following Ms. Wesley's attempts to address multiple instances of discrimination she witnessed.

73. UC Kellie Holland stated that Ms. Wesley had not been on her "radar" prior to Ms. Wesley contacting UC Holland after witnessing extreme harassment and discrimination of a female trainee. Instead of UC Holland treating the blatant EEO violations with any seriousness or concern, UC Holland threatened Ms. Wesley by stating that her coming forward would not go without consequence.

74. Ms. Wesley demonstrated outstanding academic and professional performance during BFTC, and did not receive any SNs for failing to meet objective standards. However, UC

Holland personally issued Ms. Wesley two SNs in one sitting just days before graduation. UC Holland informed Ms. Wesley that UC Holland had actively asked Ms. Wesley's counselor, supervisor and instructors for derogatory information about Ms. Wesley. UC Holland contorted the verbiage and context of a statement made by Ms. Wesley two months prior to cite Ms. Wesley for insubordination and lack of professional judgement. When Ms. Wesley challenged UC Holland on the accuracy of the statement, UC Holland quipped "Is it more important to be right or to be heard? Hmmm?"

75.    Ms. Wesley was frequently subjected to intimidation tactics and threatened with dismissal over menial and even fabricated incidents failing to rise to the level of suitability violations. On one occasion, SIA Brian Moses threatened Ms. Wesley with dismissal for tying her uniform jacket around her waist, claiming that this was not an approved manner to wear her uniform. On numerous occasions, Ms. Wesley witnessed counselors and supervisors choose not to issue SNs to male trainees for committing objective, and often egregious violations of suitability standards, while she and other trainees were constantly threatened even when doing nothing wrong. Ms. Wesley was treated with hostility, unprofessionalism, and was publicly harassed about her physical limitations and disabilities.

76.    Despite following the provided protocol for requesting Reasonable Accommodations necessary to facilitate Ms. Wesley's success at the Academy and being granted those Reasonable Accommodations by the appropriate administrative officials, Ms. Wesley was punitively stripped of her accommodations.  Ms. Wesley suffered adverse health effects from the removal of her accommodations, which required outside medical intervention and treatment.  Ms. Wesley's HIPAA-protected medical information was repeatedly disclosed in classroom settings as a way to mock and intimidate her. Ms. Wesley was also subject to harassment regarding her

marital status, parental status, and physical appearance. Ms. Wesley's counselor repeatedly claimed that Ms. Wesley had become pregnant while engaged in an extramarital affair during her time at the Academy, which was completely untrue. Ms. Wesley was subjected to frequent inappropriate sexually-charged commentary by male instructors and counselors, including comments about women needing to take their birth control to control their moods, inviting female trainees over to a male instructor's home for special "after hours" attention, and openly disparaging women following the males' divorces.

## VI. "B.A."

77. Plaintiff "B.A.", a Hispanic female, graduated from Penn State University. "B.A." attended the BFTC as a NIAT. Despite having passed all of her academic tests and requirements, "B.A." was dismissed from the BFTC ten (10) days before graduation for "lack of judgment" after receiving three (3) SNs. During her first week of training, B.A. received a SN for parking in the wrong section of the parking lot because the designated lot was full, (for a brief period of time, there were three overlapping classes at the Academy – 18-01, 18-02, and 18-03) and she was unsure of where to park. However, B.A. later learned that multiple other people parked in the wrong section of the parking lot but did not receive an SN. B.A. also received a fabricated SN from Supervisory Intelligence Analyst [hereinafter "SIA"] Tyone Jiles for "breaking chain-of-command" via email communications, and when she attempted to address the falsity of the SN with her instructor, he simply shrugged his shoulders and stated, "I don't know." B.A. then attempted to address the issue with UC Kellie Holland about the erroneously issued SN. In response, UC Holland stated that "perception is reality" and that it "didn't matter what the details were, just what things appeared to be." Ms. Holland also told B.A. she was nothing but a "distraction" to her agents, and that her entire personality was a "character flaw."

78.     Throughout her time at the Academy, B.A. was subjected to pervasive sexual harassment by attendants of the National Academy, as well as some of the New Agent Trainees, Special Agents, and members of management. Specifically, on one occasion, an approximately 55-year old National Academy male slipped B.A. his number. Additionally, on two (2) separate occasions, two (2) male NATs tried to convince her to have sexual intercourse with them in the back of their car. Similarly, on two (2) separate occasions, two (2) additional male NATs tried to convince her to sneak up to the vacant 7th floor to have sex with them. One (1) other male NAT spent about a week harassing B.A. via text, sending her up to fifteen (15) texts a day until she had to tell him how inappropriate and uncomfortable he made her feel. On yet another occasion, B.A. had to have one of her friends escort her back to her room because a different male NAT was following her throughout the night (including up to her room). None of the aforementioned males received SNs or other admonishments for their highly inappropriate sexualized behavior. Additionally, instructors and counselors would regularly tell B.A. she needed to smile more. B.A. asked dozens of other male trainees at the Academy if they had ever been formally advised they need to smile more and they all responded "no."

79.     Additionally, B.A.'s Senior Supervisory Intelligence Analyst [hereinafter "SSIA"] Brian Moses, publicly asked a group of males from B.A.'s section what they thought of her. When B.A. found out, she spoke to her class counselor about the blatant gender discrimination and harassment she was experiencing. B.A.'s counselor acknowledged the treatment of women at the Academy and said, "you own a mirror, you know you're a pretty girl", that was the way things were and to just "play the game" if she wanted to succeed. When B.A. confronted SSIA Moses about his attempts to elicit gossip about her, SSIA Moses responded by falsely claiming that there was a peer-review process in place where instructors consulted students on their opinions about

other students.  No such formal peer-review process exists: SSIA Moses demonstrated a lack of candor in attempts to legitimize his illegal behavior, in direct violation of the FBI Core Values.

