# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PAULA BIRD, CLARE COETZER, SPENCER LEE, LAUREN ROSE, DANIELLE SNIDER, ERIKA WESLEY, "B.A.", "D.A.", "S.B.", "D.C.", "P.E.", "B.G.", "L.M.", "W.M.", "C.S.", "L.S.", "G.T.", Plaintiffs on behalf of themselves and a class of those similarly situated ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) ) | Civil Action No. 1:19-CV-1581 |
| v. ) ) ) | |
| WILLIAM BARR, Attorney General of the United States, named in his official Capacity, and head of the Department of Justice, ) ) ) ) | |
| Defendants. ) ) | |

**DECLARATION OF ERIKA WESLEY IN SUPPORT OF MOTION FOR**
**PRELIMINARY INJUNCTION**

1.    I am over 18 years old and have personal knowledge of the facts set forth below.

2.    I am a plaintiff in the above captioned action, and I am one of the plaintiffs identified by name in the complaint.

3.    I am currently an Intelligence Analyst (IA) for the FBI (series 0132) at the GS-13 level, and have served in the Phoenix Division since April 2018.

4.    I have a rare genetic syndrome and related medical conditions which has resulted in the FBI providing reasonable accommodations that have permitted me to successfully complete my work as an Intelligence Analyst.  I requested an ergonomic workstation on May 10, 2018, which I received.  See Ex. A.  In addition, because my symptoms are generally least

1

present early in the day, and tend to flare up later in the day, I asked my supervisor, Supervisory

Intelligence Analyst (SIA) Mary Martinez, and received approval to work an alternative work

schedule, from 6 am to 2:45 pm. Finally, I was also permitted to keep an ERAS (secure FBI

laptop) at home so that I could telework when necessary. This reasonable accommodation was

also approved by SIA Martinez. Other employees in the Phoenix Division also telework on

occasion. This accommodation permitted me to complete my work when and where I was least

symptomatic. For example, after long periods in the office, the fluorescent lights could

exacerbate my symptoms, but if I went home and treated the flare up, I could then resume work

by using the laptop, and complete my assignments.

5.      I received excellent performance evaluations. I was promoted to GS-13 in early

2019, after completing a rigorous promotion process. And my supervisor described me as an

"exemplary employee" in my quarterly performance review.

6.      This lawsuit was filed in Federal Court on May 29, 2019, and I understand that

my counsel, David Shaffer, sent a copy of the Complaint to counsel for the FBI who had been

involved in my internal EEO complaint.

7.      The New York Times published an article on May 29, 2019 describing the

lawsuit, and identifying me by name as one of the plaintiffs. In addition, I, along with several

other plaintiffs, was interviewed by NBC News, and segments appeared on the Today show the

morning of May 30, 2019.

8.      Since filing this lawsuit, I have experienced acts of retaliation.

9.      SIA Martinez informed me that on May 29, 2019 Acting Assistant Special Agent

in Charge (A/ASAC) Andrew Braun told her that I spent all my time "doing EEO complaints"

and "suing the bureau instead of doing [my] job," and that I "need to go." SIA Martinez told him

2

that I was getting my work done and was an excellent employee.

10.     Less than one week later, on June 4, 2019, A/ASAC Braun held a meeting of intelligence analysts in the Phoenix Division, and announced that the SIAs in the division were being re-assigned to new squads. Certain analysts would also be re-assigned, however, the non-supervisory changes had not yet been decided upon. He announced that SIA Martinez was being assigned to a different, smaller squad, and that I would be assigned to another squad led by SIA Kelly Burzacchi, effective June 9, 2019.

11.     On June 6, 2019, A/ASAC Braun sent out an email which documented additional changes to the intelligence program.  In that document, my specific position, one that no other employees in that Division hold, was described as being "eradicated."  My position was the only one identified for elimination.  That same day I initiated the internal EEO process for retaliation, see Ex. B, and telephoned the Office of Internal Compliance and left a telephone report that I believed the Whistleblower Protection Act was being violated, Ex. C.

12.     On June 9, 2019, I told SIA Burzacchi that I did not have enough work assigned to me, and proposed projects that I could work on.  However, SIA Burzacchi instructed me only to work on assigned projects.  On June 11, 2019, during a squad meeting, I offered to help assist over-burdened colleagues, as I did not have sufficient work assigned to me, but SIA Burzacchi again instructed me not to do so.

13.     On June 18, 2019, SIA Burzacchi told me that SIA Martinez had requested I be temporarily assigned to her squad, and I expressed interest in such an assignment.  Instead, A/ASAC Braun temporarily assigned me to SIA DeGroot's squad, stating he thought there was greater need there, even though SIA Martinez's squad was significantly understaffed compared to SIA DeGroot's squad.  SIA DeGroot expressed surprise at my assignment to her squad, noting

3

that the staffing she had requested was filling of a vacant Staff Operations Specialist (SOS) position, a GS-7 level position, as compared to my GS-13 level. Even on SIA DeGroot's squad, however, there was little work for me to do, and I was asked to do lower level tasks that were not typically assigned to an Intelligence Analyst. Performing SOS-level work would, by its very nature and definition, preclude me from meeting my performance criteria for the IA position. I explained to SIA DeGroot that while I was willing to assist in any functions necessary to support the mission, I needed to counter-balance this lower-level work with upper level work to ensure I was meeting my performance requirements. I did not receive any Intelligence Analyst assignments until July 1, 2019, and I was subsequently informed that that project was being "shelved" until next fiscal year. I have regularly volunteered for additional work, at grade level appropriate projects that need to be handled by my current squad, and my offers have been rejected. The fact that I was significantly underutilized as an IA on DeGroot's squad was at odds with A/ASAC Braun claiming that DeGroot had a greater need for IA assistance than Martinez did.

14.    This underutilization deprives me of the chance to continue to develop and demonstrate my skill set. Prior to being moved to these temporary assignments, I was a "Reports Officer," and in that role am evaluated on how many short reports I write, how quickly I write them, and attending trainings relevant to my role. The temporary assignment is supposed to be as an Embedded Analyst, who would be evaluated on different criteria – generally completing three major intelligence projects each year, and taking training relevant to their role. But even if my next evaluation is done based on the duties of the temporary title as Embedded Analyst, I will not be able to show I have met these different criteria because the actual work assignments I have been given have been for SOS work, which is at a substantially lower level than either an

4

IA Reports Officer or an IA Embedded Analyst. Moreover, while taking ongoing training is expected for either role I might be evaluated under, because trainings must be requested some time in advance, and because it is unclear what role I will be assigned, I have not been able to request approval to participate in relevant training. Essentially, I have been set up to fail to satisfy the stated criterial of either my official position or my nominal temporary position.

15.     On June 10, 2019, I spoke with SIA Burzacchi about my reasonable accommodations that had previously been approved, including my ergonomic workstation, my alternative work schedule, and my access to an ERAS laptop and the opportunity to telework. SIA Burzacchi told me that she was unaware of the telework policy for Phoenix, and would review my file to see what reasonable accommodations had been approved. She stated that she wanted to be sure that I had "secured them [the reasonable accommodations] appropriately" and that SIA Martinez had adequately "crossed her t's and dotted her i's" when providing me the accommodations.

16.     On July 8, 2019, I sent SIA Burzacchi an email request to telework for ten hours during the week of July 15 – July 19, 2019. I explained that I needed to utilize my telework accommodation as I had many times under SIA Martinez's tenure. SIA Burzacchi replied two hours later with a very confusing message, stating that she was still unsure as to what the telework policy was (despite me bringing it up at least twice previously), and that she would inform SIA DeGroot of my request. Because SIA Burzacchi is still my permanent supervisor and handles all administrative matters, I did not understand why she would pass the request to SIA DeGroot.

17.     Mid-morning on July 8, 2019, I went into SIA Burzacchi's office to explain, once again, why my request to telework was not merely a matter of convenience but a matter of

necessity. I explained that I had initiated the reasonable accommodation process over a year

earlier, and as my medical situation has become more exacerbated in recent months, I required

additional accommodations. I told SIA Burzacchi that I had provided documentation and

information to SIA Martinez, who had actively participated in the accommodation process

locally, as the Headquarters-run Reasonable Accommodation had advised. SIA Burzacchi stated

that she been unable to locate any documentation in my "drop" file, but stated that it might be

located in my medical file, which she did not have access to. I asked her to pursue the matter, as

I felt that my needs were being questioned and marginalized.  SIA Burzacchi then told me to

discuss the matter with SIA DeGroot.

18.      I immediately sat down with SIA DeGroot after meeting with SIA Burzacchi,

who also explained that she did not know what the telework policy allowed. Once again, I

explained that this was a medical accommodation, for which I had followed the appropriate steps

that I had been advised. SIA DeGroot said that she thought A/ASAC would oppose my usage of

the telework laptop, as both he and newly-assigned SAC Sean Kaul, had indicated that they

wanted to create a new telework policy, but stated that I should follow up with SIA Burzacchi.

Both supervisors seemed determined not to respond to my request out of concern that A/ASAC

Braun might not approve of their decision.

19.      Approximately five hours after I first requested approval to telework using the

laptop from home, which has been in my possession since the fall of 2018, I received an instant

message from the Information Technology supervisor asking me to please return the laptop for

another user to use during the exact period for which I had already requested to use the laptop. In

the nine or so months since I have used the telework laptop, I have never once been asked to

return it for another employee to use.  I responded to the IT supervisor stating that I had a

pending request to use the laptop during the timeframe in question.

20.    On July 9, 2019, I received e-mails from both SIAs Burzacchi and DeGroot, summarizing a meeting they attended with the SAC Kaul and A/ASAC Braun. During this meeting, the implementation of several policy changes was discussed, including that a new telework policy was being developed, that all telework laptops were being recalled for audit, and that anyone who had a continued need for a laptop should submit the request to A/ASAC Braun. I was surprised by the claimed need to audit the laptops, since the laptops had been audited in April 2019, and were usually only audited once per year.

21.    On July 10, 2019, I emailed A/ASAC Braun and copied my supervisors, requesting approval to continue with the telework laptop as part of my reasonable accommodation. I explained that my laptop had recently been audited, and referenced my engagement in the reasonable accommodation process, my medical and family needs, and articulated the dependence I have on this accommodation to perform my duties with my disabilities. I asked that I be allowed to use the laptop during the requested period, while a formal policy was established. I also asked to have a laptop permanently re-issued to me following the audit. See Ex. D.

