## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Paula Bird, Clare Coetzer, Spencer Lee, Lauren Rose, Danielle Snider, Erika Wesley, "B.A.", "D.A.", "S.B.", "D.C.", "P.E.", "B.G.", "W.M.", "C.S.", "L.S.", "G.T.", | ) ) ) ) ) ) |
| Plaintiffs, on behalf of themselves and a class of those similarly situated | ) No. 1:19-CV-1581 (KBJ) ) ) |
| v. | ) ) |
| William Barr Attorney General of the United States, named in his official Capacity, and head of the Department of Justice, | ) Judge Ketanji B. Jackson ) ) ) ) |
| Defendant. | ) ) |

### FIRST AMENDED COMPLAINT

Plaintiffs, Paula Bird, Clare Coetzer, Spencer Lee, Lauren Rose, Danielle Snider, Erika Wesley, "B.A.", "D.A.", "S.B.", D.C.", "P.E.", "B.G.", "W.M.", "C.S.", "L.S.", "G.T.", individually and on behalf of a class of others similarly situated, allege as follows:

### <u>NATURE OF ACTION</u>

1.  Plaintiffs are current and former female employees of the Federal Bureau of Investigation who suffered sex-based discrimination when they were enrolled in the FBI Academy's Basic Field Training Course ("Basic Training"), which has had other names at times, to become Agents and Intelligence Analysts.

2.  As New Agent Trainees ("Agent Trainees") and New Intelligence Analyst Trainees ("Analyst Trainees"), Plaintiffs experienced discrimination throughout their time in Basic Training, through the FBI's policy of issuing disciplinary citations, called suitability

notations, based on subjective criteria.  Female Trainees received suitability notations more frequently and for more minor infractions than male Trainees.  Gender stereotypes and a culture of sexism within Basic Training have caused instructors to issue suitability notations in a discriminatory manner.  As a result of these suitability notations, the proposed class representatives, Plaintiffs Paula Bird, Clare Coetzer, Spencer Lee, Lauren Rose, Danielle Snider, "B.A.", "D.A.", "S.B.", D.C.", "P.E.", "W.M.", "C.S.", "L.S.", "G.T.", were placed under "Suitability Review" and/or sent before disciplinary boards called Trainee Review Boards and discharged from Basic Training by the Assistant Director of the Training Division.  Plaintiffs allege that, because of their sex, female Trainees were referred for Suitability Review or to the Trainee Review Board and discharged more frequently and for more minor infractions than similarly situated male Trainees.   The proposed class representatives bring claims for disparate treatment and disparate impact in violation of the Title VII of the Civil Rights Act of 1964 on behalf of themselves and more than 80 similarly situated female Agent Trainees and 45 similarly situated female Analyst Trainees.

3.     In addition to the discriminatory discharges of the proposed class of Analyst and Agent Trainees, the FBI discriminatorily discharged Plaintiff B.G. based on her sex without first placing her under Suitability Review or referring her to a Trainee Review Board.  The FBI also discriminated against two plaintiffs with disabilities, Ms. Lee and Ms. Wesley, when it denied them reasonable accommodations for their disabilities.  Further, the FBI subjected Ms. Wesley and B.A. to hostile work environments based on their sex.  Ms. Wesley and B.A. were subjected to persistent, graphic, and invasive gender-based and sexual comments.  These unwanted comments humiliated Ms. Wesley and B.A. so severely that they altered the conditions of Ms. Wesley's and B.A.'s employment, respectively.  The discriminatory behavior was condoned by

FBI management and was not corrected when Ms. Wesley and B.A. reported it.  Further, when Ms. Wesley reported discrimination, including through internal complaints, formal EEO complaints, and filing this lawsuit, the FBI retaliated against her.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this court in that the district courts have original jurisdiction over Title VII, and Rehabilitation Act claims under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3), because they arise under the laws of the United States and are brought to recover damages for deprivation of civil rights.

5.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3), because Defendant's headquarters is located in this district, the personnel records relevant to this case are in this district, and the personnel practices challenged herein were directed or supervised by Defendant in this district.

6.      Plaintiffs have exhausted their administrative remedies prior to bringing this suit in that each plaintiff has filed timely charges of discrimination and filed a class complaint before the Equal Employment Commission on October 23, 2018.  More than 180 days have passed since the filing of the class complaint and the EEOC has taken no action on this case since that filing.

## PARTIES

7.      Defendant William Barr is the Attorney General of the United States, and is sued here in his official capacity as head of the Federal Bureau of Investigation.

8.      Plaintiff Paula Bird is a female resident of the state of Florida, and is currently employed by the FBI as an Operational Support Technician.  She was discharged from the FBI Academy as an Agent Trainee on May 1, 2018, gave first notice of discrimination to the EEOC

on May 10, 2018, and filed a timely complaint of discrimination on May 29, 2018.  Ms. Bird amended her complaint, filing a class complaint jointly with Plaintiffs Clare Coetzer, Spencer Lee, Lauren Rose, Danielle Snider, Erika Wesley, D.A., D.C., G.T., S.B., and W.M. on October 23, 2018.

9.  Plaintiff Clare Coetzer is a female resident of the state of Washington.  She was discharged from the FBI Academy as an Agent Trainee on June 29, 2018, gave first notice of discrimination to the EEOC on August 7, 2018, and filed a timely complaint of discrimination on September 17, 2018.

10.  Plaintiff Spencer Lee, a woman with a disability, is a resident of the state of Florida.  The FBI denied Ms. Lee reasonable accommodations for her disability beginning on or about January 30, 2018, and continuing through the duration of her time in Basic Training, discharged her from the FBI Academy as an Analyst Trainee on March 9, 2018.  Ms. Lee gave first notice of discrimination to the EEOC on February 9, 2018 (prior to her dismissal), and filed a timely complaint of discrimination on February 14, 2018.

11.  Plaintiff Lauren Rose is a female resident of the state of Florida and is currently employed by the FBI as a Staff Operations Specialist.  She was discharged from the FBI Academy as an Agent Trainee on May 20, 2015, gave first notice of discrimination to the EEOC on June 1, 2015, and filed timely charges of discrimination including allegations of a pattern of discrimination against female Agent Trainees on August 3, 2015.  Ms. Rose applied for reinstatement on May 25, 2015; July 27, 2015; and August 15, 2016, and her requests were denied on October 5, 2018.  Ms. Rose filed a timely complaint of discrimination on December 20, 2018.

12.     Plaintiff Danielle Snider is a female resident of Washington, D.C.  She was discharged from the FBI Academy as an Agent Trainee on January 31, 2018, gave first notice of discrimination to the EEOC on February 8, 2018, and filed a timely complaint of discrimination on February 10, 2018.

13.     Plaintiff Erika Wesley, a woman with a disability, is a resident of the state of Arizona.  During her training to become an Intelligence Analyst, the FBI subjected her to a hostile work environment based on her sex beginning in January 2018, denied her reasonable accommodations for her disability, and retaliated against her after she opposed these and other unlawful employment practices.  She gave first notice of discrimination to the EEOC on February 8, 2018, while the conduct was still ongoing, and filed a timely complaint of discrimination and retaliation during Basic Training on May 8, 2018.  Ms. Wesley gave first notice of retaliation in her current position on June 6, 2019, and filed a timely complaint of retaliation on July 23, 2019.

14.     Plaintiff "B.A." is a female resident of the state of New York.  She was discharged from the FBI Academy as an Analyst Trainee on July 31, 2018, gave first notice of discrimination to the EEOC on November 26, 2018, and filed a timely complaint of discrimination on December 13, 2018.

15.     Plaintiff "D.A." is a female resident of the state of Maryland and is currently employed by the FBI as a Staff Operations Specialist.  She was discharged from the FBI Academy as an Agent Trainee on June 29, 2018, gave first notice of discrimination to the EEOC on July 2, 2018, and filed a timely complaint of discrimination on September 21, 2018.

16.     Plaintiff "S.B." is a female resident of the state of Maryland and is currently employed by the FBI as an Information Management Specialist.  She was discharged from the

FBI Academy as an Agent Trainee on September 20, 2017, gave first notice of discrimination to the EEOC on February 13, 2018, and filed a timely complaint of discrimination on March 12, 2018.

17.     Plaintiff "D.C." is a female resident of the Commonwealth of Virginia, and is currently employed by the FBI as an Intelligence Analyst.  She was discharged from the FBI Academy as an Agent Trainee on February 1, 2018, gave first notice of discrimination to the EEOC on March 2, 2018, and filed a timely complaint of discrimination on April 5, 2018.

18.     Plaintiff "P.E." is a female resident of the state of New York.  She was discharged from the FBI Academy as an Agent Trainee on October 25, 2016, gave first notice of discrimination to the EEOC on April 24, 2019, and filed a timely complaint of discrimination on April 24, 2019.

19.     Plaintiff "B.G." is a female resident of the state of New York.   She was discharged from the FBI Academy as an Agent Trainee on October 24, 2018, gave first notice of discrimination to the EEOC on October 31, 2018, and filed a timely complaint of discrimination on November 28, 2018.

20.     Plaintiff "W.M." is a female resident of the state of North Carolina, and is currently employed by the FBI as a Staff Operations Specialist.  She was discharged from the FBI Academy as an Agent Trainee on June 29, 2018, gave first notice of discrimination to the EEOC on July 17, 2018, and filed a timely complaint of discrimination on August 10, 2018.

21.     Plaintiff "C.S." is a female resident of the state of Arizona.  She was discharged from the FBI Academy as an Agent Trainee on July 14, 2017, gave first notice of discrimination to the EEOC on December 3, 2018, and filed a timely complaint of discrimination on February 6, 2019.

22.     Plaintiff "L.S." is a female resident of the state of California.  She was discharged from the FBI Academy as an Agent Trainee on October 2, 2015, and filed timely complaints of discrimination on January 16, 2016, and May 8, 2019.

23.     Plaintiff "G.T." is a female resident of the Commonwealth of Virginia.  She was discharged from the FBI Academy as an Agent Trainee on February 1, 2018, gave first notice of discrimination to the EEOC on February 14, 2018, and filed a timely complaint of discrimination on March 15, 2018.

## FACTUAL BACKGROUND

## I.     DISCRIMINATORY DISCHARGE PRACTICES

24.     Plaintiffs allege that the FBI discriminated against them and members of a proposed class of Agent and Analyst Trainees on the basis of sex in issuing suitability notations to female Agent Trainees and Analyst Trainees in the Academy's under circumstances where similarly situated men did not receive suitability notations, referring them for Suitability Review or to a disciplinary board called the Trainee Review Board (previously called the New Agent Review Board) when similarly situated men were not referred for review, and ultimately discharging them from the Basic Training program, without the opportunity for retraining  or retesting, when similarly situated men were permitted to graduate or return for further training. Plaintiffs allege that the FBI engaged in a pattern or practice of discrimination in terminations from Basic Training, and that the FBI's facially neutral suitability dimensions and process for evaluating Agent Trainees and Analyst Trainees, referring them for Suitability Review and to the Trainee Review Board, and terminating them had an adverse impact on women.

25.     The FBI's Training Division administers the Basic Training program for Agent Trainees and Analyst Trainees.  The Assistant Director of the Training Division is the decisionmaker for termination decisions involving Agent and Analyst Trainees.

26.     Plaintiffs seek to certify a proposed class that challenges gender bias against women in Basic Training in the issuance of suitability notations and subsequent placement in Suitability Review or referral to a Trainee Review Board that results in discriminatory terminations of female Agent and Analyst Trainees. The proposed class members fall into two groups, Agent Trainees and Analyst Trainees, which Plaintiffs seek to certify as subclasses.

**A.     Agent Trainee Program**

27.     Agent Trainees begin their training at the FBI Academy with Basic Training, a twenty-week course that contains six to eight weeks of academic courses and twelve to fourteen weeks of training and testing on law enforcement skills.  The law enforcement skills portion of Basic Training consists of three "blocks": Firearms Training, Physical Training/Defensive Tactics (one block), and Tactical Training.  During these blocks of training, Agent Trainees receive training from instructors called Supervisory Special Agents.

28.     In each of the three law enforcement skills training blocks, currently and at least since 2016, the Agent Trainees are evaluated using a rubric assigned to the particular block.  If a Supervisory Special Agent believes that an Agent Trainee has failed to demonstrate sufficient practical skills as required in one of these units, the Supervisory Special Agent may issue a "suitability notation" on the Agent Trainee's record.

29.     In addition to suitability notations for perceived practical skills deficiencies, Agent Trainees may receive suitability notations for perceived deficiencies in the FBI's "suitability dimensions," which are traits the FBI deems necessary for a person to be a suitable Special Agent.  The six suitability dimensions are: conscientiousness, cooperativeness, emotional maturity, initiative, integrity, and judgment.  Each of these dimensions is defined in the Basic Training Requirements Document with specific examples of suitable and unsuitable behavior.

Throughout Basic Training, Counselors (who oversee the Agent Trainees in their living quarters and are functionally part of the Trainee Management Unit) and Supervisory Special Agents evaluate the Agent Trainees using the suitability dimensions in addition to the practical skills rubric for each training unit.

30.     The Tactical Training block differs from the other training blocks for several reasons.  First, Trainees are simultaneously trained and evaluated in new competencies.  In the academic portion of Basic Training, as well as the Firearms Training block and the Physical Training/Defensive Tactics block, a significant amount of training is provided before Agent Trainees are assessed and evaluated.   In these other blocks of training, Agent Trainees have a clear transition from training to evaluation, with proficiency being tested on a clearly articulated date.

31.     In the Tactical Training block, Agent Trainees receive instruction in Concepts and Tactics for Survival and Care Under Fire before moving on to practical exercises. When the Agent Trainees begin the practical application programs in Tactical Training, they are expected to apply the tactical skills, often for the first time, while simultaneously being evaluated.

