# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PAULA BIRD, *et al.*, | ) |
| | ) |
| | ) Civil Action No. 1:19-CV-1581 (JMC) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Judge: Jia M. Cobb |
| | ) |
| MERRICK GARLAND, Attorney General of | ) |
| the United States, named in his official | ) |
| Capacity, as head of the Department of Justice, | ) |
| | ) |
| Defendant. | ) |

**<u>SETTLEMENT AGREEMENT</u>**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION AND SUMMARY OF CASE ............................................................ 1

II.      GENERAL TERMS OF THE SETTLEMENT AGREEMENT ........................................ 2
     A.      Definitions ............................................................................................................ 2
     B.      Cooperation .......................................................................................................... 4

III.      THE SETTLEMENT CLASS ........................................................................................ 4

IV.      NOTICE AND FINAL APPROVAL HEARING ........................................................... 5
     A.      Preliminary Approval ........................................................................................... 5
     B.      Notice ................................................................................................................... 5
     C.      Objections ............................................................................................................ 6
     D.      Opt-outs ............................................................................................................... 6
     E.      Motion for Final Approval and Dismissal of Claims ........................................... 7
     F.      Post-Approval Notice ........................................................................................... 7
     G.      Effect of Non-Approval ....................................................................................... 7

V.      MONETARY RELIEF ................................................................................................... 9
     A.      Settlement Fund ................................................................................................... 9
     B.      Tax Treatment ..................................................................................................... 9

VI.      REINSTATEMENT ...................................................................................................... 10
     A.      General Eligibility for Reinstatement ................................................................ 10
     B.      Election of Reinstatement. ................................................................................. 10
     C.      Documents Necessary to Support Reinstatement Election .................................. 11
     D.      Additional Reinstatement Terms ....................................................................... 11
     E.      Additional Relief ............................................................................................... 11

VII.      SETTLEMENT ADMINISTRATION ......................................................................... 12

VIII.      PROGRAMMATIC RELIEF ...................................................................................... 14
     A.      Selection of IOPs ............................................................................................... 14
     B.      Protocol for handling recommendations from the IOPs ...................................... 14
     C.      Scope of IOP review .......................................................................................... 15
     D.      Excluded from IOP review ................................................................................ 16
     E.      Confidentiality ................................................................................................... 16

IX.      ATTORNEYS' FEES, EXPENSES, AND COSTS ...................................................... 16

X.      RELEASES .................................................................................................................. 17
     A.      Release ............................................................................................................... 17
     B.      No Release of Future Claims .............................................................................. 17
     C.      Ownership of Claims ......................................................................................... 17

XI.      OTHER CONDITIONS OF SETTLEMENT ............................................................... 17
     A.      No Admission of Liability ................................................................................. 17

B.      Exhibits ............................................................................................................. 18
C.      Notices to Counsel ............................................................................................ 18
D.      Failure to Insist on Strict Compliance ............................................................ 18
E.      Preservation of Confidentiality ....................................................................... 19
F.      Modifications to this Agreement ..................................................................... 19
G.      No Drafting Presumption ................................................................................. 19
H.      Integration ........................................................................................................ 19
I.      Interpretation of Terms .................................................................................... 19
J.      Conditions That Render Settlement Agreement Void or Voidable .................... 19
K.      Counterparts ..................................................................................................... 19
L.      Agreement Binding .......................................................................................... 20
M.      Duties Consistent with Law and Regulations ................................................. 20
N.      Duty to Defend ................................................................................................. 20
O.      Warranty ........................................................................................................... 20
P.      Enforcement ..................................................................................................... 20

## SETTLEMENT AGREEMENT

I. **INTRODUCTION AND SUMMARY OF CASE**

    **A.**    Subject to approval by the District Court for the District of Columbia (the "Court"), this Class Action Settlement Agreement ("Agreement") is entered into by and between Plaintiffs Paula Bird, Clare Coetzer, Lauren Rose, Danielle Snider, "D.A.", "S.B.", "D.C.", "P.E.", "W.M.", "C.S.", "L.S.", "G.T.", and "T.S.", on behalf of themselves and the Class defined herein, and Defendant Merrick Garland, in his official Capacity as Attorney General of the United States, and head of the Department of Justice ("FBI" or "Defendant").[1]

    **B.**    On May 29, 2019, Plaintiffs filed a putative class complaint in the U.S. District Court for the District of Columbia alleging sex discrimination and related claims experienced by Plaintiffs and two putative subclasses while attending the Federal Bureau of Investigation's Basic Field Training Course, as well as some individual claims. Plaintiffs subsequently filed amended complaints on September 12, 2019, January 31, 2020, March 16, 2020, and June 6, 2022, and the operative complaint on August 30, 2024.

    **C.**    Specifically, among other things, the Fifth Amended Complaint alleges, on behalf of a putative class of New Agent Trainees ("NAT") that Defendant engaged in a pattern or practice of intentional discrimination against female NATs when issuing Suitability Notations, initiating Suitability Reviews, referring for Trainee Review Boards ("TRB") (previously known as New Agent Review Boards, or NARB) and making discharge, recycling, and reinstatement decisions, and also maintained a system for discharge that had an adverse impact on the class in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*

    **D.**    The purpose of this Settlement Agreement is to make a full, complete, and final resolution of all claims and causes of action, whether known or unknown as of the effective date of this Agreement, that have been or could have been asserted in *Bird v. Garland*, Case No. 19-1581 (D.D.C.) (Cobb, J.) (the "Action") against Defendant by the Settlement Class, including each of the members of that Class, arising out of their time at the FBI's Special Agent training program in Quantico, Virginia, known as the Basic Field Training Course ("BFTC"), in the period prior

---

[1] The Fourth Amended Complaint filed on June 6, 2022, also included claims on behalf of a putative class of New Intelligence Analyst Trainees and individual Title VII claims brought on behalf of four Plaintiffs, Gabrielle Barbour, Spencer Lee, Erika Wesley, and "B.G.", as well as individual claims under the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, by Plaintiffs Lee and Wesley. On August 30, 2024, Plaintiffs filed a Fifth Amended Complaint that excludes the NIAT putative class claims; the parties have also separately agreed to settle the individual claims of Plaintiffs Barbour and B.G. This Settlement Agreement is only related to the New Agent Trainee class claims, and does not apply to the individual claims of Plaintiffs Barbour, Lee, Wesley, or "B.G."

to August 10, 2024.

**E.**     Plaintiffs (as identified in Sec. II.A.23, *infra*) and Defendant (collectively "the Parties") mutually desire to avoid further litigation in this matter and to resolve, without any admission of liability, all claims which the Settlement Class or any of its members have brought or could have brought in the Action, including claims for attorneys' fees and costs.

**F.**     This Settlement Agreement is the result of months of collaborative, arm's-length settlement negotiations by the Parties and their respective counsel to resolve the claims in the Action.

## II.     GENERAL TERMS OF THE SETTLEMENT AGREEMENT

**A.**     **Definitions**: The following terms shall have the meanings defined in this Section where used in this Agreement:

1.     "Action" means the Plaintiffs' lawsuit alleging sex discrimination against Defendant captioned *Paula Bird, et. al. v. Merrick Garland*, 1:19-cv-1581 (JMC) initiated on May 29, 2019, and pending in the District Court for the District of Columbia.

2.     "Agreement" means this settlement agreement and all exhibits attached to it.

3.     The "Appointed Neutral" is the Hon. Ellen Huvelle (U.S. District Judge, inactive).

4.     "BFTC" means the Basic Field Training Course, the FBI's training program at Quantico, Virginia for New Agent Trainees and others.

5.     The "Claim Deadline" is 60 calendar days from the Final Approval Date.

6.     "Claim Form" means a document Class Members must use if they submit information to the Appointed Neutral in order for the Neutral to determine each Class Member's Damages Award. A copy of the form is attached hereto as Exhibit B.

7.     "Class Counsel" means the law firms of Cohen Milstein Sellers & Toll PLLC and David Shaffer Law PLLC.

8.     "Class Members" means all individuals in the Settlement Class (as defined herein) who do not opt out.

9.     "Class Settlement Fund" means the Nineteen Million Four Hundred Thousand Dollars ($19,400,000.00) of the Total Settlement Amount allocated to payments to Class Members for Class Claims and is inclusive

of all taxes; it is exclusive of third-party settlement administration expenses, attorneys' fees and costs.

10.  "Court" and "District Court" means the Court having jurisdiction over this Action, the District Court for the District of Columbia.

11.  A "Damages Award" is the binding and final result of the Neutral's adjudication and represents the amount allocated to each Class Member, prior to deduction of taxes.

12.  "Date of Final Approval" means the date on which an order granting approval of this Settlement Agreement is entered, via the Electronic Case Filing System of the U.S. District Court for the District of Columbia, on the docket of this Case.

13.  "Day" means calendar day, unless otherwise specified.

14.  "Defendant" means, individually and collectively, Merrick Garland, in his official capacity as Attorney General of the United States and head of the Department of Justice, his successors as Attorney General of the United States, the U.S. Department of Justice, its agencies, instrumentalities, agents, officers, and employees.

15.  "Defendant's Counsel" means counsel of record in the Action from the U.S. Department of Justice.

16.  "Effective Date" means the date on which the Settlement becomes "Effective," meaning that it was approved by the Court after the Final Fairness hearing, and either: (1) the District Court for the District of Columbia has rendered a final judgment affirming the Court's final approval without material modification and the date for further appeal or review has passed without further appeal or review; (2) the District Court for the District of Columbia has rendered a final judgment affirming the Court's final approval without material modification and the further appeals have been resolved without material modification of the final approval order; (3) the applicable date for seeking appellate review of the Court's final approval of the Settlement has passed without a timely appeal or request for review having been made; or (4) upon the date the Court grants final approval if no objections to the Settlement have been filed.

17.  "Final Approval Hearing" means the hearing at which the Court will determine whether to grant Final Approval of the Settlement Agreement.

18.  The "I/O Psychologists" or "I/OPs" are Industrial/Organizational Psychologists Dr. Wayne Cascio and Dr. Sheldon Zedeck (or any replacements), who will be conducting a review of Defendant's policies as described in Sec. VIII below.

19.     "Judgment" means the judgment entered by the Court based upon the Final Approval.

20.     "Named Plaintiffs" mean Paula Bird, Clare Coetzer, Lauren Rose, Danielle Snider, "D.A.", "S.B.", "D.C.", "P.E.", "W.M.", "C.S.", "L.S.", "G.T.", and "T.S.".

21.     "Notice" means the Notice of Class Action Settlement, substantially in the form attached hereto as Exhibit A, and as approved by the Court.

22.     "Parties" means, collectively, the Plaintiffs and Defendant as defined herein.

23.     "Plaintiffs" means, collectively, Named Plaintiffs and Class Members.

24.     "Preliminary Approval" means the Order of the Court preliminarily approving this Settlement Agreement and the form of the Notice to be sent to Class Members.

25.     "Qualified Settlement Fund" or "QSF" means the account established by the Settlement Administrator for the Class Settlement Fund.

26.     "Reinstatement Form" means a document Class Members who are eligible for reinstatement under Sec. VI must submit if they elect to seek to be reinstated. A copy of the form is attached hereto as Exhibit C.

27.     The "Settlement Administrator" means the individual or entity responsible for establishing and maintaining the Qualified Settlement Fund.

28.     "Settlement Class" means the Class as described in Sec. III below.

29.     "Total Settlement Amount" means Twenty-Two Million Six Hundred Thousand Dollars ($22,600,000.00), which consists of all payments to Class Members for Class claims, all third-party settlement expenses, any taxes owed, all payments to I/O Psychologist Experts, and attorneys' fees, costs, and expenses, together with interest subsequently earned thereon.

**B.**    **Cooperation**: The Parties agree that they will cooperate to effectuate and implement all terms and conditions of this Settlement Agreement, including the administration of the claims process, and exercise good faith efforts to accomplish the terms and conditions of this Settlement Agreement. The Parties will make every effort to consent to changes to this Settlement Agreement required by the Court in connection with Final Approval of the Settlement.

## III.    THE SETTLEMENT CLASS

**A.**    The Parties agree, for purposes of this Settlement Agreement only, to certification

of a Federal Rule 23(b)(3) opt out class, subject to court approval.

**B.**     The Settlement Class is comprised of all female New Agent Trainees who received suitability notations and were dismissed from the FBI's BFTC (previously New Agent training program) after appearing before a Trainee Review Board ("TRB") or New Agent Review Board ("NARB") between April 17, 2015, and August 10, 2024, excluding any individual whose dismissal was based solely on an Honor Code violation and any individual who previously signed a settlement agreement with Defendant waving any and all claims arising from her time at the BFTC as of the effective date of her settlement agreement.

**C.**     The Settlement Class does not include any female New Agent Trainee who was dismissed from the BFTC or New Agent training program without appearing before a TRB or NARB.

**D.**     The Settlement Class is comprised of 34 individuals, the specific identities of whom the parties have previously agreed upon and named in the attached sealed Exhibit I. Exhibit I also identifies the Class Members who may not seek an election of reinstatement.

## IV.     NOTICE AND FINAL APPROVAL HEARING

### A.     <u>Preliminary Approval</u>

1.     By October 4, 2024, Plaintiffs shall file a motion with the Court requesting the Court to enter an order preliminarily approving this Settlement Agreement, provisionally certifying the Settlement Class, and approving the Notice to be sent to Class Members describing the terms of the Settlement and informing them of their rights to submit objections and to opt out, the date of the Final Fairness Hearing, and providing copies of the Claim Form and Reinstatement Form.

2.     The proposed Notice is attached as Exhibit A, the Claim Form as Exhibit B, and the Reinstatement Form as Exhibit C.

### B.     <u>Notice</u>

1.     Within fifteen (15) days after the Court grants preliminary approval, Class Counsel will send the Notice of Settlement, Claim Form, and Reinstatement Form to all thirty-four (34) previously agreed upon Class Members by first class U.S. mail and by email. In the event of returned or non-deliverable notices, Class Counsel will make reasonable efforts to locate Class Members and re-send the notices.

2.     The definition for the Settlement Class differs from the definition of the proposed class in the Complaint, which did not exclude those dismissed solely based on Honor Code violations or those who have separately settled their claims with the FBI for claims arising from their time at the

BFTC. The individuals who fell within the definition of the original putative class as pled in the Complaint, but do not fall within the definition of the Settlement Class have been identified. They will receive notice from Class Counsel that they do not qualify under the Settlement Class definition, and thus cannot participate in this Settlement Agreement or receive any awards. A copy of the notice to these individuals is attached hereto as Exhibit D.

3.      Within seven (7) days after the Court grants preliminary approval, Defendant will provide to Class Counsel the last known address and email address for each Class Member. Defendant will simultaneously provide to Class Counsel the last known address and email address for the individuals who fell within the definition of the original proposed class but do not fall within the definition of the Settlement Class. If Class Counsel are unable to reach the Class Member using the information provided, the FBI will provide the social security number for the Class Members who could not be found to be used solely to facilitate tracing that Class Member.

**C.     <u>Objections</u>**

1.      Class Member objections to this Settlement Agreement, if any, must be submitted in writing, and must include the basis of the objection. Objections must be submitted to Class Counsel on or before forty-five (45) days after the Notice of Settlement is mailed to Class Members. Class Counsel shall provide to Defendant's Counsel on a weekly basis all objections that are timely received. No one may appear at the Final Approval Hearing for the purpose of objecting to the Settlement Agreement without first having submitted their objection(s) in writing by the deadline noted above. Class Counsel shall file with the Court all Class Member objections within five (5) days of the deadline for submitting such objections.

**D.     <u>Opt-outs</u>**

1.      Any Class Member who wishes to opt out of the Settlement must submit to Class Counsel a written, signed statement that they are opting out, postmarked or emailed to Class Counsel on or before forty-five (45) days after the Notice of Settlement is mailed to Class Members. To be effective, the statement must include a written statement confirming that the individual is aware that by opting out they will forego the opportunity to receive any benefits from this Settlement.

2.      Class Counsel shall provide to Defendant's Counsel on a weekly basis all opt out statements that are timely received. Class Counsel shall file with the Court all Class Member Opt Out Statements, with Class Members'

names filed under seal, within five (5) days of the deadline for notifying Class Counsel of an opt out.

3. Individuals who opt out are not entitled to any monetary award under this Settlement Agreement. Nor do such opt-out individuals release any claims.

4. With respect to each such individual who opts out, the statute of limitations for the individual to assert any claim for individual relief will resume running on the postmark date of their signed, written statement that they are opting out of the Settlement. Individuals who file opt outs may rescind their opt outs. To be effective, such recissions must be submitted in writing to Class Counsel and must be postmarked on or before forty-five (45) days after the date the Notice of Settlement is disseminated to Class Members.

**E.    Motion for Final Approval and Dismissal of Claims**

1. Plaintiffs will move for final approval within fourteen (14) days after the deadline for opt outs, recissions, and objections. Class Counsel will provide Defendant with a draft of the final approval motion in advance, and Defendant shall have the right to review and comment on it. Class Counsel shall provide Defendant with reasonable time to conduct such review. Class Counsel shall consider any such comments in good faith and shall not unreasonably reject such comments.

2. Within five (5) calendar days of the Effective Date (as defined in Sec. II.A.16, *supra*), the Parties will execute and jointly cause to be filed, in the United States District Court for the District of Columbia, a Joint Stipulation of Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii); a copy of the Joint Stipulation of Dismissal to be filed is attached as Exhibit E. Following such dismissal, Defendant agrees to stipulate to the filing of the Sixth Amended Complaint, attached hereto as Exhibit F.