80.     One of B.A.'s instructors, SSA Charles Ro, also engaged in highly inappropriate behavior.  During each of his lectures, Mr. Ro would lay out a string of sexist, racist, and generally sophomoric/inappropriate jokes such as a calling the only African-American female trainee with braids "spaghetti head," constantly referring to his "little blue balls" or the size of his genitals, and claiming that female informants were not reliable because they were "too emotional" and all they do is sleep around.  Mr. Ro incessantly inquired from B.A.'s male classmates about her personal life in a sexual and derogatory manner.  When B.A. politely asked him about this at the Academy, he denied ever discussing her personal life with other trainees; however, in his response to her EEOC complaint, he acknowledged he discussed her personal/sex life with other trainees, but only because they approached him about it first (those trainees firmly denied that and in fact were the ones to tell B.A. about the incidents in the first place). SA Ro twice demonstrated a lack of candor, first through denial of ever having engaged in such discussion, and second as an attempt to justify why it was okay for him, as a male instructor with the FBI, to be discussing the personal/marital/sex life of a twenty-five (25) year-old female student.  His behavior was in direct violation of the FBI Core Values.

81.     During her TRB, B.A. asked that the Board speak to her other instructors, the Board told B.A. they would, but then never did so.  B.A. was alerted to her dismissal via text message from another trainee because SSA Peter Spohn announced her dismissal to her entire class before management informed B.A. of the decision. Although B.A. was dismissed from the academy after receiving three (3) SNs, a male student in her class with at least seven (7) SNs graduated without ever being brought before the TRB.

## VII.  "D.A"

82.     D.A., an African American female, entered on duty with the FBI in December 2011, and is currently employed as a Staff Operations Specialist in the Counterterrorism Division.  D.A. graduated magna cum laude with a Dual Bachelor of Arts Degree in Criminal Justice and Sociology from Mount St. Mary's University, and then later obtained her Master of Arts in Homeland Security where she was named Valedictorian of her graduating class at Monmouth University. D.A. finished her academic career by obtaining her PhD from Nova Southeastern University.  D.A. received two (2) performance-based awards in her first three (3) years employed with the Bureau.

83.     D.A. was enrolled as a NAT in BFTC 18-03.  D.A. successfully passed the PFT on numerous occasions (including holding the all-time fastest score on the 300-meter sprint for women), all academic tests, the pistol and carbine firearms qualifications, the defensive tactics test, and other performance tests and evaluations.  She was dismissed after being brought before the TRB and discharged on June 28, 2018, after receiving three (3) SNs.

84.     D.A. was routinely singled out and embarrassed by TTU instructors for Tactical Judgement performance despite the fact that D.A.'s performance was the same or similar to that of her classmates who were not verbally criticized.   For example, D.A. was told to be more aggressive in her paint gun shooting although she successfully completed the exercise.  Another incident occurred when D.A. was issued a SN for allegedly dropping her weapon during a training scenario.  When she discussed the matter with her instructor and stated that she in fact did not drop her weapon, she was told she had been overwhelmed by the exercise and probably didn't remember it correctly.  Finally, D.A. was also threatened with a SN for "not running fast enough" during a training exercise, even though she had completed the exercise successfully.  Classmates who completed the exercise after D.A. responded and moved slower than D.A.; however, they were not

threatened with or given a SN.

**VIII. "S.B."**

85.     Plaintiff S.B., a Caucasian female, graduated Magna Cum Laude from West Virginia University with two (2) Bachelor of Arts' degrees in Criminology and Psychology. While attending undergraduate school, S.B. interned with the FBI, interned with the Monongalia County Youth Crisis Shelter, and held a part-time job as a West Virginia University Police Cadet.  Upon graduating in 2014, S.B. was hired as a Management and Program Analyst with the FBI.  S.B. received two (2) performance-based awards, was nominated for Analyst of the Year, and received a meritorious promotion in her first two (2) years working full time with the FBI.  S.B. was hired as a NAT in BFTC 17-03.

86.     Despite having successfully passed the PFT on numerous occasions, all academic tests, the pistol and carbine firearms qualifications, the defensive tactics test, and other performance tests and evaluations with no re-takes, she was dismissed two (2) weeks before graduation on September 20, 2017, after being brought before the TRB.  S.B. was informed she was being referred to the TRB after only two (2) SNs; one of which was for her first tactical error made during paint gun scenarios, and the second for questioning an instructor's feedback for clarification purposes.  S.B. had no prior tactical experience prior to entering the Academy.  When asking the instructor for clarification, S.B. was ridiculed in front of her classmates and accused of "being argumentative."  S.B. was then cornered after class by the instructor and another instructor who had been sexually harassing S.B., and was yelled at and cursed at for "having an attitude problem and being too argumentative."

87.     The TRB for S.B. was originally scheduled before the second round of paint gun scenarios, but was postponed upon request of her class supervisor, to allow her to demonstrate

improvement. S.B. was complimented by several instructors for her exceptional improvement during the second round of paint gun scenarios. Upon completion of the second round of paint gun scenarios, S.B. was informed the TRB was "on hold" and was later subjected to the OC Spray portion of training. S.B. was informed the next morning, while recovering from chemical burns in both of her eyes, that the TRB would be held that morning. S.B. was brought before the TRB on September 20, 2017, where she was issued a third SN, which violated the Bureau's protocol for issuances of SNs. She read this SN for the first time in the TRB and did not agree with the information contained in the document. S.B.'s instructor issued this SN based on false accusations made during the second round of paint gun scenarios in which several of S.B.'s male classmates corrected the instructor the day before.