22.    On July 11, 2019, SIA Burzacchi told me that my request for continued participation in the telework program and use of the telework laptop were denied by A/ASAC Braun. She did not reference the plan to develop a new telework policy, but instead cited "operational priorities" within the division as the reason why I would no longer be provided access to the telework laptop. Later that evening, A/ASAC Braun sent an email reiterating denial of my request. A/ASAC Braun claimed that I was being required to return my telework laptop so that it could be used for a "higher prioritized need," not pursuant to a new telework

7

policy or an audit that had been the original justifications for asking me to give up the telework laptop. A/ASAC Braun also stated that "we have not been made aware of any documentation supportive of your requests or your participation in the program." See Ex. D.

23.    I returned the telework laptop to SIA Burzacchi on July 12, 2019.

24.    Following the July 9, 2019 meeting referenced above, SIAs Burzacchi and DeGroot also informed me that A/ASAC Braun and SAC Kaul were considering a policy change limiting the hours that non-agent employees, including me, would be permitted to work. I am one of the few employees in the Phoenix division who works outside of the newly-established "core" hours.

25.    On July 10, 2019, I sent an email to SIA Burzacchi with the formal "Alternative Work Schedule" paperwork attached, to request continuing to work my 6 am to 2:45 pm work schedule. I also asked that I be allowed to continue working the 6 a.m. to 2:45 work schedule while the formal paperwork was being processed. I explained that this schedule best allowed me to maintain my health in light of my disabilities and family needs (I am more functional earlier in the day, and experience a worsening of symptoms later in the day; my children and I both have ongoing medical appointments scheduled in the afternoons). SIA Burzacchi did not respond to my email, but did verbally tell me on July 12, 2019 that my request to keep my schedule while I awaited permanent approval was granted. As of this writing, I have not yet received the signed formal paperwork authorizing me to work outside of "core" hours and am concerned that I may ultimately be denied this essential accommodation.

26.    On July 12, 2019, I submitted a new request for reasonable accommodation including both my alternative work schedule and telework. A copy is attached as Ex. E.

27.    I also responded to A/ASAC Braun's email on July 12, 2019, outlining the many

8

inaccuracies, inconsistencies and lies in his e-mail to me. Despite his assertions that the

"administrative review process" had been "applied to the entire workforce of 520+ employees of

the Phoenix Division." Attached here as Ex. D. I explained that very few, if any other

employees, were impacted by this new "administrative review process," and that he had given no

consideration to my disabilities and ability to access my work. I also explained that despite his

assertions, I had followed the exact protocol that I had been instructed to follow, and that if a

different administrative channel was more appropriate to secure the accommodations, I should be

allowed time to pursue those accommodations without being stripped of my access in the

interim.

28.     On the afternoon of July 12, 2019, A/ASAC Braun sent out an e-mail announcing

that a temporary supervisor had been selected for SIA Martinez's squad, as SIA Martinez was

out of the office indefinitely. SIA Martinez had recommended IA Megan Eckstein to serve as the

temporary supervisor, as she was by far the most qualified candidate and was interested in

becoming a full-time supervisor, unlike the individual selected. While Phoenix executive

management can use their discretion to select any candidate to serve in a temporary role, I

believe that IA Eckstein was deliberately excluded from the temporary assignment as retaliation

for her participation in providing a declaration in support of this lawsuit (wherein she attested to

retaliatory comments made by A/ASAC Brown against me). I also believe that SIA Martinez has

been driven out of the Phoenix Division based upon her refusal to be complicit in the ongoing

harassment and retaliation I have experienced at the hands of managers within the Phoenix

Division following my engagement in protected EEO and other whistleblower-protected

activities. I understand that SIA Martinez has requested to use sick leave, but has been denied.

Notably, while any employee's request for sick leave should be handled confidentially, I have

heard from one coworker in the last few days that people are saying that SIA Martinez has "gone MIA." Another colleague told me that she was cornered in the bathroom by an agent who asked, "has anyone found Mary yet?" When my colleague asked what this comment meant, the agent snickered "well, she's missing isn't she? She's gone missing. She's lost it," or something to that effect.

29.    On July 15, 2019, I submitted my formal complaint of retaliation and discrimination in connection with the events described in this declaration. A copy is attached as Ex. F. My efforts to obtain relief from the ongoing retaliation through internal requests and complaints have not been successful.

30.    To date I have been stripped of my telework accommodation; I have been told that alternative work schedules such as mine are generally being eliminated, though I have been permitted to remain on that schedule temporarily while my new request for approval of this reasonable accommodation is considered; and I have been told that my position will be "eradicated" and have been moved from squad to squad on temporary assignments  with very little IA work being assigned to me, so that I reasonably fear that the FBI will terminate me. I am reviewed every quarter. However, for the past two months I have not been assigned work that will permit me to show that I am meeting my expectations. And I have been given no indication that these temporary duty assignments with little, if any, Intelligence Analyst work assigned, will end soon, absent outside intervention. Further, because I am not in a regular work assignment, with a permanent assignment to a squad, I do not get included in meetings or communications; this is isolating. If I am not permitted to continue on my alternative work schedule, and am denied all opportunities to telework, then the loss of these reasonable accommodations will force me out of the FBI, as I will not be able to work a full schedule

10

without the accommodations which were previously approved.  If I am forced out of my position with the FBI, it will not just be the loss of a job, but the loss of a career that I am dedicated to.  I fought through health challenges to return to the FBI because of my dedication to this work.  It is not the sort of work that I can just do for some other employer.  I am not just being threatened with the loss of a paycheck, but being deprived of the opportunity to put my hard-won skills to use in the service of my country.

I declare under penalty of perjury that the foregoing is true and correct.

_____                    _____
Erika Wesley                                                       Date

# EXHIBIT A

FD-856
(Rev. 3-28-2013)

# FEDERAL BUREAU OF INVESTIGATION
## OEEEOA REASONABLE ACCOMMODATION REQUEST

**Note:** This form and its attachments must be safeguarded from unauthorized disclosure, and may be filed in the employee's Sub-M file, the Health Care Programs Unit, Personnel Division medical files, and in Office of Equal Employment Opportunity Affairs (OEEOA) files only. **It may not be filed in an employee's personnel record and should be stored separately from such records in the employee's Sub-M file.** Medical information in this form and its attachments may be provided to non-medical personnel only to the extent that such information is required in the performance of their official duties. Specifically, supervisors and managers may be informed about restrictions on an employee's work or duties and necessary accommodations. First aid and safety personnel may be informed, when appropriate, if the disability or condition might require emergency treatment. Personnel in the OEEOA, Office of General Counsel, some units of the Personnel Division, and members of the Reasonable Accommodation Committee may be provided such information as may be necessary to process the request or make related determinations. If necessary, attach additional information sheet.

### PRIVACY ACT STATEMENT

Authority: 28 C.F.R. 0.137

Principal Purpose: To request reasonable accommodation for an individual s disability or condition to permit performance of essential duties and functions, and to document action taken thereon. This form is not to be used to file an Equal Employment Opportunity (EEO) Complaint; to file such complaint; an employee must contact an EEO Counselor. For further information, consult the OEEOA.

Routine Uses: Information provided on this form may also be used: (a) to compile data, statistics, reports, and analyses: (b) to respond to requests from certain outside individuals or agencies (e.g., Members of Congress) regarding the status of a request or case; (c) to facilitate action on the request; and (d) other properly established routine uses.

Disclosure: Disclosure is voluntary; however, failure to provide the information requested may result in less than full consideration being given to the request, or in rejection of the request for lack of adequate information.

| Name of Requester: (Print) ERIKa WESLEY | | Date: 5/10/18 |
|---|---|---|
| Div./Office: Phoenix | Phone Number: 623-466-1669 | Room Number/Mail Stop: N-438-124 |
| Position and Grade: Intelligence Analyst, GS-12 | | |
| Supervisor's Name: SIA MaRY MaRTINEZ | | Supervisor's Phone Number: 623-466-1051 |
| Have you contacted your supervisor regarding this accommodation? ☑ Yes ☐ No | | |

Referred By:
☑ Self ☐ Supervisor ☐ HRD Specialist ☐ Physician ☑ Other Office NuRse

Description of Reasonable Accommodation Request:
I Request an ergonomically appropriate chair and workstation (to include keyboard, mouse, monitor, desk, etc.

Have you previously request a reasonable Accommodation? If yes, when and what was the nature of the request?
Yes - ① Dec 2017: FBI Academy - nature not Related to This matter
② 2009: Portland - same Request for same issue as described.

Please provide any additional information that may be beneficial in processing this request:
See attached letter to support request.

| Signature: Erika Wesley | | Date: 5/10/18 |
|---|---|---|

Please return to the Reasonable Accommodation Processing Team
JEH; Room 9304, 202-324-3976
Questions or Comments. Please call 202-324-5158 / 4131

**To Be Completed By The Office Of Equal Employment Opportunity Affairs**

| Receiver (signature): | | Date: |
|---|---|---|

Received by:
☐ Walk-In ☐ Fax ☐ E-Mail ☐ Other _____

| Follow up: ☐ Phone Call ☐ E-Mail | Date: | Initials of Case Manager: |
|---|---|---|

| Date Filed Created: | Medical Documentation Required: |
|---|---|
| | ☐ Yes ☐ No Requested Date: _____ |

# North Valley Family Medicine

05/10/2018

To Whom It May Concern:

Ms. Erika Wesley, DOB 12/05/1981, has been a patient under my medical care for four years. She has diagnoses of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with fair prognosis. Her functional limitations and recommended reasonable accomodations include a need to occasionally stand and/or walk, and an ergonomic work station and chair.