32.     During the practical applications programs within the Tactical Training block, Agent Trainees are "expected to demonstrate a familiar application of tactical concepts and the FBI deadly force policy."  Further, during a practical application program that involves paint gun exercises, the Agent Trainees are required to "execute the basic concepts and tactics for survival and apply appropriate judgment."  During each of the practical applications programs within Tactical Training, Supervisory Special Agents evaluate Agent Trainees using a detailed Tactical Training Rubric.

33.     The Tactical Training Rubric that applies to the practical exercises in the Tactical Training Unit evaluates Agent Trainees on critical elements and tactical principles.

34.     The tactical principles on which Agent Trainees are evaluated are: (1) intelligence, (2) planning, (3) superiority of personnel and firepower, (4) continually assess the situation and adapt as necessary, (5) cover and concealment, (6) clear communications, (7) control of self, subjects, and environment, and (7) tactical judgment.  Each tactical principle is defined with examples of behavior that "fails to meet standards," "partially meets standards," and "meets standards."

35.     Except for the "critical elements" described below, the Tactical Training Rubric does not provide guidance on when the deficiency or partial deficiency in a tactical principle should result in a suitability notation.  Female Agent Trainees receive suitability notations for tactical principles in Tactical Training more frequently than similarly situated male trainees.

36.     In assessing the "critical elements" in Tactical Training, Supervisory Special Agents look for the following deficiencies:

    a.     "Violates deadly force policy"

    b.     "Accidentally discharges weapon"

    c.     "Failure to apply deadly force, when appropriate and necessary, to avoid loss of life (dereliction of duty)"

    d.     "Lacks muzzle discipline (e.g. points muzzle at teammate or instructor)"

    e.     "Improper handling, transporting, or loading of weapon (e.g. rests finger on trigger, unable to resolve malfunction, weapon drawn when interviewing, leaves weapon unsecured"

37.     According to the Tactical Training Rubric, a violation of one of the critical elements should automatically result in a suitability notation.  In practice, however, not every violation of a critical element results in a suitability notation.  Female Agent Trainees receive

suitability notations for perceived violations of critical elements more frequently than similarly situated male Agent Trainees who engaged in the same behaviors.

38.     Through its simultaneous practical application and evaluation, the Tactical Training block assumes that tactical skills are innate rather than learned skills.  Indeed, Supervisory Special Agents who serve as instructors for this block have explicitly articulated their beliefs that the practical exercises test innate attributes that cannot be taught.  Due to gender-based stereotypes that assume men have better tactical instincts, female Agent Trainees are judged more harshly than male Agent Trainees in the Tactical Training block of Basic Training.  Female Agent Trainees are singled out in group tactical exercises because they are perceived as being weak, prone to failure, or not intuitively understanding law enforcement tactics.  By singling out female Agent Trainees, they are put in situations far more frequently that result in suitability notations.  Female Agent Trainees receive more unjustified suitability notations than similarly situated male Agent Trainees.

39.     Female Agent Trainees are issued suitability notations more frequently for perceived deficiencies in the suitability dimensions than similarly situated male Agent Trainees. Such differences may be driven by gender-based stereotypes that result in behavior being adjudged "command presence" when exhibited by a male Agent Trainee who explains his choice of action that an instructor criticized, but "failure to accept responsibility" or "lack of integrity" when a female Agent Trainee provides a similar explanation.

40.     As will be described in further detail below, suitability notations may result in an Agent Trainee being placed in a Suitability Review, or before a Trainee Review Board, which recommends whether the Agent Trainee should be (1) returned to Basic Training in her original class; (2) "recycled," or returned to Basic Training in a different class and allowed to retake the

courses or tests; or (3) discharged from Basic Training  Upon information and belief, female Agent Trainees are referred to the Trainee Review Board more frequently than similarly situated male Agent Trainees.  Further, female Agent Trainees who are referred for Suitability Review or to appear before the Trainee Review Board are not allowed to retrain or re-enroll in the course (including being recycled into a different class) more frequently than similarly situated male Agent Trainees.  Female Agent Trainees who are referred for Suitability Review or to appear before the Trainee Review Board are discharged from Basic Training more frequently than similarly situated male Agent Trainees.

### B.    Analyst Trainee Program

41.    Analyst Trainees begin their training at the FBI Academy with 12 weeks in Basic Training.  During the first approximately six to eight weeks, Analyst Trainees and Agent Trainees attend academic courses together.  When the Agent Trainees move on to law enforcement skills training units, Analyst Trainees continue with additional academic and intelligence curriculum.

42.    Throughout Basic Training, Analyst Trainees are evaluated on job-related skills and suitability.  Thus, throughout Basic Training, they may receive suitability notations for perceived deficiencies in the FBI's suitability dimensions: conscientiousness, cooperativeness, emotional maturity, initiative, integrity, and judgment.  These are the same suitability dimensions that apply to the Agent Trainees and each is defined in the Basic Training Requirements Document with specific examples of suitable and unsuitable behavior.  Throughout Basic Training, Counselors (who oversee the Analyst Trainees in their living quarters) and Supervisory Intelligence Analysts evaluate the Analyst Trainees using the suitability dimensions.

43.     Upon information and belief, female Analyst Trainees are issued suitability notations more frequently for perceived deficiencies in the suitability dimensions than similarly situated male Analyst Trainees.  Such differences may be driven by gender-based stereotypes that result in behavior being judged negatively when female Analyst Trainees fail to conform to gender norms.  For example, when a female Analyst Trainees act assertively, in contravention of gender expectations, and explains her choice of action that an instructor criticized, she is adjudged as failing to accept responsibility or lacking integrity.

44.     Suitability notations may result in an Analyst Trainee being placed in a Suitability Review or sent before a Trainee Review Board.  Upon information and belief, female Analyst Trainees are referred for Suitability Review or to the Trainee Review Board more frequently than similarly situated male Analyst Trainees; female Analyst Trainees who are referred for discipline are not allowed to retrain or re-enroll in the course (including being recycled into a different class) more frequently than similarly situated male Analyst Trainees; and female Analyst Trainees who are referred for discipline are discharged from Basic Training more frequently than similarly situated male Analyst Trainees.

**C.     Discipline and Discharge Processes**

45.     The Training Division is comprised of three sections: Curriculum Management, which is responsible for the Academic block of instruction; the Instruction Section, which is responsible for teaching three non-academic training blocks; and the Training Services Section, which includes the Trainee Management Unit, which handles administrative matters related to trainees.  The Supervisory Special Agents who serve as instructors in the non-academic blocks work in units within the Instruction Section, with a separate unit for each block of instruction. The Counselors mentioned above, who live with the Trainees in the dorms, participate in classes

and training with them, and who, like instructors, may also issue suitability notations, are part of the Trainee Management Unit.

46.     The Trainee Management Unit may decide to put Agent Trainees or Analyst Trainees who receive suitability notations through a Suitability Review.  The Trainee Management Unit may initiate such a review at the suggestion of one of the instructional units, or Executive Management of the Training Division, or on its own initiative.  Agent Trainees and Analyst Trainees who are placed under Suitability Review may be removed from their Basic Training curriculum during the review process.

47.     During a Suitability Review, the Trainee Management Unit will provide the Training Division Executive Management with the Trainee's suitability notations, counseling records, and other undefined sources, as well as a recommendation whether the Trainee should be able to remain in Basic Training.  Upon information and belief, the Assistant Director of the Training Division will review these materials and determine whether the Trainee should continue with Basic Training (either remaining in her original class or being recycled into a different class), be discharged, or sent before the Trainee Review Board.  Even without a Suitability Review, the Training Division Deputy Assistant Director may refer Agent Trainees and Analyst Trainees to the Trainee Review Board.

48.     The Trainee Review Board consists of the following individuals: the Deputy Assistant Director who serves as chair; three Section Chiefs (the Curriculum Management Section Chief, the Instruction Management Section Chief, and the Training Services Section Chief), who serve as board members; the Trainee Management Unit Chief, who serves as a board member; one minority representative at the GS-15 level, who serves as a board member; and at times, an Office of General Counsel representative, who serves as legal advisor.

49.     The purpose of the Trainee Review Board is to create a factual record and to provide a recommendation to the Assistant Director of the Training Division about whether to permit the trainee to remain in her Basic Training class and graduate with her class, recycle the Trainee to a different class, or to discharge the trainee.  The Assistant Director of the Training Division makes the determination whether to discharge the trainee.  If the trainee is discharged, then that decision is reviewed by the Assistant Director of the Administrative Services Division.

50.     The Deputy Assistant Director determines who may attend and serve as witnesses for the Trainee Review Board. The attendees and witnesses may or may not include the trainee's classmates, instructors, the Trainee Management Unit Chief, Supervisory Special Agents, Counselor(s), and any other individuals the Deputy Assistant Director deems relevant.

51.     The Basic Training Requirements document provides that Agent Trainees and Analyst Trainees may be discharged from Basic Training for failure to meet the proficiency standards (such as those outlined in the Tactical Training Rubric), exhibiting behavior inconsistent with the suitability dimensions, failure to adhere to the Standards of Conduct (a set of ethical standards), and failure to adhere to the FBI Academy Honor Code (a set of ethical standards that relates specifically to the Academy and its training components).

52.     Alternatively, Agent Trainees and Analyst Trainees may be "recycled," that is, returned to Basic Training and allowed to retake the courses or tests.  The Basic Training Requirements document describes the circumstances under which an Agent Trainee or Analyst Trainee may be recycled for: medical reasons, excessive absences or absences from mandatory training sessions in the physical training, defensive tactics, and firearms blocks; failing the firearms test or re-test; or failing the physical fitness test.  The Basic Training Requirements

document provides that New Agent Trainees who fail the Tactical Skills Test may re-take the test once, unless their failure was "egregious."

53.     The decisionmakers apply internal biases against women in applying the proficiency standards and suitability dimensions to female Agent Trainees and Analyst Trainees. As result female Agent Trainees and Analyst Trainees are allowed to be recycled into Basic Training less frequently than similarly situated male Agent Trainees and Analyst Trainees. Further, female Agent Trainees and Analyst Trainees are discharged from Basic Training following a Suitability Review or Trainee Review Board more frequently than male Agent Trainees and Analyst Trainees.

54.     Trainee Management Unit management and instructors actively seek out derogatory information, or "gossip," about female trainees from other instructors and counselors in order to levy additional suitability notations against female trainees.  However, readily observed violations of the Requirements Document committed by male Trainees are ignored.

## II.    AGENT TRAINEE SUBCLASS ALLEGATIONS

55.     Plaintiffs Paula Bird, Clare Coetzer, Lauren Rose, Danielle Snider, "D.A.", "S.B.", D.C.", "P.E.", "W.M.", "C.S.", "L.S.", "G.T.", ("Agent Trainee Plaintiffs") bring this action pursuant to 42 U.S.C. § 2000(e), *et seq*. and seek certification of a subclass pursuant to Rule 23, Fed. R. Civ. P, comprised of all Agent Trainees who received suitability notations and were discharged from the FBI Academy's Basic Training after appearing before a Trainee Review Board  or equivalent, or after a Suitability Review ("Agent Trainee Subclass") from April 17, 2015, through the first day of trial in this action.  Plaintiffs are members of the subclass they seek to represent.

56.     Defendant's policy, pattern, or practice of discrimination in discharging Agent Trainees based on sex, or Defendant's practice having a disparate impact based on sex, operated within 45 days of the first complaint of discrimination and unlawfully caused the discharge of one or more named plaintiffs.

57.     Agent Trainee Plaintiffs reserve the right to revise the definition of the subclass based upon information learned after the filing of this action.

58.     Agent Trainee Plaintiffs bring these claims on behalf of themselves and the Agent Trainee Subclass under Federal Rules of Civil Procedure 23(a), (b)(2) for their requests for declaratory and injunctive relief only, and (b)(3) for their requests for damages.  The proposed Agent Trainee Subclass satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those rules.

59.     **Numerosity**: The proposed Agent Trainee Subclass is so numerous that the joinder of all such persons is impracticable, and the disposition of their claims as a subclass will benefit the parties and the Court.  Upon information and belief, more than 50 Agent Trainees would qualify as members of the proposed subclass.  Membership in the subclass is ascertainable from the FBI's Basic Training records.

60.     **Commonality**: Plaintiffs and all members of the Agent Trainee Subclass have been subjected to termination using the unlawful practices alleged herein and, therefore, one or more questions of law or fact are common to the Agent Trainee Subclass.  These common questions include, but are not limited to, the following:

     a.     whether the FBI's common operating practices and procedures in its Basic Field Training Course discriminate against female Agent Trainees;

     b.     whether the FBI's common policies have had an adverse impact on the subclass, and if so, whether such impact can be justified by business necessity;

     c.     whether the FBI has acted intentionally to discharge female Agent Trainees from the Basic Field Training Course because of their sex;

d.      whether the Agent Trainee Subclass may obtain injunctive and other equitable remedies, as well as an award of damages.

61.      **Typicality**: Agent Trainee Plaintiffs and members of the Agent Trainee Subclass were subjected to the same unlawful policies, practices, and procedures and sustained similar losses, injuries, and damages.  All subclass members were subjected to the same training practices by the FBI in the Academy's Basic Field Training Course, as alleged herein, that resulted in their discriminatory discharge from the program.  Agent Trainee Plaintiffs' claims are therefore typical of the claims that could be brought by any member of the Agent Trainee Subclass, and the relief sought is typical of the relief that could be sought by each member of the Agent Trainee Subclass in separate actions.