**F.    Post-Approval Notice**

1. Once Final Approval has been granted, Class Counsel shall send the Post Approval Notice, attached hereto as Exhibit G, notifying Class Members of the Final Approval of this Settlement Agreement, and reminding Class Members of deadlines for the return of both the Claims Form and Reinstatement Form and any accompanying documentation.

**G.    Effect of Non-Approval**

1. In the event that this Settlement Agreement does not become final and binding, this Settlement Agreement will become null and void. No party shall be deemed to have waived any claims, objections, rights or defenses,

or legal arguments or positions. Neither this Settlement Agreement nor the Court's Preliminary or Final Approval thereof shall be admissible in any court regarding any issue or subject (except for the purpose of enforcing this Settlement Agreement). Each Party reserves the right to prosecute or defend the Action in the event that the Settlement Agreement does not become final and binding.

2.      If this Settlement Agreement is not approved by the Court or for any other reason is terminated or fails to become effective in accordance with its terms (or, if following approval by this Court, such approval is reversed or substantively modified on appellate review), the Parties shall be restored to their respective positions that existed in this Action prior to entering into this Settlement Agreement; the terms and provisions of this Settlement Agreement shall have no force or effect and shall not be used in the Action or in any proceeding for any purpose; the Settlement Fund shall be returned to Defendant, including the interest earned by the Settlement Fund through the date of termination (after deducting all costs and expenses, including costs of providing Notice of Settlement to Class Members paid or incurred by Class Counsel as of the date of the termination); any order entered by the Court in accordance with the terms of this Settlement Agreement shall be treated as vacated, *nunc pro tunc*; and the litigation of the Action will resume as if there had been no Settlement Agreement. The Parties retain all rights, claims, and defenses as to any of the allegations asserted in this Action. The Settlement Agreement will not represent a cap on damages available to the Named Plaintiffs or the Class if the Settlement Agreement fails to be effective in accordance with its terms.

3.      All negotiations in connection herewith, and all statements made by the Parties at or submitted to the District Court during the Fairness Hearing shall be without prejudice to the Parties to this Settlement Agreement and shall not be deemed or construed to be an admission by a Party of any fact, matter, or proposition.

4.      The Parties retain all defenses, arguments, and motions as to all claims that have been or might later be asserted in the Action, and nothing in this Settlement Agreement shall be raised or construed by anyone to defeat or limit any defenses, arguments, or motions asserted by either of the Parties. Neither this Settlement Agreement, nor the fact of its having been made, nor any exhibit or other document prepared in connection with this Settlement Agreement, shall be admissible, entered into evidence, or used in any form or manner in discovery in the Action or in any other action or proceeding for any purpose inconsistent with Rule 408 of the Federal Rules of Evidence.

## V.     MONETARY RELIEF

### A.     Total Settlement Amount

1.     Out of the Total Settlement Amount of Twenty-Two Million Six Hundred Thousand Dollars ($22,600,000.00), Nineteen Million Four Hundred Thousand Dollars ($19,400,000.00) shall be paid to the class ("Class Settlement Fund"), Two Million Seven Hundred Thousand Dollars ($2,700,000.00) shall be allocated for attorneys' fees, costs, and expenses, including settlement administration expenses, subject to Court approval as detailed in Sec. IX, and Five Hundred Thousand Dollars ($500,000.00) shall be allocated for the cost of the I/O Expert Review, as detailed in Sec. VIII. If the I/O Expert Review does not exhaust the $500,000 allocated, the remainder will be added to the Class Settlement Fund.

2.     The Class Settlement Fund is inclusive of all payments to Named Plaintiffs, Class Members, and any and all taxes owed, including employer taxes owed by Defendant.

3.     Any interest earned on the Class Settlement Fund may be used to defray settlement administration expenses.

4.     If any Class Member opts out in accordance with the procedure detailed in Sec. IV.D., a total of Five Hundred Thousand Dollars ($500,000.00) for each such individual shall be deducted from the amount Defendant must pay into the Class Settlement Fund.

### B.     Tax Treatment

1.     Compliance with all applicable federal, state, and local tax requirements will be the sole responsibility of Plaintiffs.

2.     Attached as Exhibit H, is Plaintiffs' plan for allocating the Class Settlement Fund, including tax withholding and tax reporting. As set forth in detail in Ex. H, all awards from the Class Settlement Fund will be reported to the IRS, with the awards divided between wages subject to payroll taxes and other damages not subject to withholding for payroll taxes. Defendant takes no position and expresses no approval of items in Ex. H. If this Agreement is approved by the Court, Ex. H will be considered binding on Plaintiffs.

3.     Nothing in this Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this Agreement or the settlement proceeds, and Plaintiffs are executing this Agreement without reliance on any representation by the Defendant as to the application of any such law.

## VI.    REINSTATEMENT

A.    **General Eligibility for Reinstatement:** To be eligible for Reinstatement under this Settlement Agreement, an individual must meet the following criteria:

1.    Be a Member of the certified Settlement Class;

2.    Whose dismissal from the New Agent Training Program or BFTC was not for violation of the Honor Code, FBI Core Values, FBI Standards of Conduct, or other misconduct; and

3.    Who is able to obtain and maintain a valid FBI Top Secret security clearance.

4.    Individuals who have been identified as ineligible for reinstatement based on paragraph A.2 above will be sent notice of that ineligibility with their notice of the settlement.

B.    **Election of Reinstatement:** A Class Member who elects to seek Reinstatement must notify the Parties within thirty (30) days of Final Approval of this Agreement of her election of one of the following reinstatement options by submitting the Reinstatement Form, attached hereto as Exhibit C, in addition to any supporting documentation.

1.    **Reinstatement as a NAT ("NAT Reinstatement")**: A Class Member who elects to seek reinstatement as a NAT shall attend the BFTC subject to the same terms that apply to all NATs, without any exceptions or conditions to the requirements for entrance to or graduation from the BFTC.

   a.    **Prerequisites**: A Class Member who elects NAT Reinstatement would be subject to all the prerequisites for attending the BFTC, including:

      i.    Passing the required pre-BFTC physical fitness test prior to being reinstated as a NAT; and

      ii.    Meeting the age requirement for entry to the BFTC, including by submitting the required information to obtain an age waiver, if necessary. The FBI intends to support requests for age waivers, if applicable, from eligible members of the Class.

2.    **Reinstatement as a New Intelligence Analyst Trainee ("NIAT Reinstatement")**: A Class Member who elects reinstatement as a NIAT shall attend the BFTC subject to the same terms that apply to all NIATs, without any exceptions or conditions to the requirements for entrance to or graduation from the BFTC.

10

a.   **Prerequisites:** A Class Member who elects NIAT Reinstatement would be subject to the prerequisites for attending the BFTC, including:

  i.   Passing the required pre-BFTC Phase I and Phase II tests, but not the Phase III test.

**C.   Documents Necessary to Support Reinstatement Election:**

  1.   In addition to timely returning the Reinstatement Form within thirty (30) days of Final Approval, Class Members electing Reinstatement must submit documentation consistent with the FBI's hiring policies and procedures to support their election.

**D.   Additional Reinstatement Terms:**

  1.   If a Class Member who elects to seek Reinstatement is found to be eligible for Reinstatement by Defendant and subsequently re-enrolled at the BFTC, that Class Member will only be eligible to receive a Damages Award for damages (back pay, interest, TSP losses, and compensatory damages) accrued through December 31, 2024, and would not be eligible to receive front pay as part of her Damages Award.

  2.   A Class Member who elects Reinstatement to the BFTC is not guaranteed to graduate.

    a.   **Options in the event of failure to graduate from the BFTC:** If a Class Member who elects Reinstatement does not graduate from the BFTC as a result of test failure or lack of suitability unrelated to the Honor Code, FBI Core Values, FBI Standards of Conduct, or other misconduct:

      i.   The FBI will make every effort to place them in their previous field office; or

      ii.   They may seek a professional staff position within the FBI, consistent with FBI policy.

**E.   Additional Relief:** A Class Member who graduates from the BFTC following Reinstatement as a NAT under this Agreement would receive the following additional relief:

  1.   Guaranteed placement in one of her top three field office preferences for her first office placement. After this initial placement immediately following graduation from the BFTC, any subsequent office assignments would be made on the same terms as generally applicable to FBI Special Agents.

2. Adjustment to the grade/step she would have been receiving as a Special Agent had she graduated with her original class. She will receive the adjustment upon successful completion of the New Agent Development Program in her first field office as a Special Agent.

## VII.   SETTLEMENT ADMINISTRATION

A. Exhibit H sets forth in detail Plaintiffs' explanation of how the Class Settlement Fund will be allocated, including completion of the Claim Form, Class Counsel's availability to assist, and the detailed methodology for calculating economic damages. Claims packets will be submitted by Class Counsel to the Appointed Neutral who will determine damages for each Class Member, and if the total exceeds the Class Settlement Fund, each Class Member's award will be reduced proportionately.

B. Plaintiffs are solely responsible for the administration of the settlement. Defendant makes no representation of approval and takes no position whatsoever as to the legality or appropriateness of items in the attached Exhibit H, which contains solely Plaintiffs' proposal. The Parties agree that Defendant will not have input into the distribution or allocation of Damages Awards from the Class Settlement Fund to individual Class Members. Plaintiffs have attached their proposed framework for purposes of providing notice to the Class and satisfying the requirements of Rule 23 of the Federal Rules of Civil Procedure, both required for approval of this Agreement. If this Agreement is approved by the Court, Ex. H will be considered binding on Plaintiffs.

C. Plaintiffs will provide the FBI with a report showing the amount paid to each class member for damages reported on Form 1099, and for lost wages reported on a W-2. This report will not be shared except: within the FBI on a need-to-know basis, external audits, pursuant to governmental oversight of the FBI, or as required by Congress or law.

D. **Settlement Administrator**

1. The Settlement Administrator will be responsible for:

   a. Establishing a Qualified Settlement Fund ("QSF") (as described in Section 46B of the Internal Revenue Code of 1986, as amended, and Treas. Reg. Section 1.468B-1, *et seq.*) in which to deposit monies transferred by Defendant.

   b. Making payments from the QSF for attorneys' fees, costs, and expenses to Class Counsel, consistent with the Court's order on attorneys' fees in granting final approval of this Settlement.

   c. Calculating the employer and employee share of payroll taxes associated with the wage portion of each Class Member's Damages Award as established by the Appointed Neutral, making

all required tax payments and filings, and distributing to each Class Member their payment (less any required tax payments), consistent with the Appointed Neutral's allocation.

    d.    Creating and distributing necessary tax documents to Class Members in connection with their Settlement Awards.

2.    The Settlement Administrator will be Miller Kaplan Arase LLP.

**E.    Settlement Fund**

1.    Subject to unforeseen circumstances, Defendant will make every effort to pay within sixty (60) days after the Effective Date the amount of Twenty-Two Million One Hundred Thousand Dollars ($22,100,000.00), less any deductions due to opt-outs as set forth in Sec. IV.D.3 to the QSF set up by the Settlement Administrator.

2.    This sum is inclusive of payment for: (1) all Damages Award payments to Class Members; (2) the employer's portion of payroll taxes applicable to the portion of the settlement payments designated as wages; (3) Class Counsel's attorneys' current and future fees and expenses in connection to this Action; and (4) all third-party settlement administration expenses.

3.    Within three (3) business days after the Settlement Administrator has received the amount in subparagraph 1, *supra*, from Defendant, payment will be made to Class Counsel based on the fees and costs awarded by the Court in granting final approval of the settlement.

4.    Within fifteen (15) business days after the Appointed Neutral has submitted her report detailing the award for each Class Member to the Parties and Settlement Administrator, the Settlement Administrator will calculate required tax withholdings, make necessary tax payments, and issue payment to each class member.

**F.    Appointed Neutral and the Neutral's Report**

1.    The Plaintiffs intend to request the Court appoint the Honorable Ellen Huvelle (inactive) to serve as the Appointed Neutral for the purposes of allocating the Class Settlement Fund to the Class Members. Judge Huvelle is not accepting any compensation for this service.

2.    The Appointed Neutral's determination of each Class Member's Damages Award shall be conclusive, and neither the Class Members, Class Counsel, nor Defendant shall be able to appeal the Neutral's decision.

3.    The Appointed Neutral will submit a report identifying the total Economic Damages for each Class Member, by category, and the total Compensatory Damages for each Class Member. The report will also designate for each

13

Class Member if she elected reinstatement, and thus had damages limited to exclude front pay and pension loss, and if she was found to have inadequately mitigated damages, and thus had economic damages recalculated from her original submission. Based on the Appointed Neutral's report, the Settlement Administrator will calculate the Total Damages (excluding the Minimum Payment) for each Class Member, the combined total of all of the Total Damages for all Class Members, the percentage of the total accounted for by each Class Member, and the final Damages Award for each Class Member.

4.      The Appointed Neutral's report will be due sixty (60) days after the Claims Deadline, with the option for an extension of thirty (30) days if needed. The Appointed Neutral's report will be submitted to the Class Counsel and to the Settlement Administrator.

## VIII.   PROGRAMMATIC RELIEF

### A.      <u>Selection of I/O Psychologists</u>

1.      The independent Industrial and Organizational Psychologists ("I/OPs") selected must meet certain minimum qualifications.

   a.      Agreement and approval of the parties;

   b.      Background check;

   c.      Security clearance. An I/OP must be able to obtain and maintain the requisite level of security clearance. An I/OP without a current security clearance can be selected so long as the I/OP obtains the requisite level of security clearance before commencing work.

2.      The Parties agree that the I/OPs will be Dr. Wayne Cascio and Dr. Sheldon Zedeck. In the event that Drs. Cascio and Zedeck are unable to obtain and maintain the requisite security clearance or are otherwise unable to continue to fulfill their duties as I/OPs, then the Parties will endeavor to select another I/OP.

### B.      <u>Protocol for handling recommendations from the I/OPs</u>

1.      The I/OPs will submit a report and recommendations to the FBI and Class Counsel for review.

2.      The FBI will provide a written response within a reasonable period of time not to exceed 120 days—subject to unforeseen operational constraints—to Class Counsel and the I/OPs, identifying the recommendations that are being accepted as well as a written explanation of any recommendation that the FBI intends to modify or reject.

14

3.      Within 30 days of such a written response from the FBI, the FBI, any internal personnel, Class Counsel, and the I/OPs shall meet to discuss the recommendations the FBI intends to modify or reject.

4.      The Parties and the I/OPs shall attempt to resolve their differences. The discussions will continue on a regular basis until Class Counsel declares an impasse. Any remaining disputes at the time of impasse will be submitted to the Director of the FBI. The Director or Deputy Director will meet with the I/OPs and Class Counsel, as well as review any written submissions including from Class Counsel and the I/OPs, and provide the FBI's final decision within forty-five (45) days of the meeting (with allowance for reasonable extensions as needed).

**C.      Scope of I/OP review**

1.      The I/OPs would review the policies, processes, procedures, and methods for evaluating trainees at the BFTC, for the purpose of identifying and mitigating any potential for bias and to increase the objectivity of evaluations.

2.      The role of the I/OPs is to examine and make recommendations regarding all policies/processes/procedures/methods for evaluating trainees at the BFTC *as they actually function in* practice including as interpreted or implemented by instructors, Training Division staff, the Trainee Review Board (New Agent Review Board), or Deputy Assistant Director. The I/OPs will issue a report of their recommendations at the end of this review that will include any and all recommendations, and the I/OPs will not provide contemporaneous recommendations during the review.

3.      Subject to the I/OPs' expertise and independent determination, this review could include, for example: the methods and procedures for observation and evaluation of trainees; Suitability Notation criteria and processes; Trainee Review Board criteria and processes (e.g., potential minimum notice to a NAT before a TRB proceeding; potential ability of a NAT to identify witnesses at TRB proceedings to speak on their behalf; records of TRB proceedings; and role/selection of the "minority representative" in TRB proceedings; etc.); administration of trainee surveys; training provided to instructors on providing feedback, evaluation, or assessment of trainees.

4.      The I/OPs will work with a liaison within the FBI Training Division. The liaison will facilitate the I/OPs' access to requested materials and scheduling of interviews with requested Training Division personnel. The parties may also provide documents produced in discovery to the I/OP subject to the Protective Order (modified as necessary to cover the I/OP process). The I/OPs will also meet with any of the Class Representatives who would like to provide feedback based on their personal experiences.

15

5.     The FBI will be responsible for contracting with the I/OPs and paying for their services. The total expense of the I/OP review shall not exceed $500,000 and shall last a reasonable amount of time. Following the conclusion of the I/OP review, any remainder of the $500,000 will be transferred by the FBI to the Settlement Administrator to add to the Class Settlement Fund.

**D.**     **Excluded from I/OP review**

1.     The I/OP review would not include matters that implicate FBI-wide Human Resources policies and procedures or the substantive design of the training program. Accordingly, issues that would *not* be subject to I/OP review include:

    a.     Use of Name Check;

    b.     Decisions about selection of instructors;

    c.     Removal of instructors;

    d.     Disciplinary decisions re: instructors and other Training Division staff; and

    e.     Training Division curriculum and the criteria that a trainee needs to meet for successfully graduating from the BFTC.

**E.**     **Confidentiality**

1.     The parties will move for Court approval of a revised Protective Order to explicitly cover materials produced to the I/OPs, whether previously produced in discovery or not, as well as information shared with the I/OPs through interviews or observation of BFTC.