88. S.B. was also informed that the TRB was required to talk to instructors that were involved in every aspect of training, when in reality, the TRB only spoke with S.B.'s class counselors, class supervisor, and the tactical instructors who had issued her SNs. S.B.'s class counselors and supervisor provided arguments for the TRB to retain S.B.'s and allow her to graduate. Other male trainees were issued three (3) or more SNs, but were not brought before the TRB. S.B. also witnessed male trainees questioning instructors' feedback, sometimes escalating into arguments with the instructors, and the male trainees were neither cursed at, ridiculed, or issued SNs. S.B. was dismissed the day of the Tactics Test, and was informed the basis of her dismissal was "lack of judgment and emotional maturity". S.B. was not offered any sort of remedial tactical training, as is the standard with other units in the BFTC curriculum. Additionally, S.B. informed UC Kellie Holland of the sexual harassment she experienced, who dismissed S.B.'s concerns and lamented that "there's nothing you can do about it, you will be having a lot of mixed emotions right now, and there is no internal appeal process."

89.     Further, despite S.B.'s exceptional work history as an employee of the FBI, HRD was unable to find a position for S.B., placing her in a Leave Without Pay (LWOP) status until December 22, 2017, when she was removed from the rolls of the FBI. Consequently, S.B. was forced to endure a break-in-service for over two (2) months before she was able to use her contacts to interview for her current position at the FBI.

## IX.     "D.C."

90.     Plaintiff D.C., a Caucasian female, has worked for the FBI since December 2011. D.C. received a Bachelor of Arts in Political Science with a specialized focus in Legal Studies and minor in Professional Writing from Virginia Tech University. D.C. worked full time as a Financial Operations Specialist for the FBI in San Antonio, Texas for three (3) years. D.C. then worked for the FBI as an Intelligence Analyst in the International Operations Division and deployed overseas on behalf of the FBI multiple times over a 2.5 year period. While working full-time for the FBI, D.C. earned her Master of Arts in International Relations, Security Policy at St. Mary's University in San Antonio, Texas.

91.     D.C. reported as a NAT in course BFTC 17-05 on October 17, 2017. D.C. successfully passed every PFT, all academic tests, the pistol and carbine firearms qualifications, and all other performance tests and evaluations in addition to attaining a perfect score on the defensive tactics exam (in which she had no prior experience before attending BFTC). D.C. received five (5) total SNs at TTU, was referred to the TRB, and was subsequently dismissed two (2) weeks before graduation. D.C. received two (2) SNs during the first few weeks at TTU during the same training scenario. One was for flagging a teammate during a "J-hook" room entry, during

which she witnessed a male trainee also do the day before D.C. was dismissed (towards the end of training). D.C. made this mistake with no prior tactical experience at the beginning of training and was harassed, screamed at, told she was "worthless", and written up. After his violation within mere weeks of graduation, the male NAT with previous military tactical experience, was patiently coached by the same instructor, offering remedial guidance, "the J-hook angle can be tricky, this is how you adjust in this situation."

92.     The third SN D.C. received was due to following instructions given by the same instructor during the previous training session. The fourth SN D.C. received was for three (3) "excessive shots" fired by her male colleague. D.C. was written up for "firing nine (9) shots," only six (6) of which were hers. D.C. requested the instructor do an ammo count of the weapon's magazine at the end of the scenario to verify how many shots she had fired. He declined to do so and still wrote her up for firing nine (9) shots and had one of the other instructors hand her the paperwork for the SN on a different day. The instructor refused to meet to discuss the scenario with D.C. after she received the SN. The three (3) shots that were fired were done so by the male colleague who insisted he had no memory of his actions during the training segment at all. D.C. was told by the TRB and the instructor that her memory of the encounter, despite the concrete evidence of ammunition remaining, was clearly misremembered due to the stress of the training scenario.

93.     D.C. had trained nightly with her classmates and had testified to the board that she was confident she could pass the final TTU test with all the extra work she had been putting in. D.C.'s entire section of over thirty (30) NATs all signed a letter respectfully requesting the TRB allow her to take the test with her fellow NATs. She was told that there simply was not enough time to train her adequately before graduation. D.C. was dismissed from NAT with no exam

failures two weeks before graduation.  The reason for dismissal was "lack of tactical judgement," which she was told was considered an "inherent skill."  D.C. was later informed that a male colleague who had previously failed a PFT and an academic test and who was commonly known by classmates for poor tactics, took and failed the final TTU test.  He received remedial training and retook the final TTU test in which he failed to meet the rubric standards again.  He was permitted by the review board to "articulate" the mistake made during his retake of the final TTU test and they marked it as a "pass."  He was ultimately allowed to graduate.  D.C. had demonstrated an ability and unwavering willingness to learn through her entire time at BFTC, and she was not permitted to take the final exam to demonstrate the same.  D.C. was not offered any sort of remedial tactical training, as is the standard with other units in the BFTC curriculum.  Of the seven (7) female NATs in her section, only three (3) of the female NATs graduated and are now Special Agents.