Sincerely,

Deborah Hahn, DO

Arrowhead Orchards Medical Center • 6320 W. Union Hills Dr, Suite 2800B • Glendale, Az 85308 • Office: 623-322-4991 • Fax: 623-322-9568

www.nvfm.com

# EXHIBIT B

## Wesley, Erika (PX) (FBI)

| | |
|---|---|
| **From:** | WESLEY, ERIKA (PX) (FBI) |
| **Sent:** | Thursday, June 06, 2019 12:34 PM |
| **To:** | HQ_DIV10_IPU_MAIL; HQ_DIV00_EEO_COUNSELING; HALEY, LAURA B. (DO) (FBI); MOSCHELLA, MICHELLE G. (DO) (FBI) |
| **Subject:** | Whistleblower Violation Act, Retaliation & Discrimination Complaint --- UNCLASSIFIED |
| **Importance:** | High |

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | HQ_DIV10_IPU_MAIL | |
| | HQ_DIV00_EEO_COUNSELING | |
| | HALEY, LAURA B. (DO) (FBI) | Read: 6/10/2019 5:45 AM |
| | MOSCHELLA, MICHELLE. (DO) (FBI) | Read: 6/6/2019 12:36 PM |

Classification: UNCLASSIFIED
=========================================================
TRANSITORY RECORD

I am writing to initiate the EEO process for the claims of retaliation, gender discrimination, and Inspection Division process for bullying, as well as to document violations of the Whistleblower Retaliation Act to the Office of Internal Compliance. Because the FBI makes it incredibly difficult to know who/where relevant overlapping complaints should be sent, and uses this to buck-pass taking responsibility for investigating and holding offenders accountable, I am sending this email to every single entity I can possibly think of. The compartmentalization of complaints cannot continue to come at the expense of the victim. I am absolutely appalled at the extensive discrimination, harassment, bullying, and retaliation I have been subjected to over the last year and a half, and it cannot stand, not in an organization like the FBI. I have attached numerous documents and emails in efforts to bring the seriousness of this matter to your attention, but have substantially more, as well.

The following individuals have engaged in explicit whistleblower policy act violations, retaliation, and discrimination:

- A/ASAC Andrew Braun expressed his intent to fire me based on my filing an EEO lawsuit in Federal court against the FBI (See the Bird class action suit). Braun expressed these sentiments to SIA Mary Martinez on 5/29/19 and A/SIA Megan Eckstein on 5/31/19. A/ASAC Braun tried to exploit my perceived probationary status in order to get rid of someone who "spends all of her time researching EEO policies and filing lawsuits against the FBI." On 6/5/19, Braun disseminated a reorganization plan that completely eliminated my position, and removed me from being supervised by my SIA who has refused to collude with his retaliatory attempts to terminate my employment in order to place me under someone who does not know my work ethic and performance and can be manipulated into agreeing to fire me. (I have 7.5 years of service as an IA. I am a GS-13. I have excellent and outstanding PARS and have been rated an exemplary performer.). RETALIATION.
- A/SAC Joseph Carrico was informed of A/ASAC Braun's intent to dismiss me from SIA Martinez on 5/30/19 via email. A/SAC Carrico waited an entire week to respond to SIA Martinez's e-mail, and told SIA Martinez that the matter was merely a "misunderstanding," and stated that A/ASAC Braun denied making the retaliatory comments. A/SAC did not speak with SIA Martinez about the incident before unequivocally shutting her down, nor did he contact A/SIA Eckstein to learn of the retaliatory comments A/ASAC Braun made to her. Both SIA Martinez and I asked A/SAC if the matter had been reported appropriate under the Whistleblower protection act, but did not receive a response from A/SAC Carrico. Based on A/SAC Carrico's refusal to give equal weight or input to a female GS-14 SIA (and A/UC) as a GS-14 A/ASAC, and failure to follow up with a female A/SIA, in

1

response to claims of retaliation against a female IA, I believe that A/SAC Carrico has engaged in gender discrimination. Telling female subordinates to always have a witness present when speaking with their male supervisors, as if women can only be believed if we have witnesses, as A/SAC Carrico did, is discriminatory. GENDER DISCRIMINATION and RETALIATION.

- SIA Cindy Wetzstein admonished her squad members publicly to "never, ever do what she did" referring to me and the public coverage of my recent lawsuit filing against the FBI. SIA Wetzstein tried to intimidate and threaten her people into silence by using me as an example of what will happen if you speak out about wrongdoing, and accusing me of violating FBI Policy to my peers. I have spoken out in numerous protected disclosures against SIA Wetzstein's egregious unprofessionalism, to include lack of candor, conducting outside business for personal gain on work hours, abuse of power, policy violations, and bullying. I have made my disclosures to numerous designated authorities, including former PX SAC Michael DeLeon and the FBI's general intake e-mail for OPR/INSD. SIA Wetzstein has engaged in multiple attempts to retaliate against, including co-authoring the aforementioned reorganization plan, which literally stated the office's intention in "eradicating the Reports Officer role." My specific position – just me – was the only role specifically articulated for "eradication." (I have attached the documentation regarding SIA Wetzstein's rampant bullying to be read in conjunction with this bulleted complaint and she is an exceptionally egregious offender, and since executives stovepiped my complaint here, I am hoping INSD will look into this further). RETALIATION and BULLYING

- SAC Sean Kaul – According to A/SAC Carrico, incoming Phoenix SAC Sean Kaul has not only supported efforts to keep A/ASAC Andy Braun in place despite his blatant attempts to retaliate, he has supported the "eradication" of my position, AND has been privy to my disclosures against SIA Wetzstein (through his physical presence and participation in the Phoenix Ombudsman process, as well as former SAC DeLeon telling me that he had passed on all of my concerns to SAC Kaul). SAC Kaul's refusal to give equal engagement or consideration to SIA Mary Martinez, instead wholly support A/ASAC Braun, demonstrates his gender bias and discrimination in action. RETALIATION and GENDER DISCRIMINATION.

- Former SAC Michael DeLeon and ASAC Daniel McGee – despite repeated protected disclosures against SIA Wetzstein (including most recently to ASAC McGee on 5/16/19), SAC DeLeon and ASAC McGee engaged it gender discrimination – treating me like I was a dumb little school girl ("You girls just need to get along. You girls just need to communicate better."), treating me with hostility and aggression – and refusing to taking my complaints and issues seriously. They both failed to follow through on promised measures to address SIA Wetzstein's behavior, allowing her to further retaliate against me. Please note – ASAC McGee's absolute REFUSAL to address the ongoing abuses of power and policy violations in this division have resulted in a total deterioration of the intel program, for which he was removed as the ASAC last week, yet he ironically remains the Office of Internal Compliance officer within the Phoenix Division. RETALIATION and DISCRIMINATION.

The Phoenix Division is rampant with abuse of power, policy violations, targeted harassment, bullying and retaliation (which I have personally witnessed happen to numerous female employees, including SIA Mary Martinez, IA Melissa Henratty, IA Christiana Burgess, IA Caitlin Duvall). The more that an employee makes protected disclosures, the more the executive management directly retaliates or knowingly allows others to retaliate. The Division exploits the fact that EEO is overrun with complaints, takes months to investigate, and that OPR/INSD operate so deeply under the radar (not to mention, totally disregarding well-documented complaints), they know that they will never be held accountable. They just wait for their next transfer out, or manipulate the narrative, or deny knowledge – the level is wrongdoing is sickening and pervasive and has reached a level of systemic corruption that MUST BE ADDRESSED. FBI Managers have blatantly harassed, discriminated and retaliated against me since the very first time I blew the whistle about rampant discrimination at the FBI Academy in February 2018. I have walked around with a target on my back for a year and a half, and despite all the "policies" and "measures" in place to protect me – I have not been protected. I have been abused, intentionally made physically sick and had my career destroyed. WHAT WILL IT TAKE FOR THIS TO STOP?!?

Sincerely,

IA Erika Wesley, RO
Phoenix CSCC, Squad I-1
623-466-1669

=========================================================
Classification: UNCLASSIFIED

# EXHIBIT C

**Wesley, Erika (PX) (FBI)**

| | |
|---|---|
| **From:** | WESLEY, ERIKA (PX) (FBI) |
| **Sent:** | Thursday, June 06, 2019 10:05 AM |
| **To:** | MARTINEZ, MARY L. (PX) (FBI) |
| **Subject:** | OIC --- UNCLASSIFIED |

Classification: UNCLASSIFIED
=======================================================
TRANSITORY RECORD

Mary –

I just called the Office of Internal Compliance regarding the recent violations of the Whistleblower Protection Act in the Phoenix Division. No one answered, so I left a message. I am greatly disturbed that their "hotline" is not staffed. I am letting you know of my attempts to reach out to them in the event that I am terminated before I am able to speak with them. I want to make sure that my attempt to contact them is documented, since there is NO email address provided on their website.

Sincerely,

IA Erika Wesley, RO
Phoenix CSCC, Squad I-1
623-466-1669

=======================================================
Classification: UNCLASSIFIED

# EXHIBIT D

## Wesley, Erika (PX) (FBI)

**From:**      WESLEY, ERIKA (PX) (FBI)
**Sent:**      Friday, July 12, 2019 9:44 AM
**To:**        BRAUN, ANDREW J. (PX) (FBI)
**Cc:**        BURZACCHI, KELLY B. (PX) (FBI); DEGROOT, ALICIA K. (PX) (FBI)
**Subject:**   RE: ERAS Use and Permanent Issuance Request --- UNCLASSIFIED

Classification: UNCLASSIFIED
============================================================
TRANSITORY RECORD

Thank you for your reply.

As I discussed with SIA Burzacchi yesterday, I have already begun to seek accommodations through the formal reasonable accommodation process, which I gave her permission to disclose to you during your meeting yesterday afternoon. However, I feel that the statements made in your reply do not accurately portray how the accommodation process has transpired.

I have engaged in the formal reasonable accommodation process on several occasions throughout my employment with the FBI, so it is unclear to me how you have "not been made aware" of this. The process is a convoluted, lengthy process, where non-medical officials determine whether or not accommodations are necessary, even when provided with ample medical documentation. In my experience, serious medical issues are treated with an unprofessional level of callousness and lack of concern for medical confidentiality. Nonetheless, I have followed protocol, and engaged in the process, most recently on 5/10/18.