62.      **Adequacy of Representation**: Agent Trainee Plaintiffs are able to fairly and adequately protect the interests of all members of the Agent Trainee Subclass, as they are challenging the same practices as the class as a whole, and there are no known conflicts of interest between Agent Trainee Plaintiffs and the members of the Agent Trainee Subclass. Plaintiffs have retained counsel who have extensive experience with the prosecution of discrimination claims and complex class-action litigation.

63.      This action is properly maintainable as a class action under Rule 23(b)(2), Fed. R. Civ. P., because the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

64.      The class action is also properly maintainable pursuant to Rule 23(b)(3) because the questions of law and fact common to members of the class predominate over questions affecting only individual members and a class action is superior to other available methods for the fair and efficient resolution of this controversy.

65.     Pursuit of this action as a class would provide the most efficient mechanism for adjudicating the claims of Agent Trainee Plaintiffs and the members of the Agent Trainee Subclass.

**III.    ANALYST TRAINEE SUBCLASS ALLEGATIONS**

66.     Plaintiffs Spencer Lee and B.A. ("Analyst Trainee Plaintiffs") bring this action pursuant to 42 U.S.C. § 2000(e), *et seq.* and seek certification of a subclass pursuant to Rule 23, Fed. R. Civ. P, comprised of all Analyst Trainees who received suitability notations based on suitability dimensions and were discharged from the FBI Academy's Basic Training after appearing before a Trainee Review Board or equivalent, or after a Suitability Review ("Analyst Trainee Subclass") from the April 17, 2015, through the first day of trial in this action.  Plaintiffs are members of the subclass they seek to represent.

67.     Defendant's policy, pattern, or practice of discrimination in discharging Agent Trainees based on sex, or Defendant's practice having a disparate impact based on sex, operated within 45 days of the first complaint of discrimination and unlawfully caused the discharge of one or more named plaintiffs.

68.     Plaintiffs Spencer Lee and B.A. reserve the right to revise the definition of the subclass based upon information learned after the filing of this action.

69.     Plaintiffs Spencer Lee and B.A. bring these claims on behalf of themselves and the Analyst Trainee Subclass under Federal Rules of Civil Procedure 23(a), (b)(2) for their requests for declaratory and injunctive relief only, and (b)(3) for their requests for damages.  The proposed Analyst Trainee Subclass satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those rules.

70.     **Numerosity**: The proposed Analyst Trainee Subclass is so numerous that the joinder of all such persons is impracticable, and the disposition of their claims as a subclass will benefit the parties and the Court.  Upon information and belief, more than 50 Analyst Trainees would qualify as members of the proposed subclass.  Membership in the subclass is ascertainable from the FBI's employment records.

71.     **Commonality**: Plaintiffs Spencer Lee and B.A. and all members of the Analyst Trainee Subclass have been subjected to termination using the unlawful practices alleged herein and, therefore, one or more questions of law or fact are common to the Analyst Trainee Subclass. These common questions include, but are not limited to, the following:

   a.     whether the FBI's common operating practices and procedures in its Basic Field Training Course discriminate against female Analyst Trainees;

   b.     whether the FBI's common policies have had an adverse impact on the subclass, and if so, whether such impact can be justified by business necessity;

   c.     whether the FBI has acted intentionally to discharge female Analyst Trainees from the Basic Field Training Course because of their sex;

   d.     whether the Analyst Trainee Subclass may obtain injunctive and other equitable remedies, as well as an award of damages.

72.     **Typicality**: Plaintiffs Spencer Lee and B.A. and members of the Analyst Trainee Subclass were subjected to the same unlawful policies, practices, and procedures and sustained similar losses, injuries, and damages.  All subclass members were subjected to the same training practices by the FBI in the Academy's Basic Field Training Course, as alleged herein, that resulted in their discriminatory discharge from the program.  Plaintiffs Spencer Lee's and B.A.'s claims are therefore typical of the claims that could be brought by any member of the Analyst Trainee Subclass, and the relief sought is typical of the relief that could be sought by each member of the Analyst Trainee Subclass in separate actions.

73.     **Adequacy of Representation**: Plaintiffs Spencer Lee and B.A. are able to fairly and adequately protect the interests of all members of the Analyst Trainee Subclass, as they are

challenging the same practices as the subclass as a whole, and there are no known conflicts of interest between Spencer Lee and B.A. and the members of the Analyst Trainee Subclass. Plaintiffs have retained counsel who have extensive experience with the prosecution of discrimination claims and complex class-action litigation.

74.     This action is properly maintainable as a class action under Rule 23(b)(2), Fed. R. Civ. P., because the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

75.     The class action is also properly maintainable pursuant to Rule 23(b)(3) because the questions of law and fact common to members of the class predominate over questions affecting only individual members and a class action is superior to other available methods for the fair and efficient resolution of this controversy.

76.     Pursuit of this action as a class would provide the most efficient mechanism for adjudicating the claims of Plaintiffs Spencer Lee and B.A. and the members of the Analyst Trainee Subclass.

## IV.     NAMED PLAINTIFF ALLEGATIONS

### PAULA BIRD

77.     Plaintiff Paula Bird, a woman, graduated summa cum laude from the University of Central Florida at the age of nineteen, with a Bachelor of Science in Psychology and a Certificate in Behavioral Forensics.  While she was at the University of Central Florida, Ms. Bird interned over the summer with the FBI in Washington, D.C.  She subsequently continued her internship with the FBI in the Maitland Resident Agency of the Tampa Division for a year prior to attending law school.  Ms. Bird graduated in the top 10% of her class from Barry University Dwayne O'Andreas School of Law, after which she practiced law for over six years.

78.     In 2018, Ms. Bird attended Basic Training as an Agent Trainee.  During Basic Training, Ms. Bird passed the physical fitness test, all academic tests, the pistol and carbine qualifications, the defensive tactics test, and other performance tests and evaluations.

79.     Ms. Bird received seven suitability notations, all from the Tactical Training block. Of the seven suitability notations, three were wholly unrelated to tactical performance: she was disciplined for not having the appropriate equipment with her upon arrival at training exercise.

80.     The other four suitability notations were for tactical mistakes.  For at least three of these tactical mistakes, Ms. Bird received a suitability notation while a male peer who acted in the same manner did not receive a suitability notation.  For example, then-Tactical Training Unit Chief Randall Glass issued Ms. Bird a suitability notation for applying appropriate deadly force to a paper target holding a firearm during a training exercise because neither she, nor her male partner, had a flashlight out.  Mr. Glass chastised Ms. Bird (but not her male partner) for not using a flashlight before entering the room and stated that "for all [she] knew, the paper target could have been holding a remote control."  At least one male Agent Trainee made the same "mistake" in front of Mr. Glass during the same exercise on the same day and was not issued a suitability notation.

81.     After receiving these suitability notations, the Trainee Management Unit initiated a Suitability Review and Ms. Bird was sent before a Trainee Review Board.  Of the Agent Trainees in Ms. Bird's class, only Ms. Bird, another female Agent Trainee, and a male Agent Trainee were sent before the Trainee Review Board.  Ms. Bird and the other female Agent Trainee were discharged without being allowed to take the tactics test, while the male Agent Trainee was permitted to take the test and graduate.  The male Agent Trainee who was permitted to graduate was later told by their class supervisor, Supervisory Special Agent Christopher

Neuguth, that he was only sent to the Trainee Review Board because the board was concerned that it would appear that the Academy was targeting women if they did not have at least one male Agent Trainee appear before the Trainee Review Board.  The male Agent Trainee was never in danger of being discharged and was only required to appear in front of the Trainee Review Board to create a false appearance of fairness.

82.     The Assistant Director of the Training Division discharged Ms. Bird on May 1, 2018, three weeks before graduation.  Ms. Bird was not offered any sort of remedial tactical training, as is the standard with other units in the Basic Training curriculum.  Additionally, prior to her discharge, Ms. Bird was advised that the Human Resources Department would offer her one support staff position (after reviewing her resume) which she could either accept or reject.

**CLARE COETZER**

83.     Clare Coetzer, a woman, earned a Bachelor of Arts in Psychology, a Master of Arts in Social Work, and obtained a clinical license to practice independently.  Ms. Coetzer worked as a social worker for 5 years, during which she successfully helped pilot a new program in Monterey County, CA, where mental health professionals partnered with law enforcement to address mental health crises in the field.

84.     In 2018, Ms. Coetzer attended Basic Training as an Agent Trainee.  During Basic Training, Ms. Coetzer passed the physical fitness test on numerous occasions, all academic tests, the pistol and carbine firearms qualifications, the defensive tactics test, and other performance tests and evaluations.

85.     Ms. Coetzer received four suitability notations, all from the Tactical Training Unit for deficiencies noted during tactical training scenarios.  Two suitability notations were for scenarios that the majority of the class failed.

86.     Ms. Coetzer was treated less favorably than male colleagues who received the same number of suitability notations. During a meeting with the primary tactical instructor, Supervisory Special Agent Paul Herron, and the class counselor, Mr. Herron told a male classmate with four suitability notations that he would "be fine" and "to keep working hard, and not worry about it."  Only minutes after, Mr. Herron told Ms. Coetzer that her four suitability notations were "a lot" and that "people don't typically graduate with four SNs."  This same male classmate later failed his tactics exam twice; and instead of following protocol for an automatic discharge from Basic Training, he was recommended for a Trainee Review Board in an effort to retain him despite his failures.

87.     On June 12, 2018, Ms. Coetzer overheard two male colleagues question their suitability notations to the Mr. Herron and their suitability notations were rescinded.  No such reconsideration was afforded to female trainees.  If anything, questioning their suitability notations resulted in being issued additional suitability notations.

88.     On June 18, 2018, Ms. Coetzer was informed by her counselor that she had been placed under Suitability Review for tactical deficiencies.  Four of the nine women in Ms. Coetzer's class were recommended by Tactical Training Unit instructors for a Suitability Review, whereas only two of the thirty men in her section were recommended by Tactical Training Unit instructors for a Suitability Review.

89.     Although Ms. Coetzer had demonstrated improvement, Ms. Coetzer was sent before the Trainee Review Board, without a chance to take the tactics exam. When Ms. Coetzer asked Mr. Herron for feedback on how she could continue to improve, he responded that there was nothing she could do.  He told her she was "not aggressive enough or decisive enough" and remarked, "You can't teach judgement."

90.     After Ms. Coetzer appeared before the Trainee Review Board, the Assistant Director of the Training Division discharged Ms. Coetzer from Basic Training on June 29, 2018. She was not offered any sort of remedial tactical training, as is the standard with other units in the BFTC curriculum.

## SPENCER LEE

91.     Plaintiff Spencer Lee, a woman with a disability, holds a bachelor's degree in Psychology and Criminal Justice, a Master's degree in Clinical Mental Health Counseling, and is currently studying Biomedical Sciences at the University of South Florida while preparing for enrollment in Medical School.  Prior to attending Basic Training, Ms. Lee was employed by the FBI as an Investigative Specialist for the Special Surveillance Group in Kansas City.  Ms. Lee experienced sexual harassment while working in the FBI office in Kansas City, and filed an internal complaint.  As part of the resolution of that complaint, Ms. Lee entered Basic Training as an Analyst Trainee, in part to get away from the hostile work environment in Kansas City.

92.     Ms. Lee has debilitating migraines which substantially limit major life activities and substantially limit major bodily functions when they are active.  These migraines can be triggered by certain smells and dehydration, and her symptoms are exacerbated if Ms. Lee is hungry.  Prior to attending Basic Training, Ms. Lee followed the protocol for requesting reasonable accommodations, including permission to have a personal refrigerator in her dormitory room to store her medications, to carry water with her to class, and to eat small amounts of food outside of designated mealtimes.  Although the FBI initially granted such reasonable accommodations, it did not adequately follow through and later denied Ms. Lee her accommodations.

93.     In 2018, Ms. Lee. attended Basic Training as an Analyst Trainee.  During Basic Training, Ms. Lee passed all of her academic tests and job-related requirements.

94.     On or about February 7, 2018, Ms. Lee's counselor, Intelligence Analyst Vanessa Bouey, conducted an inspection of Ms. Lee's dormitory and disciplined her for having a refrigerator and storing medicine.  After the inspection, Ms. Bouey addressed Ms. Lee's classroom, stating that she had found "contraband" in Ms. Lee's and Ms. Wesley's rooms. As will be described below, Ms. Wesley has a disability and had requested reasonable accommodations.  When Ms. Bouey stated that she found contraband in their rooms, she was referring to Ms. Lee's and Ms. Wesley's medical accommodations.  Although Ms. Bouey found prohibited items in other rooms, she named only Ms. Lee and Ms. Wesley in this lecture.  In subjecting Ms. Lee to ridicule and discipline for storing her medication in a personal refrigerator, Ms. Bouey effectively denied her reasonable accommodations.  Ms. Lee suffered adverse health effects from the denial of these accommodations, which required outside medical intervention and treatment.

95.     Ms. Lee received three suitability notations for minor or falsely claimed infractions of the suitability dimensions.  First, on January 30, 2018, Ms. Lee received a suitability notation from her field counselor, Special Agent Daniel Zwiesler, for failing to swallow a small bit of food she was chewing prior to entering the classroom.  Although Defendant had agreed that it would allow Ms. Lee to eat small amounts several times per day and frequently drink water, where eating in the classrooms was otherwise barred, it denied her this accommodation when Mr. Zwiesler disciplined her for eating.  When she contested the suitability notation, Mr. Zwiesler accused her of having a lack of candor.  Second, February 22, 2018, Ms. Lee received a suitability notation for entering the classroom carrying water in a sealed container, which Mr. Zwiesler and Ms. Lee's counselor, Intelligence Analyst Vanessa Bouey, arbitrarily determined was not spill-proof and therefore violated the rules.  Again, Ms.