## IX.     ATTORNEYS' FEES, EXPENSES, AND COSTS

**A.**     Defendant and its attorneys will not oppose Class Counsel's applications for attorneys' fees, costs, and expenses in a total amount not to exceed Two Million Seven Hundred Thousand Dollars ($2,700,000.00), a sum negotiated by the Parties separate from the negotiation of the Class Settlement Fund.

**B.**     The Court has discretion over the award of fees and costs to Class Counsel, and approval of the Settlement Agreement is not dependent upon the Court awarding the full amount of attorneys' fees, costs, and expenses sought.

**C.**     Once the Court has set the fee award and granted Final Approval to the Settlement Agreement, the Settlement Administrator is authorized to disburse to Class

Counsel the amount of the award.

X.    **RELEASES**

    A.    <u>**Release**</u>

      1.    Class Members, collectively and individually, together with all their heirs, administrators, representatives, attorneys, successors, and assigns, hereby RELEASE, WAIVE, ACQUIT, and FOREVER DISCHARGE the United States, including the FBI, and the Attorney General from, and are hereby FOREVER BARRED and PRECLUDED from prosecuting, any and all presently known or unknown claims, causes of action, or requests for any injunctive and/or monetary and/or any other form of relief, including, but not limited to, damages, tax payments, debt relief, costs, attorneys' fees, expenses, and/or interest that have been or could have been asserted in the Action by reason of, with respect to, in connection with, or which arise out of, their time at the BFTC, which occurred before August 10, 2024.

      2.    The Parties agree that every Class Member ended her time in BFTC or New Agent Training prior to August 10, 2024, and no Class Member will return to BFTC for training until after the Effective Date of the Settlement.

    B.    <u>**No Release of Future Claims**</u>

      1.    Nothing in this Agreement shall be deemed a release, settlement, or waiver of claims by Plaintiffs related to or arising out of acts or omissions by Defendant after the Effective Date of this Agreement, including any acts or omissions following eligible class members' reinstatement to BFTC, if any.

    C.    <u>**Ownership of Claims**</u>

      1.    Settlement Class Members may not assign or transfer their rights to participate in this Settlement Agreement. The Parties and their counsel represent, covenant, and warrant that they have not directly or indirectly assigned, transferred, encumbered, or purported to assign, transfer, or encumber to any person or entity any portion of any liability, claim, demand, action, cause of action or right herein released and discharged.

XI.    **OTHER CONDITIONS OF SETTLEMENT**

    A.    <u>**No Admission of Liability**</u>

      1.    Neither this Settlement Agreement nor any order approving it constitutes an admission by the Attorney General and/or the United States of the truth of any allegation or the validity of any claim asserted in the Case, or of the liability of the Attorney General and/or the United States, nor a concession or an admission of any fault or omission of any act or failure to act, or of

any statement, written document, or report heretofore issued, filed or made by the Attorney General and/or the United States.

2.      Neither this Settlement Agreement nor any confidential papers related to the Settlement Agreement and created for settlement purposes only, nor any of the terms of either, may be offered or received as evidence of discrimination or unfair treatment in any civil, criminal, or administrative action or proceeding, nor shall they be the subject of any discovery or construed by anyone for any purpose whatsoever as an admission or presumption of any wrongdoing on the part of the Attorney General and/or the United States, or as an admission by any Party to this Settlement Agreement that the consideration to be given under the terms of this Agreement represents the relief that could have been recovered after trial.

3.      Defendant expressly denies any wrongdoing, as alleged by the Plaintiffs in this Action or otherwise. Defendant does not admit or concede any actual or potential fault, wrongdoing, or liability in connection with any facts or claims that have been or could have been alleged in this Action. Nonetheless, Defendant considers it desirable to settle the putative class claims in this Case on the terms set forth in this Agreement.

**B.      Exhibits**

1.      The Exhibits to this Settlement Agreement are material and integral parts hereof and are fully incorporated herein by this reference.

**C.      Notices to Counsel**

1.      All notices to counsel required or desired to be given under this Settlement Agreement shall be in writing and by email to lead counsel for the respective Parties. Specifically, such notices shall be email to Christine Webber (cwebber@cohenmilstein.com) of Cohen Milstein Sellers & Toll PLLC, and David Shaffer (david.shaffer@davidshafferlaw.com) of David Shaffer Law PLLC, for the Plaintiffs, and Section Chief, Litigation Branch, Office of General Counsel, Federal Bureau of Investigation, 935 Pennsylvania Ave NW, Washington DC, 20535 for Defendant at their respective addresses set forth herein (or to other such address as any party or counsel may designate in a notice).

**D.      Failure to Insist on Strict Compliance**

1.      The failure of any Party to insist in any one or more instances on strict compliance with the terms and conditions hereof shall not be construed to be a waiver of remedies available with respect to any prior or subsequent breach.

E.    **Preservation of Confidentiality**

1.    The provisions set forth in the July 14, 2022, Stipulated Protective Order Regarding Confidential Information shall remain in effect until replaced by an updated Protective Order as set forth in Sec. VIII.E, which shall remain in effect even after the conclusion of this litigation and all matters related to this Settlement.

F.    **Modifications to this Agreement**

1.    This Settlement Agreement may only be modified with the written agreement of the Parties, the approval of the District Court, and, if the District Court requires, notice to the Class Members.

G.    **No Drafting Presumption**

1.    All Parties hereto have participated, through their respective counsel, in the drafting of this Settlement Agreement and, therefore, this Settlement Agreement shall not be construed more strictly against one Party than another.

H.    **Integration**

1.    This Settlement Agreement and its Exhibits constitute the entire agreement of the Parties, and no prior statement, representation, or agreement that is not contained herein, will have any force or effect.

I.    **Interpretation of Terms**

1.    Whenever possible, each provision and term of this Settlement Agreement shall be interpreted in such a manner as to be valid and enforceable.

J.    **Conditions That Render Settlement Agreement Void or Voidable**

1.    This Settlement Agreement shall be void if it is disapproved at any stage by the Court and/or if the Court denies the motion for Final Approval or joint stipulation of dismissal mentioned in Sec. IV.E, *supra*.

K.    **Counterparts**

1.    This Settlement Agreement may be executed in counterparts. Each signed counterpart together with the others shall constitute the full Settlement Agreement. All executed counterparts and each of them shall be deemed to be one and the same instrument.

**L.**     **Agreement Binding**

1.     This Settlement Agreement will be binding on the Parties in all respects once it receives Final Approval by the Court. This Settlement Agreement shall inure to the benefit of, and be binding upon, the Parties hereto and their respective heirs, dependents, executors, administrators, trustees, legal representatives, personal representatives, agents, successors and assigns; provided, however, that this Settlement Agreement shall not inure to the benefit of any third party.

**M.**     **Duties Consistent with Law and Regulations**

1.     Nothing contained in this Settlement Agreement shall impose on the Attorney General and/or the United States any duty, obligation, or requirement, the performance of which would be inconsistent with law, as set forth in federal statutes, federal regulations, or elsewhere in effect at the time of such performance.

**N.**     **Duty to Defend**

1.     The Parties to this Settlement Agreement shall defend against any challenges to it in any forum.

**O.**     **Warranty**

1.     Plaintiffs' counsel and the Attorney General's counsel warrant that they are authorized to stipulate to settlement of the Action in accordance with the provisions set forth in the Settlement Agreement.

**P.**     **Enforcement**

1.     The Parties agree that the process set forth in this section is the exclusive process for remedying alleged violations of this Settlement Agreement, including failure to comply with any I/OP review process, following the filing of the joint stipulation of dismissal. The Parties further agree that following the filing of the stipulation of dismissal described in Sec. IV.E.2, *supra*, no other litigation action in the case pertaining to the enforcement of this Settlement Agreement, including but not limited to the filing of any motions or pleadings, may be taken except as set forth in this section.

2.     The Parties will work diligently and in good faith to resolve all disputes that may arise during the term of this Settlement Agreement concerning the rights, obligations, and duties of the Parties to the Settlement Agreement.

3.     The Court shall retain jurisdiction over this action beyond the Final Approval of this Agreement only with respect to the payment provision of

Sec. VII.E and the Claims Process outlined in Sec. VII and Ex. H, and only for a period of eight months from the Effective Date of this Agreement. Other than this provision, the Court will not retain jurisdiction over any aspect of this action, or in connection with the enforcement of any of its provisions, after Final Approval.

4.     Enforcement of any provision of this Settlement Agreement shall be prosecuted by Class Counsel or Defendant's Counsel only, not third parties.

5.     **Notice of Non-Compliance:** If a Party to this Settlement Agreement ("Initiating Party") believes that any other Party ("Responding Party") has not complied with any of the provisions of this Agreement, the Initiating Party shall provide the Responding Party with a written Notice of Non-Compliance containing the following information: (i) the alleged act of non-compliance; (ii) a reference to the specific provision(s) of this Agreement that the Initiating Party alleges the Responding Party has not complied with; (iii) a statement of the remedial action sought by the Initiating Party; (iv) a brief statement of the specific facts, circumstances, and legal argument supporting the position of the Initiating Party; and (v) any reasonably available, non-privileged information that supports the alleged failure to comply. The Notice of Non-Compliance must be served promptly, and no later than 60 days after the Initiating Party becomes aware, or reasonably should have become aware, of a potential violation.

6.     **Response:** Within thirty (30) days of receipt of a Notice of Non-Compliance, the Responding Party shall respond to the Initiating Party in writing. The Responding Party may request that the Initiating Party provide to the Responding Party any additional non-privileged information in the Initiating Party's possession that may assist investigation of the alleged failure to comply. The Responding Party may further request that its time to respond be tolled until such information is provided.

7.     **Meet and Confer:** Within thirty (30) days after the response described above, or as soon as practically possible thereafter, representatives of the Parties shall informally meet, either in person or via teleconference, and confer and attempt to resolve the issues raised in the Notice of Non-Compliance.

8.     **Request for Judicial Enforcement:** If the Parties are unable to reach a mutually acceptable resolution through mediation, the Initiating Party may seek judicial enforcement of compliance with this Settlement Agreement. The Parties agree to engage in the above dispute resolution procedures to resolve any dispute relating to the interpretation or implementation of this Settlement Agreement before bringing the matter to the Court's attention. In the event that the Initiating Party seeks judicial enforcement of the provisions of this Agreement, the Initiating Party shall file a motion

pursuant to Fed. R. Civ. P. 60(b)(6) seeking relief from the stipulation of dismissal. The Parties agree not to dispute that the filing of such a motion constitutes an appropriate mechanism to seek enforcement of the provisions of this Agreement. However, the Responding Party shall not be deemed to have waived any available defenses to the substance of such motion, and any right or authority to contend that no violation of this Settlement Agreement has occurred. The Parties agree that any Rule 60(b)(6) motion for enforcement shall not include a request that any party or nonparty to the case be held in contempt.

*Christine E. Webber*

Joseph M. Sellers (#318410)
Christine E. Webber (#439368)
Rebecca A. Ojserkis (#1781442)
Dana Busgang (#90006138)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
(202) 408-4600
jsellers@cohenmilstein.com
cwebber@cohenmilstein.com
rojserkis@cohenmilstein.com
dbusgang@cohenmilstein.com

David J. Shaffer (#413484)
David Shaffer Law PLLC
5012 Aurora Dr.
Kensington, MD 20895
(202) 508-1490
david.shaffer@davidshafferlaw.com

*Attorneys for Plaintiffs*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

Jean Lin
Special Litigation Counsel

AMBER RICHER (CA Bar No. 253918)
ANNA DEFFEBACH (DC Bar No. 241346)
ALLISON WALTER (DC Bar No. 90008637)
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
E-mail: amber.richer@usdoj.gov

*Counsel for Defendant*

23

_____

Joseph M. Sellers (#318410)
Christine E. Webber (#439368)
Rebecca A. Ojserkis (#1781442)
Dana Busgang (#90006138)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
(202) 408-4600
jsellers@cohenmilstein.com
cwebber@cohenmilstein.com
rojserkis@cohenmilstein.com
dbusgang@cohenmilstein.com

David J. Shaffer (#413484)
David Shaffer Law PLLC
5012 Aurora Dr.
Kensington, MD 20895
(202) 508-1490
david.shaffer@davidshafferlaw.com

*Attorneys for Plaintiffs*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

Jean Lin
Special Litigation Counsel

9/12/24

AMBER RICHER (CA Bar No. 253918)
ANNA DEFFEBACH (DC Bar No. 241346)
ALLISON WALTER (DC Bar No. 90008637)
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
E-mail: amber.richer@usdoj.gov

*Counsel for Defendant*

23

# Exhibit A: Class Notice



# Class Action Notice

### Authorized by the U.S. District Court
### for the District of Columbia
### Bird, et al. v. Garland, Case No. 1:19-CV-1581 (JMC)

**Records show you were dismissed from New Agent Training at the FBI between April 17, 2015 and August 10, 2024.**

**There is a $22.6 million settlement of a lawsuit.**

**You are entitled to money.**

**To be part of this settlement, you should:**

**Read this notice.**

**Respond by [date].**

Important things to know:

- If you take no action, you will still be bound by the settlement, and your rights will be affected.

- You can learn more at: www.cohenmilstein.com/FBI-women-settlement.

You are part of a class action settlement for a class of female New Agent Trainees ("NAT") who received suitability notations and were dismissed from the FBI's Basic Training Field Course ("BFTC") (previously New Agent training program) after appearing before a Trainee Review Board ("TRB") or New Agent Review Board ("NARB") between April 17, 2015 and August 10, 2024, excluding any individuals whose dismissal was based solely on an honor code violation, or who previously settled their claims with the FBI.

There is a $22,600,000.00 settlement of a lawsuit, and you are entitled to money. To receive the maximum relief you are eligible for, you should: read this notice, respond by [date – 45 days after mailing] if you wish to opt-out (and receive no money), return the claims forms by the date provided in the forthcoming post-approval notice, return the reinstatement form (if eligible and interested) by 30 days after Final Approval (exact date to be provided in forthcoming post-approval notice).

# Table of Contents

**Table of Contents** ........................................................................................ **2**

**About This Notice** ......................................................................................... **3**

Why did I get this notice? .............................................................................. 3

What do I do next? ........................................................................................ 3

What are the most important dates? ............................................................. 3

**About the Lawsuit** ....................................................................................... **4**

What is this lawsuit about? ........................................................................... 4

Why is there a settlement in this lawsuit? .................................................... 5

What happens next in this lawsuit? .............................................................. 5

**Learning About the Settlement** .................................................................... **6**

What monetary relief does the settlement provide? ..................................... 6

Can I be reinstated? ...................................................................................... 6

What other relief does the settlement provide? ........................................... 7

How do I know if I am part of this settlement? ............................................. 7

How much will my payment be? .................................................................... 8

How will I make these calculations? ............................................................. 8

Who decides how much my payment will be? .............................................. 8

Will taxes be deducted from my payment? ................................................... 8

**Deciding What to Do** ..................................................................................... **9**

How do I weigh my options? ......................................................................... 9

What is the best path for me? ....................................................................... 9

**Submitting a Claim** .................................................................................... **10**

How do I get a payment as a class member? .............................................. 10

Do I have a lawyer in this lawsuit? .............................................................. 11

Do I have to pay the lawyers in this lawsuit? .............................................. 11

**Opting Out** ................................................................................................ **11**

What if I don't want to be part of this settlement? ..................................... 12

How do I opt out? ....................................................................................... 12

**Objecting** .................................................................................................. **13**

What if I disagree with the settlement? ...................................................... 13

**Doing Nothing** ........................................................................................... **13**

What are the consequences of doing nothing? ........................................... 13

**Key Resources** ........................................................................................... **14**

How do I get more information?................................................................................. 14

# About This Notice

## Why did I get this notice?

This notice is to tell you about the settlement of a class action lawsuit, *Bird, et. al. v. Garland*, brought on behalf of female New Agent Trainees who received suitability notations and were dismissed from the FBI's BFTC (previously New Agent training program) after appearing before a TRB or NARB between April 17, 2015 and August 10, 2024, excluding any individuals whose dismissal was based solely on an honor code violation or who previously settled their claims with the FBI. **You received this notice because you are a member of the group of people affected, called the "Settlement Class."** This notice gives you a summary of the terms of the proposed settlement agreement, explains what rights Settlement Class members have, and helps Settlement Class members make informed decisions about what action to take.

## What do I do next?

Read this notice to understand the settlement and to determine if you are a class member. Then, decide if you want to:

| Options | More information about each option |
|---|---|
| **Submit a Claim Form** | If you do not submit a claim form, you will receive only $50,000. If you submit a claim form, you may receive a larger payment. You will be bound by the settlement. |
| **Do Nothing** | Receive the minimum $50,000 payment. Give up rights resolved by settlement. |
| **Opt Out** | Get no payment. Allows you to bring another lawsuit against the FBI about the same issues. |
| **Object** | Tell the Court why you don't like the settlement. |

Read on to understand the specifics of the settlement and what each choice would mean for you.