## X.     "P.E."

94.     Plaintiff P.E., a Hispanic female, graduated with a Bachelors of Arts Degree in Language, Culture and World Trade from Pace University.  Prior to entering on duty with the FBI, P.E. served her country as a United States Marine.  She attended and completed the Marine Infantry Course in 2002.  The course consisted of the assembly and operation of multiple weapon systems.  Additionally, P.E. was trained in military tactics and maneuvers.  Upon graduation, P.E. was mobilized in support of the War on Terror in January 2003.  She served as a Radio Operator during the invasion into Iraq.  In 2004, P.E. once again deployed overseas in support of Operation Iraqi Freedom.  She served as a Radio Operators on convoy traveling to and from Ramadi, Iraq.  P.E. was recognized for her outstanding performance in keeping accountability of all the communication equipment readiness for Communications Platoon, 1st Marine Division.

95.     P.E. entered on duty with the FBI in October 2006, while still in the Marine Corps Reserves.  During her time at the FBI, she held many positions, and had the opportunity to go on Temporary Duty to Baghdad, Iraq.  She later served as a Surveillance Specialist in the Counterintelligence Unit for four (4) years.  In 2013, P.E., completed a third overseas deployment in support of The Georgian Deployment Program, where she served as Radio Chief Instructor and advisor in the program.  P.E. had completed a total of fourteen (14) years in the United States Marine Corps.  She was a 4th award expert rifleman and acquired her third degree black belt in the Marine Corps Martial Arts Program.  P.E. continued to serve as a Gunnery Sergeant in the Marine Corps Reserve.

96.     In June 2016, P.E. entered BFTC 16-04.  Despite having successfully passed the PFT on numerous occasions, all academic tests, pistol and carbine firearms qualifications, and other performance tests and evaluations, P.E. was dismissed by TRB on October 25, 2016, after receiving four (4) SNs from TTU.  The first day of TTU, SSA Nguyen, approached P.E. after class and asked her about her military history.  P.E. summarized her military history, SSA Nguyen smugly walked away without a response.  P.E. did not understand why she was singled out by SSA Nguyen, as there were several other veterans in the class.  From that day forward, every time P.E. asked questions, SSA Nguyen verbally berated her.  During a review of a scenario, P.E. asked a question and SSA Nguyen started yelling and cursing at her.  Thereafter, SSA Nguyen would talk to the male NATs but would not address any questions P.E. asked.  P.E. asked SSA Nguyen if he could assist in arranging after hours training for those who wanted supplemental practice but he refused.

97.     P.E. received three (3) of the four (4) SNs on one day.  One SN was issued for flagging Instructors while P.E. took a fall.  NATs had been instructed not to lower their weapons

when Instructors walked around observing scenarios. P.E. was issued the second SN for flagging her partner when entering a room, despite instructors stating during the classroom instruction that flagging partners would be inevitable in certain entry situations. That same day, P.E. male partner was not written up for the more egregious error of shooting an unarmed subject. Her partner later told her the Instructor had spoken to him and another male classmate and they were both told not to worry because they would not be written up. The third SN claimed that P.E. hesitated 3-4 seconds to engage and had to be told by her partner to shoot. Her partner went on to tell P.E. to cuff the subject. P.E. did not want to get confrontational with her partner, so she did not respond negatively and just cuffed the subject. P.E. was not aware that she had received the SNs until a week later. The Instructor provided with copies of the SNs, but did not have the signature and dates of when they were signed.

98.     During the training scenarios some of P.E.'s male counterparts had committed similar or worse mistakes and did not receive SNs. P.E. was dismissed with just fifteen (15) training days left. Upon being dismissed, P.E., was recommended for continued employment. P.E. was placed on annual leave for one (1) pay period and then placed on leave without pay for the next pay period. P.E. was offered a Support Service Technician GS-7 position in Virginia, three pay grades below the Special Agent position, and well below her prior grade. P.E. informed Human Resource Specialist that she was a 10-year employee with the FBI and was previously a Surveillance Specialist, GS-11 step 4, New York (NY), before attending BFTC. The Specialist stated they would refer her situation to the NY field office for consideration, however, when P.E. reached out to the New York office, she was told they were not aware of her situation. She was later contacted by the Administrative Officer and offered a Special Operations Specialist position on The Joint Terrorism Task Force. P.E. accepted the position and served in the position for six

(6) months.  In June, 2017, P.E. voluntarily departed the FBI to attend The Department of Homeland Security, Criminal Investigator Program at the Federal Law Enforcement Training Center, Glenn County Georgia.  P.E. successfully completed the Criminal Investigator Program and received recognition for achieving a Top Shooter score.

## XI.    "B.G."

99.    Plaintiff B.G., a Hispanic female, received a full scholarship to the University at Albany, where she studied International Relations, and led her graduating class as the Commencement Day Speaker.  She went on to pursue a career within the U.S. Intelligence Community and after a decade of government service, was eager to join the FBI.  While serving overseas in Europe, B.G. received just one month's notice that she had been slated to attend the FBI Academy.  Committed to accepting her position and ensuing relocation, she sold her car, furniture, and household goods and embarked on a one-way trip to the Academy in July 2018 to attend BFTC 18-04.

100.    While at Quantico, B.G. passed her academic, physical fitness, and firearms exams with impressive scores.  With three (3) weeks left for graduation, B.G. was informed that she had failed her grappling test and would not be graduating. When she inquired as to the exact reason for her exam failure, the Training Division stated that they were uncertain but informed her that she would be recommended for Academy re-entry the following year.  Since B.G. had been serving overseas for three (3) years prior to Quantico, she did not have a home in the U.S. to report to upon being dismissed from the Academy.  Despite being homeless, she was hurried out of the Academy within hours of receiving notice of her exam failure.  During out-processing, requests for temporary storage of her personal belongings were turned down and she was forced to donate the

majority of her personal valuables to the FBI. Her belongings were collected in large plastic bags and removed by FBI staff.