On 5/10/18, with the support of SIA Mary Martinez, I submitted a reasonable accommodation request in support of my disability. I provided supporting documentation to SIA Martinez. On 5/11/18, SIA Martinez confirmed via email that this paperwork had been submitted to the appropriate entities at HQ. On 6/14/18 – over a month later – I received my first response from Angela Belt of the Reasonable Accommodation office. Over the next several weeks, I interacted with multiple parties within the RA office, and ultimately, both the RA office and the Phoenix Division provided the accommodations I requested. During this process, SIA Martinez and I learned that a Field Office is able to provide accommodations, when resources are available to do so. Participation in the Reasonable Accommodation is NOT required. In fact, part of my requested accommodations – to receive a more ergonomically supportive chair – was not only facilitated but also financed by the Phoenix division through AO Tamra Cash and SAS Val Scheele – NOT through reasonable accommodation, demonstrating in action that the field office CAN provide necessary accommodations. (I have the emails documenting all of this.)

Another accommodation in my request was to have an ergonomic assessment of my workstation completed, which was completed by Regional Safety and Environmental Program Manager Nurse Saida Hulse from the Los Angeles Division on 7/19/18. (I previously had an ergonomic assessment in the Portland field office provided through Reasonable Accommodation in 2009. Again, the FBI should have a record of this.) Ms. Hulse completed the evaluation, and provided her findings to me and several others, including AO Tamra Cash, via e-mail on 7/24/18. Ms. Hulse also informed me that the FBI allowed teleworking, so that if the in-office accommodations did not fully address my issues, I could pursue that option.

As such, when I began to experience a severe flare of symptoms and exacerbation of my conditions in fall of 2018, and needed additional accommodations, I engaged SIA Martinez regarding ERAS use to telework. I was aware that following the ACTIC build out, there were numerous ERASs that were either under-utilized or not utilized at all. As explained in my earlier email, there is not a policy in place in either Phoenix or Bureau-wide regarding intermittent teleworking. I initially considered filing another reasonable accommodation form, however, due to the incredibly lengthy process, my

1

immediate need, and the previous discussions with EEO/RA and AO Cash, both SIA Martinez and I understood that when the field office had the resources available locally, the supervisor could allow these resources to be utilized at his/her discretion. Participation in the RA process is NOT required. SIA Martinez granted me permission to utilize the ERAS from home, in order to help me address the exacerbation of my conditions. (I had numerous doctor visits, medical tests, therapy, lab visits, and experienced side effects while I tried new medications, all of which encroached on my ability to be at work for nine hours straight. However, I was still totally mentally capable of doing my work – just not in the traditional way. I also needed to accrue leave in order to have enough time to take off for surgery, which I still require.)

I would like to be VERY candid about why my need to use the ERAS was so immediate, and why my conditions were exacerbated: I have been subjected to months of abuse, harassment, bullying and retaliation since my re-instatement, with absolutely no recourse (and yes, I have engaged EAP, the ombudsman, relevant internal regulatory entities, etc). I have repeatedly communicated how the constant abuse, harassment, bullying, and retaliation have had incredibly negative health consequences for me, both physically and mentally, to executive management in this office (and previously to the medical staff at the Academy). I have experienced extreme anxiety, physical pain and other physical complications, a dramatic increase in migraines, increased medical visits, increased hospital visits, and an increase in the medication I need to handle my symptoms. (Should this ever become necessary, I have ample medical documentation to prove these assertions.) Absolutely NO concern has been shown by the executives in this office for what I have and continue to experience. Even in your most recent e-mail to me, despite my transparent communication, you did not express a single iota of concern. I do not expect to be coddled, but I do expect to be respected.

My most recent request – which came before the ERAS recall – was an attempt to balance my schedule while my husband is out of town. I am most productive in the morning – I experience worsening of symptoms in the evening – so while my request was due to childcare, it is just as much about the difficulties I face being as productive in the evening. It is just as much about my ability to still attend weekly doctor visits for both myself and my children (which I could not do if I worked later in the evening). It is just as much about trying to find balance – balance of my disabilities – balance of my work – and balance of my home life. Because without balance, my health WILL deteriorate to the point of incapacitation.

This is not a game to me. This is not about me asking for special treatment. This is not about me trying to make claims I can't back up or circumvent doing the appropriate paperwork. I have legitimate, function-limiting disabilities. I have done EVERYTHING I have been advised to do in the past in order to secure the accommodations and adjustments I need to help facilitate my success and provide. Phoenix did not previously have a policy specifically regulating ERAS use, however, I understand that with each new SAC, administrative changes are made that may effect the entire division. However, not all 520+ employees in the division are adversely effected by these new admin changes. I have been. I have had an accommodation I relied upon – an accommodation critical to providing me the access I need to do my job in light of my disabilities - an accommodation critical to preventing further deterioration of my health induced by the toxicity of my work environment – taken from me.

I asked to keep the ERAS and have continuity of access while this new policy is created or while my reasonable accommodation request was processed, but you have denied that. So yes, it feels retaliatory, especially given the lack of consistent messages about ERAS usage and policies. It feels retaliatory when I am told that others are still being allowed to telework because they have "proper" telework requests, when, in fact the telework file for Phoenix is completely empty (see 67Q-HQ-A1539214-PX). Coupled with the other "administrative" changes that all seem to create barriers for me, it feels retaliatory. . So yes, it feels retaliatory, especially given the lack of consistent messages about ERAS usage and policies. It feels retaliatory when I am told that others are still being allowed to telework because they have "proper" telework requests, when, in fact the telework file for Phoenix is completely empty (see 67Q-HQ-A1539214-PX). Coupled with the other "administrative" changes that all seem to create barriers for me, it feels retaliatory. Statements like, "we have not been made aware of any documentation supportive or your requests or participation in the program," and "(we) requested that you return your ERAS so that it can be utilized in the service of a higher prioritized need" seem to not only question my integrity but also minimize or delegitimize my need. And statements like "I can assure you that you have not been, nor will be, singled out for retaliation," feels like an attempt to gaslight me, particularly given your stated desire to terminate my employment.

I turned my ERAS in to SIA Burzacchi this morning. I am on my way to the doctor now to request additional reasonable accommodation paperwork and to discuss the current flare I am experiencing, yet again, due to this office's treatment of me. I am reachable via my Samsung should you wish to discuss this further. Thank you.

Erika Wesley

---

**From:** BRAUN, ANDREW J. (PX) (FBI)
**Sent:** Thursday, July 11, 2019 6:40 PM
**To:** WESLEY, ERIKA (PX) (FBI) <EWESLEY@fbi.sgov.gov>
**Cc:** BURZACCHI, KELLY B. (PX) (FBI) <KBBURZACCHI@fbi.sgov.gov>; DEGROOT, ALICIA K. (PX) (FBI) <AKDEGROOT@fbi.sgov.gov>
**Subject:** RE: ERAS Use and Permanent Issuance Request --- UNCLASSIFIED

Classification: UNCLASSIFIED
==========================================================
TRANSITORY RECORD

Good afternoon Erika,

Just a follow-up note in support of some recent conversations you have had with the SIA's and your email. We have an identified need for ERAS computers in support of prioritized operational mission requirements within the division. As you know, the ERAS's are a very limited and high demand resource that PX Branch A-5 is tasked with caretaking. They have requested that you return your ERAS so that it can be utilized in the service of a higher prioritized need.

Regarding your request for Teleworking and/or Alternative Work Schedule, we have not been made aware of any documentation supportive or your requests or participation in the program. We are required to utilize the Reasonable Accommodation process to formally authorize your participation in these types of programs. I am providing you with two links to support your facilitation of this action:
https://go.fbinet.fbi/DO/OEEOA/EEOServices/Pages/RAP.aspx
https://go.fbinet.fbi/DO/OEEOA/Documents/FastFacts/ReasonableAccommodationsFF.pdf

Finally, the administrative review process surrounding the aforementioned items has been applied to the entire workforce of 520+ employees of the Phoenix Division. I am sure with a new SAC, there will be more to come. I can assure you that you have not been, nor will be, singled out for retaliation. Take care,

-Andy

A/ASAC Andrew J. Braun
Intel & Administration
FBI Phoenix

---

**From:** WESLEY, ERIKA (PX) (FBI)
**Sent:** Wednesday, July 10, 2019 8:35 AM
**To:** BURZACCHI, KELLY B. (PX) (FBI) <KBBURZACCHI@fbi.sgov.gov>; DEGROOT, ALICIA K. (PX) (FBI) <AKDEGROOT@fbi.sgov.gov>
**Cc:** BRAUN, ANDREW J. (PX) (FBI) <AJBRAUN@fbi.sgov.gov>
**Subject:** ERAS Use and Permanent Issuance Request --- UNCLASSIFIED

Classification: UNCLASSIFIED
=========================================================
TRANSITORY RECORD

A/ASAC Braun, SIA Burzacchi, and SIA DeGroot –

I have requested to utilize the ERAS for ten hours next week (July 15 – 19), as my husband will be in Seattle, as I will need to balance my childcare needs and doctors' appointments while also meeting mission needs. While I understand that the office has scheduled an audit of the ERAS, I brought the ERAS in for inventory/audit in early April. Because I submitted my request to use the ERAS prior to this recall notice, and because the ERAS has been audited very recently, I am asking to hold onto the ERAS (or bring it in for audit/have it returned to me on the same day) so that I may continue to use it next week. I am also requesting to have an ERAS issued to me for permanent use.

While I understand that having an ERAS issued to me on a permanent basis is a unique request, I do have unique needs that substantiate my request, for which the FBI has been provided ample medical documents both recently, and spanning back more than ten years. Not only do I have several medical co-morbidities that cause significant daily challenges for me, I also have two children, both of whom have ongoing health/special needs. I have weekly doctor and therapy appointments for each of my children, and I require frequent doctor visits, in-patient treatments, and rest for my own conditions. Having continued access to the ERAS allows me to continue to work a full day and contribute to both the mission in a less-than-traditional, but still fully committed manner. Without the ERAS, I will be faced with the burden of using leave far more frequently than I am able to accrue it. I have successfully utilized the ERAS for the past nine or so months with absolutely no performance issues, to which SIA Martinez can attest.