Lee was denied her reasonable accommodation.  On March 1, 2018, Ms. Lee received her third

suitability notation for asking for her first duty assignment to be changed to a different location.

96.     Ms. Lee received these suitability notations for minor infractions and

misunderstandings, while similarly situated male Analyst Trainees did not receive suitability

notations for more severe infractions, including the pervasive sexual harassment of Plaintiff B.A.

97.     After Ms. Lee's third suitability notation, Trainee Management Unit Chief Kellie

Holland placed Ms. Lee under Suitability Review.  On March 8, 2018, Ms. Lee was required to

appear before a Trainee Review Board.  Ms. Bouey testified before the Trainee Review Board,

that Ms. Lee had "contraband" in her room, again referring to Ms. Lee's reasonable

accommodations.  The Board recommended Ms. Lee be discharged from Basic Training.  On

March 9, 2018, the Acting Assistant Director of the Training Division discharged Ms. Lee from

Basic Training.

**LAUREN ROSE**

98.     Plaintiff Lauren Rose, a woman, graduated from Liberty University in 2007 with

a Bachelor of Science in Psychology and Communications.  Ms. Rose entered on duty with the

FBI in September 2009, where she worked in professional staff positions for more than five

years.

99.     In 2015, Ms. Rose attended Basic Training (then called "New Agents Training")

as an Agent Trainee.  During Basic Training, Ms. Rose passed all academic exams, the physical

fitness test, pistol and carbine firearms qualifications, and defensive tactics tests without

incident.

100.     Ms. Rose received three suitability notations, all from the Tactical Training Unit

(then called the Practical Applications Unit).  Several male trainees made the same, and more

egregious, tactical mistakes but were not written up or counseled accordingly.

101.    After her third suitability notation, Ms. Rose was placed under Suitability Review

and a Trainee Review Board (then called the New Agent Review Board) was convened.  On May

19, 2015, Ms. Rose appeared before the Trainee Review Board and on May 20, 2015, the

Assistant Director of the Training Division discharged Ms. Rose from Basic Training, just one

week prior to graduation.  When she asked if she could be recycled, Ms. Rose was informed the

Academy did not recycle for tactics.  However, within that same fiscal year, another male Agent

Trainee had been recycled for issues arising from the tactical portion of the training and was later

allowed to graduate.

102.    On May 25, 2015, Ms. Rose wrote an email to then-Director James Comey

informing him of the prejudicial and discriminatory practices running rampant at the FBI

Academy.  She requested reinstatement and stated that she was not permitted to meet with the

Assistant Director to learn why she was discharged rather than recycled.  In his response,

Director Comey denied such discrimination was occurring and instead suggested she use her

"pain" to reflect on her strengths and weaknesses.  On June 5, 2015, Ms. Rose sent letters to

then-Assistant Directors Owen Harris (Training Division) and James Turgal (Human Resources

Division) notifying them of the unequitable treatment of female trainees at the FBI Academy.

No response was received.  Ms. Rose filed a timely complaint of discrimination on August 3,

2015.

103.    On July 27, 2015, Ms. Rose applied for Reinstatement pursuant to FBI Special

Agent Reinstatement Policy 0323D 8.8.  Included in her request for reinstatement was

notification of the uneven distribution of suitability notations.  On August 15, 2016, Ms. Rose

again requested consideration for reinstatement via FBI Corporate policy by sending a formal

letter to then-Assistant Director of Training Division David Resch.   Ms. Rose has communicated

with Human Resources Division and Training Division, in writing, about her request for

reinstatement several times over the course of more than three years.  On October 5, 2018, Ms.

Rose was effectively denied her request for reinstatement by Training Division Counsel Amy

Armstrong.  Ms. Rose subsequently filed a timely complaint of retaliation and discrimination on

December 10, 2018.

### DANIELLE SNIDER

104.    Plaintiff Danielle Snider, a woman, earned a Bachelor of Science degree in

Behavioral Science and Arabic from the United States Air Force Academy.  She served on active

duty in the United States Air Force for four years, during which she obtained the rank of Captain.

After that, Ms. Snider earned a Master of Arts from the University of Kansas in Political

Psychology and African Studies.  Ms. Snider is currently an Air Force Reserve Captain.

Immediately prior to starting at the FBI, she worked at the National Counterterrorism Center

(NCTC) as an Intelligence Analyst and is a graduate of the Central Intelligence Agency Sherman

Kent Career Intelligence Analyst Course and an honor graduate of the U.S. John F. Kennedy

School of Special Warfare Psychological Operations Qualification Course.

105.    In 2017, Ms. Snider attended Basic Training as an Agent Trainee.  During Basic

Training, Ms. Snider passed the physical fitness test on numerous occasions, all academic tests,

the pistol and carbine firearms qualifications, and other performance tests and evaluations.

106.    Ms. Snider received five suitability notations, all from the Tactical Training Unit.

Ms. Snider observed male Agent Trainees make some of the same alleged mistakes for which

she earned suitability notations, but these men did not receive suitability notations.  Ms. Snider

had no previous adverse marks on her record during Basic Training, and was told by a

Supervisory Special Agent that she was in the top 25 out of her class of 150 students.

107.    After Ms. Snider received these suitability notations, the Trainee Management Unit initiated a Suitability Review on January 30, 2018, and on January 31, 2018, the Executive Management of the Training Division convened a Trainee Review Board. After Ms. Snider appeared before the Trainee Review Board, the Assistant Director of the Training Division discharged Ms. Snider two weeks prior to graduation for failure to demonstrate tactical judgement during the tactical skills portion of her training.

108.    Of the approximately 30 female Agent Trainees and approximately 120 male Agent Trainees in Ms. Snider's class, five women and one man appeared before the Trainee Review Board.  All five women were discharged.  The only Agent Trainee in Ms. Snider's class who was allowed to graduate after appearing before the Trainee Review Board was a man. Students and instructors who observed the male Agent Trainee's mistakes described them as "so egregious," and outside the norm of lawful law enforcement behavior.  At least two other male Agent Trainees had received the same number or more suitability notations than the female Agent Trainees who were ultimately discharged, but these male Agent Trainees were not brought before the Trainee Review Board and were allowed to graduate from Basic Training.

109.    Ms. Snider was not given the opportunity to retrain or be recycled into a different class. Members of the Trainee Review Board told Ms. Snider and the four other female Agent Trainees that there was not enough time to retrain them before graduation.  However, when several male New Agent Trainees in her class failed the tactical training final exam, they were given additional training and allowed to retest less than two weeks before graduation.  In addition, a male Agent Trainee in Ms. Snider's class failed the physical fitness test, an academic test, and the Tactical Training test, but was not submitted a to review board and was allowed to graduate.

**ERIKA WESLEY**

110.    Plaintiff Erika Wesley, a woman with a disability, earned a Bachelor of Business Administration from the College of William and Mary.  Ms. Wesley earned a Master's Degree in Criminology from the University of Essex in England at age 21, where she also worked for the Disabled Students Services Department.  Ms. Wesley completed one year of Law School at Pepperdine University prior to accepting a position with the FBI.  Ms. Wesley worked for the FBI for six years, earning several performance awards and promotions.  Ms. Wesley voluntarily separated from the FBI in 2010, just prior to the birth of her first child.  Ms. Wesley applied for reinstatement in 2014, and received a conditional offer of employment in 2016.

111.    Ms. Wesley has a medical condition that substantially limits major life activities and major bodily functions when it is active or "flaring up."  It impairs her ability to sit for long periods of time, causes migraines, severe allergies, and other debilitating symptoms.  Prior to attending Basic Training, Ms. Wesley followed the protocol for requesting reasonable accommodations, including permission to place a personal refrigerator in her dormitory room and permission to place a medical grade air purifier in her dormitory room.  Although the FBI initially granted such reasonable accommodations, it did not adequately follow through and later denied Ms. Wesley her accommodations.

112.    In 2018, Ms. Wesley attended Basic Training as an Analyst Trainee.  During Basic Training, Ms. Wesley passed all final tests and evaluations.  She demonstrated outstanding academic and professional performance, and did not receive any suitability notations for failing to meet objective standards.

113.    Meanwhile, however she was subjected to pervasive harassment based on her sex, and retaliation after she reported discrimination that she witnessed on multiple occasions.

114.    Ms. Wesley was subjected to a hostile work environment based on her sex.  Ms. Wesley's Counselor repeatedly claimed that Ms. Wesley had become pregnant while engaged in an extramarital affair during her time at the Academy, which was completely untrue.  Ms. Wesley was subjected to frequent inappropriate sexually-charged commentary by male instructors and counselors, including frequent comments about women needing to take their birth control to control their moods, inviting female trainees over to a male instructor's home for special "after hours" attention, and openly disparaging women.

115.    Several of Ms. Wesley's instructors in the Tactical Training Unit responded with derision when Ms. Wesley or any other female Analyst Trainee asked a question, but usually responded genially when a male Analyst Trainee asked a question.  Ms. Wesley was frequently subjected to intimidation tactics and threatened with dismissal over minor and even fabricated incidents failing to rise to the level of suitability violations, where male Agent Trainees were granted leniency for serious violations of suitability standards.  For example, on one occasion, Supervisory Intelligence Analyst Brian Moses threatened Ms. Wesley with a suitability notation for tying her uniform jacket around her waist, claiming that this was not an approved manner to wear her uniform.  Ms. Wesley observed that instructors would often reprimand female Analyst Trainees over behavior that did not violate any job-related proficiencies or suitability dimension and they would use the Trainees' responses to issue suitability notations.  For example, if the female Analyst Trainees did not contest the feedback she was accused of being too deferential, but if she contested the feedback she was accused of being insubordinate.

116.    In addition, Ms. Wesley was publicly harassed about her physical limitations and disabilities.  On several occasions, Ms. Wesley's field counselor, Mr. Zweisler, questioned her derisively about the small bag she took to class containing allergy medications, which Ms.

32

Case 1:19-cv-01581-JMC   Document 22   Filed 09/12/19   Page 33 of 71

Wesley needed to keep on her person in case of a life-threatening allergic reaction.  He accused her of violating the rules for bringing it and when Ms. Wesley explained the need for it, he told her to keep the medications down the hall.  In subjecting Ms. Wesley to ridicule and threats for carrying her bag of medications to class, Mr. Zwiesler effectively denied her a reasonable accommodation.

117.    Ms. Wesley reported discrimination on several occasions.  First, on or about January 16, 2018, she informed her counselor, Intelligence Analyst Vanessa Bouey that Mr. Zwiesler had challenged her disability accommodations in an abusive manner that humiliated Ms. Wesley.  Ms. Wesley also informed Ms. Bouey that she had a medical issue that required her to use the bathroom more frequently than the allotted breaks.

118.    Rather than address Ms. Wesley's complaints, the FBI retaliated against her. After this conversation, Ms. Bouey publicly referenced Ms. Wesley's accommodations on multiple occasions in a way that Ms. Wesley felt violated her privacy and added unnecessary physical and mental stress to her training.  In addition. shortly after Ms. Wesley complained to Ms. Bouey about Mr. Zwiesler, he began ignoring her.  He would not make eye contact with her and would avoid interacting with her.  Upon information and belief, he was ignoring her because he had learned of her complaint about his discriminatory treatment.

119.    On or about February 7, 2018, Ms. Bouey conducted an inspection of Ms. Wesley's dormitory and required her to unplug her refrigerator and remove her medical grade air purifier—thereby denying her reasonable accommodations.  Ms. Wesley suffered adverse health effects from the denial of these accommodations, which required outside medical intervention and treatment.  After the inspection, Ms. Bouey addressed Ms. Wesley's classroom, stating that she had found "contraband" (referring to their medical accommodations) in Ms. Wesley's and

Ms. Lee's rooms.  Although Ms. Bouey found prohibited items in other rooms, she named only Ms. Lee and Ms. Wesley in this lecture.  Ms. Wesley's HIPAA-protected medical information was repeatedly disclosed in classroom settings as a way to mock and intimidate her.

120.    The next day, Ms. Wesley reported to Supervisory Intelligence Analyst Brian Moses that Ms. Bouey had removed her accommodations and made inappropriate comments about Ms. Wesley and her accommodations.  Ms. Wesley also explained that she thought Ms. Lee was being targeted based on her disability and gender.  Mr. Moses told Ms. Wesley he would speak to Ms. Bouey.  Shortly after that, however, Ms. Bouey began disciplining Ms. Wesley for petty infractions.  For example, she supported Mr. Moses when he issued Ms. Wesley a suitability notation for having her phone in the lobby of the class building after-hours, Ms. Bouey had previously given  Ms. Wesley permission to use her phone in the building after-hours and  other students routinely did so without punishment.  Further, Ms. Bouey disparaged Ms. Wesley to her classmates, even telling one student not to trust Ms. Wesley and that Ms. Wesley was "trouble."

121.    In the beginning of March 2018, Ms. Wesley reported misconduct further up the chain of command when she told Trainee Management Unit Chief Kellie Holland that she had witnessed Mr. Zwiesler targeting and harassing Ms. Lee.  Ms. Wesley told Ms. Holland that some of the male counselors and instructors were very unprofessional around female Trainees, often treating them worse than male Trainees, and that she thought there was rampant discrimination.   In response, Ms. Holland stated that Ms. Wesley had not been on her "radar" prior to that day.  Instead of Ms. Holland treating the blatant EEO violations with any seriousness or concern, Ms. Holland threatened Ms. Wesley by stating that her coming forward would not go without consequence.

122.    Ms. Holland followed through with her threat of retaliation when she personally issued Ms. Wesley a suitability notation, just days before graduation.  Ms. Holland informed Ms. Wesley that she had proactively asked Ms. Wesley's counselor, supervisor and instructors for derogatory information about Ms. Wesley.  Ms. Holland misconstrued a statement Ms. Wesley had made two months prior to cite Ms. Wesley for insubordination and lack of professional judgement.  When Ms. Wesley challenged Ms. Holland on the accuracy of the statement, Ms. Holland quipped "Is it more important to be right or to be heard? Hmmm?"