## What are the most important dates?

- Deadline to object or opt out: [45 days after notice is mailed]

- Settlement approval hearing: [DATE]

3

- Deadline to submit a claim form: 60 days after Final Approval (you will be sent another notice from us once the settlement is approved that will provide the actual date to submit a claim form)

- Deadline to submit a Reinstatement Election Form: 30 days after Final Approval (you will be sent another notice from us once the settlement is approved that will provide the actual date to submit a Reinstatement Election Form)

# About the Lawsuit

## What is this lawsuit about?

Plaintiffs Paula Bird, Clare Coetzer, Lauren Rose, Danielle Snider, "D.A.", "S.B.", "D.C.", "P.E.", "W.M.", "C.S.", "L.S.", "G.T.", and "T.S."[1] filed a lawsuit in 2019 claiming that the FBI violated federal anti-discrimination law by discriminating against female NATs when issuing Suitability Notations, initiating Suitability Reviews, referring female NATs for TRBs or NARBs, and in making dismissal, recycling, and reinstatement decisions.

The FBI denies that it did anything wrong.

**Where can I learn more?**
You can get a complete copy of the proposed settlement and other key documents in this lawsuit at:

www.cohenmilstein.com/FBI-women-settlement

---

[1] Many of the named Plaintiffs were permitted to proceed anonymously.

## Why is there a settlement in this lawsuit?

In September 2024, the parties agreed to settle, which means they have reached an agreement to resolve the lawsuit. Both sides want to avoid the risk and expense of further litigation. The settlement is on behalf of the named Plaintiffs who brought the case and all the members of the Settlement Class. The Court has not decided this case in favor of either side.

### What is a class action settlement?
A class action settlement is an agreement between the parties to resolve and end the case. Settlements can provide money to class members and changes to the practices that caused the harm.

## What happens next in this lawsuit?

The Court will hold a Fairness hearing to decide whether to approve the settlement. The hearing will be held at:

**Where:** U.S. District Court for the District of Columbia, 333 Constitution Avenue, N.W., Washington, D.C.  20001

**When:** [TBD]

The Court has directed the parties to send you this notice about the proposed settlement. Because the settlement of a class action decides the rights of all members of the proposed class, the Court must give final approval to the settlement before it can take effect. Payments will only be made if the Court approves the settlement.

You don't have to attend, but you may at your own expense. You may also ask the Court for permission to speak and express your opinion about the settlement. If the Court does not approve the settlement or the parties decide not to move forward with the settlement, the settlement agreement will be void and the lawsuit will continue. The date of the hearing may change without further notice to members of the class. To learn more and confirm the hearing date, go to www.cohenmilstein.com/FBI-women-settlement.

5

# Learning About the Settlement

## What monetary relief does the settlement provide?

The FBI has agreed to pay $22,100,000 into a settlement fund. This money will be divided among the members of the Court-approved Settlement Class and will also be used to pay for costs and fees approved by the Court, including the cost of administering this settlement, and attorneys' fees and costs. Separately, $500,000 is set aside for the cost of a team of experts to review select FBI policies and procedures. Members of the settlement class will "release" their claims as part of the settlement, which means they cannot sue the FBI for the same issues in this lawsuit. The full terms of the release can be found in Section X of the settlement agreement.

The settlement provides $19,400,000 of the total to be divided among class members.

The settlement also provides an opportunity for some Settlement Class members to pursue reinstatement and provides for outside experts to review some of the FBI's procedures. Both of these elements are described further below.

## Can I be reinstated?

The FBI has agreed to offer reinstatement to the BFTC to certain eligible Settlement Class members as either a NAT or a NIAT. You may be eligible to elect reinstatement if you:

- Were not dismissed from the New Agent Training Program or BFTC for violations of the Honor Code, FBI Core Values, FBI Standards of Conduct, or other misconduct; and

- Are able to obtain or maintain a valid Top Secret security clearance.

If you are ineligible to elect reinstatement, you will receive an additional notice informing you of that, enclosed with this notice.

If you are eligible to seek reinstatement, submit the reinstatement election form, and meet the requirements, you will be reinstated, and your reinstatement to the BFTC would be subject to the same terms that apply to all NATs or NIATs.

*Being reinstated to the BFTC does not guarantee graduation.* If you graduate from the BFTC following reinstatement as NAT, you will be guaranteed placement in one of your top three field offices for your first office placement. Upon completion of the New Agent Development Program at your first office, your salary will be adjusted to the grade and step you would have been receiving had you graduated with your original class.

6

If you elect reinstatement, that will affect your monetary award, as described below.

## What other relief does the settlement provide?

**Programmatic Relief:** As part of the settlement agreement, two industrial-organizational psychologists ("IOP") agreed to by the parties will review certain policies, processes, procedures, and methods for evaluating trainees at the BFTC as they actually function in practice. Following their review, the IOPs will make recommendations for improving the policies, processes, procedures, and methods for evaluating trainees at the BFTC.

## How do I know if I am part of this settlement?

Plaintiffs and Defendants have agreed to a list of 34 individuals who make up the members of the class. If you are receiving this notice, you are part of this settlement and eligible to receive settlement funds.

## How much will my payment be?

The amount of your payment will depend on several factors. For more detailed explanation of each of the factors, and how the calculation of your payment will be determined, see Ex. H to the Settlement Agreement.

Each Class Member will receive a minimum of $50,000 in compensatory damages for emotional distress, whether or not a claim form is submitted. Your claim form will ask for information and documents that determine the remainder of your payment, which fall into two categories: economic damages and compensatory (emotional) damages.

Your **economic damages** will be determined by calculating the difference between what you would have earned in past salary, future salary, Thrift Savings Plan, and Pension if you had graduated from the BFTC and continued on as an FBI Special Agent versus your actual past and expected future employment. The total of these losses is your total economic damages.

*Note: if you elect to be reinstated, front pay and pension loss will not be included in your economic damages.*

Your **compensatory (emotional) damages** will start at the minimum $50,000. How much more compensatory damages you receive depends on what you submit with your claim form, including a statement about your emotional distress, and any medical documentation of treatment you received for that medical distress.

## How will I make these calculations?

As part of the settlement, Class Counsel, the law firm of Cohen Milstein Sellers & Toll PLLC, will help you complete the claim form and calculate your economic damages according to the methodology in Ex. H to the settlement agreement.  If you prefer you can select someone else to assist you, but you will be responsible for the cost related to the calculation, if any. Anyone performing the calculations must follow the instructions and methodology described in Ex. H to the settlement agreement.

## Who decides how much my payment will be?

The claim form, accompanying documentation, and calculations will be submitted to the Honorable Ellen Huvelle (U.S. District Judge, inactive), who has been appointed as the Neutral to decide how much your economic damages and compensatory damages are based on all the information submitted.  If the total of all class members economic and compensatory damages exceeds the total class settlement fund, each class member will receive a share of the settlement fund proportionate to their share of the total damages.

## Will taxes be deducted from my payment?

Yes. Portions of your payment that are for back and front pay will have applicable

8

payroll tax withholdings and deductions made. The remainder of your payment will not have taxes deducted, but all of the payments will be reported to the IRS and are subject to taxation.

Class Counsel is not offering tax advice and encourages you to consult a tax professional regarding any tax questions.

# Deciding What to Do

## How do I weigh my options?

You have four options: You can stay in the settlement and submit a claim; you can opt out of the settlement; you can object to the settlement; or you can do nothing. This chart shows the effects of each option:

|  | Submit a Claim | Opt out | Object | Do Nothing |
|---|---|---|---|---|
| **Can I receive settlement money if I . . .** | YES | NO | YES | YES |
| **Am I bound by the terms of this lawsuit if I . . .** | YES | NO | YES | YES |
| **Can I pursue my own case if I . . .** | NO | YES | NO | NO |
| **Will the class lawyers represent me if I . . .** | YES | NO | NO | YES |

## What is the best path for me?



# Submitting a Claim

## How do I get a payment as a class member?

You will automatically receive a minimum $50,000 payment even if you do nothing. If you wish to receive more than the minimum payment, you must submit a completed claim form, along with any required documentation, by 60 days after Final Approval (a follow up notice will be sent when this date is determined) to Class Counsel at cwebber@cohenmilstein.com or by mail to:

Cohen Milstein Sellers & Toll PLLC
Attn: Christine Webber
1100 New York Ave NW, Fifth Floor
Washington, DC 20005

## Do I have a lawyer in this lawsuit?

In a class action, the court appoints class representatives and lawyers to work on the case and represent the interests of all the class members. For this settlement, the Court has appointed the following individuals and lawyers.

Your lawyers: Christine Webber, Rebecca Ojserkis, and Dana Busgang of Cohen Milstein Sellers & Toll PLLC, and David Shaffer of David Shaffer Law PLLC. These are the lawyers who negotiated this settlement on your behalf. These lawyers will also work with you, at no cost, to prepare your claim submission to the Neutral to determine your payment.

If you want to be represented by your own lawyer, you may hire one at your own expense.

## Do I have to pay the lawyers in this lawsuit?

Lawyers' fees and costs will be paid from the Settlement Fund. **You will not have to pay the lawyers directly.**

To date, your lawyers have not been paid for all of their work or the expenses that they have paid for the case. To pay for their time, including work remaining to be done to assist you with the claims process and working with the IOPs conducting their review, your lawyers will request, as part of the final approval of this Settlement, that the Court approve a payment of up to $2,700,000 total in attorneys' fees, plus the reimbursement of out-of-pocket expenses to date, as well as the costs associated with settlement administration.

Lawyers' fees and expenses will only be awarded if approved by the Court as a fair and reasonable amount.  You have the right to object to the lawyers' fees even if you think the settlement terms are fair.

# Opting Out

11

## What if I don't want to be part of this settlement?

You can opt out. If you do, you will not receive payment and cannot object to the settlement. You will not be bound or affected by anything that happens in this lawsuit and may be able to file your own case.

## How do I opt out?

To opt out of the settlement, you must submit a written, signed statement that you are opting out, postmarked or email by [date – 45 days of the mailing of notice] to Class Counsel at:

> Cohen Milstein Sellers & Toll PLLC
> Attn: Christine Webber
> 1100 New York Ave NW, Fifth Floor
> Washington, DC 20005
>
> cwebber@cohenmilstein.com

The written statement must include your name, address, telephone number, signature, and confirm that you are aware that by opting out, you will not receive any money from this settlement.

# Objecting

## What if I disagree with the settlement?

If you disagree with any part of the settlement (including the lawyers' fees) but don't want to opt out, you may object. You must give reasons why you think the Court should not approve it and say whether your objection applies to just you, a part of the class, or the entire class. The Court will consider your views. The Court can only approve or deny the settlement — it cannot change the terms of the settlement. You may, but don't need to, hire your own lawyer to help you.

To object, you must send a letter to Class Counsel that:
(1) is postmarked by [date – 45 days after notice];
(2) includes your full name, address and telephone number, and email address (if you have one);
(3) states the reasons for your objection;
(4) says whether either you or your lawyer intend to appear at the final approval hearing and your lawyer's name;
(5) your signature.

You or your lawyer may not appear at the final approval hearing to object to the settlement agreement without having first submitted your objection in writing by the deadline.

Mail the letter to:

> Cohen Milstein Sellers & Toll PLLC
> Attn: Christine Webber
> 1100 New York Ave NW, Fifth Floor
> Washington, DC 20005
>
> cwebber@cohenmilstein.com

# Doing Nothing

## What are the consequences of doing nothing?

If you do nothing, you will receive the minimum $50,000 payment. You will still

be bound by the settlement and its "release" provisions, meaning that you won't be able to start, continue, or be part of any other lawsuit against the FBI about the issues in this case. A full description of the release can be found in Section X of the settlement agreement.

# Key Resources

## How do I get more information?

This notice is a summary of the proposed settlement. The complete settlement with all its terms can be found on the case website at www.cohenmilstein.com/FBI-women-settlement.

To get a copy of the settlement agreement or get answers to your questions:
- contact Class Counsel
- visit the case website at www.cohenmilstein.com/FBI-women-settlement

| Resource | Contact Information |
|---|---|
| **Case website** | www.cohenmilstein.com/FBI-women-settlement |
| **Your Lawyers** | Cohen Milstein Sellers & Toll PLLC<br>Attn: Christine Webber<br>1100 New York Ave NW, Fifth Floor<br>Washington, DC 20005<br>cwebber@cohenmilstein.com<br>202-408-4600 |
| **Court (DO NOT CONTACT)** | U.S. District Court for the District of Columbia<br>333 Constitution Ave NW<br>Washington, DC 20001 |

14

# Exhibit B: Claim Form

**BIRD V. GARLAND**

**NEW AGENT TRAINEE SEX DISCRIMINATION CLAIM FORM**

The attached claim form is designed to collect all the information needed from you so that your economic damages can be calculated, and so that you have the opportunity to explain your compensatory damages.

Every Settlement Class member is entitled to assistance from Class Counsel in calculating back pay, lost TSP earnings, front pay (if applicable), and pension losses (if applicable). There will be no charge to you for this assistance from Class Counsel, as their request for fees for their work in this case (which will be paid by Defendant separate from the settlement fund for the Class) encompasses preparing your claim packet for submission. You are strongly encouraged to work with Class Counsel, however, if you prefer to have someone else calculate your economic damages, you may do so. You will be responsible for the cost of any such outside assistance, however. And anyone performing the calculations must follow the methodology described in Ex. H to the Settlement Agreement, so that all class members' claims packets will be comparable.

Please contact Class Counsel as soon as possible so we can review with you the information and documents you will need to collect and answer your questions. Once we have your claim form draft and supporting materials, we will prepare the relevant calculations, and will review them with you before your final Claim Packet will be submitted to the Neutral.

1.    Name and contact information:

    a.    Full Name: _____

    b.    Mailing Address:_____

    _____

    c.    Email Address: _____

    d.    Telephone Number: _____

2.    Did you elect reinstatement?

    a.    _____ Yes _____ No

    b.    I understand that pursuing reinstatement does not guarantee I will graduate from the BFTC.  I understand that by electing reinstatement, my damages will be calculated through the end of 2024 only, with the understanding that I will return to the BFTC only after  completing required hiring forms, passing applicable BFTC prerequisites, and obtaining and maintaining a Top Secret clearance. _____ (please initial if you answered "Yes" to 2a, above)

    c.    I understand that if I previously submitted an election of reinstatement form indicating my interest in reinstatement, but I checked "No" above, that this will operate to withdraw my request for reinstatement. _____ (please initial if you previously requested reinstatement but checked No above).

3.    Dismissal from BFTC/New Agent Training:

    a.    Date you were dismissed from training: _____

    b.    Date your class would have graduated if you graduated with your class?

    _____

    c.    What was your GS grade and step while attending basic training? _____

4.      For each year, starting with the date on which you were dismissed, and continuing

through 2024, list the year, your earnings, and what documentation you are submitting in support

(e.g. a W-2, 1099, year end paystub).  If you held more than one job in a calendar year, please

list each job on a separate row with start/end dates.  If you were in a federal job, please provide

the grade and step, along with geographic location in the "Supporting Document" field.  For any

year in which you were unemployed for part of the year, note the period of unemployment. For

the year in which you were dismissed, report earnings only after the date of your dismissal:

| Year | Earnings | Supporting Document |
|------|----------|---------------------|
|      |          |                     |
|      |          |                     |
|      |          |                     |
|      |          |                     |
|      |          |                     |
|      |          |                     |
|      |          |                     |
|      |          |                     |
|      |          |                     |
|      |          |                     |
|      |          |                     |
|      |          |                     |
|      |          |                     |
|      |          |                     |
|      |          |                     |

5.      Have you ever participated in the Thrift Savings Plan (TSP) for federal employees?

_____ yes _____ no

     a.      If you answered "no" to question 5, skip to question 6.

     b.      If yes, during what years did you participate? _____

     c.      If yes, and if you want to use your actual percentage contribution to TSP instead

of the rate assumed for settlement purposes, state your annual percentage contribution

and attach a TSP document showing that was your contribution, otherwise we will

assume a 5% contribution (which is high enough to receive the maximum government

matching contribution).

     d.      If yes, and you want to use your actual average rate of return from the TSP

instead of the rate assumed for settlement purposes, state what fund you were invested in,

and your average rate of return during the time you participated in TSP, and attach a TSP

document showing that was your average rate of return.  If you never participated in TSP,

or do not have records of your TSP participation, we will assume you selected or would

have selected the Lifecycle plan corresponding to your birth year.  Please note the year

you were born: _____.

6.      Following your dismissal from New Agent Training, did you participate in a 401(k) or

have access to any other retirement or pension program?  _____ yes _____ no

     a.      If you answered yes to question 6, please provide documents showing your annual

contributions to 401k or similar retirement savings plan, any employer match, and your

rate of return.  If the alternate plan you had access to was a pension plan, please provide

information about how your pension benefits would be calculated from your employment

following dismissal from basic training.

7.      For any period of unemployment or less-than-full-time employment following your dismissal from BFTC, state the time period, why you were unemployed or employed less than full-time, and what, if anything, you did to seek employment or earn income during that time period:

| Time Period | Explanation for unemployment/actions taken to obtain employment or earn income during this period |
|---|---|
| | |
| | |
| | |
| | |

8.      Are there any other economic damages you experienced as a direct result of dismissal from BFTC/New Agent Training?

        a.      Out of pocket expense for health insurance: _____

        b.      Out of pocket expense for mental health treatment required due to FBI termination: _____

        c.      Loss of student loan forgiveness due to lack of public sector employment:

Please submit supporting documentation for such other economic damages.  **Not included**: moving expenses, housing costs, travel costs. _____

      d.      Please attach supporting documentation for such other economic damages.

9.      Please submit a statement of no more than three (3) pages describing any information you would like the Neutral to consider in support of your claim for compensatory damages.  If you sought mental health treatment associated in whole or in part with your dismissal from New Agent training, and wish to rely on your medical treatment to support your compensatory damages claim, please submit a summary from your health care provider of the diagnosis, treatment, and link to dismissal from the FBI.