101. Days after her dismissal, FBI Human Resources Division [hereinafter "HRD"] contacted B.G. to offer her a position as an entry-level Operational Support Technician. B.G. was grateful for the opportunity but was reluctant to accept a GS-8, Step 1 position and salary due to her extensive IC experience and prior grade of GS-11, Step 4. B.G. was informed that because she was an "FBI dismissal" her grade and position could not be negotiated. She was likewise advised that if she did not accept the first job offered to her that she would be terminated and face a break in Federal service. According to HRD, "Staffing has been advised to treat dismissal candidates as demotions for unacceptable performance"; however, upon request, HRD was unable to provide an official policy to substantiate this assertion.

102. B.G.'s previous accomplishments and financial situation were treated with complete disregard due to a subjective grappling evaluation, for which no remediation was offered, which somehow allowed the FBI to justify discrediting ten (10) years of prior government service, an $18,000 salary cut, career derailment, and a one-year waiting period to even re-apply to the academy (which B.G. would have to completely start over). HRD admonished that a request to re-enter the Academy upon dismissal is not a guarantee that re-entry will be granted, demonstrating even further subjectivity. B.G. was discriminated against during Defensive Tactics [hereinafter "DT"] and wrongfully dismissed from BFTC after being constantly singled out and targeted because of her gender. B.G., who has a metal rod in her back, was accused of not trying hard enough, being "not intense enough", and being "lazy." B.G. is 5 ft, 124-pounds, and has a physical disability, but in no way lacks the drive, commitment or physical prowess necessary to perform the required duties of a Special Agent.

103.    On multiple occasions during her BFTC, B.G. was precluded from grappling with other students, which is common practice.  Instead, she was repeatedly singled out to grapple with DT instructors SSA Sirko and SSA Belinda.  Very rarely, if ever, were male trainees required to grapple with DT instructors.  Selecting B.G. to grapple the DT instructors became so predictable that other female classmates made statements like, "Whoa, they really do love you, Grace."  SSA Sirko and SSA Belinda were the only DT instructors at the Academy that consistently targeted females to grapple with them.

104.    Despite receiving SNs months earlier from TTU, TMU waited until three (3) weeks prior to B.G.'s graduation to inform her that "she did not meet the standard" in defensive tactics required for graduation. However, the Defensive Tactics Unit [hereinafter "DTU"] never informed B.G. that she was deficient in grappling, nor did they articulate why she continued to be singled out to fight by the instructors.  DTU did not issue an SN to inform B.G. of her perceived missteps until her dismissal.  B.G. was not afforded the opportunity to present her case before the TRB, again demonstrating the inconsistency with which SNs and dismissals are rendered. DTU failed to offer remedial sessions offered to other trainees, and never suggested a performance plan for improvement. This practice contrasts greatly with how other units at the Academy operate, including the Firearms Training Unit, which offers comprehensive remediation to ensure trainee success.  Firearms instructors inform both the student and his/her supervisor of a possible deficiency and offer timely remedial sessions to improve the trainee's technique.

## XII.    "L.M."

105.    Plaintiff L.M., a multi-racial female with a disability, who holds a bachelor's degree in Psychology/Criminal Justice, a Master's degree in Clinical Mental Health Counseling, and is currently studying Biomedical Sciences at the University of South Florida while preparing for

enrollment in Medical School. Prior to attending the BFTC 18-01, L.M. was employed by the FBI as an investigative specialist for the Special Surveillance Group (SSG) in Kansas City.

106. L.M. was enrolled in the BFTC 18-01 as a NIAT, after being forced to enter the program by her former Special Agent in Charge [hereinafter "SAC"], Darrin Jones. L.M. had passed phase I and II of the application process for the Special Agent position but SAC Jones actively targeted L.M. and endeavored to put a stop to her application. This led L.M. to file a complaint with the EEOC, which led to mediation and ultimately L.M.'s enrollment in BFTC as a NIAT to enable her to leave the Kansas City Division.

107. During her training at the FBI Academy, L.M. was subjected to pervasive harassment because of an approved disability accommodation to eat small amounts several times a day and frequently drink water. Despite this, on several occasions, she received SNs for entering the classroom water in a sealed container, (but was arbitrarily determined to not be spill-proof, despite never spilling), failing to swallow a small bit food she was chewing prior to entering the classroom, and otherwise tending to her medical needs. Her former SAC even approached her while at the Academy to let her know that he was "surprised" to see that she was still there, clearly suggesting that he was surprised she had not been dismissed. She was also subjected to frequent unwarranted scrutiny of her dress and appearance. When she complained of hostility and harassment, she was told by UC Kellie Holland that she was guilty of unprofessional behavior, told she didn't know what "real" discrimination looked like, and would be immediately recommended for dismissal. Despite attempts by fellow trainees and instructors to speak at the TRB on L.M.'s behalf, none were given the opportunity to do so, and L.M. was dismissed.

108. Additionally, subsequent to her dismissal, the FBI failed to pay L.M. her final paycheck and kept her in the system as an employee on leave without pay rather than a former

employee, thereby resulting in Ms. Spencer being wrongfully charged for health insurance from the period of March 2018 through December 2018.  This further resulted in damaging L.M.'s credit report. Despite promising to correct the fraudulent charges, the FBI has failed to do so.  Further, when L.M. received her tax refund for 2018, she was made aware that the FBI had garnished the money for the fraudulent health insurance charges from her 2018 tax return refund.

## XIII.   "W.M."

109.   Plaintiff W.M., a Caucasian female, graduated with a Bachelor of Arts in Political Science from North Carolina State University, and a Master of Arts in Political Science from the University of North Carolina-Chapel Hill.