Because of the unpredictable nature of chronic illness symptom flares, it is difficult for me to predict how often or when I will need to utilize the ERAS. For example, I may be fine for several weeks, but wake up one morning with symptoms that make it very difficult for me to drive. In this instance, utilizing the ERAS allows me to still work my full shift, but does not require me to burn an entire day of SL or risk driving when it may be unsafe. Another example – after six hours at work, the intense fluorescent light in the office triggers a migraine. I am unable to finish the remaining hours of my shift, however, after going home, taking rescue medication, and resting for a few hours, I am able to finish those final two work hours later in the evening.

The nature and scope of my work is very conducive to ERAS use. When I have meetings or need to be in the office, I absolutely am. I am a very conscientious, diligent worker, with great performance reviews over the entirety of my career, and have never abused ERAS use. I am trying my very best to balance my health and family challenges with having a career. It is not easy, but the telework and work-life programs help me balance this. I hope you will continue to support my efforts to be a productive contributor to the mission and to society, while also maintaining my health, as SIA Martinez has in the past. I also hope that you will consider my request in the spirit of the purpose of the telework program, as outlined in the telework program guide:

"The Telework Program assists employees in managing their work and family lives; serves as an effective tool for managers in accomplishing the FBI's mission requirements; prevents the loss of critical skills; can improve morale, productivity, and the overall quality of life; and reduces absenteeism."

Thank you very much for your time and consideration in this matter. If you require additional medical documentation to support my request, please indicate what specific information is required so that I may request the relevant documentation from my medical providers.

Sincerely,

4

IA Erika Wesley, RO
Phoenix CSCC, Squad I-1
623-466-1669

```
========================================================
```
Classification: UNCLASSIFIED

```
========================================================
```
Classification: UNCLASSIFIED

```
========================================================
```
Classification: UNCLASSIFIED

# EXHIBIT E



**EEO Services Unit**

OFFICE OF EQUAL EMPLOYMENT OPPORTUNITY AFFAIRS

## REASONABLE ACCOMMODATION REQUEST MEDICAL INQUIRY FORM

| **Employee Name:** Erika Wesley | **Date:** 7/12/18 |
|---|---|

### A. Does the employee have a disability?

For reasonable accommodation(s) under the Americans with Disabilities Act, as amended, an employee has a disability if he/she has an impairment that substantially limits one (1) or more major life activities and/or major bodily functions or a record of such impairment.  The following questions may help determine whether an employee has a disability.

| 1. Does the employee have a physical or mental impairment? | ☑ Yes | ☐ No |
|---|---|---|

a. If *yes*, what is the impairment?

Her chronic conditions result in symptoms of fluctuating intensity including severe fatigue, musculoskeletal pain, headaches, and anxiety.

2. Diagnosis?

█████████████████████████████████

3. Prognosis?

Fair. Ms. Wesley's diagnoses are chronic and at this time not curable. She is able to function with necessary accomodations. Her symptoms may worsen over time.




**EEO Services Unit**

OFFICE OF EQUAL EMPLOYMENT OPPORTUNITY AFFAIRS

---

4. Medications related to diagnosis?

Ms. Wesley does take several prescription medications for her conditions, but she is not willing to disclose the medication information.

---

Answer the following question based on what limitations the employee has when his/her condition is in an active state and what limitations the employee would have if no mitigating measures were used. Mitigating measures include things such as medication, medical supplies, equipment, hearing aids, mobility devices, the use of assistive technology, reasonable accommodations or auxiliary aids or services, prosthetics, learned behavioral or adaptive neurological modifications, psychotherapy, behavioral therapy, and/or physical therapy. Mitigating measures do not include ordinary eyeglasses or contact lenses.

---

| 5. Does the impairment substantially limit a major life activity and/or major bodily function as compared to most people in the general population?<br><br>*Note:   Does not need to significantly or severely restrict to meet this standard.  It may be useful in certain cases to consider the condition under which the individual performs the major life activity and/or major bodily function; the manner in which the individual performs the major life activity and/or major bodily function; and/or the duration of time it takes the individual to perform the major life activity and/or major bodily function, or for which the individual can perform the major life activity.* | ☑ Yes | ☐ No |

a. If *yes*, what major life activity(s) is/are affected?

| ☑ Bending<br>☐ Breathing<br>☐ Caring For Self<br>☑ Concentrating<br>☑ Eating | ☐ Hearing<br>☐ Interacting with Others<br>☐ Learning<br>☑ Lifting<br>☐ Performing Manual Tasks | ☑ Reaching<br>☐ Reading<br>☐ Seeing<br>☑ Sitting<br>☑ Sleeping | ☐ Speaking<br>☑ Standing<br>☑ Thinking<br>☑ Walking<br>☑ Working | ☐ Other (describe):<br>_____<br>_____<br>_____<br>_____ |

2



EEO Services Unit

OFFICE OF EQUAL EMPLOYMENT OPPORTUNITY AFFAIRS

b. If *yes*, what major bodily function(s) is/are affected?

☑ Bladder     ☑ Digestive     ☐ Lymphatic     ☐ Reproductive

☑ Bowel     ☐ Endocrine     ☑ Musculoskeletal     ☑ Respiratory

☑ Brain     ☑ Genitourinary     ☑ Neurological     ☑ Special Sense Organs & Skin

☑ Cardiovascular     ☐ Hemic     ☐ Normal Cell Growth     ☐ Other: (describe)

☑ Circulatory     ☑ Immune     ☐ Operation of an Organ

---

### B. Is an accommodation needed?

An employee with a disability is entitled to an accommodation only when the accommodation is needed because of the disability. The following questions may help determine whether the requested accommodation is needed because of the disability:

1. What limitation(s) is/ are interfering with job performance or accessing a benefit of employment?

①  Restricting access to previous telework option, and
②  Restricting access to work schedule conducive to meeting her medical needs

2. What job function(s) or benefits of employment is/are the employee having trouble performing or accessing because of the limitation(s)?

Because she no longer has telework and alternative work schedule benefits, Ms. Wesley has been forced to use leave in excess of her alloted amount, due to her above listed diagnoses and symptoms.

3. How does the employee's limitation(s) interfere with his/her ability to perform the job function(s) or access a benefit of employment?

By restricting telework and requiring that Ms. Wesley work later hours, she has reduced access to medical care and rest, and is unable to work around flareups of her conditions.

3



**EEO Services Unit**

OFFICE OF EQUAL EMPLOYMENT OPPORTUNITY AFFAIRS

| 4. The following duty limitations/restrictions apply: | N/A — Non-Agent |
|---|---|
| Expected end date, if applicable: | |

| **Impacted Activity, if applicable** | **Additional Details** |
|---|---|
| ☐ No lifting / ☐ Carrying *(please check)* | Weight Restriction at or above: _____ pounds |
| ☐ No pushing | |
| ☐ No pulling | |
| ☐ No climbing | |
| ☐ No running | |
| ☐ No walking | |
| ☐ No jumping | |
| ☑ No work above shoulder height | |
| ☐ No kneeling, bending, twisting, squatting | |
| ☐ No operating a motor vehicle | |
| ☑ No prolonged standing, *(please define)* must be allowed to sit when symptomatic | |
| ☑ No prolonged sitting, *(please define)* Must be allowed to stand/stretch when necessary | |
| ☐ No grasping | |
| ☐ No assignments in altitudes above 7,000 feet and/or air travel | |
| ☐ No participation in defensive tactics | |
| ☐ No participation in raids, arrests, undercover surveillance, or reactive squad duty: _____ N/A _____ | |
| ☐ No Firearms for training & qualification due to: 1. ☐ Illness/Injury   or   2. ☐ Breastfeeding N/A | |
| ☑ Other Limitations/Restrictions: __ No excessive temperatures __ | |
| ☐ Comments: | |

| 5. Maximum Medical Improvement Achieved? | ☑ Yes   ☐ No   At this time |



EEO Services Unit

OFFICE OF EQUAL EMPLOYMENT OPPORTUNITY AFFAIRS



---

**C. Recommended**

If an employee has a disability and needs an accommodation(s) because of the disability, the employer must provide a reasonable and effective accommodation(s) for both the employee and the Agency, unless the accommodation(s) poses an undue hardship. The following questions may help determine reasonable and effective accommodations:

1. Do you have any suggestions regarding possible accommodation(s) to improve job performance?

☑ Yes ☐ No   If *yes*, what are they?

① Allow telework as needed

② Permit alternate work schedule as needed (she requests 6:00 am start time)

2. How would your suggestions improve the employee's job performance?

Ms. Wesley would better be able to attend frequent doctor's appointments and have time to rest when symptoms flare, reducing strain on her. Also, she is least

**D. Other comments or additional information**

(continued)

Symptomatic in the mornings, so allowing an earlier work time will result in better performance, and leave afternoons open for medical visits.

| **Medical Professional's Signature:** | **Medical Professional's Name Print:** |
|---|---|
| | Deborah Hahn, D.O. |
| **Date:**  7/12/19 | North Valley Family Medicine |
| | **Telephone:** 6320 W. Union Hills Dr. Suite 2800B |
| **Specialty:**  Family Medicine | Glendale, AZ 85308 |
| | Office (623) 322-4991 Fax (623) 322-9568 |

Please be advised the Genetic Information Non-discrimination Act of 2008 (GINA) prohibits employers and other entities covered by Title II of GINA from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, the Office of Equal Employment Opportunity Affairs is requesting you not provide any genetic information when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's genetic tests or those of his/her family member(s), the fact an individual or his/her family member(s) sought or received genetic services, and genetic information of a fetus carried by an individual or an individual family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

# EXHIBIT F

**U.S. Department of Justice**

# Complaint of Discrimination
*(see instructions on reverse)*

PRIVACY ACT STATEMENT: 1. AUTHORITY-The authority to collect this information is derived from 42 U.S.C. Section 2000e-16; 29 CFR Sections 1614.106 and 1614.108.
2. PURPOSE AND USE-This information will be used to document the issues and allegations of a complaint of discrimination based on race, color, sex (including sexual harassment), religion, national origin, age, disability (physical or mental), sexual orientation or reprisal.

The signed statement will serve as the record necessary to indicate an investigation will become part of the complaint file during the investigation; hearing, if any; adjudication; and appeal, if one, to the Equal Employment Commission.
3. EFFECTS OF NON-DISCLOSURE-Submission of this information is MANDATORY. Failure to furnish this information will result in the complaint being returned without action.