123.    After Ms. Wesley graduated from Basic Training, she was assigned to worked as an Intelligence Analyst in the FBI's Phoenix Division beginning in April 2018.  Due to her disability, Ms. Wesley requested, and received, the following reasonable accommodations that have permitted her to successfully complete her work as an Intelligence Analyst:

    a.    an ergonomic workstation;
    b.    an alternative work schedule, starting at 6 am; and
    c.    permission to keep an ERAS (secure FBI laptop) at home so that she can
          telework when necessary.

124.    Ms. Wesley further engaged in protected activity when she filed her EEO charge of discrimination on May 18, 2018, and when she filed this lawsuit on May 29, 2019.  Although the Complaint was filed under seal pending resolution of the request by some plaintiffs to proceed anonymously, a copy of the Complaint, in which Erika Wesley is named, was sent via email to counsel for the FBI who had been handling the internal EEO complaints.  Further, Ms. Wesley appeared and was named in media coverage about the case on May 29, 2019.

125.    In the two days following Ms. Wesley's filing of this case, one of her superiors, Acting Assistant Special Agent in Charge Andrew Braun, made explicit threats to terminate her because of her participation in this lawsuit.  On May 29, 2019, Mr. Braun spoke to Ms. Wesley's supervisor, Supervisory Intelligence Analyst Mary Martinez about potential changes to Ms.

Martinez's position.  Understanding that a re-organization might be underway, Ms. Martinez

expressed a desire to have Ms. Wesley on whatever squad she was supervising.  In response, Mr.

Braun stated:

> That is not happening.  That is not what I mean.  She is a
> probationary employee and she spends all her time doing her EEO
> complaints and is busy suing the bureau instead of doing her job.
> She needs to go.

126.    On May 31, 2019, Mr. Braun asked Acting Supervisory Intelligence Analyst

Megan Eckstein, what she thought of someone new who "spent all their time researching EEO

policies and filing lawsuits."

127.    In the next few weeks, Ms. Wesley was subjected to several adverse employment

actions.  On June 4, 2019, Mr. Braun called a meeting of intelligence analysts in the Phoenix

Division and announced that Ms. Wesley would be assigned to work on another squad.  Two

days later, on June 6, 2019, A/ASAC Braun sent out an email which documented additional

changes to the intelligence program.  In that document, Ms. Wesley's specific position, one that

no other employees in that Division hold, was described as being "eradicated."  Ms. Wesley was

transferred to work under Supervisory Intelligence Analyst Kelly Burzacchi on June 9, 2019, but

was not assigned enough work in her new position to keep her occupied. When she volunteered

to work on additional projects, Ms. Burzacchi told her not to.

128.    On June 18, 2019, Ms. Wesley supported a request by Ms. Martinez to

temporarily assign Ms. Wesley to Ms. Martinez's squad.  Instead she was temporarily moved to

another squad, under Supervisory Intelligence Analyst Alicia DeGroot, where she again was not

assigned sufficient work.  In addition, the majority of the work that she was assigned was work

for a Staff Operations Specialist, a lower level position than Intelligence Analyst.

129.     In June and July 2019, Ms. Welsey's superiors threatened to take away her reasonable accommodations and did in fact revoke some of her accommodations.  When Ms. Wesley submitted a request to telework, Ms. Burzacchi stated that she was unaware of the telework policy and referred the request to Ms. DeGroot.  On June 8, 2019, Ms. Wesley was asked to return her laptop.  Ms. Wesley submitted a formal request to continue using her laptop as a reasonable accommodation, but Mr. Braun denied her request, citing an "operational priority." Ms. Wesley returned the laptop, but it was not subsequently assigned to another worker.

130.     The day after Ms. Wesley was asked to return her laptop, Ms. Burzacchi and Ms. DeGroot informed her that Mr. Braun and Special Agent in Charge Sean Kaul were considering a policy change limiting the hours within which non-agent employees, including Ms. Wesley, would be permitted to work. Thus, the FBI was threatening to take away Ms. Wesley's alternative work schedule in addition to her other accommodations.

**"B.A."**

131.     Plaintiff "B.A.", a woman, earned a bachelor's degree in international politics and print journalism in 2014 from Pennsylvania State University, where she had been a student athlete.  In 2016, she earned a master's degree in Middle East Studies from George Washington University's Elliott School of International Affairs.  Prior to joining the FBI she worked as a consultant for Grant Thornton LLP and as a Risk Governance Associate at JP Morgan.

132.     In 2018, B.A. attended Basic Training as an Analyst Trainee.  During Basic Training, B.A. passed all of her academic tests and job-related requirements.

133.     However, B.A received three suitability notations for minor infractions. During her first week of training, B.A. received a suitability notation for parking in the wrong section of the parking lot because the designated lot was full, (for a brief period of time, there were three

overlapping classes at the Academy – 18-01, 18-02, and 18-03) and she was unsure of where to park.  B.A. later learned that multiple other people, including one man in her class, parked in the wrong section of the parking lot but did not receive a suitability notation.  B.A. also received a suitability notation from Supervisory Intelligence Analyst Tyrone Jiles for emotional maturity, cooperativeness, and judgment, alleging that she improperly responded to an email from a guest speaker and expressed interest in being assigned to that speaker's squad, and for "breaking chain-of-command" via email communications requesting leave.  When B.A. attempted to address errors in the suitability notation with Ms. Holland, Ms. Holland stated that "perception is reality" and that it "didn't matter what the details were, just what things appeared to be."  Ms. Holland also told B.A. she was nothing but a "distraction" to the other Trainees.  B.A. understood that Ms. Holland was referencing unwanted sexual attention that B.A. received from some of her peers.  Ms. Holland could not have been referring to B.A.'s coursework or demeanor in class because B.A. was a model student.

134.    Throughout her time at the Academy, B.A. was subjected to pervasive sexual harassment by attendants of the National Academy, as well as some of the New Agent Trainees, Special Agents, and members of management.  Specifically, on one occasion, a man participating in National Academy training slipped B.A. his number.  Additionally, on two separate occasions, two male Agent Trainees tried to convince her to have sexual intercourse with them in the back of their car.  Similarly, on two additional separate occasions, two additional male Agent Trainees tried to convince her to sneak up to the vacant 7th floor to have sex with them.  One other male Agent Trainee spent about one week harassing B.A. via text message, sending her up to fifteen messages per day.  He eventually stopped after she told him how inappropriate and uncomfortable he made her feel.  On yet another occasion, B.A. had to

have one of her friends escort her back to her room because a different male Agent Trainee was following her throughout the night (including up to her room).

135.    These sexual advances were unwanted and made Basic Training miserable for B.A. She was embarrassed to receive so much unwanted attention and disappointed in the lack of professionalism by her peers.  These sexual advances added pressure to B.A.'s training, which was already a high-stakes process.

136.    The sexual and gender-based commentary directed at B.A. was not only from her peers.  Additionally, instructors and counselors would regularly tell B.A. she needed to smile more.  B.A. asked dozens of other male trainees at the Academy if they had ever been formally advised they need to smile more and they all responded "no."  Further, Senior Supervisory Intelligence Analyst Brian Moses, who supervised Mr. Jiles publicly asked a group of males from B.A.'s section what they thought of her.  When B.A. confronted Mr. Moses about his attempts to elicit gossip about her, he responded by falsely claiming that there was a peer-review process in place where instructors consulted students on their opinions about other students.  No such formal peer-review process exists.

137.    B.A. reported harassment to her class counselor, Anita Belt.  In approximately her second week in Basic Training, B.A. informed Ms. Belt that she was receiving unwanted sexual attention from men during Basic Training and that she thought Mr. Moses was targeting her because she was a woman.  B.A.'s counselor acknowledged the discriminatory treatment of women at the Academy and said, "you own a mirror, you know you're a pretty girl," that was the way things were, and to just "play the game" if she wanted to succeed.  After that, B.A.'s harassment continued and escalated.

138.     One of B.A.'s instructors, Supervisory Special Agent Charles Ro, also engaged in highly inappropriate behavior.  During each of his lectures, Mr. Ro would lay out a string of sexist, racist, and generally sophomoric/inappropriate jokes such as a calling the only African-American female trainee with braids "spaghetti head," constantly referring to his "little blue balls" or the size of his genitals, and claiming that female informants were not reliable because they were "too emotional" and all they do is sleep around.  Mr. Ro incessantly inquired from B.A.'s male classmates about her personal life in a sexual and derogatory manner.  When B.A. politely asked him about this at the Academy, he denied ever discussing her personal life with other trainees; however, in his response to her EEOC complaint, he acknowledged he discussed her personal/sex life with other trainees, but only because they approached him about it first (those trainees firmly denied that, and in fact were the ones who told B.A. about Mr. Ro's discussions of her in the first place).

139.     On July 31, 2018, B.A. was required to appear before a Trainee Review Board. B.A. asked that the Board speak to two instructors who were not present and who B.A. believed would support her. The Board told B.A. they would speak to them, but then never did so.  That same day, the Assistant Director of the Training Division discharged B.A. from Basic Training. Although B.A. was discharged from the academy after receiving three suitability notations a male student in her class with at least seven suitability notations graduated without ever being brought before the Trainee Review Board.

**"D.A."**

140.     D.A., a woman, graduated magna cum laude with a dual Bachelor of Arts Degree in Criminal Justice and Sociology from Mount St. Mary's University, and later obtained her Master of Arts in Homeland Security from Monmouth University, where she was named Valedictorian.  D.A. also earned a Ph.D. from Nova Southeastern University.  She began

working for the FBI as a Staff Operations Specialist in December 2011, where she received two performance-based awards in her first three years.

141.    In 2018, D.A. attended Basic Training as an Agent Trainee. During Basic Training, D.A. passed the physical fitness test on numerous occasions (including holding the all-time fastest score on the 300-meter sprint for women), all academic tests, the pistol and carbine firearms qualifications, the defensive tactics test, and other performance tests and evaluations.

142.    D.A. was routinely singled out and embarrassed by Tactical Training Unit instructors for her performance during tactical training, despite the fact that D.A.'s performance was the same or similar to that of her classmates who were not verbally criticized.  For example, D.A. was told to be more aggressive in her paint gun shooting although she successfully completed the exercise.  D.A. was also threatened with a suitability notation for "not running fast enough" during a training exercise, even though she had completed the exercise successfully. Classmates who completed the exercise after D.A. responded and moved more slowly than D.A.; however, they were not threatened with or given a suitability notation.

143.    D.A. received a total of three suitability notations, all from the Tactical Training Unit.  The first suitability notation was for allegedly dropping her weapon during a training exercise. When D.A. questioned her instructor's feedback and showed him that she still had her weapon, he told her that she must have picked it back up and that she was too overwhelmed to remember it accurately.  D.A. did not feel overwhelmed.  The second suitability notation involved a scenario for which approximately half of the class received suitability notations for the same or similar actions as D.A.  D.A. received her third suitability notation from a tactical exercise involving a hostage situation.  D.A. did not have a clear line to shoot the hostage-taker,

but her female partner did have a clear shot.  Neither of them shot the hostage-taker, so they both received suitability notations.

144.    D.A. appeared before a Trainee Review Board on June 27, 2018, and the Assistant Director of the Training Division discharged her on June 28, 2019.

**"S.B."**

145.    Plaintiff S.B., a woman, graduated Magna Cum Laude from West Virginia University with two Bachelor of Arts degrees in Criminology and Psychology.  While attending undergraduate school, S.B. interned with the FBI, interned with the Monongalia County Youth Crisis Shelter, and held a part-time job as a West Virginia University Police Cadet.  Upon graduating in 2014, S.B. was hired as a Management and Program Analyst with the FBI.  S.B. received two performance-based awards, was nominated for Analyst of the Year, and received a meritorious promotion in her first two years working full time with the FBI.

146.    In 2017, S.B. attended Basic Training as an Agent Trainee.  S.B. passed the physical fitness test on numerous occasions, all academic tests, the pistol and carbine firearms qualifications, the defensive tactics test, and other performance tests and evaluations with no re-takes.

147.    S.B. received three suitability notations, all from the Tactical Training Unit.  She received the first suitability notation for her first tactical error made during paint gun scenarios, and the second suitability notation for questioning an instructor's feedback for clarification purposes.  S.B. had no prior tactical experience prior to entering the Academy.  When she asked Supervisory Special Agent Herron for clarification on his instructions, Mr. Herron ridiculed S.B. in front of her classmates and accused her of "being argumentative."  After class, Mr. Herron and another instructor, Supervisory Special Agent Mehnert cornered S.B. and cursed at her for "having an attitude problem and being too argumentative."

148.    On September 18, 2017, shortly after the second incident, S.B. was informed that she was selected to appear before a Trainee Review Board.  However, the Trainee Review Board was postponed upon request of her class supervisor, to allow her to demonstrate improvement. S.B. subsequently completed the second round of paint gun scenarios and was complimented by several instructors for her exceptional improvement.  S.B. was then informed that the Trainee Review Board was "on hold," only to be told the next day that the Review Board would take place that morning, September 20, 2017.  At the Trainee Review Board, S.B. was presented with a third suitability notation from the Tactical Training Unit.  Mr. Mehnert issued her a suitability notation with false descriptions of purported deficiencies in the tactical exercises that had not been raised at the time of the exercises, or any time thereafter until the Trainee Review Board was underway.