10.      Attach calculations for your back pay, front pay, TSP losses, Pension Losses, and other economic losses, and fill in the amount for each below:

      a.      Back pay $_____

      b.      Front pay $_____

      c.      TSP Loss $_____

      d.      Pension Loss $_____

      e.      Other economic losses $_____

Name (print): _____

Name (sign): _____          Date:_____

# Exhibit C: Reinstatement Election Form

**BIRD V. GARLAND**

**ELECTION OF REINSTATEMENT**

If you want to be reinstated as a New Agent Trainee or New Intelligence Analyst Trainee, you must be a Class Member whose dismissal from the New Agent Training Program or BFTC was not for violation of the Honor Code, FBI Core Values, FBI Standards of Conduct, or other misconduct. You will be separately notified if the circumstances of your dismissal make you ineligible for reinstatement. If you submit this form and subsequently change your mind regarding electing reinstatement, you may do so up until the date claim packets are due to Class Counsel on [DATE] by submitting a claim form indicating you do not elect reinstatement on or before that date.

**New Agent Trainee Reinstatement Election**

To be reinstated as a New Agent Trainee you must receive a favorable adjudication after a new background investigation; and maintain or obtain a Top Secret security clearance. You are not required to have a current security clearance. You must then pass the required pre-BFTC physical fitness test, and either meet the age requirement for entry to the BFTC or obtain an age waiver.

If you elect to pursue reinstatement as a New Agent Trainee, you must sign, date, and return this document to Class Counsel no later than [DATE].

> I elect to be reinstated as a New Agent Trainee. I understand that pursuing reinstatement does not guarantee I will graduate from BFTC. I understand that by electing reinstatement, my damages under this settlement will be calculated through the end of 2024 only, with the understanding that I will return to the BFTC only after completing the required hiring forms, passing a pre-BFTC Physical Fitness Test, and receiving approval for a Top Secret clearance.

Signed: _____

Printed Name: _____

Date Signed: _____

**IF YOU ELECT REINSTATEMENT AS A NEW AGENT TRAINEE YOU MUST PROVIDE THE FOLLOWING INFORMATION:**

A. Please provide your top three (3) Field Office Preferences for post-BFTC graduation:

1. _____

2. _____

     3. _____

B. Are you a current FBI employee? YES   NO

C. Date Of Birth: _____

D. If you are a current or former member of the military, please attach your most recent Form DD-214 along with this completed form.

E. Email address: _____.  The FBI may contact you directly with links to additional forms you will have to complete online, or other requests for information.

**New Intelligence Analyst Trainee Reinstatement Election**

     To be reinstated as a New Intelligence Analyst Trainee you must receive a favorable adjudication after a new background investigation; and maintain or obtain a Top Secret security clearance. You are not required to have a current security clearance. You must then pass the required pre-BFTC Phase I and Phase II tests, but not Phase III.

     If you elect to pursue reinstatement as a New Intelligence Analyst Trainee, you must sign, date, and return this document to Class Counsel no later than [DATE].

> I elect to be reinstated as a New Intelligence Analyst Trainee.  I understand that pursuing reinstatement does not guarantee I will graduate from BFTC.  I understand that by electing reinstatement, my damages under this settlement will be calculated through the end of 2024 <u>only</u>, with the understanding that I will report to the BFTC only after completing the required hiring forms, receiving approval for a Top Secret clearance, and passing Phase I and II tests.

Signed: _____

Printed Name: _____

Date Signed: _____

**IF YOU ELECT REINSTATEMENT AS A NEW INTELLIGENCE ANALYST TRAINEE YOU MUST PROVIDE THE FOLLOWING INFORMATION:**

A. Are you a current FBI employee? YES   NO

B. Email address: _____.  The FBI may contact you directly with links to additional forms you will have to complete online, or other requests for information.

# Exhibit D:
# Notice of Exclusion from Class

**BIRD V. GARLAND**

**NOTICE OF EXCLUSION FROM CLASS DEFINITION**

On May 29, 2019, a Complaint was filed against the FBI on behalf of women trainees. On March 16, 2020, an Amended Complaint was filed including the following class definition:

> All female Agent Trainees who received suitability notations and were discharged from the FBI Academy's Basic Training after appearing before a Trainee Review Board or equivalent, or after a Suitability Review ("Agent Trainee Subclass") from April 17, 2015, through the first day of trial in this action.

According to records maintained by the FBI, you fell within the scope of this class definition.  Before the Court ruled on whether or not to certify such a class, the parties reached a Settlement Agreement, which included certification of a class for settlement purposes, with the following definition:

> All female Agent Trainees who received suitability notations and were dismissed from the FBI's BFTC (previously New Agent training program) after appearing before a Trainee Review Board ("TRB") or New Agent Review Board ("NARB") between April 17, 2015 and August 10, 2024, excluding any individuals whose dismissal was based solely on an honor code violation and any individuals who previously signed a settlement agreement with Defendant waving any and all claims arising from their time at the BFTC as of the effective date of those settlement agreements.

According to records maintained by the FBI, you do not fall within the scope of this Settlement Class definition, and thus will not be able to participate in the settlement or receive any payment from the settlement fund.  This notice is being provided to you so that if you have been relying upon the pending litigation to protect your rights, you know that you can no longer do so.

During the time that this litigation was pending, from May 20, 2019 through the date that this notice was postmarked, [DATE], the statute of limitations for any claim you might have that sex discrimination caused your dismissal from BFTC has been tolled.  However, as of [DATE], the limitations period is running once again.  Thus, if you wish to take any action concerning your dismissal by the FBI, you must act promptly, and cannot rely upon the *Bird* litigation.

# Exhibit E:
# Joint Stipulation of Dismissal

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| PAULA BIRD, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-1581 (JMC) |
| | ) | |
| MERRICK GARLAND, Attorney General | ) | |
| of the United States, named in his official | ) | |
| capacity, as head of the Department | ) | |
| of Justice, | ) | |
| | ) | |
| *Defendant*. | ) | |
| _____ | ) | |

## <u>JOINT STIPULATION OF DISMISSAL WITH PREJUDICE</u>

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), Plaintiffs Paula Bird, Clare Coetzer, Lauren Rose, Danielle Snider, "D.A.", "S.B.", "D.C.", "P.E.", "W.M.", "C.S.", "L.S.", "G.T.", and "T.S." and Defendant hereby stipulate to dismissing with prejudice the claims of Plaintiffs Paula Bird, Clare Coetzer, Lauren Rose, Danielle Snider, "D.A.", "S.B.", "D.C.", "P.E.", "W.M.", "C.S.", "L.S.", "G.T.", and "T.S." on behalf of themselves and the New Agent Trainee ("NAT") class, specifically Counts One and Two of the Fifth Amended Complaint.

Dated: XXXXX, 2024                          Respectfully submitted,

_____

Joseph M. Sellers (#318410)                 BRIAN M. BOYNTON
Christine E. Webber (#439368)               Principal Deputy Assistant Attorney General
Rebecca A. Ojserkis (#1781442)
Dana Busgang (#90006138)                    Jean Lin
Cohen Milstein Sellers & Toll PLLC          Special Litigation Counsel
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005                         Emily Nestler
(202) 408-4600                              Assistant Branch Director
jsellers@cohenmilstein.com
cwebber@cohenmilstein.com
rojserkis@cohenmilstein.com                 _____
dbusgang@cohenmilstein.com
                                            AMBER RICHER (CA Bar No. 253918)
                                            ANNA DEFFEBACH (DC Bar No. 241346)
David J. Shaffer (#413484)                  ALLISON WALTER (DC Bar No. 90008637)
David Shaffer Law PLLC                      Trial Attorneys, U.S. Department of Justice
5012 Aurora Dr.                             Civil Division, Federal Programs Branch
Kensington, MD 20895                        1100 L Street, N.W.
(202) 508-1490                              Washington, D.C. 20005
david.shaffer@davidshafferlaw.com           Ph: (202) _____
                                            E-mail: _____@usdoj.gov

*Attorneys for Plaintiffs*                   *Counsel for Defendant*

# Exhibit F:
# Sixth Amended
# Complaint

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Spencer Lee and Erika Wesley, | ) | |
| | ) | |
| Plaintiffs | ) | No. 1:19-CV-1581 (JMC) |
| | ) | |
| v. | ) | |
| | ) | |
| Merrick Garland, | ) | Judge Jia M. Cobb |
| Attorney General of the United States, | ) | |
| named in his official Capacity, and | ) | |
| head of the Department of Justice, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SIXTH AMENDED COMPLAINT**

Plaintiffs Spencer Lee and Erika Wesley, allege as follows:

**NATURE OF ACTION**

1.     Plaintiffs Spencer Lee and Erika Wesley are former female employees of the

Federal Bureau of Investigation who suffered sex and disability-based discrimination when they

were enrolled in the FBI Academy's Basic Field Training Course ("Basic Training") to become

Intelligence Analysts, and when Ms. Wesley was employed by the FBI as an Intelligence

Analyst, where she also was subjected to retaliation.

2.     As a New Intelligence Analyst Trainee ("Analyst Trainee"), Plaintiff Lee

experienced discrimination throughout her time in Basic Training, through the FBI's policy of

issuing disciplinary citations, called suitability notations, based on subjective criteria.  Plaintiff

Lee received suitability notations more frequently and for more minor infractions than male

Trainees.  Gender stereotypes and a culture of sexism within Basic Training have caused

instructors to issue suitability notations in a discriminatory manner.  As a result of these

suitability notations, Plaintiff Spencer Lee was sent before a disciplinary board called Trainee

Review Board and discharged from Basic Training by the Assistant Director of the Training
Division

3.      The FBI also discriminated against Ms. Lee and Ms. Wesley when it denied them
reasonable accommodations for their disabilities.  Further, the FBI subjected Ms. Wesley to a
hostile work environment based on her sex.  Ms. Wesley was subjected to persistent, graphic,
and invasive gender-based and sexual comments.  These unwanted comments humiliated Ms.
Wesley so severely that they altered the conditions of Ms. Wesley's employment.  The
discriminatory behavior was condoned by FBI management and was not corrected when Ms.
Wesley reported it.  Further, when Ms. Wesley reported discrimination, including through
internal complaints, formal EEO complaints, and filing this lawsuit, the FBI retaliated against
her.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this court in that the district courts have original
jurisdiction over Title VII, and Rehabilitation Act claims under 28 U.S.C. §§ 1331 and 1343 and
42 U.S.C. § 2000e-5(f)(3), because they arise under the laws of the United States and are brought
to recover damages for deprivation of civil rights.

5.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42
U.S.C. § 2000e-5(f)(3), because Defendant's headquarters is located in this district, the personnel
records relevant to this case are in this district, and many personnel practices challenged herein
were directed or supervised by Defendant in this district.

6.      Plaintiffs have exhausted their administrative remedies prior to bringing this suit
in that Plaintiff Lee filed a timely charges of discrimination before the Equal Employment

Commission on February 14, 2018 and Plaintiff Wesley filed a timely charge of discrimination before the Equal Employment Commission on May 8, 2018 and July 23, 2019.

## PARTIES

7.      Defendant Merrick Garland is the Attorney General of the United States, and is sued here in his official capacity as head of the Federal Bureau of Investigation.

8.      Plaintiff Spencer Lee, a woman with a disability, is a resident of the state of Florida.  The FBI denied Ms. Lee reasonable accommodations for her disability beginning on or about January 30, 2018, continuing through the duration of her time in Basic Training, and discharged her from the FBI Academy as an Analyst Trainee on March 9, 2018.  Ms. Lee gave first notice of discrimination to the EEOC on February 9, 2018 (prior to her dismissal), and filed a timely complaint of discrimination on February 14, 2018.

9.      Plaintiff Erika Wesley, a woman with a disability, is a resident of the state of Arizona.  During her training to become an Intelligence Analyst, the FBI subjected her to a hostile work environment based on her sex beginning in January 2018, denied her reasonable accommodations for her disability, and retaliated against her after she opposed these and other unlawful employment practices.  She gave first notice of discrimination to the EEOC on February 8, 2018, while the conduct was still ongoing, and filed a timely complaint of discrimination and retaliation during Basic Training on May 8, 2018.  Ms. Wesley gave first notice of retaliation in her current position on June 6, 2019, and filed a timely complaint of retaliation on July 23, 2019; Ms. Wesley filed further complaints on April 13, 2021 (amended on June 22, 2021) and November 2, 2021.

## FACTUAL BACKGROUND

## I.      DISCRIMINATORY  EVALUATION  AND  DISCHARGE  PRACTICES  IN  THE

## ANALYST TRAINEE PROGRAM

10.      Plaintiff Lee alleges that the FBI discriminated against her on the basis of sex in issuing her suitability notations in the Academy under circumstances where similarly situated men did not receive suitability notations, referring her to a disciplinary board called the Trainee Review Board when similarly situated men were not referred for review, and ultimately discharging her from the Basic Training program, without the opportunity for retraining  or retesting, when similarly situated men were permitted to graduate or return for further training.

11.      The FBI's Training Division administers the Basic Training program for Analyst Trainees.  The Assistant Director of the Training Division is the decisionmaker for termination decisions involving Analyst Trainees.

12.      Analyst Trainees begin their training at the FBI Academy with 12 weeks in Basic Training where they attend various academic and intelligence courses.

13.      Throughout Basic Training, Analyst Trainees are evaluated on job-related skills and suitability.  Thus, throughout Basic Training, they may receive suitability notations for perceived deficiencies in the FBI's suitability dimensions: conscientiousness, cooperativeness, emotional maturity, initiative, integrity, and judgment.  Throughout Basic Training, Counselors (who oversee the Analyst Trainees in their living quarters) and Supervisory Intelligence Analysts evaluate the Analyst Trainees using the suitability dimensions.

14.      Upon information and belief, female Analyst Trainees are issued suitability notations for perceived deficiencies in the suitability dimensions under circumstances when similarly situated male Analyst Trainees are not.  Such differences may be driven by gender-based stereotypes that result in behavior being judged negatively when female Analyst Trainees

4

fail to conform to gender norms.  For example, when a female Analyst Trainees act assertively, in contravention of gender expectations, and explains her choice of action that an instructor criticized, she is adjudged as failing to accept responsibility or lacking integrity.

15.    Suitability notations may result in an Analyst Trainee being placed in a Suitability Review or sent before a Trainee Review Board.

16.    The Training Division is comprised of three sections: Curriculum Management, which is responsible for the Academic block of instruction; the Instruction Section, which is responsible for teaching three non-academic training blocks; and the Training Services Section, which includes the Trainee Management Unit, which handles administrative matters related to trainees.  The Supervisory Special Agents who serve as instructors in the non-academic blocks work in units within the Instruction Section, with a separate unit for each block of instruction. The Counselors mentioned above, who live with the Trainees in the dorms, participate in classes and training with them, and who, like instructors, may also issue suitability notations, are part of the Trainee Management Unit.

17.    The Trainee Management Unit may decide to put Analyst Trainees who receive suitability notations through a Suitability Review.  The Trainee Management Unit may initiate such a review at the suggestion of one of the instructional units, or Executive Management of the Training Division, or on its own initiative.  Analyst Trainees who are placed under Suitability Review may be removed from their Basic Training curriculum during the review process.

18.    During a Suitability Review, the Trainee Management Unit will provide the Training Division Executive Management with the Trainee's suitability notations, counseling records, and other undefined sources, as well as a recommendation whether the Trainee should be able to remain in Basic Training.  Upon information and belief, the Assistant Director of the

Training Division will review these materials and determine whether the Trainee should continue with Basic Training (either remaining in her original class or being recycled into a different class), be discharged, or sent before the Trainee Review Board.  Even without a Suitability Review, the Training Division Deputy Assistant Director may refer Analyst Trainees to the Trainee Review Board.

19.     The Trainee Review Board consists of the following individuals: the Deputy Assistant Director who serves as chair; three Section Chiefs (the Curriculum Management Section Chief, the Instruction Management Section Chief, and the Training Services Section Chief), who serve as board members; the Trainee Management Unit Chief, who serves as a board member; one minority representative at the GS-15 level, who serves as a board member; and at times, an Office of General Counsel representative, who serves as legal advisor.

20.     The purpose of the Trainee Review Board is to create a factual record and to provide a recommendation to the Assistant Director of the Training Division about whether to permit the trainee to remain in her Basic Training class and graduate with her class, recycle the Trainee to a different class, or to discharge the trainee.  The Assistant Director of the Training Division makes the determination whether to discharge the trainee.  If the trainee is discharged, then that decision is reviewed by the Assistant Director of the Administrative Services Division.

21.     The Deputy Assistant Director determines who may attend and serve as witnesses for the Trainee Review Board. The attendees and witnesses may or may not include the trainee's classmates, instructors, the Trainee Management Unit Chief, Supervisory Special Agents, Counselor(s), and any other individuals the Deputy Assistant Director deems relevant.

22.     The Basic Training Requirements document provides that Analyst Trainees may be discharged from Basic Training for failure to meet the proficiency standards, exhibiting

behavior inconsistent with the suitability dimensions, failure to adhere to the Standards of

Conduct (a set of ethical standards), and failure to adhere to the FBI Academy Honor Code (a set

of ethical standards that relates specifically to the Academy and its training components).