110.  W.M. was enrolled in BFTC 18-02.   Despite having successfully passed the Physical Fitness Test (PFT), all academic tests, the pistol and carbine firearms qualifications, the defensive tactics test, and other performance tests and evaluations, W.M. was brought before the TRB and dismissed three (3) weeks prior to graduation, for lack of judgement.  Furthermore, the TRB did not recommend W.M. for re-employment with the FBI due to "lack of emotional maturity and evasiveness."   However, prior to attending the BFTC, W.M. had been highly successful in her previous position, earning near perfect or perfect annual reviews and several performance-based awards.   Upon hearing of her dismissal from the BFTC, W.M. previous supervisor and Executive Management immediately took action, without hesitation, to have her re-instated because of her previous reputation as a high-performing employee. W.M. has continued to receive a perfect performance rating from her current office. It is incomprehensible that someone who has been a model employee before and after attending the Academy, acted so reprehensibly as to be refused a recommendation for re-hire during the Academy.

111.   W.M. was given a total of three (3) SNs by TTU for tactical deficiencies noted

during tactical training scenarios. She also received one SN when she initially failed her driving test, but then passed on her first attempt at the retest. The first two (2) of W.M.'s SNs, issued on June 18, 2018, were for scenarios in which the majority of NATs in her section struggled and failed. On this day specifically, approximately half of the class received SNs for the same scenarios as W.M.; however, W.M. was selected for the TRB based on these two (2) SNs, whereas her classmates largely were not. W.M. was later issued a third SN for an accidental discharge of her weapon in a scenario where she was specifically instructed not to unload her weapon prior to beginning a "dry fire" exercise.

112.    At the time she was selected for the TRB, four (4) male trainees and two (2) other females were also selected for review. All male trainees had more SNs than W.M. Of those males, one was allowed to return to training, without having to appear before the TRB. Two (2) others were allowed to return to training after attending their TRBs. Only the fourth male was dismissed. The other two (2) females were also dismissed. W.M. was given no option for remedial training, as is the standard with other units in the BFTC. In addition, she had received no feedback from the instructors to indicate she was considered to have been failing at TTU.

113.    On only the second day of training at TTU, she was called a "fucking analyst" by her PTI after she asked a simple question, and then was told she was "falling behind." W.M. received no subsequent feedback from the PTI regarding her performance at TTU. Conversely, she was told by another NAT, who had been selected to serve as a go-between for the students and the TTU staff, that the PTI thought she had improved and could tell she had been practicing. When she specifically asked her PTI how she might improve after finding out she was under review, she was told by the PTI that he could not provide comments on her performance and that he was unable to identify any areas for improvement. In this same meeting, her PTI relayed a rumor he had heard

that W.M. was telling other NATs not to take the TTU training seriously because it was not realistic. In fact, the opposite was true; that is, when other students talked about how unrealistic training was, W.M. corrected them to reiterate the importance of the training. Ignoring her answer, the PTI proceeded to berate her for this rumor. Her PTI must have relayed this conversation to the TRB, because they asked for her opinion on the feedback mechanisms for TTU, a deviation from the standard practice of only asking about SNs. When W.M. answered their question and expressed her concerns, she was chastised by the TRB and told that she was not taking responsibility for her actions and attempting to cast blame elsewhere. Because of this interaction, W.M. believes she was not recommended for re-hire out of retaliation for her speaking out against the current practices within TTU. W.M. was dismissed approximately two (2) hours before she was scheduled to take the final tactics test, which was also the final test remaining in training.

## XIV. C.S.

114.    Plaintiff C.S., a Caucasian female, graduated from Baldwin-Wallace College with a Bachelor's of Science in Psychology in December 2010. Following graduation, she worked for a mental health agency in the forensic mental health department with individuals diagnosed with severe mental health disorders and criminal justice involvement. After approximately four (4) years of serving in various positions within this agency, C.S. went on to become a Probation Officer with Cuyahoga County in Cleveland, Ohio. After a few years working in probation, she was then hired by the FBI and began training at the Academy on March 5, 2017, in BFTC 17-02. Despite having successfully passed the PFT, all academic tests, pistol and carbine firearms qualifications, the defensive tactics test, and other performance tests and evaluations, C.S. was dismissed just a few weeks before graduation on July 14, 2017, after being brought before the TRB.

115.    C.S. received her first SN on the first day or training at Hogan's Alley on May 23,

2017.  The first part of the suitability stated the following:

> During CATS-1Action/Re-Action drills, NAT ▆▆▆▆ demonstrated confusion/unfamiliarity with handgun manipulation and frustration when she incurred multiple perceived (only one was observed by staff) malfunctions.  On the first malfunction, staff removed NAT from the line and talked NAT through the clearing of a double-feed.  NATs on the line were repeatedly told to work any malfunction in-place "within their space."  In approximately three subsequent "malfunctions," NAT ▆▆▆▆ removed herself from the line, gun in hand flagging her fellow trainees, to meander behind other NATs while attempting to clear the weapon. Upon each observation, staff immediately directed and/or reminded NAT to correct her muzzle disciple and to "find a wall" to safely conduct the clearing.

This suitability clearly states that she was told to "work within her space" to clear a malfunction and then later states she was told to "find a wall" to safely clear her weapon.  There is obvious ambiguity in the directions that were given which created confusion as to whether to stay on the line or move off of it to clear her weapon.  Prior to this day they had only ever worked on their malfunctions at firearms on the firing line, so she was doing what she had been trained to do up to that point.  Due to the Tactical Training Unit's unclear instructions of where to go to clear her weapon, she had no idea or expectation of what exactly they were looking for. It should further be noted that C.S. had never had any prior issues with muzzle control when she was training with the Firearms Training Unit.