1. Complainant's Full Name   ERIKA WESLEY

2. Your Telephone Number *(including area code)*
Home  503-577-0167
Work  623-466-1669

Street Address, RD Number, or Post Office Box Number
1807 W Mary Jane Lane
City, State and Zip Code
Peoria, AZ 85382

3. Which Department of Justice Office Do You Believe Discriminated Against You?  FBI

4. Current Work Address
21711 N. 7th St. Phoenix, AZ 85024

A. Name of Office Which You Believe Discriminated Against You.
Training Division - Located at Quantico FBI Academy

A. Name of Agency Where You Work
FBI

B. Street Address of Your Agency
21711 N. 7th St. Phoenix,

B. Street Address of Office
1 Range Road

City, State and Zip Code
Phoenix, AZ 85024

C. City, State and Zip Code
Quantico, VA  22135

Title and Grade of Your Job
Intelligence Analyst, Grade 12

5. Date on Which Most Recent Alleged Discrimination Took Place

| Month | Day | Year |
|-------|-----|------|
| 05    | 04  | 2018 |

6. Check Below Why You Believe You Were Discriminated Against?

- ☐ Race or Color *(Give Race or Color)* _____
- ☐ Religion *(Give Religion)* _____
- ☑ Sex *(Give Sex)*  ☐ Male  ☑ Female
  - ☐ Sexual Harassment
- ☐ Age *(Give Age)* _____
- ☐ National Origin *(Give National Origin)* _____
- ☑ Disability  ☑ Physical  ☐ Mental   ✓ Retaliation

- ☐ Sexual Orientation
- ☑ Reprisal
- ☐ Parental Status
- ☐ Class Complaint
- ☐ Genetic Information

7. Explain how you were discriminated against *(Treated differently from other employees or applicants)* Because of Your Race, Color, Religion, Sex, Age, Handicap, Reprisal, or National Origin *(You may continue your answer on another sheet of paper if you need more space).*

Please see attached. (10 total pages)

8. What Corrective Action Do You Want Taken on Your Complaint?

Please see attached.

9. A) I Have Discussed My Complaint With an Equal Employment Opportunity Counselor and/or other EEO Official:
DATE OF FIRST CONTACT WITH EEO OFFICE:
02/07/18
DATE OF RECEIPT OF NOTICE OF FINAL INTEVIEW WITH EEO COUNSELOR
05/04/18

B. Name of Counselor:
Careyann Redli

☐ I Have Not Contacted an EEO Counselor

10. Date of This Complaint:

| Month | Day | Year |
|-------|-----|------|
| 05    | 08  | 2018 |

11. Sign Your (Complainant's) Name Here:
Erika Wesley

FORM DOJ-201A
APR. 2011

U.S. Department of Justice                    Complaint of Discrimination – Erika Wesley

**Explain how you were discriminated against (Treated differently than other employees or applicants) Because of your Race, Color, Religion, Sex, Age, Handicap, Reprisal or National Origin.**

**COMPLAINTS**
- Between December 2017 – April 2018, I experienced employment discrimination on the bases of disability and sex (gender) while employed by the Federal Bureau of Investigation.
- I faced reprisal/retaliation for requesting Reasonable Accommodations; bringing the discrimination and harassment I experienced to the attention of my superiors; and for speaking to management about egregious discrimination I witnessed against another student based upon her protected class.
- Finally, I believe that the recently implemented policy, "Basic Field Training Course: New Agent and Intelligence Analyst Graduation Requirements" document, a policy all new agents and analysts (including myself) first view are required to sign *after* arriving at the FBI Academy, is discriminatory in that it allows discrimination to run rampant and unchecked due to the manipulable wording and coercive nature of the document. To be more specific – the "Requirements" document serves as a backstop to enable persistent discrimination at the Academy: rather than enforcing the policies uniformly, the document is used to justify adversarial action taken against targeted students, specifically students of protected EEO classes.   The culture at the Academy isn't one of training: it's a culture of trying to weed out the "undesirables" through bullying.

**BACKGROUND**
- On 12/11/17 the Assistant Director of the Human Resource Division of the FBI offered me a written letter of employment, inviting me to attend training for 3+ months at the FBI Academy located in Quantico, Virginia, to commence on 1/6/18.  I was required to accept or decline the offer within 14 days, however, I did not receive this offer until 12/18/17, due to an error by the FBI's HR staff (the employment offer was sent to the incorrect e-mail address).  In order to accept my offer letter, I needed to secure Reasonable Accommodations for my health issues/disability, however, I was only afforded a week to do so due to the e-mail delay. As discussed below, I accepted my letter and arrived at the FBI Academy in Quantico, Virginia to commence Basic Field Training Course (BFTC) on 1/6/18.
- I previously attended a basic analytical course at the Academy in 2005, similar in concept to the training I attended in 2018.  After six years as a successful, highly-rated Intelligence Analyst, I left the FBI in 2010 to start a family, with plans to return to the FBI after I was finished having children.  I entered the lengthy re-hire process in 2014, was given a conditional offer of employment in 2016, and finally attended BFTC in 2018.  I include this background information because I know from personal experience that the Academy has not always been such a festering bed of discrimination, harassment and hostility, and I am genuinely shocked and appalled at what is being allowed to transpire at BFTC.
- My chain of command while at the Academy is referenced frequently in this complaint.  For purposes of clarification, my chain of command consisted of (in order): 1) BFTC field counselor Intelligence Analyst (IA) Vanessa Bouey; 2) Supervisory Intelligence Analyst (SIA) Brian Moses; and 3) Unit Chief (UC) Kellie Holland.

**DISABILITY DISCRIMINATION**

1

U.S. Department of Justice                                    Complaint of Discrimination – Erika Wesley

- **I believe that I was discriminated against due to my disability before even arriving at the Academy, due to my Reasonable Accommodation request.**
  - After reading over the employment materials provided to me in my offer of employment, I contacted the individual outlined as the Reasonable Accommodations (RA) Coordinator, Management and Program Analyst (MAPA) Michelle L. Miller on 12/19/17 to initiate the RA process for my anticipated 3 month residence at the Academy.  Due to the FBI's e-mail error, I was left with only a week to make necessary arrangements for RA, which happened to fall right over the holiday season.  MAPA Miller responded to my request on 12/20/17, stating that rather than provide the accommodations I requested, I could "wait and see how it goes when you get here." I felt this statement was discriminatory in and of itself, as minimized the significance of my health/disability concerns. I expressed my frustrations to MAPA Miller, only to learn that she was out of the office on holiday leave.  With the clock ticking on the time I had to accept my offer, I grew increasingly concerned that I would be disqualified from employment, because I could not get my reasonable accommodation requests met in the short time the FBI provided me.  On 12/22/17, with no word from MAPA Miller, I contacted the other FBI employees I had interacted with during the hiring process, including HR Specialist Erica Benson-Mainor and Supervisory Intelligence (SIA) Teresa Tamburrino. Ms. Mainor did not reply and SIA Tamburrino stated that she had nothing to do with the RA process, but forwarded my email to HR Supervisor Charles Pritchett, who never responded.  I grew increasingly stressed that I was going to be disqualified from employment based on my RA request since my offer was set to expire on 12/25/17, and I was unable to accept until my RA request was processed.  On 12/27/17, two days after my offer letter expired, I was asked to provide medical documentation supporting my RA request, which I immediately provided.  On 12/28/17, I was told that all my RA requests would be met and I would still be able to accept my offer letter, which I did that day.  I noted in my official letter of acceptance that my acceptance was "contingent upon my reasonable accommodation request being met."  (As a note: while I was approved to have certain RA items during my stay at the Academy, I was required to provide what I requested, with the exception of a mini-fridge discussed below.  The RA items I requested would not have caused an undue hardship for the FBI to provide, and cost perhaps $100.)
  - On 1/6/17, I arrived at the FBI Academy and commenced the orientation process.  I immediately noticed that I was being treating with a level of impatience, rudeness and hostility that the other new employees were not subjected to.  I wondered if this treatment had to do with my reasonable accommodation request, my delayed acceptance, or the fact that I arrived without having received the same information as the other new employees due to the e-mail snafu.  This e-mail mistake was acknowledged, in writing, by the FBI employee who made the mistake, however, the Academy staff still treated me with noticeable hostility, which led me to believe that it was due to my RA request.  The tenor at the FBI Academy is one that no one deserves "special" treatment – the fact that I was being allowed certain concessions based on medical need didn't seem to sit well with my superiors.  Special Agent (SA) Daniel Zwiesler, a class counselor for my Basic Field Intelligence Course (BFTC), was especially unprofessional, stating that I wasn't starting my new job off on good footing and wasn't making a very good impression.  I did not press him on what he meant by this comment, but immediately felt a sense hostility that became increasingly pervasive.

2

U.S. Department of Justice                                   Complaint of Discrimination – Erika Wesley

- **My health was knowingly and repeatedly compromised by Academy staff: despite repeatedly communicating that filthy living conditions were contributing to the demise of my health, no efforts were taken to address this; in fact, staff perpetuated the exposure by forcing me to work/reside in an environment that made me more sick.**
  - My dorm room was an incubator of illness: the furniture and floors were covered in sweater-thick layers of dust – to which I am highly allergic. I communicated several times – both in writing and in person – with IA Bouey, asking her how to handle the dust in my room. I cleaned all accessible surfaces myself, but couldn't access other areas due to furniture placement. After two weeks of the matter being unaddressed, I found a vacuum in a hallway closet on 1/15/18 and attempted to vacuum my room. The vacuum I located nearly started on fire when I attempted to vacuum, throwing off thick sparks and smoke, further worsening my allergies. I told IA Bouey about all of this - repeatedly asked for the cleaning staff to vacuum or to be provided a vacuum. Because I was asking for cleaning services outside the scope of their regular duties, this request had to be made through my chain of command, which was IA Bouey. IA Bouey claimed she made the request, but never followed up with me or the cleaning staff. Up until the day I left, the cleaning staff <u>never</u> addressed the dust issue. On 2/7/18, I finally located a vacuum on another floor, but was advised that I could not move the furniture in my room to eliminate the dust, as it was a policy violation (as listed in the "Requirements" document). Several other students had moved their furniture for the simple reason that they wanted to re-configure the arrangements in their room, but they were not threatened with write-ups. I needed to move the furniture to be able to access the piles of dust, yet was threatened with a "write-up" if I moved the dorm room furniture to vacuum the excessive dust myself. I have photos of the piles of dust to put the matter in context. I repeatedly tried to mitigate the situation by taking action to protect myself, but faced threats of reprisal.
  - When I arrived to my dorm room on 1/6/18, I discovered that one of the reasonable accommodation items that was provided to  me, a mini refrigerator in which to refrigerate medication, had fuzzy black mold all over the inside, which I am very allergic to (I have photos of this mold). Given that I had to demonstrate that the fridge was required for medical use, the FBI knew why I would be using it, yet no precautions had been taken to prepare or clean the refrigerator. I cleaned and bleached the refrigerator myself, however, upon telling IA Bouey about the matter later in the week, she discounted my concerns, saying that I shouldn't even have a fridge in my room at all, and commented that she was going to have it removed. I explained to her that I had permission to have it, she just said it had been left in my room by a previous tenant. Her hostility towards me for having "special" privileges (i.e. a fridge in my room) was intense from the very first day at the Academy.