149.    S.B. was treated differently in the tactical training block because of her gender. Some male Agent Trainees had received three or more suitability notations, but were not brought before the Trainee Review Board.  S.B. also witnessed male Agent Trainees questioning instructors' feedback, sometimes escalating into arguments with the instructors, and the male trainees were neither cursed at, ridiculed, or issued suitability notations. One of her instructors, Mr. Mehnert, leered at S.B. in a sexual manner on numerous occasions throughout her time in the tactical training block.  He repeatedly stared at S.B.'s chest, sometimes while licking his lips, and on one occasion he winked at her. S.B. informed Trainee Management Unit Chief Kellie Holland of the sexual harassment, but Ms. Holland dismissed S.B.'s concerns.

150.    The Assistant Director of the Training Division discharged S.B. the day of the Tactics Test, for "lack of judgment and emotional maturity."  S.B. was not offered any sort of remedial tactical training, as is the standard with other blocks in the Basic Training curriculum.

**"D.C."**

151.    Plaintiff D.C., a woman, earned a Bachelor of Arts in Political Science with a specialized focus in Legal Studies from Virginia Tech University.  In 2011, she began working for the FBI as a Financial Operations Specialist in San Antonio, Texas.  After three years, D.C. transitioned to an Intelligence Analyst role in the FBI's International Operations Division and deployed overseas on behalf of the FBI multiple times over a 2.5-year period.  While working full-time for the FBI, D.C. earned her Master of Arts in International Relations, Security Policy at St. Mary's University in San Antonio, Texas.

152.    In 2017, D.C. attended Basic Training as an Agent Trainee.  During Basic Training, D.C. passed every physical fitness test, all academic tests, the pistol and carbine firearms qualifications, and all other performance tests and evaluations. In addition, D.C. earned a perfect score on the defensive tactics exam (an area in which she had no prior experience before attending Basic Training).

153.    D.C. received five suitability notations, all from the Tactical Training Unit.  D.C. received the first two suitability notations during her first few weeks of tactical training instruction during the same training scenario.  D.C. received one of these suitability notations for "flagging" (pointing her gun at) a teammate during a "J-hook" room entry.  D.C. made this mistake having no prior tactical experience.  In response, her instructor, Mr. Herron, yelled at her, told her she was "worthless," and gave her a suitability notation.  In contrast, in the final weeks of training, D.C. witnessed a male Agent Trainee make the same mistake.  After the male Agent Trainee, who had previous military tactical experience, made the same error, the same instructor patiently coached the male Agent Trainee and offered remedial guidance, saying "the J-hook angle can be tricky, this is how you adjust in this situation."

154.     D.C. received another suitability notation for three "excessive shots" fired by her male colleague—she was written up for "firing nine shots," but only six were hers.  The instructor refused to count the ammunition remaining in her weapon and the male colleague insisted he had no memory of his actions during the training segment at all.  Later, the instructor told D.C. she clearly misremembered the incident due to the stress of the training scenario.

155.     On or about January 27, 2018, D.C. learned that she was under Suitability Review.  She was required to appear before a Trainee Review Board on or about January 31, 2018.  D.C. had trained nightly with her classmates and testified to the board that she was confident she could pass the final Tactical Training test with all the extra work she had been putting in.  D.C.'s entire section of over thirty Agent Trainees all signed a letter respectfully requesting the Trainee Review Board allow D.C. to take the test with her fellow Agent Trainees. She was told that there simply was not enough time to train her adequately before graduation.

156.     After D.C. appeared before the Trainee Review Board, the Assistant Director of the Training Division discharged D.C. from Basic Training for lack of "Tactical judgment" two weeks before graduation.  D.C. had not failed any final exams but she had been told that tactical judgment was considered an "inherent skill."  D.C. was not offered any sort of remedial tactical training, as is the standard with other units in the Basic Training curriculum.

157.     Of the seven female Agent Trainees in her section, only three graduated and are now Special Agents.  In contrast to D.C.'s experience, a male colleague who had previously failed a physical fitness test and an academic test and who was commonly known by classmates for poor tactics, took and failed the final Tactical Training test.  He received remedial training and retook the final Tactical Training test.  In his second test, he failed to meet the rubric standards again.  The male Agent Trainee was then referred to the Trainee Review Board where

he was permitted to explain the mistake he made during his retake. After that, his test score was changed to a passing grade and he was ultimately allowed to graduate.

**"P.E."**

158.    Plaintiff P.E., a woman, earned a Bachelor of Arts Degree in Language, Culture and World Trade from Pace University.  Before joining the FBI, P.E. served as a United States Marine.  As a Marine, she was trained in multiple weapons systems, and in military tactics and maneuvers.  She was deployed twice in Iraq and was recognized for her outstanding performance.  In October 2006, P.E. entered duty with the FBI, while still in the Marine Corps Reserves.  During her time at the FBI, she held many positions, including serving as a Surveillance Specialist in the Counterintelligence Unit for four years.  By 2016, P.E. had completed a total of fourteen years in the United States Marine Corps.  She was a 4th award expert rifleman and attained the third level of training in the Marine Corps Martial Arts Program. P.E. continued to serve as a Gunnery Sergeant in the Marine Corps Reserve.

159.    In 2016, P.E. attended Basic Training as an Agent Trainee.  During Basic Training, P.E. passed the physical fitness test on numerous occasions, all academic tests, pistol and carbine firearms qualifications, and other performance tests and evaluations.

160.    P.E. received four suitability notations from the Tactical Training Unit.  Her first suitability notation was for a mistake she made during her first exercise.  Her second suitability notation was for flagging her partner when entering a room, despite instructors stating during the classroom instruction that flagging partners would be inevitable in certain entry situations.  That same day, P.E.'s male partner was not written up for the more egregious error of shooting an unarmed subject.  Her partner later told her the instructor had spoken to him and another male classmate and they were both told not to worry because they would not be written up.  In another exercise, P.E. received her third suitability notation because her instructor believed that she

46

hesitated before shooting and waited until her partner told her to shoot.  P.E. disputes this account. That same day, P.E. received her fourth suitability notation for failing to use deadly force in a mock carjacking scenario. The carjacker was already disarmed by the time P.E. had unholstered her weapon, and P.E. believed shooting him would be excessive force.

161.    During the training scenarios some of P.E.'s male counterparts had committed similar or worse mistakes than the mistakes P.E. made, but these male counterparts did not receive suitability notations.  Further, P.E. was singled out by a male instructor beginning her first day in the tactical training block.  Supervisory Special Agent Nguyen, approached P.E. after class and asked her about her military history, which was extensive.  After P.E. summarized her military history, Mr. Nguyen walked away without a response.  P.E. did not understand why she was singled out by Mr. Nguyen, as there were several other veterans in the class.  From that day forward, when P.E. asked questions, Mr. Nguyen verbally berated her.  During a review of a scenario, P.E. asked a question and Mr. Nguyen yelled and cursed at her.  Thereafter, Mr. Nguyen would talk to the male Agent Trainees but would not address any questions from P.E.

162.    On or about October 25, 2016, P.E. was required to appear before a Trainee Review Board.  After she appeared before the board, the Assistant Director of the Training Division, discharged her from Basic Training, with just fifteen training days left

**"B.G."**

163.    Plaintiff B.G., a woman, earned a degree in International Relations from the State University of New York at Albany, where she led her graduating class as the Commencement Day Speaker.  She went on to pursue a career within the U.S. Intelligence Community for a decade, before joining the FBI.

164.    In 2018, B.G. attended Basic Training as an Agent Trainee.  During Basic Training, B.G. passed her physical fitness test, all academic tests, and firearms test with impressive scores.

165.    B.G. received a few suitability notations, all from the Tactical Training Unit. B.G. observed that the Tactical Training Unit instructors treated men and women differently. When a female and male Agent Trainee were partnered together for an exercise, the instructors would pay much closer attention to the woman's actions in the exercise.

166.    On multiple occasions during the Defensive Tactics instruction for B.G., the instructors precluded B.G.  from grappling with other students, which was the ordinary way for students to practice.  Instead, Defensive Tactics instructors Sirko and Belinda repeatedly singled B.G. out to grapple with them.  Very rarely, if ever, were male trainees required to grapple with Defensive Tactics instructors.  Mr. Sirko and Mr. Belinda consistently targeted female Trainees in B.G.'s class to grapple with them.

167.    Three weeks prior to B.G.'s graduation, the Trainee Management Unit informed her that "she did not meet the standard" in defensive tactics required for graduation because she had failed her grappling test.   B.G. failed the grappling portion of her exam because she allegedly had a "lazy escape" meaning that she successfully escaped the scenario, but did not do so forcefully enough.  Although B.G. had made a full effort to escape, and was successful, she was judged more harshly due to her weight and stature.  Her score was further lowered for allegedly turning her back to her partner, which was not accurate.  When B.G. took the retest, she was not paired with another student, as was the usual practice, and instead was paired with an instructor, thereby increasing the difficulty of the test.

168.     The Defensive Tactics instructors never informed B.G. that she was deficient in grappling, nor did they articulate why she continued to be singled out to fight by the instructors. Defensive Tactics instructors did not issue a suitability notation to inform B.G. of her perceived missteps until after her grappling test.  Further, she was not given a performance plan for improvement. This practice contrasts greatly with how other units at the Academy operate, including the Firearms Training Unit, which offers comprehensive remediation to ensure trainee success.  Firearms instructors inform both the student and his/her supervisor of a possible deficiency and offer timely remedial sessions to improve the trainee's technique.

169.     B.G. was required to leave Quantico the same day she was notified of her discharge.  The FBI did not give her time to make arrangements to move her belongings. Because she had relocated from a military assignment overseas to attend Basic Training, she was forced to leave her belongings at Quantico, where they were confiscated by the FBI.

**"W.M."**

170.     Plaintiff W.M., a woman, earned a Bachelor of Arts in Political Science from North Carolina State University, and a Master of Arts in Political Science from the University of North Carolina-Chapel Hill.  Beginning in September 2014, W.M. worked for the FBI as a Special Operations Specialist for four years.

171.     In 2018, W.M.  attended Basic Training as an Agent Trainee.

172.     During Basic Training, W.M. passed the physical fitness test, all academic tests, the pistol and carbine firearms qualifications, the defensive tactics test, and other performance tests and evaluations.

173.     W.M. received four suitability notations, all from the Tactical Training Unit. W.M. received two of these suitability notations on June 18, 2018, for scenarios in which the majority of Agent Trainees in her section and at least one other section struggled and failed.  On

this day specifically, approximately half of the class received suitability notations for the same scenarios as W.M.  When W.M. received these suitability notations, she was notified that she was under Suitability Review.  However, several male Agent Trainees in W.M.'s class had more than two suitability notations and were not selected for a Suitability Review.  On June 20, 2019, W.M. received a third for an accidental discharge of her weapon in a scenario where she was specifically instructed not to unload her weapon prior to beginning a "dry fire" exercise. Because a dry fire exercise is one in which the participants shoot an unloaded weapon, W.M. faced an impossible choice—disobey a direct order or follow orders and discharge her weapon where she was not supposed to.  W.M. received her fourth suitability notation, from a sub-unit of the Tactical Training Unit that handles driving tests, when she did not pass her first driving test. However, when she retook the test, W.M. passed it.

174.    While under Suitability Review, W.M. was required to appear before a Trainee Review Board.  At the time she was placed under Suitability Review, four male Agent Trainees and two other female Agent Trainees were also selected for review.  All male Agent Trainees undergoing suitability review had more suitability notations than W.M.  Of the men, one was allowed to return to training without having to appear before the Trainee Review Board.  Two others appeared before a Trainee Review Board and were allowed to return to training.  Only the fourth male was discharged from Basic Training.  The other two female Agent Trainees, like W.M., were discharged from Basic Training.

175.    After she appeared before the Trainee Review Board, the Assistant Director of the Training Division discharged W.M. from Basic Training, approximately two hours before she was scheduled to take the final tactics test, which was also the final test remaining in training. She was given no option for remedial training, as is the standard with other units in Basic

Training.  Furthermore, the Trainee Review Board did not recommend W.M. for re-employment with the FBI due to "lack of emotional maturity and evasiveness."  However, prior to attending the Basic Training, W.M. had been highly successful in her previous position, earning near perfect or perfect annual reviews and several performance-based awards.  Upon hearing of her dismissal from the Basic Training, W.M.'s previous supervisor and Executive Management quickly took action to have her re-instated because of her previous reputation as a high-performing employee.  W.M. has continued to receive a perfect performance rating as a Staff Operations Specialist from her current FBI office, the Charlotte Division, Raleigh Resident Agency.

### "C.S."

176.    Plaintiff C.S., a woman, graduated from Baldwin-Wallace College with a Bachelor of Science in Psychology in December 2010.  Following graduation, she worked for a mental health agency for approximately four years, then as a Probation Officer for more than two years.

177.    In 2017, C.S. attended Basic Training as an Agent Trainee.  During Basic Training, C.S. passed the physical fitness test, all academic tests, pistol and carbine firearms qualifications, the defensive tactics test, and other performance tests and evaluations.

178.    C.S. received three suitability notations, all from the Tactical Training Unit.  On May 23, 2017, she received her first suitability notation for lack of muzzle discipline on the first day of tactical training exercises in Hogan's Alley.  The particular exercise involved fixing handgun malfunctions in the field.  Prior to this day, C.S.'s class had only ever worked on firearm malfunctions on the firing line.  During this training, C.S. was not sure of where to go to clear her weapon, and did not understand the supervisor's instructions.  C.S. had never had any prior issues with muzzle control when she was training with the Firearms Training Unit.

179.     The same suitability notation also stated that C.S. acted unprofessionally with a

male Agent Trainee during a jovial "Wild West" scenario.  Both she and the male Agent Trainee

were friends and made lighthearted jokes with each other during the scenario, however, only C.S.

received a suitability notation, not the male Agent Trainee.  Although C.S. did not want to sign

the suitability notation, which she believed was inaccurate, she had been advised to refrain from

arguing with or challenging the authority of Tactical Training Unit instructors because they

"aren't like the rest of the academy instructors."