23.     Alternatively, Analyst Trainees may be "recycled," that is, returned to Basic

Training and allowed to retake the courses or tests.  The Basic Training Requirements document

describes the circumstances under which an Analyst Trainee may be recycled for: medical

reasons, excessive absences due to personal life events, or poor performance.

24.     Trainee Management Unit management and instructors actively seek out

derogatory information, or "gossip," about female trainees from other instructors and counselors

in order to levy additional suitability notations against female trainees.  However, readily

observed violations of the Requirements Document committed by male Trainees are ignored.

II.     **PLAINTIFF SPENCER LEE**

25.     Plaintiff Spencer Lee, a woman with a disability, holds a bachelor's degree in

Psychology and Criminal Justice, a Master's degree in Clinical Mental Health Counseling, and is

currently pursuing her medical degree at the University of South Florida, and also studying law

at Stetson University.  Prior to attending Basic Training, Ms. Lee was employed by the FBI as an

Investigative Specialist for the Special Surveillance Group in Kansas City.  Ms. Lee experienced

sexual harassment while working in the FBI office in Kansas City, and filed an internal

complaint.  As part of the resolution of that complaint, Ms. Lee entered Basic Training as an

Analyst Trainee, in part to get away from the hostile work environment in Kansas City.

26.     Ms. Lee has debilitating migraines which substantially limit major life activities

and substantially limit major bodily functions when they are active.  These migraines can be

triggered by certain smells and dehydration, and her symptoms are exacerbated if Ms. Lee is

hungry.  Prior to attending Basic Training, Ms. Lee followed the protocol for requesting

reasonable accommodations, including permission to have a personal refrigerator in her

dormitory room to store her medications, to carry water with her to class, and to eat small

amounts of food outside of designated mealtimes.  Although the FBI initially granted such

reasonable accommodations, it did not adequately follow through and later denied Ms. Lee her

accommodations.

      27.     In 2018, Ms. Lee attended Basic Training as an Analyst Trainee.  During Basic

Training, Ms. Lee passed all of her academic tests and job-related requirements.

      28.     On or about February 7, 2018, Ms. Lee's counselor, Intelligence Analyst Vanessa

Bouey, conducted an inspection of Ms. Lee's dormitory and disciplined her for having a

refrigerator and storing medicine.  After the inspection, Ms. Bouey addressed Ms. Lee's

classroom, stating that she had found "contraband" in Ms. Lee's and Ms. Wesley's rooms. As

will be described below, Ms. Wesley has a disability and had requested reasonable

accommodations.  When Ms. Bouey stated that she found contraband in their rooms, she was

referring to Ms. Lee's and Ms. Wesley's medical accommodations.  Although Ms. Bouey found

prohibited items in other rooms, she named only Ms. Lee and Ms. Wesley in this lecture.  In

subjecting Ms. Lee to ridicule and discipline for storing her medication in a personal refrigerator,

Ms. Bouey effectively denied her reasonable accommodations.  Ms. Lee suffered adverse health

effects from the denial of these accommodations, which required outside medical intervention

and treatment.

      29.     Ms. Lee received three suitability notations for minor or falsely claimed

infractions of the suitability dimensions.  First, on January 30, 2018, Ms. Lee received a

suitability notation from her field counselor, Special Agent Daniel Zwiesler, for failing to

swallow a small bit of food she was chewing prior to entering the classroom.  Although

Defendant had agreed that it would allow Ms. Lee to eat small amounts several times per day and

frequently drink water, where eating in the classrooms was otherwise barred, it denied her this

accommodation when Mr. Zwiesler disciplined her for eating.  When she contested the

suitability notation, Mr. Zwiesler accused her of having a lack of candor.  Second, February 22,

2018, Ms. Lee received a suitability notation for entering the classroom carrying water in a

sealed container, which Mr. Zwiesler and Ms. Lee's counselor, Intelligence Analyst Vanessa

Bouey, arbitrarily determined was not spill-proof and therefore violated the rules.  Again, Ms.

Lee was denied her reasonable accommodation.  On March 1, 2018, Ms. Lee received her third

suitability notation for asking for her first duty assignment to be changed to a different location.

30.     Ms. Lee received these suitability notations for minor infractions and

misunderstandings, while similarly situated male Analyst Trainees did not receive suitability

notations for more severe infractions.

31.     After Ms. Lee's third suitability notation, Trainee Management Unit Chief Kellie

Holland placed Ms. Lee under Suitability Review.  On March 8, 2018, Ms. Lee was required to

appear before a Trainee Review Board.  Ms. Bouey testified before the Trainee Review Board,

that Ms. Lee had "contraband" in her room, again referring to Ms. Lee's reasonable

accommodations.  The Board recommended Ms. Lee be discharged from Basic Training.  On

March 9, 2018, the Acting Assistant Director of the Training Division discharged Ms. Lee from

Basic Training.

III.   **PLAINTIFF ERIKA WESLEY**

32.     Plaintiff Erika Wesley, a woman with a disability, earned a Bachelor of Business

Administration from the College of William and Mary.  Ms. Wesley earned a Master's degree in

Criminology from the University of Essex in England at age 21, where she also worked for the

Disabled Students Services Department.  Ms. Wesley completed one year of Law School at

Pepperdine University prior to accepting a position with the FBI.  Ms. Wesley worked for the

FBI for six years, earning several performance awards and promotions.  Ms. Wesley voluntarily

separated from the FBI in 2010, just prior to the birth of her first child.  Ms. Wesley applied for

reinstatement in 2014, and received a conditional offer of employment in 2016.

33.     Ms. Wesley has a medical condition that substantially limits major life activities

and major bodily functions when it is active or "flaring up."  It impairs her ability to sit for long

periods of time, causes migraines, severe allergies, and other debilitating symptoms.  Prior to

attending Basic Training, Ms. Wesley followed the protocol for requesting reasonable

accommodations, including permission to place a personal refrigerator in her dormitory room

and permission to place a medical grade air purifier in her dormitory room.  Although the FBI

initially granted such reasonable accommodations, it did not adequately follow through and later

denied Ms. Wesley her accommodations.

34.     In 2018, Ms. Wesley attended Basic Training as an Analyst Trainee.  During

Basic Training, Ms. Wesley passed all final tests and evaluations.  She demonstrated outstanding

academic and professional performance, and did not receive any suitability notations for failing

to meet objective standards.

35.     Meanwhile, however she was subjected to pervasive harassment based on her sex,

and retaliation after she reported discrimination that she witnessed on multiple occasions.

36.     Ms. Wesley was subjected to a hostile work environment based on her sex.  Ms.

Wesley's counselor repeatedly claimed that Ms. Wesley had become pregnant while engaged in

an extramarital affair during her time at the Academy, which was completely untrue.  Ms.

Wesley was subjected to frequent inappropriate sexually-charged commentary by male instructors and counselors, including frequent comments about women needing to take their birth control to control their moods, inviting female trainees over to a male instructor's home for special "after hours" attention, and openly disparaging women.

37.     Several of Ms. Wesley's instructors responded with derision when Ms. Wesley or any other female Analyst Trainee asked a question, but usually responded genially when a male Analyst Trainee asked a question.  Ms. Wesley was frequently subjected to intimidation tactics and threatened with dismissal over minor and even fabricated incidents failing to rise to the level of suitability violations, where male Analyst Trainees were granted leniency for serious violations of suitability standards.  For example, on one occasion, Supervisory Intelligence Analyst Brian Moses threatened Ms. Wesley with a suitability notation for tying her uniform jacket around her waist, claiming that this was not an approved manner to wear her uniform.  Ms. Wesley observed that instructors would often reprimand female Analyst Trainees over behavior that did not violate any job-related proficiencies or suitability dimension and they would use the Trainees' responses to issue suitability notations.  For example, if the female Analyst Trainee did not contest the feedback, she was accused of being too deferential, but if she contested the feedback, she was accused of being insubordinate.

38.     In addition, Ms. Wesley was publicly harassed about her physical limitations and disabilities.  On several occasions, Ms. Wesley's field counselor, Mr. Zweisler, questioned her derisively about the small bag she took to class containing allergy medications, which Ms. Wesley needed to keep on her person in case of a life-threatening allergic reaction.  He accused her of violating the rules for bringing it and when Ms. Wesley explained the need for it, he told her to keep the medications down the hall.  In subjecting Ms. Wesley to ridicule and threats for

carrying her bag of medications to class, Mr. Zwiesler effectively denied her a reasonable accommodation.

39.     Ms. Wesley reported discrimination on several occasions.  First, on or about January 16, 2018, she informed her counselor, Intelligence Analyst Vanessa Bouey that Mr. Zwiesler had challenged her disability accommodations in an abusive manner that humiliated Ms. Wesley.  Ms. Wesley also informed Ms. Bouey that she had a medical issue that required her to use the bathroom more frequently than the allotted breaks.

40.     Rather than address Ms. Wesley's complaints, the FBI retaliated against her. After this conversation, Ms. Bouey publicly referenced Ms. Wesley's accommodations on multiple occasions in a way that Ms. Wesley felt violated her privacy and added unnecessary physical and mental stress to her training.  In addition, shortly after Ms. Wesley complained to Ms. Bouey about Mr. Zwiesler, he began ignoring her.  He would not make eye contact with her and would avoid interacting with her.  Upon information and belief, he was ignoring her because he had learned of her complaint about his discriminatory treatment.

41.     On or about February 7, 2018, Ms. Bouey conducted an inspection of Ms. Wesley's dormitory and required her to unplug her refrigerator and remove her medical grade air purifier—thereby denying her reasonable accommodations.  Ms. Wesley suffered adverse health effects from the denial of these accommodations, which required outside medical intervention and treatment.  After the inspection, Ms. Bouey addressed Ms. Wesley's classroom, stating that she had found "contraband" (referring to their medical accommodations) in Ms. Wesley's and Ms. Lee's rooms.  Although Ms. Bouey found prohibited items in other rooms, she named only Ms. Lee and Ms. Wesley in this lecture.  Ms. Wesley's HIPAA-protected medical information was repeatedly disclosed in classroom settings as a way to mock and intimidate her.

42.     The next day, Ms. Wesley reported to Supervisory Intelligence Analyst Brian Moses that Ms. Bouey had removed her accommodations and made inappropriate comments about Ms. Wesley and her accommodations.  Ms. Wesley also explained that she thought Ms. Lee was being targeted based on her disability and gender.  Mr. Moses told Ms. Wesley he would speak to Ms. Bouey.  Shortly after that, however, Ms. Bouey began disciplining Ms. Wesley for petty infractions.  For example, she supported Mr. Moses when he issued Ms. Wesley a suitability notation for having her phone in the lobby of the class building after-hours, Ms. Bouey had previously given Ms. Wesley permission to use her phone in the building after-hours and other students routinely did so without punishment.  Further, Ms. Bouey disparaged Ms. Wesley to her classmates, even telling one student not to trust Ms. Wesley and that Ms. Wesley was "trouble."

43.     In the beginning of March 2018, Ms. Wesley reported misconduct further up the chain of command when she told Trainee Management Unit Chief Kellie Holland that she had witnessed Mr. Zwiesler targeting and harassing Ms. Lee.  Ms. Wesley told Ms. Holland that some of the male counselors and instructors were very unprofessional around female Trainees, often treating them worse than male Trainees, and that she thought there was rampant discrimination.   In response, Ms. Holland stated that Ms. Wesley had not been on her "radar" prior to that day.  Instead of Ms. Holland treating the blatant EEO violations with any seriousness or concern, Ms. Holland threatened Ms. Wesley by stating that her coming forward would not go without consequence.

44.     Ms. Holland followed through with her threat of retaliation when she personally issued Ms. Wesley a suitability notation, just days before graduation.  Ms. Holland informed Ms. Wesley that she had proactively asked Ms. Wesley's counselor, supervisor and instructors for

derogatory information about Ms. Wesley.  Ms. Holland misconstrued a statement Ms. Wesley had made two months prior to cite Ms. Wesley for insubordination and lack of professional judgement.  When Ms. Wesley challenged Ms. Holland on the accuracy of the statement, Ms. Holland quipped "Is it more important to be right or to be heard? Hmmm?"

45.     After Ms. Wesley graduated from Basic Training, she was assigned to worked as an Intelligence Analyst in the FBI's Phoenix Division beginning in April 2018.  Due to her disability, Ms. Wesley requested, and received, the following reasonable accommodations that have permitted her to successfully complete her work as an Intelligence Analyst:

a.      an ergonomic workstation;

b.      an alternative work schedule, starting at 6 am; and

c.      permission to keep an ERAS (secure FBI laptop) at home so that she can telework when necessary.

46.     Ms. Wesley further engaged in protected activity when she filed her EEO charge of discrimination on May 18, 2018, and when she filed this lawsuit on May 29, 2019.  Although the Complaint was filed under seal pending resolution of the request by some plaintiffs to proceed anonymously, a copy of the Complaint, in which Erika Wesley is named, was sent via email to counsel for the FBI who had been handling the internal EEO complaints.  Further, Ms. Wesley appeared and was named in media coverage about the case on May 29, 2019.

47.     In the two days following Ms. Wesley's filing of this case, one of her superiors, Acting Assistant Special Agent in Charge Andrew Braun, made explicit threats to terminate her because of her participation in this lawsuit.  On May 29, 2019, Mr. Braun spoke to Ms. Wesley's supervisor, Supervisory Intelligence Analyst Mary Martinez about potential changes to Ms. Martinez's position.  Understanding that a re-organization might be underway, Ms. Martinez expressed a desire to have Ms. Wesley on whatever squad she was supervising.  In response, Mr. Braun stated:

14

> That is not happening.  That is not what I mean.  She is a
> probationary employee and she spends all her time doing her EEO
> complaints and is busy suing the bureau instead of doing her job.
> She needs to go.

48.     On May 31, 2019, Mr. Braun asked Acting Supervisory Intelligence Analyst

Megan Eckstein, what she thought of someone new who "spent all their time researching EEO

policies and filing lawsuits."

49.     In the next few weeks, Ms. Wesley was subjected to several adverse employment

actions.  On June 4, 2019, Mr. Braun called a meeting of intelligence analysts in the Phoenix

Division and announced that Ms. Wesley would be assigned to work on another squad.  Two

days later, on June 6, 2019, A/ASAC Braun sent out an email which documented additional

changes to the intelligence program.  In that document, Ms. Wesley's specific position, one that

no other employees in that Division hold, was described as being "eradicated."  Ms. Wesley was

transferred to work under Supervisory Intelligence Analyst Kelly Burzacchi on June 9, 2019, but

was not assigned enough work in her new position to keep her occupied. When she volunteered

to work on additional projects, Ms. Burzacchi told her not to.

50.     On June 18, 2019, Ms. Wesley supported a request by Ms. Martinez to

temporarily assign Ms. Wesley to Ms. Martinez's squad.  Instead she was temporarily moved to

another squad, under Supervisory Intelligence Analyst Alicia DeGroot, where she again was not

assigned sufficient work.  In addition, the majority of the work that she was assigned was work

for a Staff Operations Specialist, a lower-level position than Intelligence Analyst.

51.     In June and July 2019, Ms. Wesley's superiors threatened to take away her

reasonable accommodations and did in fact revoke some of her accommodations.  When Ms.

Wesley submitted a request to telework, Ms. Burzacchi stated that she was unaware of the

telework policy and referred the request to Ms. DeGroot.  On June 8, 2019, Ms. Wesley was

asked to return her laptop.  Ms. Wesley submitted a formal request to continue using her laptop

as a reasonable accommodation, but Mr. Braun denied her request, citing an "operational

priority."  Ms. Wesley returned the laptop, but it was not subsequently assigned to another

worker.

52.     The day after Ms. Wesley was asked to return her laptop, Ms. Burzacchi and Ms.

DeGroot informed her that Mr. Braun and Special Agent in Charge Sean Kaul were considering

a policy change limiting the hours within which non-agent employees, including Ms. Wesley,

would be permitted to work. Thus, the FBI was threatening to take away Ms. Wesley's

alternative work schedule in addition to her other accommodations.

53.     Mr. Braun took retaliatory actions by removing Ms. Wesley's reasonable

accommodations and by making unfounded and knowingly untruthful allegations against Ms.

Wesley.

54.     On July 15, 2019, Ms. Wesley made a formal request for reinstatement of her

removed reasonable accommodations, including telework and an alternative work schedule.  The

FBI did not engage Ms. Wesley in an interactive process, and did not provide the requested

telework accommodation.

55.     The FBI compounded this injustice by relying on Mr. Braun's unfounded

allegations to subject Ms. Wesley to unwarranted and excessive scrutiny.  In November 2019,

Ms. Wesley became the subject, upon referral by Mr. Braun, of what would be a two-year

Inspection Division (INSD) investigation and Office of Professional Responsibility (OPR

adjudication), during which she could not be promoted, trained, transferred, or eligible for other

benefits.  Her security clearance was suspended for much of this time, as there was a parallel

investigation by the Security Division (SECD), causing a 14-month suspension without pay of her employment.[1]

56.     In November 2020, Ms. Wesley received notification that her security clearance was restored and that she was eligible to return to work.  Yet Defendant prevented her from returning for two months, until January 2021, without explanation.  There was a long delay in processing the pay owed to her for the delay after she was eligible to return to work, and she was never compensated for the year she was suspended without pay while her security clearance was reviewed.

57.     Upon Ms. Wesley's return to work, the FBI denied her a series of reasonable accommodations and retaliated against her for her prior EEO complaints.