116.    The second portion of the suitability claimed that C.S. acted unprofessionally with another male NAT during the jovial "Wild West" scenario.  Both she and the male NAT were friends and made lighthearted jokes at each other during the scenario, however, only C.S. received an SN. Additionally, the SN was written in a manner that was both misleading and lacked candor.  Although C.S. did not want to sign the SN, she had been advised to refrain from arguing with or challenging the authority of TTU because they "aren't like the rest of the academy instructors."

117.     C.S. received her next two (2) SNs during her tactical exam on July 11, 2017, both for "judgement issues with deadly force." Tactical Instructors are easily able to create the appearance of failure or deficiency by misrepresenting scenarios and inducing failure in female trainees at will, which was absolutely the case for C.S. Due to the combination of misdirection/lack of direction during the exam, C.S. was under the impression that when the subject was down, the scenario would be over. However, when the instructor failed to end the first scenario after C.S. appropriately applied deadly force, C.S. was under the mistaken belief that the instructor intended for her to shoot the subject once more to ensure that he was not making a move towards his weapon. The instructor gave C.S. no feedback after the first scenario and moved on to the second scenario during which the instructor, once again, failed to end the scenario and, instead, specifically chose to wait thereby creating further confusion as to what C.S. was supposed to do. This unnecessary but intentional delay created by the instructor manufactured an unrealistic and artificial environment and led to another SN for misapplication of deadly force for C.S.

118.     Throughout her training at Hogan's Alley, C.S. participated in many exercises that involved multiple situations which required discretion and judgement with deadly force, and never had an issue with deadly force. However, there was a male NAT in her class that had "issues with deadly force" during a Hogan's Alley scenario when he entered a motel room and during the scenario, and shot an innocent, unarmed man in the bathroom. He never went to the review board for this significant error in judgment and was allowed to graduate.

119.     C.S. was initially told (along with others who did not pass) that she would be given a re-test on July 14, 2017. However, C.S. was ultimately denied the opportunity to do so as she was referred to the TRB and dismissed on July 14, 2017. Meanwhile, another male NAT from her section who also failed the Tactics exam and was referred to the TRB was allowed to re-take the

Tactics exam and later graduated from the Academy. It should further be noted that C.S. subsequently, and successfully, graduated from the Phoenix Regional Police Academy, which also has a tactics segment, in April, 2019.

## XV.     "L.S."

120.    Plaintiff L.S., a Caucasian female, has a Bachelor of Business Administration and an MBA in Accounting. She obtained her CPA license in 2012 and actively maintains her license in New York State. Prior to receiving a class date for New Agents' Training, she worked as an auditor in public accounting for over four (4) years.

121.    On September 29, 2015, L.S.'s class participated in a Moot Court practical exercise in which an undercover employee (UCE) played the role of a fourteen year-old girl who was picked up by an adult pedophile that led to the subsequent arrest of the pedophile. L.S. was assigned the role of UCE for her group. L.S.'s Primary Tactical Instructor, SSA Gary Galdes, told L.S. that she should wear "short-shorts, pigtails, pink lipstick, and chew bubblegum." Mr. Galdes's comments made L.S. extremely uncomfortable. On the day of the exercise, L.S. opted to wear jeans, a long sleeve shirt, and a backpack. While she was changing for the exercise, L.S. noticed another female trainee putting on short-shorts and styling her hair into pigtails. L.S. asked her classmate why she was dressing in that manner, to which her classmate responded "I'm giving him (SSA Galdes) what he wants." When L.S. entered her classroom, Galdes asked her why she wasn't wearing short-shorts, pigtails, and pink lipstick, and chewing bubblegum. Again, Mr. Galdes's comment made L.S. feel uncomfortable.

122.    Mr. Galdes made an additional comment to L.S. that made her feel uncomfortable when he told her that she was going to be his "special project." L.S. felt the comment was "out of the blue" and it caught her off guard. On September 28, 2015, L.S. learned from a classmate

that SSA Galdes made a derogatory comment about women when he was chastising another trainee about his performance during a tactical exercise. L.S.'s classmate told her Galdes admonished the trainee by saying "you are no better than a fucking female." L.S. believes this comment clearly showed SSA Galdes's hostility toward women. L.S. reported Galdes's comments to class supervisor SSA Jill Sheets, Class Counselor SA Steven Spahn, and SA Kieko Wagner. SSA Sheets interviewed the trainee Galdes directed the comment to, and confirmed Galdes had in fact made the comment.

123. While L.S. was at the Academy, she was aware of a male trainee in her class who failed the Handcuffing One exam. The male trainee passed when he (and other students who failed) were permitted to retake the exam. The male trainee later failed the Handcuffing Two exam, which per the policy, should have resulted in an automatic dismissal from the NAT for failure of two exams. However, on October 2, 2015, the male trainee was removed from the classroom during a non-defensive tactics class and permitted to retake Handcuffing Two (without other members of class 15-10 present) and then was allowed to continue on and graduate with NAC 15-10, indicating a clear bias in favor of males to be successful despite poor performance (and in violation of documented policy).

124. During a conversation that L.S. had with SSA Jill Sheets (one of NAC 15-10's class supervisors) Ms. Sheets stated that "It's as if they want you to fail" due to the way L.S. was being treated and singled out in TTU, indicating a bias within the Tactical Training Unit and a perception that TTU targets particular NATs.