- **I was knowingly stripped of my reasonable accommodations which I had obtained through the prescribed procedure.**
  - On 2/7/18, my room was inspected without notice. Following the inspection, IA Bouey came into the classroom, and announced in front of my classmates that I had items in my room which violated FBI policy (NONE of the items in my room violated policy). She aggressively challenged me (and another student with a reasonable accommodation) on why I had items in my room that were part of my RA request. She demanded an answer and when I told her I felt that the information was protected by my privacy rights, and had been coordinated through RA, she grew very angry. She claimed I did NOT have an

approved RA request, grew furious, yelled, wagged her finger at me, and challenged both my honesty and integrity in front of my classmates.  I am not able to adequately articulate just how horrible IA Bouey's behavior was, however, this incident was recorded on tape in the classroom. Witnessing this incident, in addition to my classmates, was instructor SIA John Evertsen, who replied in front of the whole classroom "*hashtag awkward*."  I communicated IA Bouey's egregious behavior to SIA Moses, however, SIA Moses said he was unaware of any RA granted to me.  (I had previously addressed IA Bouey's harassing/discriminatory behavior with SIA Moses, but she continued to target me).

- o I was forced to remove the medical devices from my room the evening on 2/7/18.  After a week of making no headway to get my RA items back within my chain of command (IA Bouey and SIA Moses), I finally contacted MAPA Miller and asked her to intervene.  In writing, she affirmed that I WAS authorized to have my medical RA items, and that IA Bouey had no authority to force the removal of said items.  Only after I went out of my chain of command, directly to MAPA Miller, did SIA Moses confirm that I had a valid RA request on file.

- o Removal of these RA items did not go without consequence.  I became increasingly ill and had to see an off-campus physician, who said the only remedy I had was to go on a high-dose of steroids, which caused side-effects that caused further suffering and health compromise.

- o In March, when facing what I believe to be retaliatory disciplinary action from Unit Chief Kellie Holland (which is discussed in more detail below), UC Holland attempted to legitimize what IA Bouey did by stating that the items were removed after a recent inspection by the Marine Corps Fire Marshall.  While the Fire Marshall *did* conduct an inspection at the FBI Academy the day prior to the removal of my items, The Fire Marshall never inspected my room or even my building.  The Fire Marshall inspected another building on campus and was livid about the use of Keurig coffee makers in dorm rooms.  Absolutely no review or determination was made by the Fire Marshall about the items in my room. Even if the Fire Marshall had inspected my room, ALL the devices in my room had been pre-approved by MAPA Miller, as discussed above.  Furthermore, MAPA Miller stated that the Fire Marshall had no issue with any of my items.

- o IA Bouey refused to allow me to ship my RA items to my new field office through intra-office mail, and did not allow me to ask SIA Moses permission to do so.  I had to abandon the items, as the FBI does not pay for overage costs for checked airline bags.

- **While extremely sick, I was denied permission to forgo a field trip and forced to work outdoors in bitter temperatures on 2/2/18.**
  - o Despite seeing the campus nurse twice in the two previous weeks, and being put on two rounds of strong antibiotics to treat sinus/ear infections stemming from prolonged exposure to the unhealthy living conditions in my dorm room, I was denied the opportunity to visit the nurse to request limited duty verification, and forced to attend a field trip in Washington, DC, where I was exposed to sub-zero temperatures and brutal winds.
  - o During a previous field trip, another student was excused from attending because of a sore leg. I do not know any additional details about this student's injury, but I do know that concessions were made for her that we not made for me.

- **I was harassed about having necessary medication readily accessible to me in the classroom.**

- o On 1/16/18, SA Zwiesler prevented me from entering the classroom because I had my purse with me, citing that "shoulder bags" are not allowed in the classroom per the "Requirements" document.  Given my allergy issues, I needed to keep several allergy meds and inhalers on hand and kept them in a small purse.  I had already discussed this situation with SIA Moses, who was in my chain of command, and had been granted authority to bring the purse into class.  SA Zwiesler is not in my chain of command and I did not feel it was necessary to disclose my personal medical information to him, and merely told him that I had permission to have the purse.
- o When challenged about my interaction with SA Zwiesler, IA Bouey asked why I couldn't just put my medication in my locker, located outside the classroom and down the hallway.  I explained that if I was having trouble breathing or having an allergic episode, it wasn't prudent for me to have to get up from the class, maneuver around the other students in my row, walk to the door, go down the hall, and struggle with a combination lock all while in medical distress.  I also told her that SIA Moses had approved me having the purse with the medication in class. Nevertheless, I was called into a disciplinary meeting a few days later– which felt more like an interrogation – to discuss my "insubordination" and "bad attitude" with IA Bouey, and SIA Tyrone Jiles. When I explained the situation to SIA Jiles, he was understanding and did not write me a citation, however, I did have to disclose private medical information with IA Bouey and SIA that I had already disclosed and coordinated with SIA Moses.  Once again, I feel that my right to privacy was violated and I was harassed for my disability.

- **My private medical information was not only repeatedly publicly shared, which I believe violated HIPPA rules, but the information was used to ridicule me in front of my peers and instructors.**
    - o Disclosing my reasonable accommodation items in front my classmates and instructor violated my privacy rights and was discriminatory, as discussed above.  The disclosure and ensuing scolding were so hostile that I had to leave the room to go to the bathroom and cry.  IA Bouey was vicious in her demeanor and absolutely targeted me and the other student with RA items to humiliate us.
    - o IA Bouey made comments about me always "being sick" in front of my classmates (such as "Damn! Are you sick AGAIN??).  She said it in a repulsed, mocking tone, as if I was some sort of pariah.
    - o After going to the doctor off-campus, on a weekend, IA Bouey later berated me and told me I was not allowed to seek medical attention without being accompanied by a counselor.  This is not a rule in the "requirements" document – but she insisted it was, and insisted I disclose my diagnosis to her.  All I told her was that I would be able to return to duty after the weekend.  When I wouldn't give her the information she demanded, she proceeded to ask several of my classmates the specific details of my visit, and suggested to them that I snuck off base without authorization, once again impugning my character.
    - o The medical information I sought to keep private was detailed and documented in an Electronic Communication (EC), and given to IA Bouey prior to Mediation of this matter. I was not informed that IA Bouey would be given this information, and once again, I felt violated because I wasn't okay with being subjected to disability discrimination.

**SEX/GENDER**

- **Discrimination against women is rampant and blatant at the Academy, from the peer level to the executive management level.**
    - Unit Chief Holland readily dispels or minimizes legitimate discrimination claims made by women, saying that as a woman, she has experienced much worse. Moreover, she threatens retaliation if you "talk back" or attempt to stand up for yourself when facing unsubstantiated disciplinary action based on gender. It is my experience that UC Holland is far more aggressive and demeaning of women than she is of men. It is also my experience that UC Holland knows that her subordinates are telling blatant and egregious lies in their disciplinary citations of women and does nothing about the lies, which empowers those subordinates to target and harass with impunity. I have personal knowledge of at least five disciplinary "citations" written against women in my class alone that were lacking candor, fabricated, or complete lies. When I attempted to bring this to UC Holland's attention, she said to me "Is it more important to be right or to be heard?" making it very clear to me that I needed to stop talking or face further retaliation.
    - SA Dan Zwiesler targeted certain women and treated them with serious unprofessionalism and disdain, over-scrutinized their behavior, and targeted them for disciplinary action, which he was allowed to do under the authority of the "Requirements" document, despite not actually being a supervisor. I know of several other women in my class who experienced targeting by SA Zwiesler. SA Zwiesler treated me with such hostility and disdain that I brought it to the attention of my chain of command. He aggressively barked orders at me, treated me with gross condescension, harassed me about anything and everything he possibly could, even though he was not in my chain of command. If a male student had a question, SA Zwiesler was jovial and professional in his response. If I (or certain other targeted women) had a question, SA Zwiesler was intolerant, condescending and demeaning. I watched SA Zwiesler target a particular female student in our class and harass her to the point that I, as a bystander, addressed this discrimination with my chain of command. SA Zwiesler lied about this student's behavior, which resulted in disciplinary action being taken against her, and ultimately, her termination. More than just treating certain women poorly, SA Zwiesler seemed gleeful in doing so. At one point in class, SA Zwiesler made comments about women's hormones, needing to stay on their birth control pills, and made condescending remarks about women, in general, as he recounted his divorce.
    - The targeting of females, particularly by males in leadership roles at the Academy, was not limited to SA Zwiesler. I witnessed firsthand and heard of instructors engaging in inappropriate and entrapping behavior with female students that led to those women being issued citations (some of which were taped, as they happened in the classroom setting). No matter what the women said/did, they would be issued citations. If they tried to be deferential, they were "lacking professionalism"; if they stood their ground, they were being "insubordinate."
    - IA Bouey repeatedly made comments about my being a mother, and how that adversely affected my abilities in the workplace.
    - I was repeatedly referred to as an "overly emotional woman" by IA Bouey and UC Holland. I was under such distress from the constant discrimination and targeting, that I cried a few times while at the Academy. Instead of taking this as a sign of their improper conduct, I was marginalized as being too emotional to do my job. (Incidentally, my professional performance was never – NOT ONCE – at issue. I excelled academically. Nor did I find the academics stressful – I thrive when being intellectually stimulated. It

U.S. Department of Justice                                    Complaint of Discrimination – Erika Wesley

> was the unrelenting harassment that was stressful. )  I have since learned that UC
> Holland frequently leverages words like "emotional" or "overwhelmed" at females in
> order to undermine their suitability for employment with the FBI.