180.     C.S. received her next two suitability notations during her tactical exam on July

11, 2017, both for "judgement issues with deadly force."  C.S. made a mistake due to confusion

over the instructor's failure to end the scenario.  Worse, the instructor did not tell her that she had

done anything wrong, and thus when the scenario was repeated, and the instructor again failed to

end the scenario, C.S. continued as she had before, making the same error.

181.     C.S. was initially told (along with others who did not pass) that she would be

given a re-test on July 14, 2017.  However, C.S. was ultimately denied the opportunity to do so

as she was referred to the Trainee Review Board and on July 14, 2017, the Assistant Director of

the Training Division discharged her from Basic Training.

182.     Meanwhile, a male Agent Trainee in C.S.'s class who also failed the Tactics exam

and was referred to the Trainee Review Board was allowed to re-take the tactical training exam

and later graduated from the Academy.  Further, throughout her tactical training, C.S. had

participated in many exercises that involved multiple situations which required discretion and

judgement with deadly force, and did not have an issue with deadly force.  In contrast, a male

Agent Trainee in her class had "issues with deadly force" during a tactical training scenario

when he entered a motel room and shot an innocent, unarmed man in the bathroom.  He was not

referred to the Trainee Review Board for this significant error in judgment and was allowed to graduate.

## "L.S."

183.     Plaintiff L.S., a woman, attended Basic Training, then called New Agent Training, in 2015 as an Agent Trainee.

184.     During Basic Training, L.S. passed the physical fitness test multiple times, all academic tests, the pistol and carbine qualifications, the defensive tactics test, and other performance tests and evaluations.

185.     L.S. received three suitability notations, all from the Tactical Training Unit.

186.     In the tactical training block, L.S.'s instructors treated her and other female Agent Trainees in an inappropriate sexualized manner.  On September 29, 2015, L.S.'s class participated in a Moot Court practical exercise in which an undercover employee played the role of a fourteen year-old girl who was picked up by an adult pedophile that led to the subsequent arrest of the pedophile.  L.S. was assigned the undercover employee role for her group.  L.S.'s Primary Tactical Instructor, Supervisor Special Agent Gary Galdes, told L.S. that she should wear "short-shorts, pigtails, pink lipstick, and chew bubblegum."  Mr. Galdes's comments made L.S. extremely uncomfortable.  On the day of the exercise, L.S. opted to wear jeans, a long sleeve shirt, and a backpack.  While she was changing for the exercise, L.S. noticed another female trainee putting on short-shorts and styling her hair into pigtails.  L.S. asked her classmate why she was dressing in that manner, to which her classmate responded, "I'm giving him [Mr. Galdes] what he wants."  When L.S. entered her classroom, Galdes asked her why she was not wearing short-shorts, pigtails, and pink lipstick, and chewing bubblegum.  Again, Mr. Galdes's comment made L.S. feel uncomfortable.

187.    Mr. Galdes made an additional comment to L.S. that made her feel uncomfortable when he told her that she was going to be his "special project."  L.S. felt the comment was singling her out. When L.S. spoke with her counselor about the comment, the counselor suggested that some of the instructors did not like petite attractive women.  L.S.'s anxiety increased because she felt Mr. Galdes was scrutinizing her for something over which she had no control.   On September 28, 2015, L.S. learned from a classmate that SSA Galdes made a derogatory comment about women when he was chastising a male Agent Trainee about his performance during a tactical exercise.  L.S.'s classmate told her Galdes admonished the Agent Trainee by saying "you are no better than a fucking female."  L.S. believes this comment clearly showed Mr. Galdes's hostility toward women.  L.S. reported Mr. Galdes's comments to class supervisor Supervisory Special Agent Jill Sheets, Class Counselor Steven Spahn, and Special Agent Kieko Wagner.  Ms. Sheets interviewed the trainee to whom Mr. Galdes made the comment, and confirmed that Mr. Galdes had in fact made the comment.

188.    In September 2015, after L.S. received her third suitability notation in the Tactical Training Unit, L.S. was placed under Suitability Review and required to appear before the Trainee Review Board (then called the New Agent Review Board).  The Board recommended L.S. be discharged, and on October 2, 2015 – just two weeks before graduation –the Assistant Director of the Training Division discharged L.S. from Basic Training.

189.    While L.S. was at the Academy, she was aware of a male Agent Trainee in her class who failed the Handcuffing One exam—an exam in the Tactical Training block.  The male trainee passed when he (and other students who failed) were permitted to retake the exam.  The male Agent Trainee later failed the Handcuffing Two exam, which per the policy, should have resulted in an automatic dismissal from Basic Training for failure of two exams.  However, on

October 2, 2015, the male trainee was removed from the classroom during a non-defensive tactics class and permitted to retake Handcuffing Two (without other members of the class present).  He was allowed to continue on and graduate with his class, indicating a bias in favor of permitting men multiple opportunities to re-take tests in order to qualify for graduation, despite poor performance, and in violation of documented policy.

190.    During a conversation that L.S. had with Supervisory Special Agent Jill Sheets (one of  L.S.'s class supervisors), Ms. Sheets stated that "It's as if they want you to fail" regarding the way L.S. was being treated and singled out in Tactical Training block, indicating a bias within the block and a perception that Tactical Training  Unit instructors targeted particular Agent Trainees.

**"G.T."**

191.    Plaintiff G.T., a woman, graduated from the University of Maryland with a Bachelor of Arts in Political Science.  She is licensed to practice law in Virginia, Pennsylvania and New Jersey and litigated for four years.

192.    In 2017, G.T. attended Basic Training as an Agent Trainee.  During Basic Training, G.T. passed the physical fitness test on numerous occasions, all academic tests, the pistol and carbine firearms qualifications, the defensive tactics test, as well as other performance evaluations.

193.    G.T. received three suitability notations, all from the Tactical Training Unit.  She was informed she was being referred to the Trainee Review Board after she received her first two suitability notations.  For one of her suitability notations, half of G.T.'s class received a suitability notation for the same scenario.  G.T. knew of many men in her class who had more than two suitability notations who were not recommended for a Trainee Review Board.

194.     When G.T. was brought before the Trainee Review Board on February 1, 2018,

she was presented with a third suitability notation from the Tactical Training Unit.  The tactical

training test was scheduled for February 2, 2018, the day after G.T.'s Trainee Review Board.

Supervisory Special Agent Cortney Merkel, G.T.'s counselor, requested the board allow G.T. to

take the test before the board issued a recommendation.  However, G.T. was not permitted to

take the test.  After G.T. appeared before the Trainee Review Board, the Assistant Director of the

Training Division discharged G.T. on February 1, 2018, just two weeks before graduation.  No

offer of remedial training was provided to G.T  She and other female trainees were told by the

TRB that there was not enough time before graduation for them to receive remedial training;

however, when several male Agent Trainees failed the tactical training exam, they were given

the opportunity for additional training and a retest less than two weeks before graduation.

## V.     CAUSES OF ACTION

### COUNT ONE
**Violation of Title VII, 42 U.S.C. § 2000e *et seq.*,**
**(Disparate Treatment – Agent Trainee Subclass)**
**Brought by Plaintiffs Paula Bird, Clare Coetzer, Lauren Rose, Danielle Snider, "D.A.",**
**"S.B.", "D.C.", "P.E.", "W.M.", "C.S.", "L.S.", "G.T.", on behalf of themselves and others**
**similarly situated.**

195.     Plaintiffs reallege and incorporate by reference the allegations contained in

paragraphs 1 through 65 and 77 through 194.

196.     This claim is brought by Plaintiffs Paula Bird, Clare Coetzer, Lauren Rose,

Danielle Snider, "D.A.", "S.B.", "D.C.", "P.E.", "W.M.", "C.S.", "L.S.", "G.T.", on behalf of

themselves and the Agent Trainee Subclass as defined above.

197.     The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. 2000(e), *et seq.*, and constitutes a continuing violation of that Act.

Defendant has engaged in a pattern or practice of intentional discrimination against its female

Agent Trainees in issuing Suitability Notations, initiating Suitability Reviews, referring them for Trainee Review Boards, and making discharge, recycling, and reinstatement decisions.

198.   The discharge decisions were made by a single decisionmaker, the Assistant Director of the Training Division, and only a small group of decisionmakers were involved in the preliminary steps of issuing Suitability Notations, Suitability Reviews, and Trainee Review Boards.

199.   Defendant's discriminatory practices described above have denied members of the Agent Trainee Subclass the opportunity to graduate from Basic Training and enter Agent positions, and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

200.   The conduct described above caused the members of the Agent Trainee Subclass emotional harm and other forms of harm proximately caused by the FBI's discriminatory conduct.

201.   Agent Trainee Plaintiffs request relief as provided in the Prayer for Relief below.

**<u>COUNT TWO</u>**
**Violation of Title VII, 42 U.S.C. § 2000e *et seq.*,**
**(Disparate Impact – Agent Trainee Subclass)**
**Brought by Plaintiffs Paula Bird, Clare Coetzer, Lauren Rose, Danielle Snider, "D.A.",**
**"S.B.", "D.C.", "P.E.", "W.M.", "C.S.", "L.S.", "G.T.", on behalf of themselves and others**
**similarly situated.**

202.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 65 and 77 through 194.

203.   This claim is brought by Plaintiffs Paula Bird, Clare Coetzer, Lauren Rose, Danielle Snider, "D.A.", "S.B.", "D.C.", "P.E.", "W.M.", "C.S.", "L.S.", "G.T.", on behalf of themselves and the Agent Trainee Subclass as defined above.

204.    The conduct described above violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000(e), *et seq.*, and constitutes a continuing violation of that Act.

205.    Defendant has maintained a system for discharge from Basic Training that has had an adverse impact on the Agent Trainee Subclass.  Its policies and practices for issuing Suitability Notations and making other decisions culminating in discharge from the New Agent Training program without reinstatement or recycling into the program is excessively subjective. A small group of decisionmakers, similarly trained and working closely together, exercise discretion over issuing Suitability Notations.  A smaller group of decisionmakers, Executive Management of the Trainee Management Unit, determines if a Suitability Review will be conducted, conducts such reviews, and determines if a Trainee Review Board will be conducted. A similarly small group participates in the Trainee Review Board and makes a recommendation about discharge.  A single decisionmaker, the Assistant Director of the Training Division, decides on discharge.

206.    Defendant has failed to create or maintain the data that would allow analysis of the impact of each of these policies and practices separately.  It does not maintain records of individuals who engage in behaviors similar to those issued suitability notations, but who are not issued suitability notations.  It does not appear that records of suitability notations are maintained in a database, or whether information about those potentially eligible for Suitability Review or Trainee Review Board is similarly tracked in a database.  Defendant's policies and procedures regarding issuing Suitability Notations, determining who will undergo a Suitability Review, and then who will go before the Trainee Review Board are thus not capable of separation for analysis, and accordingly the entire decision-making process for termination decisions may be analyzed as one employment practice.  42 U.S.C. 2000e-2(k)(1)(B)(i).

207.     The FBI's Suitability Notation through discharge policies challenged herein are not job related or consistent with business necessity.  There are less discriminatory alternatives which would address the FBI's business needs more effectively than its current practices.

208.     The FBI's discriminatory practices described above have denied the Agent Trainee Subclass members the opportunity to graduate from Basic Training and enter Agent positions, and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

209.     The Agent Trainee Plaintiffs request relief as provided in the Prayer for Relief below.

**COUNT THREE**
**Violation of Title VII, 42 U.S.C. § 2000e *et seq.*,**
**(Disparate Treatment – Analyst Trainee Subclass)**
**Brought by Plaintiffs Spencer Lee and "B.A." on behalf of themselves and others similarly situated.**

210.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 54, and 66 through 194.

211.     This claim is brought by Plaintiffs Spencer Lee and B.A. on behalf of themselves and the Analyst Trainee Subclass as defined above.

212.     The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000(e), *et seq.*, and constitutes a continuing violation of that Act. Defendant has engaged in a pattern or practice of intentional discrimination against its female Analyst Trainees in issuing Suitability Notations, initiating Suitability Reviews, referring them for Trainee Review Boards, and making discharge, recycling, and reinstatement decisions.

213.     The discharge decisions were made by a single decisionmaker, the Assistant Director of the Training Division, and only a small group of decisionmakers were involved in the

preliminary steps of issuing Suitability Notations, Suitability Reviews, and Trainee Review Boards.

214.     Defendant's discriminatory practices described above have denied members of the Analyst Trainee Subclass the opportunity to graduate from Basic Training and enter Analyst positions, and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

215.     The conduct described above caused the members of the Analyst Trainee Subclass emotional harm and other forms of harm proximately caused by the FBI's discriminatory conduct.

216.     Analyst Trainee Plaintiffs request relief as provided in the Prayer for Relief below.

**COUNT FOUR**
**Violation of Title VII, 42 U.S.C. § 2000e *et seq.*,**
**(Disparate Impact – Analyst Trainee Subclass)**
**Brought by Plaintiffs Spencer Lee and "B.A." on behalf of themselves and others similarly situated.**

217.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 55, and 66 through 194.

218.     This claim is brought by Plaintiffs Spencer Lee and B.A. on behalf of themselves and the Analyst Trainee Subclass as defined above.

219.     The conduct described above violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and constitutes a continuing violation of that Act.