58.     Ms. Wesley's accrued annual and sick leave, which she would have used for doctor's appointments, was deleted.  Her further requests for leave time were delayed or denied because of demands that she produce new copies of medical documentation already on file.

59.     On February 2, 2021, Ms. Wesley renewed her July 15, 2019 request for reasonable accommodations. Again, the agency did not engage her in an interactive process.

60.     Moreover, upon her return, Ms. Wesley faced unwarranted criticism, excessive scrutiny of her work, and offensive remarks by management and peers.  Ms. Wesley applied for, but was denied attendance in, several training courses, which were required to meet her annual performance metrics and promotion.

61.     In April 2021, Ms. Wesley was informed that she was suspended and that OPR recommended her for termination. This was despite the fact that the investigation of Ms. Wesley

---

[1] Ms. Wesley cannot fully plead the details of this investigation due to the FBI's requirement that she agree to certain nondisclosure provisions.

was initiated out of retaliatory motives, and the grounds for the investigation were not substantiated, but rather were pretext for a subsequent fishing expedition.  The OPR investigation and adjudicative process contained significant deficiencies, including failure to interview relevant witnesses, failure to consider exculpatory evidence, policy violations, and pretextual practices.  Termination was a disproportionately harsh penalty for any wrongdoing for which OPR might be found to have established a factual basis.

62.      On September 17, 2021, Ms. Wesley received by personal delivery a letter, dated September 15, 2021, informing her that she was terminated.

63.      Ms. Wesley has exhausted her administrative remedies with respect to her complaint regarding the failure to provide reasonable accommodations.  Ms. Wesley first made contact with the EEO office on February 17, 2021.  Ms. Wesley filed her formal complaint on April 13, 2021 and amended it on June 22, 2021.  She received the Report of Investigation on November 5, 2021.  On December 2, 2021, over 180 days ago, Ms. Wesley requested a Final Agency Decision.  She still has not received a Final Agency Decision.

64.      Ms. Wesley has exhausted her administrative remedies with respect to her termination complaint. Ms. Wesley first contacted the EEO Office regarding her termination on September 23, 2021, and she submitted her written explanation on September 30, 2021.  On November 2, 2021, she filed her formal complaint.  The FBI's Report of Investigation was issued on May 27, 2022, within the 30 days prior to filing Plaintiffs' Fourth Amended Complaint.

**IV.     CAUSES OF ACTION**

<u>**COUNT ONE**</u>
**Violation of Title VII, 42 U.S.C. § 2000e *et seq.*,**
**(Disparate Treatment)**
**Brought by Plaintiff Spencer Lee.**

65.     Plaintiff Lee reallege and incorporate by reference the allegations contained in paragraphs 1 through 64.

66.     The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000(e), *et seq.*, and constitutes a continuing violation of that Act. Defendant discriminated against Plaintiff Lee in discharging her from Basic Training because of her sex.

67.     Plaintiff Lee was qualified for the Analyst Trainee position, performed her duties adequately, and passed all of her academic tests.

68.     Defendant treated Plaintiff Lee differently than her male colleagues when it issued her several suitability notations for minor infractions – such as failing to swallow a small bite of food before entering a classroom or being falsely accused of not having a spill-proof water bottle – while similarly situated male Analyst Trainees did not receive suitability notations for more severe infractions.

69.     Plaintiff Lee's sex was the determining factor and/or a motivating factor in her discharge from Basic Training.

70.     Defendant's discriminatory practices described above denied Plaintiff Lee the opportunity to graduate from Basic Training and enter an Analyst position, and compensation and promotions to which she is entitled, which has resulted in the loss of past and future wages and other job benefits.

71.     The conduct described above caused Plaintiff Lee emotional harm and other forms of harm proximately caused by the FBI's discriminatory conduct.

72.     Plaintiffs Lee requests relief as provided in the Prayer for Relief below.

**COUNT TWO**
**Violation of Title VII, 42 U.S.C. § 2000e *et seq.*,**
**(Hostile Work Environment)**
**Brought by Plaintiff Erika Wesley.**

73.     Plaintiff Erika Wesley repeats and realleges the allegations contained in paragraphs 1 through 64.

74.     Defendant created a hostile environment for Plaintiff Erika Wesley.  Defendant denied Ms. Wesley a non-abusive workplace and the opportunity to work without fear, intimidation, ridicule, upset, humiliation and unwelcome disturbances.  Defendant's conduct was severe and pervasive, and that conduct altered the terms, conditions and enjoyment of Ms. Wesley's employment with Defendant.  Reasonable female employees would find the conduct abusive, offensive and humiliating.

75.     Supervisors have made and condoned the actions of other employees in making comments to female employees, including Ms. Wesley, that were unwelcome and based on sex.

76.     These comments were sufficiently severe and pervasive as to alter the terms, conditions and privileges of employment, and to create an abusive, intimidating, hostile and offensive working environment for Ms. Wesley.

77.     This conduct constitutes sexual harassment and discrimination based on sex in violation of § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2.

78.     These supervisors were acting within the scope of their employment with defendants when they engaged in harassment of and discrimination against female employees.

79.    This harassment and discrimination took place in the workplace during working hours.

80.    Defendant had actual and constructive knowledge of harassment of and discrimination against Ms. Wesley and failed to take remedial action of any kind whatsoever.

81.    Defendant acted in such a manner as to render the FBI's EEO or anti-harassment policies meaningless as a policy to address and/or combat sexual harassment and abuse in the workplace.  Nonetheless, Ms. Wesley expressly complained about the harassment.  Ms. Wesley informed Trainee Management Unit Chief Kellie Holland in the beginning of March 2018.

82.    As a proximate result of Defendant's actions, Ms. Wesley suffered humiliation, fear, intimidation, ridicule, upset, economic losses and other emotional injuries and will suffer severe damages and injuries including but not limited to, humiliation, loss of self-esteem, hurt, fear, frustration, emotional distress, inconvenience and damage to her professional reputation.

83.    The conduct alleged above, which was permitted to occur by Defendant, was undertaken with malice or with reckless indifference to the federally protected rights of Ms. Wesley.  Defendant is liable to Ms. Wesley for violation of § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2.

## COUNT THREE
**Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.***
**(Discrimination in Denial of Reasonable Accommodations)**
**Brought by Plaintiffs Spencer Lee and Erika Wesley.**

84.    Plaintiffs Spencer Lee and Erika Wesley repeat and reallege the allegations contained in paragraphs 1 through 64.

85.    Ms. Lee and Ms. Wesley have disabilities under the meaning of 29 U.S.C. § 705(20) and 42 U.S.C. § 12102(1)(A).  Ms. Lee has debilitating migraines which substantially limit major life activities and major bodily functions when they are active.  Ms. Wesley's

medical condition substantially limits her major life activities and major bodily functions when it is active.  It impairs her ability to sit for long periods of time, causes migraines, severe allergies, and other debilitating symptoms.

86.     Prior to attending Basic Training, Ms. Lee and Ms. Wesley gave notice of their disabilities by formally requesting reasonable accommodations.

87.     Ms. Lee and Ms. Wesley were qualified for their positions as Analyst Trainees and were able to perform the essential functions of the positions with reasonable accommodations.

88.     The FBI denied Ms. Lee and Ms. Wesley reasonable accommodations.  Ms. Lee was denied her accommodations when her instructor, Mr. Zwiesler, and her counselor, Ms. Bouey, interfered with her ability to store her medications in a personal refrigerator, carry water to class, and eat small amounts of food outside of mealtimes.  Ms. Wesley was denied her accommodations when her instructor, Mr. Zwiesler, interfered with her ability to bring a purse containing medicine to class and when her counselor, Ms. Bouey required her to unplug her personal refrigerator and remove the medical grade air purifier.

89.     Ms. Bouey and Mr. Zwiesler were acting within the scope of their employment when they denied Ms. Lee's and Ms. Wesley's accommodations.

90.     Defendant's discriminatory practices described above have caused Ms. Lee and Ms. Wesley harm, including severe emotional distress and physical harm, including adverse health effects from the removal of the accommodations.

91.     Accordingly, Defendant violated Ms. Lee's and Ms. Wesley's rights protected by Rehabilitation Act of 1973, 29 U.S.C. § 794.

**COUNT FOUR**
**Violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act of 1973, § 29**
**U.S.C. § 794.**
**(Retaliation)**
**Brought by Plaintiff Erika Wesley.**

92.    Plaintiff Wesley repeats and realleges the allegations contained in paragraphs 1

through 64.

93.    Ms. Wesley opposed unlawful employment practices by objecting to sexual

advances and sexual and gender-based comments, objecting to the denial of her and Ms. Lee's

reasonable accommodations, and filing internal complaints of harassment and disability

discrimination, then EEO charges, and ultimately this lawsuit.  Such activities are protected

under § 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, and the Americans with

Disabilities Act, 42 U.S.C. § 12203.  Such activities were known to her management at the FBI.

94.    Following such actions, Ms. Wesley faced harassing actions such as issuing

suitability notations during Basic Training, removing her previously approved accommodations

during Basic Training, being denied the opportunity to telework, which she was previously

permitted to do, having her assigned position eliminated, and not being assigned work consistent

with her Analyst position and grade level.  Because of her protected activities, the FBI launched

a pretextual investigation that unreasonably resulted in Ms. Wesley's termination. These actions

constitute retaliation in violation of § 704(a) of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e-3, and the Rehabilitation Act of 1973, § 29 U.S.C. § 794.

95.    Supervisors were acting within the scope of their employment when they

retaliated against Ms. Wesley.

96.    Defendant had actual and constructive knowledge of the retaliation perpetrated

against employees and refused to take remedial action of any kind.

23

97.     Defendant's retaliatory practices described above have caused Ms. Wesley harm, including severe emotional distress and loss of wages.

98.     Accordingly, Defendant violated Plaintiff's rights protected by § 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3, and the Rehabilitation Act of 1973, § 29 U.S.C. § 794.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

As to Plaintiff Lee's individual claims:

99.     An award of all damages that Plaintiff Lee has sustained as a result of the Federal Bureau of Investigation's conduct, including pain and suffering, medical costs, back pay, front pay, general and special damages for lost compensation and job benefits that she would have received but for the discriminatory practices of the Federal Bureau of Investigation.

100.    An award of compensatory damages and injunctive relief, appropriate to the proof at trial;

101.    Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

102.    Pre-Judgment and Post-Judgment interest, as provided by law; and

103.    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

As to Plaintiff Wesley's individual claims:

104.    An award of all damages that Plaintiff Wesley has sustained as a result of the Federal Bureau of Investigation's conduct, including pain and suffering, medical costs, back pay, front pay, general and special damages for lost compensation and job benefits that she would have received but for the discriminatory practices of the Federal Bureau of Investigation;

105.     An award of compensatory damages and injunctive relief, appropriate to the proof at trial;

106.     Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

107.     Pre-Judgment and Post-Judgment interest, as provided by law; and

108.     Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial as to all claims so triable.

[DATE]                                             Respectfully submitted,


                                                   */s/ Christine E. Webber*
                                                   Joseph M. Sellers (#318410)
                                                   Christine E. Webber (#439368)
                                                   Rebecca A. Ojserkis (#1781442)
                                                   Dana Busgang (#90006138)
                                                   Cohen Milstein Sellers & Toll PLLC
                                                   1100 New York Ave. NW, Fifth Floor
                                                   Washington, DC 20005
                                                   (202) 408-4600
                                                   jsellers@cohenmilstein.com
                                                   cwebber@cohenmilstein.com
                                                   rojserkis@cohenmilstein.com
                                                   dbusgang@cohenmilstein.com

                                                   David J. Shaffer (#413484)
                                                   David Shaffer Law PLLC
                                                   5012 Aurora Dr.
                                                   Kensington, MD 20895
                                                   (202) 508-1490
                                                   david.shaffer@davidshafferlaw.com

                                                   *Attorneys for Plaintiffs*

# Exhibit G:
# Post-Approval Notice

## BIRD V. GARLAND

### POST-APPROVAL NOTICE

You were previously mailed notice regarding the settlement in *Bird v. Garland*, on behalf of women New Agent Trainees dismissed from basic training by the FBI, and you did not opt-out.  This notice contains some important updates:

- The Court granted Final Approval for the settlement on [date].

- That means the deadline to submit your Election of Reinstatement is [date+30].

- And the deadline to submit your Claim Form is [date+60].

- If you have not already done so, please schedule an appointment with Class Counsel to discuss preparation of your Claim Form.  You can email Christine Webber at cwebber@cohenmilstein.com.

- If you plan to have someone other than Class Counsel assist you with preparation of your Claim Form, please let us know.

- If you plan to have Class Counsel assist you, please contact us promptly so we can discuss with you the documents we will need and ensure your claim packet is ready on time.

# Exhibit H: Plaintiffs' Plan for Allocation and Distribution of Settlement Funds

**EXHIBIT H: PLAINTIFFS' PLAN FOR ALLOCATION AND DISTRIBUTION OF SETTLEMENT FUNDS**

I.      **OVERVIEW**

    A.      This Exhibit sets forth in detail Plaintiffs' explanation of how the Class Settlement Fund will be allocated, including completion of a claim form, Class Counsel's availability to assist, and the detailed methodology for calculating economic damages.  Claims packets will be submitted by Class Counsel to the Appointed Neutral who will determine damages for each class member, and if the total exceeds the Class Settlement Fund, each class member's award will be reduced proportionately.

    B.      Plaintiffs are solely responsible for the administration of the settlement. Defendant takes no position whatsoever as to the legality or appropriateness and makes no representation of approval of items in this Exhibit, which contains solely Plaintiffs' proposal. The Parties agree that Defendant will not have input into the distribution or allocation of Damages Awards from the Class Settlement Fund to individual Class Members.  This proposed framework is attached to the Settlement Agreement for purposes of providing notice to the Class and satisfying the requirements of Rule 23 of the Federal Rules of Civil Procedure, both required for approval of the Agreement. If the Agreement is approved by the Court, this Exhibit will be considered binding on Plaintiffs.

    C.      The information contained herein supplements the terms included in the Settlement Agreement (the "Agreement") Sections V and VII. Nothing contained herein is intended to contradict any terms explicitly included in the Agreement.

II.     **SETTLEMENT ADMINISTRATION**

    A.      **Claims**

        1.      Every Class Member who does not opt-out will be awarded a minimum of Fifty Thousand Dollars ($50,000) in compensatory damages, whether any Claim Form is submitted by a Class Member or not.

        **1.**      To receive more than the automatic $50,000 award, Class Members must submit a completed Claim Form, attached to the Settlement Agreement as Exhibit B, and accompanying required documentation ("Claim Packet"), within sixty (60) days after Final Approval.

        **2.**      After Final Approval, a Post Approval Notice will be issued to the thirty-four (34) class members to alert them to the final deadlines for submitting the Reinstatement Form and the Claim Form, as the deadline for both will depend on the date of Final Approval.

        **3.**      Every Class Member is eligible for and will be offered a consultation with Class Counsel to assist in completing the Claim Form. Fees for assisting

Class Members in completing and submitting their Claim Forms are included in the allocated attorneys' fees portion of the Settlement Amount. No Class Member will be separately charged for Class Counsel's assistance in submitting Claim Forms.

a.   Any Class Member seeking Class Counsel assistance must provide documentation as requested by Class Counsel sufficient to determine their backpay, TSP loss, other economic damages, and, if not electing Reinstatement, their front pay and pension loss. Documentation must be submitted to Class Counsel, along with a draft Claim Form, within 30 days of Final Approval. See Claim Form, attached to the Settlement Agreement as Exhibit B, for a complete list of required documentation.  This will permit Class Counsel to review all information with each Class Member, complete calculations, and prepare the final Claim Form for submission to the Appointed Neutral.

b.   If a Class Member elects to seek third-party assistance in compiling and submitting their Claim Packet, the Class Member is responsible for any fees, costs, or expenses associated with that third-party assistance. Any Claim Packet submitted must follow the same rules for calculating claim amounts as set forth in section III, Calculations for Claim Submission, below.

**4.**   For any Class Member who elected not to work with Class Counsel to complete the Claim Packet, they must submit their completed Claim Packet to Class Counsel by 12 noon ET on the 60th day after Final Approval.  For each Class Member, Class Counsel will submit the Claim Forms, Claim Packets, and damages calculations to the Neutral no later than 7 pm ET on the 60th day after Final Approval.

B.   **The Appointed Neutral**

1.   The Plaintiffs intend to request the Court appoint the Honorable Ellen Huvelle (inactive) to serve as the Appointed Neutral for the purposes of allocating the Class Settlement Fund to the Class Members.  Judge Huvelle is not accepting any compensation for this service.

2.   The Appointed Neutral's determination of each Class Member's Damages Award shall be conclusive, and neither the Class Members, Class Counsel, nor Defendant shall be able to appeal the Neutral's decision.

**3.**   The Neutral will review the calculations submitted to confirm the formulas outlined below were followed.  The Neutral may modify totals if the Neutral determines that the calculations submitted do not comply with formulas outlined in the Calculations for Claim Submission subsection below. The Neutral may also request Class Counsel revise calculations if

the Neutral determines that the calculations do not comply with the formulas outlined below. The Neutral will review claims for other economic damages to confirm they flow clearly from the Class Member's dismissal, and are supported by submitted documentation.

4.   The Neutral will evaluate any period of unemployment or minimal earnings by considering the written explanation of mitigation included with the Claim Form and decide what, if any, impact the mitigation question will have on economic damages calculations.  The Neutral may request Class Counsel revise calculations following whatever determination the Neutral has made regarding mitigation.