## XVI.   G.T.

125.    Plaintiff G.T., a Caucasian female, graduated from the University of Maryland with a Bachelor of Arts in Political Science.  She is licensed to practice law in Virginia, Pennsylvania and New Jersey and litigated for four (4) years before becoming a NAT in the BFTC 17-03, beginning May 14, 2017.  After suffering a serious hand injury that required surgery and three (3) pins in July 2017, she had to leave training to heal but was allowed to return to the Academy and continue her training in BFTC 17-05 in October 2017.

126.    G.T. successfully passed the PFT on numerous occasions, all academic tests, the pistol and carbine firearms qualifications, the defensive tactics test, as well as other performance evaluations.  G.T. was informed she was being referred to the TRB after only two (2) SNs, neither of which were particularly egregious.  Half of G.T.'s class received a SN related to the same scenario as one (1) of her SNs.  G.T. knew of many males in her class who had more than two (2) SNs who were not recommended for a TRB.

127.    G.T. was brought before the TRB on February 1, 2018, where she was issued a third SN from TTU, which violated the Bureau's own protocol for issuances of SNs.  She read this SN for the first time in the TRB and did not agree with the information contained in the document.  The TTU test, which is designed to be a more objective test as compared to the "scenarios" arranged by TTU during the course of training, was scheduled for February 2, 2018, the day after G.T.'s review board.  SSA Cortney Merkel, G.T.'s counselor, requested the board allow G.T.'s to take the TTU test before they made their decision.  G.T. was not permitted to take it and was dismissed after the TRB on February 1, 2018, just two (2) weeks before graduation.  No offer of remedial training was provided to G.T.  She and other female trainees were told by the TRB that there was not enough time before graduation for them to receive remedial training; however, when several

male NATs failed the TTU final exam, they were given the opportunity for additional training and a retest less than two (2) weeks before graduation.

## VIOLATIONS OF LAW

128.     The FBI's unlawful subjective employment practices violate Title VII of the Civil Rights Act of 1964 THE, as amended, the ADA and the Rehabilitation Act 1973 of because plaintiffs are informed and believe that the FBI has maintained and knowingly allowed to persist a subjective personnel system that has not been properly validated under the Uniform Guidelines, 29 C.F.R. Section 1907, and which has an adverse impact on a  protected group, here, females.

129.     Moreover, the Bureau has been on notice of the disparities in the treatment of female trainees since at least May of 2015 and the Inspector General has issued a report finding underutilization of females in the hiring and retention of females in the Special Agent and Intelligence Analyst job groups, but, the FBI has intentionally failed to address adequately these unlawful employment practices.

130.     This discrimination is both disparate treatment and disparate impact and the Bureau tolerates an atmosphere of sexual harassment and retaliation, a lull in violation of Title VII.

131.     Plaintiffs, and those similarly situated, have experienced severe and pervasive sexual, racial and disability harassment beyond that which a reasonable woman would tolerate.

WHEREFORE, Plaintiffs request that the Court certify a class of females who, since April 10, 2015 have been at the FBI's Academy as trainees to become Special Agents and Intelligence Analysts who have been subjected to: Sexual harassment; isolation by instructors; and subjected to a hostile work environment, outdated gender stereotypes and suffered severe emotional distress form the atmosphere at the FBI Academy/terminated; constructively discharged, forced to resign under

pressure or who perceived that continuing in the training would be a futile gesture; were subjected to retaliation because they were women of color or have disabilities and were additionally harassed isolated, secluded, and subjected to even harsher aspects of the practices alleged herein; when offered other Bureau employment was forced to take position several grades lower than their previous grade or experience justified; and suffered other forms of harassment more than similarly situated males trainees.

PRAYER FOR RELIEF

Plaintiffs request relief for the class as follows:

a. Issue a Declaratory Judgment that that the FBI's personnel practices at the FBI's Training Division violate Title VII, the Rehabilitation Act of 973, and the ADA;

b. Order the FBI to conduct a validation study of the training evaluation process at the TDU, order that a validated system that minimizes adverse impact of all protected groups be established; pursuant to 29 C.F.R. Section 1607;

c. Require all instructors, counselors and other personnel who are assigned FBI's Academy before they are permitted to take their position, to undergo equal employment sensitivity training of at least two days by a recognized expert in sexual harassment and discrimination;

d. Order the FBI to take effective affirmative action to recruit more female training instructors, with a required goal of representation equal to that of the FBI as a whole;

e.   Award remedial relief by re-instating, upon request, the plaintiffs, and other members of the class to the TDU and provide each Plaintiff with rightful place seniority and placement upon graduation;

f.   Award back pay for each member of the class according to proof;

g.   For those who do not choose reinstatement, front pay according to proof;

h.   Award damages for emotional distress for each member of the class up to $300,000 per class member according to proof;

i.   Award compensation for members of the class for their expense in bringing this suit;

j.   Award Attorneys' fees according to proof;

k.   Order Correction of any personnel files of any affected members of the class;

l.   Provide such other relief as may be deemed just and Proper

Respectfully Submitted

_____/s/_____
David   J.   Shaffer
#413484
5012 Aurora Dr.
Kensington, Maryland 20895
Phone:  202-210-7424
E-Mail: davidshaffer511@gmail.com

Attorney for Class Plaintiffs, individually,
and on behalf of a putative class

JURY DEMAND

Plaintiffs demand a trial by jury.



Respectfully Submitted


_____/s/_____
David   J.   Shaffer
#413484
5012 Aurora Dr.
Kensington, Maryland 20895
Phone:  202-210-7424
E-Mail: davidshaffer511@gmail.com

Attorney for Class Plaintiffs, individually,
and on behalf of a putative class