- o   IA Bouey also liked to make jokes about me being pregnant (which I was not) to my
  classmates: I made it very clear that I was NOT pregnant, but tried to let the jokes roll of
  my back because I had already been called "too sensitive."  Nevertheless, the pregnancy
  jokes escalated too far when IA Bouey said in front of the class that she was going to call
  my husband and tell him that I "got myself knocked up by someone else" during my
  training session.

## REPRISAL/RETALIATION

**To be explicitly clear: I believe that the more I spoke up about the improper actions of Academy staff,
the more I was targeted for harassment and dismissal. It was made clear to me on numerous
occasions that enduring the offensive conduct was a condition of my continued employment.**

- I notified IA Bouey, the first in my chain of command, of SA Zwiesler's inappropriate behavior
  towards me.  I also informed her that he seemed to have a noticeable problem treating women
  equally.  She told me that she spoke to him: after she did so, I noticed that SA Zwiesler began
  acting as if I did not exist.  He would not respond when I greeted him (which we were required
  to do), he would not make eye contact with me, would not interact with me in a professional
  setting whatsoever.  Instead of treating me equally, he punished me for speaking out.  His overt
  hostility towards me was noticed and commented on by other students.  I also believe that the
  way he treated me made other students weary of being associated with me, leaving me feeling
  isolated.  I felt so consistently and frequently targeted that I stopped doing things that could
  provide any exposure, including limiting my visits to the cafeteria – instead I hunkered down in
  my room.
- I discussed IA Bouey's targeting several times in writing and in person with SIA Moses, who said
  he spoke with her about it.  Her behavior did not improve: instead, after SIA Moses spoke with
  IA Bouey, I started to feel targeted for disciplinary action.  I had not received any write-ups or
  citations prior to bringing my disability and gender discrimination issues to the attention of
  management.  But almost immediately after, I started getting citations and was threatened with
  citations and dismissal on a constant basis.  For example, I was given a disciplinary citation for
  doing something that I had not only been told was ok to do, but that numerous other students
  did both before and after I was written up (I had my phone  powered on, but on silent, in the
  classroom building on the weekend, while studying.  My phone was NOT in the classroom. My
  phone was NOT in a SCIF. And it was not during work hours, which I had been told was when
  phones were restricted).  Despite being told otherwise, and seeing many other students have
  their phones on, this no-phone rule was in the "requirements" document, so I took ownership
  for my actions.  I acknowledged my mistake, but was then challenged to explain myself.  When I
  provided an explanation, I was told I lacked accountability.  Again – this speaks to the nature of
  the "requirements" document, the entrapment, and the hostility it creates. Once you have been
  targeted, all action taken against you (even if everyone else is doing it) is somehow ok, because
  the "requirements" document says it is. It also speaks to the unchecked authority of field
  counselors – they are not real supervisors, yet they are given the power to destroy lives and
  careers.
- After my previous interactions with IA Bouey, she told another student not to trust me, that I
  was trouble, and that I would stab the other student in the back the first change I got.  I heard
  this conversation, as I was in the room of this other student, and the phone conversation was on

speaker.  IA Bouey was consistently divisive and impeded my ability to develop professional relationships with classmates.  She disparaged me, and played favorites with other students. She allowed others to break rules (for example, she gave a mini fridge to one of the students she liked, who did not have a medical note or need for it, while harassing me and another student for having mini fridges in our rooms, even though we both had medical need and permission to have them), while coming down on me for things that were not even real rules.  I developed such a sense of anxiety every time she entered the classroom, because I knew that when she came to class, it was almost always to discipline, harass, or bully me.  Again, other students noticed this, and when they saw her enter, all eyes would dart to me.

- After asking to speak with UC Holland about another female student, who I witnessed being targeted and harassed by IA Bouey, SA Zwiesler and other managers, UC Holland began targeting me for unwarranted disciplinary action.  She said something to the effect of "I'm sure you thought that you were doing the right thing by speaking up for the other student.  But that brought you to my radar.  You weren't even on my radar before.  But now you are.  And there are consequences to speaking up."  She proceeded to berate me for failing to take proper accountability for the citation I discussed earlier regarding the phone.  She then told me that since I was "on her radar," she had asked the staff about me, about my performance and demeanor.  To be clear – she singled me out and tried to elicit negative information about me because I stood up for myself and another student based on our protected classes.  (This goes beyond a "motivating factor" in terms of disciplinary/retaliatory action).  She did not disclose to me everyone she had spoken to, but she was fishing for negative information about me from Academy staff so that she could further retaliate, which she did (see the incident details below). UC Holland issued me a double citation claiming I had called her "unprofessional."  Not only was this assertion based on gross misrepresentations provided to UC Holland by IA Bouey, it happened eight weeks earlier.  If this behavior was so egregious, why did she wait eight weeks to discipline me?  Why wasn't I disciplined by IA Bouey or SIA Moses, who were both there when the incident occurred?  UC Holland only wrote me up because I had dared speak out against discrimination, and even said as much.  But disciplining me for the incident wasn't enough.  UC Holland berated and verbally abused me for a solid hour.  She told me how overly emotional I was.  She said that the "behavior" I demonstrated at the Academy made her never want to work with me, that my reputation was soiled.  She made comments about my interest in being a Special Agent, and said it was a good thing I hadn't become one because I couldn't have hacked it.  She ridiculed concern I had for my daughter who was in the hospital during my time in the Academy, saying that other students had relatives die, and that was much more severe than a sick child.  She made it clear that I was on tenuous footing and could dismissed at any time.  She was so incredibly unprofessional, hostile, cruel and retaliatory, that the rest of my time at the Academy was spent in complete and total terror – fearing that I would be dismissed for breathing too loudly.
    - (Incident details: IA Bouey told UC Holland that I had called UC Holland "unprofessional" and "demanded an explanation" when UC Holland abruptly removed our BFTC SSA eight weeks prior (who is a woman, which I do not believe is coincidence).  UC Holland presented the dismissal to the class in what I viewed to be an unprofessional manner, and, offered both disparaging misleading information about the SSA's removal.  We were then admonished from interacting or communicating with the SSA in any form, which I felt was, again, punitive and unprofessional.  After UC Holland briefed us on the dismissal and left the room, SIA Moses and IA Bouey asked the analysts if we had any questions.  The tenor was very somber, and we were all reeling, as we all liked the SSA very much.  I asked if we were privy to know what happened, but was told we were not.

That was the entire extent of my "demanding an explanation" – I asked a legitimate question in the appropriate forum, when invited to do so.  After class, numerous students were saying things "That was so fucked up," or "Why would they treat the SSA like that?"  I didn't curse or disparage, but said to my peers that I thought the situation wasn't handled very professionally.  This incident was also video recorded.

- I was repeatedly threatened with citations, and impending dismissal, for minor "infractions."  For example, during an extremely windy day, a gust of wind blew my parking pass off my dashboard when I opened my car door. I was unable to retrieve the parking pass. The wind was so severe that the entire base had been closed the previous day for dangerous wind conditions, yet I was threatened with a write-up for losing government property and lacking professional responsibility.
- I was consistently targeted and threatened with disciplinary action in the moments right before critical exams or performance tests.  For example, minutes before a briefing performance test, IA Bouey pulled me aside, and told me that UC Holland wanted me her in her office at the end of the work day.  As described above, going before UC Holland was never a good thing.  This was an intimidation tactic that the Academy staff frequently utilized to be disruptive to targeted students.  If they couldn't "get" us on bad behavior, maybe they could scare us so bad that we would perform poorly on exams and they could dismiss us for that.  This happened to me three times – and happened to other women on at least four other occasions that I know of.
- I was constantly scrutinized, criticized and bullied for things that other students were not.  For example, after getting too warm in my uniform fleece jacket, I took it off and tied it around my waist, while still wearing my uniform polo underneath.  Lots of other students do that.  Yet, I was told that I was wearing the uniform incorrectly and told I could be written up.

## What Corrective Action Do You Want Taken On Your Complaint?

- I would like a thorough investigation conducted of the matters discussed herein in the hopes that future discrimination is avoided. It troubles me deeply that good people are being forced out of the Academy after being aggressively bullied over gender or disability.
- Because my time at the Academy is over and I am now relocated in the field, nothing about what I experienced can be corrected or undone.  However, I do feel that the FBI should be held responsible for the knowing, willful and egregious actions of the staff at the FBI Academy in the form of both pecuniary and non-pecuniary compensatory damages.
  - Pecuniary Damages: Due to the reckless nature of FBI Academy staff, I was forced to incur personal costs.  As such, I am seeking reimbursement for doctor's visit off campus; reimbursement for medications; reimbursement for personal time taken to visit doctor and pick up prescriptions.  Approximate Total: $500 (may change when I obtain billing records from my insurance company: should pecuniary damages be awarded, the entire cost of visits and medications would need to be reimbursed, not just my co-pays.  I do not have access to this information at the time of this filing.)
  - Non-Pecuniary Damages: Not only did FBI Academy staff know of my disability issues, and concerns about gender discrimination, they willfully used that information to target me for harassment, hostility, undue discipline and discrimination.  As such, I believe the FBI is directly responsible for my loss of health; physical pain and suffering; emotional suffering; mental anguish; injury to my character and reputation; humiliation; indignity; apprehension; and isolation.  The physical and emotional consequences of my distress were well noted by Academy nurses, family members, co-workers, and personal medical providers, and include: sleep issues; anxiety; physical pain; increased used of breathing

medication; stress; frequent infections; and chewing my cheeks and tongue as a stress reaction.  Due to the severe, intentional and punitive nature of my suffering, I am requesting $100,000.  I also request 240 hours of annual leave be credited to my leave bank, so that I may take time to mentally, emotionally and physically recover from the unnecessary and unwarranted trauma I was forced to endure at the Academy.