220.     Defendant has maintained a system for discharge from Basic Training that has had an adverse impact on the Analyst Trainee Subclass.  Its policies and practices for issuing Suitability Notations and making other decisions culminating in discharge from the New Intelligence Analyst Training program without reinstatement or recycling into the program is

60

excessively subjective.  A small group of decisionmakers, similarly trained and working closely together, exercise discretion over issuing Suitability Notations.  A smaller group of decisionmakers, Executive Management of the Trainee Management Unit, determines if a Suitability Review will be conducted, conducts such reviews, and determines if a Trainee Review Board will be conducted.  A similarly small group participates in the Trainee Review Board and makes a recommendation about discharge.  A single decisionmaker, the Assistant Director of the Training Division, decides on discharge.

221.    Defendant has failed to create or maintain the data that would allow analysis of the impact of each of these policies and practices separately.  It does not maintain records of individuals who engage in behaviors similar to those issued suitability notations, but who are not issued suitability notations.  It does not appear that records of suitability notations are maintained in a database, or whether information about those potentially eligible for Suitability Review or Trainee Review Board is similarly tracked in a database.  Defendant's policies and procedures regarding issuing Suitability Notations, determining who will undergo a Suitability Review, and then who will go before the Trainee Review Board are thus not capable of separation for analysis, and accordingly the entire decision-making process for termination decisions may be analyzed as one employment practice.  42 U.S.C. 2000e-2(k)(1)(B)(i).

222.    The FBI's Suitability Notation through discharge policies challenged herein are not job related or consistent with business necessity.  There are less discriminatory alternatives which would address the FBI's business needs more effectively than its current practices.

223.    The FBI's discriminatory practices described above have denied the Analyst Trainee Subclass members the opportunity to graduate from Basic Training and enter Analyst

positions, and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

224.     The Analyst Trainee Plaintiffs request relief as provided in the Prayer for Relief below.

**<u>COUNT FIVE</u>**
**Violation of Title VII, 42 U.S.C. § 2000e *et seq.*,**
**(Disparate Treatment)**
**Brought by Plaintiff "B.G." on behalf of herself.**

225.     Plaintiff B.G. repeats and realleges the allegations contained in paragraphs 1 through 54, and 77 through 194.

226.     This claim is brought by Plaintiff B.G. on behalf of herself.

227.     The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*  Defendant discriminated against B.G. in discharging her from Basic Training because of her sex.

228.     B.G. was qualified for the Agent Trainee position, performed her duties adequately and met the expectations of her employer, having completed all but one of the required academic and skills tests with impressive scores.  During grappling training sessions B.G. did not receive feedback indicating a deficiency in grappling skills.

229.     Defendant treated B.G. differently than her male colleagues when it singled her out in grappling training sessions and partnered her with instructors rather than other students in training sessions and her grappling retest.  Defendant applied subjective metrics of the grappling tests more harshly to B.G. because of her gender and relied on such tests to discharge her from Basic Training.

230.     B.G.'s sex was the determining factor and/or a motivating factor in her discharge from Basic Training.

231.    Defendant's discriminatory practices described above denied B.G. the opportunity to graduate from Basic Training and enter an Agent position, and compensation and promotions to which she is entitled, which has resulted in the loss of past and future wages and other job benefits.

232.    The conduct described above caused B.G. emotional harm and other forms of harm proximately caused by the FBI's discriminatory conduct.

233.    Agent Trainee Plaintiffs request relief as provided in the Prayer for Relief below.

### COUNT SIX
#### Violation of Title VII, 42 U.S.C. § 2000e *et seq.*,
#### (Hostile Work Environment)
#### Brought by Plaintiffs Erika Wesley and B.A. on behalf of themselves.

234.    Plaintiffs Erika Wesley and B.A. repeat and reallege the allegations contained in paragraphs 1 through 54, and 77 through 194.

235.    Defendant created hostile environments for Plaintiffs Erika Wesley and B.A. Defendant denied Ms. Wesley and B.A. a non-abusive workplace and the opportunity to work without, fear, intimidation, ridicule, upset, humiliation and unwelcome disturbances. Defendant's conduct was severe and pervasive, and that conduct altered the terms, conditions and enjoyment of Ms. Wesley's and B.A.'s employment with Defendant.  Reasonable female employees would find the conduct abusive, offensive and humiliating.

236.    Supervisors have made and condoned the actions of other employees in making comments to female employees, including Ms. Wesley and B.A., that were unwelcome and based on sex.

237.    These comments were sufficiently severe and pervasive as to alter the terms, conditions and privileges of employment, and to create an abusive, intimidating, hostile and offensive working environment for Ms. Wesley and B.A.

238.   This conduct constitutes sexual harassment and discrimination based on sex in violation of § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2.

239.   These supervisors were acting within the scope of their employment with defendants when they engaged in harassment of and discrimination against female employees.

240.   This harassment and discrimination took place in the workplace during working hours.

241.   Defendant had actual and constructive knowledge of harassment of and discrimination against Ms. Wesley and B.A. and failed to take remedial action of any kind whatsoever.

242.   Defendant acted in such a manner as to render the FBI's EEO or anti-harassment policies meaningless as a policy to address and/or combat sexual harassment and abuse in the workplace.  Nonetheless, Ms. Wesley and B.A. expressly complained about the harassment.  Ms. Wesley informed Trainee Management Unit Chief Kellie Holland in the beginning of March 2018.  B.A. informed her class counselor of the harassment in late May or early June 2018.

243.   As a proximate result of Defendant's actions, Ms. Wesley and B.A. suffered humiliation, fear, intimidation, ridicule, upset, economic losses and other emotional injuries and will suffer severe damages and injuries including but not limited to, humiliation, loss of self-esteem, hurt, fear, frustration, emotional distress, inconvenience and damage to their professional reputations.

244.   The conduct alleged above, which was permitted to occur by Defendant, was undertaken with malice or with reckless indifference to the federally protected rights of Ms. Wesley and B.A.  Defendant is liable to Ms. Wesley and B.A. for violation of § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2.

## COUNT SEVEN
**Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.***
**(Discrimination in Denial of Reasonable Accommodations)**
**Brought by Plaintiffs Spencer Lee and Erika Wesley on behalf of themselves.**

245.     Plaintiffs Spencer Lee and Erika Wesley repeat and reallege the allegations contained in paragraphs 1 through 54, and 77 through 194.

246.     Ms. Lee and Ms. Wesley have disabilities under the meaning of 29 U.S.C. § 705(20) and 42 U.S.C. § 12102(1)(A).  Ms. Lee has debilitating migraines which substantially limit major life activities and major bodily functions when they are active.  Ms. Wesley's medical condition substantially limits her major life activities and major bodily functions when it is active.  It impairs her ability to sit for long periods of time, causes migraines, severe allergies, and other debilitating symptoms.

247.     Prior to attending Basic Training, Ms. Lee and Ms. Wesley gave notice of their disabilities by formally requesting reasonable accommodations.

248.     Ms. Lee and Ms. Wesley were qualified for their positions as Analyst Trainees and were able to perform the essential functions of the positions with reasonable accommodations.

249.     The FBI denied Ms. Lee and Ms. Wesley reasonable accommodations.  Ms. Lee was denied her accommodations when her instructor, Mr. Zwiesler, and her counselor, Ms. Bouey, interfered with her ability to store her medications in a personal refrigerator, carry water to class, and eat small amounts of food outside of mealtimes.  Ms. Wesley was denied her accommodations when her instructor, Mr. Zwiesler, interfered with her ability to bring a purse containing medicine to class and when her counselor, Ms. Bouey required her to unplug her personal refrigerator and remove the medical grade air purifier.

250.     Ms. Bouey and Mr. Zwiesler were acting within the scope of their employment when they denied Ms. Lee's and Ms. Wesley's accommodations.

251.     Defendant's discriminatory practices described above have caused Ms. Lee and Ms. Wesley harm, including severe emotional distress and physical harm, including adverse health effects from the removal of the accommodations.

252.     Accordingly, Defendant violated Ms. Lee's and Ms. Wesley's rights protected by Rehabilitation Act of 1973, 29 U.S.C. § 794.

### COUNT EIGHT
**Violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act of 1973, § 29 U.S.C. § 794.**
**(Retaliation)**
**Brought by Plaintiff Erika Wesley on behalf of herself.**

253.     Plaintiff Wesley repeats and realleges the allegations contained in paragraphs 1 through 54, and 77 through 194.

254.     Ms. Wesley opposed unlawful employment practices by objecting to sexual advances and sexual and gender-based comments, objecting to the denial of her and Ms. Lee's reasonable accommodations, and filing internal complaints of harassment and disability discrimination, then EEO charges, and ultimately this lawsuit.  Such activities are protected under § 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, and the Americans with Disabilities Act, 42 U.S.C. § 12203.  Such activities were known to her management at the FBI.

255.     Following such actions, Ms. Wesley faced harassing actions such as issuing suitability notations during Basic Training, removing her previously approved accommodations during Basic Training, being denied the opportunity to telework, which she was previously permitted to do, having her assigned position eliminated, and not being assigned work consistent with her Analyst position and grade level.  These actions constitute retaliation in violation of

§ 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3, and the Rehabilitation Act of 1973, § 29 U.S.C. § 794.

256.    Supervisors were acting within the scope of their employment when they retaliated against Ms. Wesley.

257.    Defendant had actual and constructive knowledge of the retaliation perpetrated against employees and refused to take remedial action of any kind.

258.    Defendant's retaliatory practices described above have caused Ms. Wesley harm, including severe emotional distress and loss of wages.

259.    Accordingly, Defendant violated Plaintiff's rights protected by § 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3, and the Rehabilitation Act of 1973, § 29 U.S.C. § 794.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

1.      Certify the proposed class, with a subclass of Agent Trainees, the Agent Trainee Plaintiffs as Agent Trainee Subclass representatives, and Cohen Milstein Sellers & Toll PLLC and David Shaffer as class counsel;

2.      Certify the proposed class, with a subclass of Analyst Trainees, the Analyst Trainee Plaintiffs as Analyst Trainee Subclass representatives, and Cohen Milstein Sellers & Toll PLLC and David Shaffer as class counsel;

3.      Enter a declaratory judgment that the practices complained of in the First, Second, Third, and Fourth Causes of Action are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*;

4.      Enter a permanent injunction prohibiting the FBI, its officers, agents, employees and successors, from engaging in the discriminatory employment practices complained of herein

67

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.*, as amended;

5.    Enter a permanent mandatory injunction requiring the FBI adopt employment practices in conformity with the requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*;

6.    An award of all damages that Plaintiffs, including the Agent Trainee Subclass and Analyst Trainee Subclass, have sustained as a result of the Federal Bureau of Investigation's conduct, including back pay, front pay, general and special damages for lost compensation and job benefits that they would have received but for the discriminatory practices of the Federal Bureau of Investigation;

7.    An award of compensatory damages for emotional distress that Plaintiffs, including the Agent Trainee Subclass and Analyst Trainee Subclass, have sustained;

8.    Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

9.    Pre-Judgment and Post-Judgment interest, as provided by law; and

10.    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

As to Plaintiff B.G.'s individual claims:

11.    An award of all damages that Plaintiff B.G. has sustained as a result of the Federal Bureau of Investigation's conduct, including back pay, front pay, general and special damages for lost compensation and job benefits that she would have received but for the discriminatory practices of the Federal Bureau of Investigation.

12.    An award of compensatory damages and injunctive relief, appropriate to the proof at trial;

13.    Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

14.    Pre-Judgment and Post-Judgment interest, as provided by law; and

15.    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

As to Plaintiff Lee's individual claims:

16.    An award of all damages that Plaintiff Lee has sustained as a result of the Federal Bureau of Investigation's conduct, including pain and suffering, medical costs, back pay, front pay, general and special damages for lost compensation and job benefits that she would have received but for the discriminatory practices of the Federal Bureau of Investigation.

17.    An award of compensatory damages and injunctive relief, appropriate to the proof at trial;

18.    Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

19.    Pre-Judgment and Post-Judgment interest, as provided by law; and

20.    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

As to Plaintiff Wesley's individual claims:

21.    An award of all damages that Plaintiff Wesley has sustained as a result of the Federal Bureau of Investigation's conduct, including pain and suffering, medical costs, back pay,

front pay, general and special damages for lost compensation and job benefits that she would have received but for the discriminatory practices of the Federal Bureau of Investigation;

22.     An award of compensatory damages and injunctive relief, appropriate to the proof at trial;

23.     Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

24.     Pre-Judgment and Post-Judgment interest, as provided by law; and

25.     Such other and further legal and equitable relief as this Court deems necessary, just and proper.

As to Plaintiff B.A.'s individual claims:

26.     An award of all damages that Plaintiff B.A. has sustained as a result of the Federal Bureau of Investigation's conduct, including back pay, front pay, general and special damages for lost compensation and job benefits that she would have received but for the discriminatory practices of the Federal Bureau of Investigation;

27.     An award of compensatory damages and injunctive relief, appropriate to the proof at trial;

28.     Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

29.     Pre-Judgment and Post-Judgment interest, as provided by law; and

30.     Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial as to all claims so triable.

September 12, 2019                                 Respectfully submitted,


                                                   */s/Christine E. Webber*
                                                   Joseph M. Sellers (#318410)
                                                   Christine E. Webber (#439368)
                                                   Stacy Cammarano, DC Bar #1510736
                                                   Cohen Milstein Sellers & Toll PLLC
                                                   1100 New York Ave. NW ● Fifth Floor
                                                   Washington, DC 20005
                                                   (202) 408-4600
                                                   jsellers@cohenmilstein.com
                                                   cwebber@cohenmilstein.com
                                                   scammarano@cohenmilstein.com

                                                   David J. Shaffer #413484
                                                   5012 Aurora Dr.
                                                   Kensington, Maryland 20895
                                                   Phone:  202-210-7424
                                                   E-Mail: davidshaffer511@gmail.com

                                                   *Attorneys for Plaintiffs*