5.   The Neutral will then, considering all information submitted by the Class Member and Class Counsel, determine the "Total Economic Damages" for each class member submitting a Claim Form, which will encompass subtotals for Back Pay, TSP, Front Pay, Pension losses, and any Other Economic Damages. For any Class Member electing reinstatement, only Back Pay and TSP losses through December 31, 2024 will be considered. The Neutral will also determine the Compensatory Damages for each class member submitting a Claim Form.

**6.**   The Neutral will prepare a report setting forth her determination of each Class Member's Economic Damages by category, as well as Compensatory Damages. The Neutral's report will also provide an indication of whether the Class Member elected reinstatement and thus had damages limited to exclude front pay and pension loss, and if the Class Member was found to have inadequately mitigated damages and thus had economic damages recalculated from her original submission. *See* Agreement Sec. VII.F.3. This report will be due to Class Counsel and the Settlement Administrator sixty (60) days after the Claims Deadline, with the option for an extension of thirty (30) days if needed.

**C.   Settlement Administrator Distribution of Class Member Awards**

1.   The Settlement Administrator will deduct the Fifty Thousand Dollar ($50,000) "Minimum Payment" for every Class Member for compensatory damages – a total of One Million Seven Hundred Thousand ($1,700,000.00) for the 34 Class Members –from the Class Settlement Fund as a "Guaranteed Fund." The remaining Seventeen Million Seven Hundred Thousand Dollars ($17,700,000.00) from the Class Settlement Fund will be allocated as a "Claims Based Fund."[1]

2.   The Settlement Administrator, using the report prepared by the Neutral in accordance with section II.B.6. above, will calculate the Total Damages

---

[1] To the extent there are any opt-outs, these totals will be adjusted to reflect the reduction per opt-out.

(deducting $50,000 for the Minimum Payment) for each Class Member who submitted a Claim Packet, the combined total of all of the Total Damages for all Class Members who submitted a Claim Packet, and the percentage of the total accounted for by each Class Member. *See* Agreement Sec. VII.F.3.

3.    The Settlement Administrator will then multiply each Class Member's percentage of the Total Damages by the Claims Based Fund amount of Seventeen Million Seven Hundred Thousand Dollars ($17,700,000) to determine the Class Member's share of the Claims Based Fund, and then the Fifty Thousand Dollar ($50,000) minimum compensatory damages payment will be added to each Class Member's share from the Guaranteed Fund, including $50,000 for each Class Member who did not submit a claim form. This sum will be the class member's final Damages Award.

4.    The Settlement Administrator will then calculate required tax withholdings, make necessary tax payments, and issue payment to each Class Member within fifteen (15) business days after receiving the Appointed Neutral's report. *See* Agreement Section. VII.E.4.

**D.    <u>Disposition of Uncashed Settlement Checks</u>**

1.    The Settlement Administrator shall make multiple efforts by telephone, text, email, and U.S. mail to ensure that any Class Members who have not cashed their checks after forty-five (45) days do so. Checks will become void one hundred and eighty (180) days after checks are mailed.

2.    Unused funds from IOP Review: in accordance with Settlement Agreement Sec. VII.C.5., any remainder of the $500,000 portion of the Total Settlement Amount designated for the IOP review after the IOP review is completed shall revert to the Class Settlement Fund.

3.    After unused IOP funds have been released to the Class Settlement Fund, the funds from any uncashed settlement checks and any unused IOP funds will be used to make a second distribution.  Thirty (30) days after release of the IOP funds, or two-hundred and ten (210) days after the first distribution checks are void, whichever is later, the Settlement Administrator will send out a second distribution to Class Member in proportion to their first share of the Claims Based Fund, as determined by section C above.

**E.    Deceased Class Members**

1.    If a Class Member is, or becomes, deceased, a representative of the estate may pursue that Class Member's claim for economic damages, but not for compensatory damages.

2.    An individual seeking to pursue a claim on behalf of a deceased person

must submit (i) a death certificate, and (ii) either (A) proof of current legal representation, or (B) in a situation in which a legal representative has not yet been appointed, a sworn statement describing why the submitting individual believes he or she will be appointed the legal representative of the Class Member's estate.

3. The representative of the estate must submit a claim form with the same information as for other class members.

4. Prior to issuing a check to the representative of the estate, the Settlement Administrator must receive proof that the individual is the legal representative of the estate.  The check will be issued in the name of Estate of [Class Member], not in the name of the legal representative.

## III.   CALCULATIONS FOR CLAIM SUBMISSION

The following contains a detailed methodology for calculating economic damages, including back pay, TSP Loss, front pay, Pension loss, other economic damages, and compensatory damages.

A.   **Back Pay:** the difference in annual salary between what would have been Class Member's salary as an FBI Special Agent and Class Member's actual earnings from each year starting with the year she was dismissed from the BTFC through to the present.

1. To determine Back Pay, calculate the cumulative difference between what Class Member would have earned as an FBI Special Agent had she graduated the BFTC as scheduled ("Expected Pay") and her actual earnings based on submitted documentation ("Actual Pay"), plus interest.

2. To determine the Class Member's Expected Pay, the U.S. Office of Personnel Management ("OPM") General Schedule[2] ("GS") for the appropriate year in the Washington-Baltimore-Arlington, DC-MD-VA-WV-PA locality pay area will be used.[3] A 1.25 law enforcement availability pay multiplier will be added to the OPM GS schedule.

3. The Class Member's appropriate grade and step will be determined by relying on documentation in the Claim Packet to determine what grade and step the Class Member was at the time of their termination, and then utilize the following GS progression to determine the proper grade and step per year:

---

[2] Located here: https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/

[3] While some Class Members were made aware of the station they would be reporting to upon graduation, many Class Members' reporting station was not finalized, and therefore the locality used for all Class Members will be the Washington, DC field office for consistency.

a.    For Class Members with no prior federal experience before the BFTC:

    *i.*    Year 1: GS-10-1

    *ii.*    Year 2: GS-10-2

    *iii.*    Year 3: GS-11-3

    *iv.*    Year 4: GS-12-1

    *v.*    Year 5: GS-12-2

    *vi.*    Year 6: GS-13-1

    *vii.*    Year 7: GS-13-2

    *viii.*    Year 8: GS-13-3

    *ix.*    Year 9: GS-13-4

    *x.*    Year 10: GS-13-4

b.    For Class Members with federal experience prior to the BFTC, beginning at the grade and step level as of her dismissal from the BFTC, using GS-10-9 as an example:

    *i.*    Year 1: GS-10-9

    *ii.*    Year 2: GS-10-9

    *iii.*    Year 3: GS-11-8 (this grade/step level was determined by finding the GS-11 salary equivalent to GS-10-10 with no salary loss, then going up two steps)

    *iv.*    Year 4: GS-12-2 (this grade/step level was identified by finding the GS-12 salary equal to or greater than the prior year's GS-11-8 salary)

    *v.*    Year 5: GS-12-3

    *vi.*    Year 6: GS-13-1

    *vii.*    Year 7: GS-13-2

    *viii.*    Year 8: GS-13-3

    *ix.*    Year 9: GS-13-4

*x.*      Year 10: GS-13-4

4.      To determine Actual Pay, Class Members will be asked to provide a history of their income, year by year, since the date of their dismissal from the BFTC, and provide Form W-2s, year-end pay stubs, or Form 1099s to confirm their earnings.

5.      For any period of unemployment, Class Members will be asked to detail their efforts at job hunting sufficient to show they were attempting to mitigate damages. Class Members may, but are not required to, submit documentation of their job search efforts in support of their claim.

6.      Interest will be calculated, compounding annually, according to the following history 1-year treasury bill rates. To simplify calculations, a full year of lost wages will be treated as if the full loss first occurred half-way through the year, and thus the interest on that first year will be divided in half; similar methods will be used to calculate interest for partial years:[4]

a.      2015: 0.32%

b.      2016: 0.61%

c.      2017: 1.19%

d.      2018: 2.33%

e.      2019: 2.05%

f.      2020: 0.37%

g.      2021: 0.10%

h.      2022: 2.8%

i.      2023: 5.08%

j.      2024: 4.97%

7.      The Class Member's annual TSP contribution (calculated according to subsection B, below) will be subtracted from the Class Member's Actual (if applicable) and Expected Pay in order to not double count the amount of the TSP contribution.

8.      To determine Back Pay, for each year from the date of the Class

---

[4] *See* 28 U.S.C. § 1961(a); https://www.macrotrends.net/2492/1-year-treasury-rate-yield-chart summarizing https://home.treasury.gov/policy-issues/financing-the-government/interest-rate-statistics.

Member's dismissal to December 31, 2024, subtract the Class Member's Actual Pay from their Expected Pay each year, and add interest. For each subsequent year, calculate interest on the cumulative total of the past losses as well as interest for the current year's losses. The sum of the yearly difference between Expected Pay and Actual Pay, plus interest, will be the Class Member's Back Pay.

**B.      Thrift Savings Plan ("TSP") Loss**

1.      If a Class Member is or was a federal employee, and has a record of participating in the TSP, the Class Member will produce records of their yearly contribution percentage, and the funds[5] they invested in. The Class Member's average contribution percentage of her yearly salary (and corresponding 1%-5% government match)[6], or, if the Class Member does not supply records of participation in the TSP, an average contribution of 5% of her yearly salary (plus corresponding 5% government match), will be used to determine both Actual and Expected TSP Value. Unless a Class Member has submitted documentation that the average rate of return ("RoR") on her TSP account is higher, the Lifetime average RoR for the appropriate Lifecycle Fund[7] ("L Fund") according to the Class Member's birth year, will be used to determine both Actual and Expected TSP Value.

2.      To calculate a Class Member's TSP value if she had remained at the FBI as a Special Agent ("Expected TSP Value"), either her average contribution percentage plus corresponding government match or 5% contribution percentage plus 5% government match will be applied to the corresponding year's Expected Pay to determine the amount of yearly Expected TSP Contribution. The Expected TSP Contribution will then be multiplied by the RoR, as determined by subparagraph 1 above, to calculate the yearly Expected TSP Earnings. The Expected TSP Contribution and Expected TSP Earnings will be added to determine the yearly Expected TSP Value. For each subsequent year, the same process will be followed, and then added to the previous year's Expected TSP Value, until a cumulative total Expected TSP Value is determined for the year that the Class Member would reach twenty (20) years of service as an Agent.

3.      To calculate a Class Member's TSP value if she remains in a federal civilian position ("Actual TSP Value"), either her average contribution percentage plus corresponding government match or 5% contribution percentage plus 5% government match will be applied to the corresponding year's Actual Pay to determine the amount of yearly Actual

---

[5] *See* https://www.tsp.gov/investment-options/

[6] *See* https://www.tsp.gov/making-contributions/contribution-types/

[7] *See* https://www.tsp.gov/funds-lifecycle/

TSP Contribution. The Actual TSP Contribution will then be multiplied by the RoR, as determined by subparagraph a above, to calculate the yearly Actual TSP Earnings. The Actual TSP Contribution and Actual TSP Earnings will be added to determine the yearly Actual TSP Value. For each subsequent year, the same process will be followed, and then added to the previous year's Actual TSP Value, until a cumulative total Actual TSP Value is determined for the year that the Class Member would reach twenty (20) years of federal service.

4.      To calculate the final TSP Loss, the final cumulative Actual TSP Value will be subtracted from the final cumulative Expected TSP Value, and then reduced to the net present value.

5.      For non-federal employee Class Members, only subparagraph 2 above will be followed to calculate the Class Member's Expected TSP Value, which will then be reduced to its net present value and used as the Class Member's TSP Loss, because any 401(k) or alternate pension the Class Member has is addressed in offsetting the Expected Agent Pension as described below.

6.      If a Class Member elects reinstatement, the TSP loss will only be calculated through December 31, 2024.

**C.      Front Pay**

1.      Front Pay will be calculated for each Class Member until she would reach 20 years as a Special Agent, starting with the date of expected graduation. If a Class Member is eligible for and has elected Reinstatement, then she will not receive Front Pay.

2.      To predict what the Class Member's future earnings would be had she graduated from the BFTC ("Expected Future Pay"), apply an average 2.49% cost-of-living increase to the Class Member's 2024 Expected Pay, as well as a 3.2% average step increase for each year a step increase is prescribed. The grade and step progression will be the same as listed in Sec. III.A.3.a and b above, and continue as follows:

a.      Year 11: GS-13-4

b.      Year 12: GS-13-5

c.      Year 13: GS-13-5

d.      Year 14: GS-13-6

e.      Year 15: GS-13-6

f.      Year 16: GS-13-7

g.      Year 17: GS-13-7

h.      Year 18: GS-13-7

i.      Year 19: GS-13-8

j.      Year 20: GS-13-8

k.      Year 21: GS-13-8

l.      Year 22: GS-13-9

3.      To predict a Class Member's future earnings in their current position ("Actual Future Pay"), the same process will be utilized as for Expected Future Pay for federal employees using their current grade and step and salary and applying the 2.49% average cost-of-living increase yearly and 3.2% average step increase, when applicable. For non-federal employees, a 5% increase (encompassing both raises and potential promotion) will be applied to their last reported salary as of 2024, and each year thereafter.

4.      The Actual Future Pay will then be subtracted from the Expected Future Pay, and the difference per year for the entire front pay period until the Class Member would reach 20 years at the FBI will be added together. That sum, the total difference between a Class Member's Expected Future Pay and Actual Future Pay, will then be reduced to Net Present Value, with a discount rate of 4%, to determine a Class Member's Front Pay.

## D.    Pension Loss

1.      To determine the value of the Class Member's Expected Special Agent pension, use the highest three years of the Class Member's Expected Future Pay to calculate an average salary, multiply by twenty (20) (for their expected years of service as Special Agent), and multiply by .017[8]to calculate the yearly value of a Special Agent Pension. Calculate the Net Present Value of the Expected Pension, considering the expected pension amount, age at retirement, average life expectancy for women, and a discount factor of 4%.

2.      For any federal employees in non-FBI Agent positions, the Expected Non-Agent pension is calculated by taking the highest three years of a Class Member's non-Special Agent civilian salary based on their Front Pay calculation above, calculate the average, multiply by their years of federal service, and then multiply by .01 to calculate the yearly value of a non-FBI Agent Pension.[9] Calculate the Net Present Value of the Actual

---

[8] *See* https://www.opm.gov/retirement-center/fers-information/computation/

[9] *Id.*

Pension, considering the expected pension amount, age at retirement, average life expectancy for women, and a discount factor of 4%.

3.  To calculate the final Pension Loss amount, current federal employee's expected civilian pension net present value will be subtracted from the Net Present Value of their Expected Agent Pension.

4.  For any non-federal employee, the value of any current 401(k) retirement account will be projected forward based on the average contributions and rates of return to the present until they would reach twenty years of service as an Agent, and then reduced to Net Present Value with a 4% discount rate. The Class Member's projected net present 401(k) value will then be subtracted from the value of the Expected Agent Pension to calculate their pension loss.

**E.    Other Economic Damages**

1.  Class Members may also submit, as part of the Claim Packet, any other economic damages incurred as a direct result of their termination from the BFTC. Expenses that may be considered as part of the Class Member's damages include, but are not limited to: loss of student loan forgiveness, health insurance costs, out-of-pocket medical expenses for any mental health treatment related to the FBI's termination of Class Member. Class Members seeking damages for other economic losses shall submit a brief explanation demonstrating the connection between their dismissal from New Agent training and the claimed economic loss. Moving and housing expenses will not be included as other economic losses.

**F.    Compensatory damages**

1.  As noted above, all Class Members, regardless of whether they submit a Claim Form or not, will receive a minimum of Fifty Thousand Dollars ($50,000.00) in compensatory damages.

2.  The Appointed Neutral will evaluate the information included in Class Members' Claim Forms regarding compensatory damages, and decide on the total compensatory damages to award, not to exceed Three Hundred Thousand Dollars ($300,000) in total per Class Member, including the $50,000 minimum.

3.  Each Class Member seeking above the minimum $50,000 in compensatory damages will be asked to include a written statement with their Claim Form concerning their emotional distress, and may further support their request with records of any treatment received for emotional distress. Medical documentation is not required to obtain compensatory damages, but will be considered as support for a larger award.

IV.   **TAX TREATMENT**

A.   All awards from the Class Settlement Fund will be reported to the IRS by the Settlement Administrator, with the awards divided between wages subject to payroll taxes and other damages not subject to withholding for payroll taxes.  The Settlement Administrator will use the Neutral's Report to determine what percentage of each Class Member's Final Award will be treated as wages (Back Pay total before interest is added, and Front Pay) and what percentage of the Final Award will be treated as non-wage damages (interest, TSP Loss, Pension Loss, compensatory damages).

B.   The Wage Portion of each Class Member's Damages Award will be reduced by applicable payroll tax withholding and deductions, including the employer's share of payroll taxes, and the Settlement Administrator will issue to each Class Member a Form W-2 with respect to the Wage Portion.

C.   The Non-Wage Portion of each Class Member's Damages Award will not be reduced by payroll tax withholding and deductions, and the Settlement Administrator will issue to reach Class Member a Form 1099 with respect to the Non-Wage Portion.

**D.**   The Settlement Administrator will make the required tax payments and reports, and distribute to each Class Member her payment (less the required tax payments).

# Exhibit I:
# Class List
# (to be filed under seal)

## <u>EXHIBIT I – CLASS LIST</u>

**Name** | **Eligibility to Seek Reinstatement**

