**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Spencer Lee and Erika Wesley,<br><br>Plaintiffs<br><br>v.<br><br>Merrick Garland,<br>Attorney General of the United States,<br>named in his official Capacity, and<br>head of the Department of Justice,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:19-CV-1581 (JMC)<br><br>Judge Jia M. Cobb |

## SIXTH AMENDED COMPLAINT

Plaintiffs Spencer Lee and Erika Wesley, allege as follows:

## NATURE OF ACTION

1. Plaintiffs Spencer Lee and Erika Wesley are former female employees of the Federal Bureau of Investigation who suffered sex and disability-based discrimination when they were enrolled in the FBI Academy's Basic Field Training Course ("Basic Training") to become Intelligence Analysts, and when Ms. Wesley was employed by the FBI as an Intelligence Analyst, where she also was subjected to retaliation.

2. As a New Intelligence Analyst Trainee ("Analyst Trainee"), Plaintiff Lee experienced discrimination throughout her time in Basic Training, through the FBI's policy of issuing disciplinary citations, called suitability notations, based on subjective criteria. Plaintiff Lee received suitability notations more frequently and for more minor infractions than male Trainees. Gender stereotypes and a culture of sexism within Basic Training have caused instructors to issue suitability notations in a discriminatory manner. As a result of these suitability notations, Plaintiff Spencer Lee was sent before a disciplinary board called Trainee

Review Board and discharged from Basic Training by the Assistant Director of the Training Division

3. The FBI also discriminated against Ms. Lee and Ms. Wesley when it denied them reasonable accommodations for their disabilities. Further, the FBI subjected Ms. Wesley to a hostile work environment based on her sex. Ms. Wesley was subjected to persistent, graphic, and invasive gender-based and sexual comments. These unwanted comments humiliated Ms. Wesley so severely that they altered the conditions of Ms. Wesley's employment. The discriminatory behavior was condoned by FBI management and was not corrected when Ms. Wesley reported it. Further, when Ms. Wesley reported discrimination, including through internal complaints, formal EEO complaints, and filing this lawsuit, the FBI retaliated against her.

## JURISDICTION AND VENUE

4. Jurisdiction is proper in this court in that the district courts have original jurisdiction over Title VII, and Rehabilitation Act claims under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3), because they arise under the laws of the United States and are brought to recover damages for deprivation of civil rights.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3), because Defendant's headquarters is located in this district, the personnel records relevant to this case are in this district, and many personnel practices challenged herein were directed or supervised by Defendant in this district.

6. Plaintiffs have exhausted their administrative remedies prior to bringing this suit in that Plaintiff Lee filed a timely charges of discrimination before the Equal Employment

Commission on February 14, 2018 and Plaintiff Wesley filed a timely charge of discrimination before the Equal Employment Commission on May 8, 2018 and July 23, 2019.

## PARTIES

7. Defendant Merrick Garland is the Attorney General of the United States, and is sued here in his official capacity as head of the Federal Bureau of Investigation.

8. Plaintiff Spencer Lee, a woman with a disability, is a resident of the state of Florida. The FBI denied Ms. Lee reasonable accommodations for her disability beginning on or about January 30, 2018, continuing through the duration of her time in Basic Training, and discharged her from the FBI Academy as an Analyst Trainee on March 9, 2018. Ms. Lee gave first notice of discrimination to the EEOC on February 9, 2018 (prior to her dismissal), and filed a timely complaint of discrimination on February 14, 2018.

9. Plaintiff Erika Wesley, a woman with a disability, is a resident of the state of Arizona. During her training to become an Intelligence Analyst, the FBI subjected her to a hostile work environment based on her sex beginning in January 2018, denied her reasonable accommodations for her disability, and retaliated against her after she opposed these and other unlawful employment practices. She gave first notice of discrimination to the EEOC on February 8, 2018, while the conduct was still ongoing, and filed a timely complaint of discrimination and retaliation during Basic Training on May 8, 2018. Ms. Wesley gave first notice of retaliation in her current position on June 6, 2019, and filed a timely complaint of retaliation on July 23, 2019; Ms. Wesley filed further complaints on April 13, 2021 (amended on June 22, 2021) and November 2, 2021.

## FACTUAL BACKGROUND

### I. DISCRIMINATORY EVALUATION AND DISCHARGE PRACTICES IN THE ANALYST TRAINEE PROGRAM

10. Plaintiff Lee alleges that the FBI discriminated against her on the basis of sex in issuing her suitability notations in the Academy under circumstances where similarly situated men did not receive suitability notations, referring her to a disciplinary board called the Trainee Review Board when similarly situated men were not referred for review, and ultimately discharging her from the Basic Training program, without the opportunity for retraining or retesting, when similarly situated men were permitted to graduate or return for further training.

11. The FBI's Training Division administers the Basic Training program for Analyst Trainees. The Assistant Director of the Training Division is the decisionmaker for termination decisions involving Analyst Trainees.

12. Analyst Trainees begin their training at the FBI Academy with 12 weeks in Basic Training where they attend various academic and intelligence courses.

13. Throughout Basic Training, Analyst Trainees are evaluated on job-related skills and suitability. Thus, throughout Basic Training, they may receive suitability notations for perceived deficiencies in the FBI's suitability dimensions: conscientiousness, cooperativeness, emotional maturity, initiative, integrity, and judgment. Throughout Basic Training, Counselors (who oversee the Analyst Trainees in their living quarters) and Supervisory Intelligence Analysts evaluate the Analyst Trainees using the suitability dimensions.

14. Upon information and belief, female Analyst Trainees are issued suitability notations for perceived deficiencies in the suitability dimensions under circumstances when similarly situated male Analyst Trainees are not. Such differences may be driven by gender-based stereotypes that result in behavior being judged negatively when female Analyst Trainees

fail to conform to gender norms. For example, when a female Analyst Trainees act assertively, in contravention of gender expectations, and explains her choice of action that an instructor criticized, she is adjudged as failing to accept responsibility or lacking integrity.

15. Suitability notations may result in an Analyst Trainee being placed in a Suitability Review or sent before a Trainee Review Board.

16. The Training Division is comprised of three sections: Curriculum Management, which is responsible for the Academic block of instruction; the Instruction Section, which is responsible for teaching three non-academic training blocks; and the Training Services Section, which includes the Trainee Management Unit, which handles administrative matters related to trainees. The Supervisory Special Agents who serve as instructors in the non-academic blocks work in units within the Instruction Section, with a separate unit for each block of instruction. The Counselors mentioned above, who live with the Trainees in the dorms, participate in classes and training with them, and who, like instructors, may also issue suitability notations, are part of the Trainee Management Unit.

17. The Trainee Management Unit may decide to put Analyst Trainees who receive suitability notations through a Suitability Review. The Trainee Management Unit may initiate such a review at the suggestion of one of the instructional units, or Executive Management of the Training Division, or on its own initiative. Analyst Trainees who are placed under Suitability Review may be removed from their Basic Training curriculum during the review process.

18. During a Suitability Review, the Trainee Management Unit will provide the Training Division Executive Management with the Trainee's suitability notations, counseling records, and other undefined sources, as well as a recommendation whether the Trainee should be able to remain in Basic Training. Upon information and belief, the Assistant Director of the

Training Division will review these materials and determine whether the Trainee should continue with Basic Training (either remaining in her original class or being recycled into a different class), be discharged, or sent before the Trainee Review Board. Even without a Suitability Review, the Training Division Deputy Assistant Director may refer Analyst Trainees to the Trainee Review Board.

19. The Trainee Review Board consists of the following individuals: the Deputy Assistant Director who serves as chair; three Section Chiefs (the Curriculum Management Section Chief, the Instruction Management Section Chief, and the Training Services Section Chief), who serve as board members; the Trainee Management Unit Chief, who serves as a board member; one minority representative at the GS-15 level, who serves as a board member; and at times, an Office of General Counsel representative, who serves as legal advisor.

20. The purpose of the Trainee Review Board is to create a factual record and to provide a recommendation to the Assistant Director of the Training Division about whether to permit the trainee to remain in her Basic Training class and graduate with her class, recycle the Trainee to a different class, or to discharge the trainee. The Assistant Director of the Training Division makes the determination whether to discharge the trainee. If the trainee is discharged, then that decision is reviewed by the Assistant Director of the Administrative Services Division.

21. The Deputy Assistant Director determines who may attend and serve as witnesses for the Trainee Review Board. The attendees and witnesses may or may not include the trainee's classmates, instructors, the Trainee Management Unit Chief, Supervisory Special Agents, Counselor(s), and any other individuals the Deputy Assistant Director deems relevant.

22. The Basic Training Requirements document provides that Analyst Trainees may be discharged from Basic Training for failure to meet the proficiency standards, exhibiting

behavior inconsistent with the suitability dimensions, failure to adhere to the Standards of Conduct (a set of ethical standards), and failure to adhere to the FBI Academy Honor Code (a set of ethical standards that relates specifically to the Academy and its training components).

23. Alternatively, Analyst Trainees may be "recycled," that is, returned to Basic Training and allowed to retake the courses or tests. The Basic Training Requirements document describes the circumstances under which an Analyst Trainee may be recycled for: medical reasons, excessive absences due to personal life events, or poor performance.

24. Trainee Management Unit management and instructors actively seek out derogatory information, or "gossip," about female trainees from other instructors and counselors in order to levy additional suitability notations against female trainees. However, readily observed violations of the Requirements Document committed by male Trainees are ignored.

## II. PLAINTIFF SPENCER LEE

25. Plaintiff Spencer Lee, a woman with a disability, holds a bachelor's degree in Psychology and Criminal Justice, a Master's degree in Clinical Mental Health Counseling, and is currently pursuing her medical degree at the University of South Florida, and also studying law at Stetson University. Prior to attending Basic Training, Ms. Lee was employed by the FBI as an Investigative Specialist for the Special Surveillance Group in Kansas City. Ms. Lee experienced sexual harassment while working in the FBI office in Kansas City, and filed an internal complaint. As part of the resolution of that complaint, Ms. Lee entered Basic Training as an Analyst Trainee, in part to get away from the hostile work environment in Kansas City.

26. Ms. Lee has debilitating migraines which substantially limit major life activities and substantially limit major bodily functions when they are active. These migraines can be triggered by certain smells and dehydration, and her symptoms are exacerbated if Ms. Lee is

hungry. Prior to attending Basic Training, Ms. Lee followed the protocol for requesting reasonable accommodations, including permission to have a personal refrigerator in her dormitory room to store her medications, to carry water with her to class, and to eat small amounts of food outside of designated mealtimes. Although the FBI initially granted such reasonable accommodations, it did not adequately follow through and later denied Ms. Lee her accommodations.

27. In 2018, Ms. Lee attended Basic Training as an Analyst Trainee. During Basic Training, Ms. Lee passed all of her academic tests and job-related requirements.

28. On or about February 7, 2018, Ms. Lee's counselor, Intelligence Analyst Vanessa Bouey, conducted an inspection of Ms. Lee's dormitory and disciplined her for having a refrigerator and storing medicine. After the inspection, Ms. Bouey addressed Ms. Lee's classroom, stating that she had found "contraband" in Ms. Lee's and Ms. Wesley's rooms. As will be described below, Ms. Wesley has a disability and had requested reasonable accommodations. When Ms. Bouey stated that she found contraband in their rooms, she was referring to Ms. Lee's and Ms. Wesley's medical accommodations. Although Ms. Bouey found prohibited items in other rooms, she named only Ms. Lee and Ms. Wesley in this lecture. In subjecting Ms. Lee to ridicule and discipline for storing her medication in a personal refrigerator, Ms. Bouey effectively denied her reasonable accommodations. Ms. Lee suffered adverse health effects from the denial of these accommodations, which required outside medical intervention and treatment.

29. Ms. Lee received three suitability notations for minor or falsely claimed infractions of the suitability dimensions. First, on January 30, 2018, Ms. Lee received a suitability notation from her field counselor, Special Agent Daniel Zwiesler, for failing to

swallow a small bit of food she was chewing prior to entering the classroom. Although Defendant had agreed that it would allow Ms. Lee to eat small amounts several times per day and frequently drink water, where eating in the classrooms was otherwise barred, it denied her this accommodation when Mr. Zwiesler disciplined her for eating. When she contested the suitability notation, Mr. Zwiesler accused her of having a lack of candor. Second, February 22, 2018, Ms. Lee received a suitability notation for entering the classroom carrying water in a sealed container, which Mr. Zwiesler and Ms. Lee's counselor, Intelligence Analyst Vanessa Bouey, arbitrarily determined was not spill-proof and therefore violated the rules. Again, Ms. Lee was denied her reasonable accommodation. On March 1, 2018, Ms. Lee received her third suitability notation for asking for her first duty assignment to be changed to a different location.

30. Ms. Lee received these suitability notations for minor infractions and misunderstandings, while similarly situated male Analyst Trainees did not receive suitability notations for more severe infractions.

31. After Ms. Lee's third suitability notation, Trainee Management Unit Chief Kellie Holland placed Ms. Lee under Suitability Review. On March 8, 2018, Ms. Lee was required to appear before a Trainee Review Board. Ms. Bouey testified before the Trainee Review Board, that Ms. Lee had "contraband" in her room, again referring to Ms. Lee's reasonable accommodations. The Board recommended Ms. Lee be discharged from Basic Training. On March 9, 2018, the Acting Assistant Director of the Training Division discharged Ms. Lee from Basic Training.

## III. PLAINTIFF ERIKA WESLEY

32. Plaintiff Erika Wesley, a woman with a disability, earned a Bachelor of Business Administration from the College of William and Mary. Ms. Wesley earned a Master's degree in

Criminology from the University of Essex in England at age 21, where she also worked for the Disabled Students Services Department. Ms. Wesley completed one year of Law School at Pepperdine University prior to accepting a position with the FBI. Ms. Wesley worked for the FBI for six years, earning several performance awards and promotions. Ms. Wesley voluntarily separated from the FBI in 2010, just prior to the birth of her first child. Ms. Wesley applied for reinstatement in 2014, and received a conditional offer of employment in 2016.

33. Ms. Wesley has a medical condition that substantially limits major life activities and major bodily functions when it is active or "flaring up." It impairs her ability to sit for long periods of time, causes migraines, severe allergies, and other debilitating symptoms. Prior to attending Basic Training, Ms. Wesley followed the protocol for requesting reasonable accommodations, including permission to place a personal refrigerator in her dormitory room and permission to place a medical grade air purifier in her dormitory room. Although the FBI initially granted such reasonable accommodations, it did not adequately follow through and later denied Ms. Wesley her accommodations.

34. In 2018, Ms. Wesley attended Basic Training as an Analyst Trainee. During Basic Training, Ms. Wesley passed all final tests and evaluations. She demonstrated outstanding academic and professional performance, and did not receive any suitability notations for failing to meet objective standards.

35. Meanwhile, however she was subjected to pervasive harassment based on her sex, and retaliation after she reported discrimination that she witnessed on multiple occasions.

36. Ms. Wesley was subjected to a hostile work environment based on her sex. Ms. Wesley's counselor repeatedly claimed that Ms. Wesley had become pregnant while engaged in an extramarital affair during her time at the Academy, which was completely untrue. Ms.

Wesley was subjected to frequent inappropriate sexually-charged commentary by male instructors and counselors, including frequent comments about women needing to take their birth control to control their moods, inviting female trainees over to a male instructor's home for special "after hours" attention, and openly disparaging women.

37. Several of Ms. Wesley's instructors responded with derision when Ms. Wesley or any other female Analyst Trainee asked a question, but usually responded genially when a male Analyst Trainee asked a question. Ms. Wesley was frequently subjected to intimidation tactics and threatened with dismissal over minor and even fabricated incidents failing to rise to the level of suitability violations, where male Analyst Trainees were granted leniency for serious violations of suitability standards. For example, on one occasion, Supervisory Intelligence Analyst Brian Moses threatened Ms. Wesley with a suitability notation for tying her uniform jacket around her waist, claiming that this was not an approved manner to wear her uniform. Ms. Wesley observed that instructors would often reprimand female Analyst Trainees over behavior that did not violate any job-related proficiencies or suitability dimension and they would use the Trainees' responses to issue suitability notations. For example, if the female Analyst Trainee did not contest the feedback, she was accused of being too deferential, but if she contested the feedback, she was accused of being insubordinate.

38. In addition, Ms. Wesley was publicly harassed about her physical limitations and disabilities. On several occasions, Ms. Wesley's field counselor, Mr. Zweisler, questioned her derisively about the small bag she took to class containing allergy medications, which Ms. Wesley needed to keep on her person in case of a life-threatening allergic reaction. He accused her of violating the rules for bringing it and when Ms. Wesley explained the need for it, he told her to keep the medications down the hall. In subjecting Ms. Wesley to ridicule and threats for

carrying her bag of medications to class, Mr. Zwiesler effectively denied her a reasonable accommodation.

39. Ms. Wesley reported discrimination on several occasions. First, on or about January 16, 2018, she informed her counselor, Intelligence Analyst Vanessa Bouey that Mr. Zwiesler had challenged her disability accommodations in an abusive manner that humiliated Ms. Wesley. Ms. Wesley also informed Ms. Bouey that she had a medical issue that required her to use the bathroom more frequently than the allotted breaks.

40. Rather than address Ms. Wesley's complaints, the FBI retaliated against her. After this conversation, Ms. Bouey publicly referenced Ms. Wesley's accommodations on multiple occasions in a way that Ms. Wesley felt violated her privacy and added unnecessary physical and mental stress to her training. In addition, shortly after Ms. Wesley complained to Ms. Bouey about Mr. Zwiesler, he began ignoring her. He would not make eye contact with her and would avoid interacting with her. Upon information and belief, he was ignoring her because he had learned of her complaint about his discriminatory treatment.

41. On or about February 7, 2018, Ms. Bouey conducted an inspection of Ms. Wesley's dormitory and required her to unplug her refrigerator and remove her medical grade air purifier—thereby denying her reasonable accommodations. Ms. Wesley suffered adverse health effects from the denial of these accommodations, which required outside medical intervention and treatment. After the inspection, Ms. Bouey addressed Ms. Wesley's classroom, stating that she had found "contraband" (referring to their medical accommodations) in Ms. Wesley's and Ms. Lee's rooms. Although Ms. Bouey found prohibited items in other rooms, she named only Ms. Lee and Ms. Wesley in this lecture. Ms. Wesley's HIPAA-protected medical information was repeatedly disclosed in classroom settings as a way to mock and intimidate her.

42. The next day, Ms. Wesley reported to Supervisory Intelligence Analyst Brian Moses that Ms. Bouey had removed her accommodations and made inappropriate comments about Ms. Wesley and her accommodations. Ms. Wesley also explained that she thought Ms. Lee was being targeted based on her disability and gender. Mr. Moses told Ms. Wesley he would speak to Ms. Bouey. Shortly after that, however, Ms. Bouey began disciplining Ms. Wesley for petty infractions. For example, she supported Mr. Moses when he issued Ms. Wesley a suitability notation for having her phone in the lobby of the class building after-hours, Ms. Bouey had previously given Ms. Wesley permission to use her phone in the building after-hours and other students routinely did so without punishment. Further, Ms. Bouey disparaged Ms. Wesley to her classmates, even telling one student not to trust Ms. Wesley and that Ms. Wesley was "trouble."

43. In the beginning of March 2018, Ms. Wesley reported misconduct further up the chain of command when she told Trainee Management Unit Chief Kellie Holland that she had witnessed Mr. Zwiesler targeting and harassing Ms. Lee. Ms. Wesley told Ms. Holland that some of the male counselors and instructors were very unprofessional around female Trainees, often treating them worse than male Trainees, and that she thought there was rampant discrimination. In response, Ms. Holland stated that Ms. Wesley had not been on her "radar" prior to that day. Instead of Ms. Holland treating the blatant EEO violations with any seriousness or concern, Ms. Holland threatened Ms. Wesley by stating that her coming forward would not go without consequence.

44. Ms. Holland followed through with her threat of retaliation when she personally issued Ms. Wesley a suitability notation, just days before graduation. Ms. Holland informed Ms. Wesley that she had proactively asked Ms. Wesley's counselor, supervisor and instructors for

derogatory information about Ms. Wesley. Ms. Holland misconstrued a statement Ms. Wesley had made two months prior to cite Ms. Wesley for insubordination and lack of professional judgement. When Ms. Wesley challenged Ms. Holland on the accuracy of the statement, Ms. Holland quipped "Is it more important to be right or to be heard? Hmmm?"

45. After Ms. Wesley graduated from Basic Training, she was assigned to worked as an Intelligence Analyst in the FBI's Phoenix Division beginning in April 2018. Due to her disability, Ms. Wesley requested, and received, the following reasonable accommodations that have permitted her to successfully complete her work as an Intelligence Analyst:

a. an ergonomic workstation;

b. an alternative work schedule, starting at 6 am; and

c. permission to keep an ERAS (secure FBI laptop) at home so that she can telework when necessary.

46. Ms. Wesley further engaged in protected activity when she filed her EEO charge of discrimination on May 18, 2018, and when she filed this lawsuit on May 29, 2019. Although the Complaint was filed under seal pending resolution of the request by some plaintiffs to proceed anonymously, a copy of the Complaint, in which Erika Wesley is named, was sent via email to counsel for the FBI who had been handling the internal EEO complaints. Further, Ms. Wesley appeared and was named in media coverage about the case on May 29, 2019.

47. In the two days following Ms. Wesley's filing of this case, one of her superiors, Acting Assistant Special Agent in Charge Andrew Braun, made explicit threats to terminate her because of her participation in this lawsuit. On May 29, 2019, Mr. Braun spoke to Ms. Wesley's supervisor, Supervisory Intelligence Analyst Mary Martinez about potential changes to Ms. Martinez's position. Understanding that a re-organization might be underway, Ms. Martinez expressed a desire to have Ms. Wesley on whatever squad she was supervising. In response, Mr. Braun stated:

> That is not happening. That is not what I mean. She is a probationary employee and she spends all her time doing her EEO complaints and is busy suing the bureau instead of doing her job. She needs to go.

48. On May 31, 2019, Mr. Braun asked Acting Supervisory Intelligence Analyst Megan Eckstein, what she thought of someone new who "spent all their time researching EEO policies and filing lawsuits."

49. In the next few weeks, Ms. Wesley was subjected to several adverse employment actions. On June 4, 2019, Mr. Braun called a meeting of intelligence analysts in the Phoenix Division and announced that Ms. Wesley would be assigned to work on another squad. Two days later, on June 6, 2019, A/ASAC Braun sent out an email which documented additional changes to the intelligence program. In that document, Ms. Wesley's specific position, one that no other employees in that Division hold, was described as being "eradicated." Ms. Wesley was transferred to work under Supervisory Intelligence Analyst Kelly Burzacchi on June 9, 2019, but was not assigned enough work in her new position to keep her occupied. When she volunteered to work on additional projects, Ms. Burzacchi told her not to.

50. On June 18, 2019, Ms. Wesley supported a request by Ms. Martinez to temporarily assign Ms. Wesley to Ms. Martinez's squad. Instead she was temporarily moved to another squad, under Supervisory Intelligence Analyst Alicia DeGroot, where she again was not assigned sufficient work. In addition, the majority of the work that she was assigned was work for a Staff Operations Specialist, a lower-level position than Intelligence Analyst.

51. In June and July 2019, Ms. Wesley's superiors threatened to take away her reasonable accommodations and did in fact revoke some of her accommodations. When Ms. Wesley submitted a request to telework, Ms. Burzacchi stated that she was unaware of the telework policy and referred the request to Ms. DeGroot. On June 8, 2019, Ms. Wesley was

asked to return her laptop. Ms. Wesley submitted a formal request to continue using her laptop as a reasonable accommodation, but Mr. Braun denied her request, citing an "operational priority." Ms. Wesley returned the laptop, but it was not subsequently assigned to another worker.

52. The day after Ms. Wesley was asked to return her laptop, Ms. Burzacchi and Ms. DeGroot informed her that Mr. Braun and Special Agent in Charge Sean Kaul were considering a policy change limiting the hours within which non-agent employees, including Ms. Wesley, would be permitted to work. Thus, the FBI was threatening to take away Ms. Wesley's alternative work schedule in addition to her other accommodations.

53. Mr. Braun took retaliatory actions by removing Ms. Wesley's reasonable accommodations and by making unfounded and knowingly untruthful allegations against Ms. Wesley.

54. On July 15, 2019, Ms. Wesley made a formal request for reinstatement of her removed reasonable accommodations, including telework and an alternative work schedule. The FBI did not engage Ms. Wesley in an interactive process, and did not provide the requested telework accommodation.

55. The FBI compounded this injustice by relying on Mr. Braun's unfounded allegations to subject Ms. Wesley to unwarranted and excessive scrutiny. In November 2019, Ms. Wesley became the subject, upon referral by Mr. Braun, of what would be a two-year Inspection Division (INSD) investigation and Office of Professional Responsibility (OPR adjudication), during which she could not be promoted, trained, transferred, or eligible for other benefits. Her security clearance was suspended for much of this time, as there was a parallel

investigation by the Security Division (SECD), causing a 14-month suspension without pay of her employment.[1]

56. In November 2020, Ms. Wesley received notification that her security clearance was restored and that she was eligible to return to work. Yet Defendant prevented her from returning for two months, until January 2021, without explanation. There was a long delay in processing the pay owed to her for the delay after she was eligible to return to work, and she was never compensated for the year she was suspended without pay while her security clearance was reviewed.

57. Upon Ms. Wesley's return to work, the FBI denied her a series of reasonable accommodations and retaliated against her for her prior EEO complaints.

58. Ms. Wesley's accrued annual and sick leave, which she would have used for doctor's appointments, was deleted. Her further requests for leave time were delayed or denied because of demands that she produce new copies of medical documentation already on file.

59. On February 2, 2021, Ms. Wesley renewed her July 15, 2019 request for reasonable accommodations. Again, the agency did not engage her in an interactive process.

60. Moreover, upon her return, Ms. Wesley faced unwarranted criticism, excessive scrutiny of her work, and offensive remarks by management and peers. Ms. Wesley applied for, but was denied attendance in, several training courses, which were required to meet her annual performance metrics and promotion.

61. In April 2021, Ms. Wesley was informed that she was suspended and that OPR recommended her for termination. This was despite the fact that the investigation of Ms. Wesley

[1] Ms. Wesley cannot fully plead the details of this investigation due to the FBI's requirement that she agree to certain nondisclosure provisions.

was initiated out of retaliatory motives, and the grounds for the investigation were not substantiated, but rather were pretext for a subsequent fishing expedition. The OPR investigation and adjudicative process contained significant deficiencies, including failure to interview relevant witnesses, failure to consider exculpatory evidence, policy violations, and pretextual practices. Termination was a disproportionately harsh penalty for any wrongdoing for which OPR might be found to have established a factual basis.

62. On September 17, 2021, Ms. Wesley received by personal delivery a letter, dated September 15, 2021, informing her that she was terminated.

63. Ms. Wesley has exhausted her administrative remedies with respect to her complaint regarding the failure to provide reasonable accommodations. Ms. Wesley first made contact with the EEO office on February 17, 2021. Ms. Wesley filed her formal complaint on April 13, 2021 and amended it on June 22, 2021. She received the Report of Investigation on November 5, 2021. On December 2, 2021, over 180 days ago, Ms. Wesley requested a Final Agency Decision. She still has not received a Final Agency Decision.

64. Ms. Wesley has exhausted her administrative remedies with respect to her termination complaint. Ms. Wesley first contacted the EEO Office regarding her termination on September 23, 2021, and she submitted her written explanation on September 30, 2021. On November 2, 2021, she filed her formal complaint. The FBI's Report of Investigation was issued on May 27, 2022, within the 30 days prior to filing Plaintiffs' Fourth Amended Complaint.

## IV. CAUSES OF ACTION

**COUNT ONE**
**Violation of Title VII, 42 U.S.C. § 2000e *et seq.*,**
**(Disparate Treatment)**
**Brought by Plaintiff Spencer Lee.**

65. Plaintiff Lee reallege and incorporate by reference the allegations contained in paragraphs 1 through 64.

66. The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000(e), *et seq.*, and constitutes a continuing violation of that Act. Defendant discriminated against Plaintiff Lee in discharging her from Basic Training because of her sex.

67. Plaintiff Lee was qualified for the Analyst Trainee position, performed her duties adequately, and passed all of her academic tests.

68. Defendant treated Plaintiff Lee differently than her male colleagues when it issued her several suitability notations for minor infractions – such as failing to swallow a small bite of food before entering a classroom or being falsely accused of not having a spill-proof water bottle – while similarly situated male Analyst Trainees did not receive suitability notations for more severe infractions.

69. Plaintiff Lee's sex was the determining factor and/or a motivating factor in her discharge from Basic Training.

70. Defendant's discriminatory practices described above denied Plaintiff Lee the opportunity to graduate from Basic Training and enter an Analyst position, and compensation and promotions to which she is entitled, which has resulted in the loss of past and future wages and other job benefits.

71. The conduct described above caused Plaintiff Lee emotional harm and other forms of harm proximately caused by the FBI's discriminatory conduct.

72. Plaintiffs Lee requests relief as provided in the Prayer for Relief below.

**COUNT TWO**
**Violation of Title VII, 42 U.S.C. § 2000e *et seq.*,**
**(Hostile Work Environment)**
**Brought by Plaintiff Erika Wesley.**

73. Plaintiff Erika Wesley repeats and realleges the allegations contained in paragraphs 1 through 64.

74. Defendant created a hostile environment for Plaintiff Erika Wesley. Defendant denied Ms. Wesley a non-abusive workplace and the opportunity to work without fear, intimidation, ridicule, upset, humiliation and unwelcome disturbances. Defendant's conduct was severe and pervasive, and that conduct altered the terms, conditions and enjoyment of Ms. Wesley's employment with Defendant. Reasonable female employees would find the conduct abusive, offensive and humiliating.

75. Supervisors have made and condoned the actions of other employees in making comments to female employees, including Ms. Wesley, that were unwelcome and based on sex.

76. These comments were sufficiently severe and pervasive as to alter the terms, conditions and privileges of employment, and to create an abusive, intimidating, hostile and offensive working environment for Ms. Wesley.

77. This conduct constitutes sexual harassment and discrimination based on sex in violation of § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2.

78. These supervisors were acting within the scope of their employment with defendants when they engaged in harassment of and discrimination against female employees.

79. This harassment and discrimination took place in the workplace during working hours.

80. Defendant had actual and constructive knowledge of harassment of and discrimination against Ms. Wesley and failed to take remedial action of any kind whatsoever.

81. Defendant acted in such a manner as to render the FBI's EEO or anti-harassment policies meaningless as a policy to address and/or combat sexual harassment and abuse in the workplace. Nonetheless, Ms. Wesley expressly complained about the harassment. Ms. Wesley informed Trainee Management Unit Chief Kellie Holland in the beginning of March 2018.

82. As a proximate result of Defendant's actions, Ms. Wesley suffered humiliation, fear, intimidation, ridicule, upset, economic losses and other emotional injuries and will suffer severe damages and injuries including but not limited to, humiliation, loss of self-esteem, hurt, fear, frustration, emotional distress, inconvenience and damage to her professional reputation.

83. The conduct alleged above, which was permitted to occur by Defendant, was undertaken with malice or with reckless indifference to the federally protected rights of Ms. Wesley. Defendant is liable to Ms. Wesley for violation of § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2.

## COUNT THREE
**Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.***
**(Discrimination in Denial of Reasonable Accommodations)**
**Brought by Plaintiffs Spencer Lee and Erika Wesley.**

84. Plaintiffs Spencer Lee and Erika Wesley repeat and reallege the allegations contained in paragraphs 1 through 64.

85. Ms. Lee and Ms. Wesley have disabilities under the meaning of 29 U.S.C. § 705(20) and 42 U.S.C. § 12102(1)(A). Ms. Lee has debilitating migraines which substantially limit major life activities and major bodily functions when they are active. Ms. Wesley's

medical condition substantially limits her major life activities and major bodily functions when it is active. It impairs her ability to sit for long periods of time, causes migraines, severe allergies, and other debilitating symptoms.

86. Prior to attending Basic Training, Ms. Lee and Ms. Wesley gave notice of their disabilities by formally requesting reasonable accommodations.

87. Ms. Lee and Ms. Wesley were qualified for their positions as Analyst Trainees and were able to perform the essential functions of the positions with reasonable accommodations.

88. The FBI denied Ms. Lee and Ms. Wesley reasonable accommodations. Ms. Lee was denied her accommodations when her instructor, Mr. Zwiesler, and her counselor, Ms. Bouey, interfered with her ability to store her medications in a personal refrigerator, carry water to class, and eat small amounts of food outside of mealtimes. Ms. Wesley was denied her accommodations when her instructor, Mr. Zwiesler, interfered with her ability to bring a purse containing medicine to class and when her counselor, Ms. Bouey required her to unplug her personal refrigerator and remove the medical grade air purifier.

89. Ms. Bouey and Mr. Zwiesler were acting within the scope of their employment when they denied Ms. Lee's and Ms. Wesley's accommodations.

90. Defendant's discriminatory practices described above have caused Ms. Lee and Ms. Wesley harm, including severe emotional distress and physical harm, including adverse health effects from the removal of the accommodations.

91. Accordingly, Defendant violated Ms. Lee's and Ms. Wesley's rights protected by Rehabilitation Act of 1973, 29 U.S.C. § 794.

**COUNT FOUR**
**Violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act of 1973, § 29 U.S.C. § 794.**
**(Retaliation)**
**Brought by Plaintiff Erika Wesley.**

92. Plaintiff Wesley repeats and realleges the allegations contained in paragraphs 1 through 64.

93. Ms. Wesley opposed unlawful employment practices by objecting to sexual advances and sexual and gender-based comments, objecting to the denial of her and Ms. Lee's reasonable accommodations, and filing internal complaints of harassment and disability discrimination, then EEO charges, and ultimately this lawsuit. Such activities are protected under § 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, and the Americans with Disabilities Act, 42 U.S.C. § 12203. Such activities were known to her management at the FBI.

94. Following such actions, Ms. Wesley faced harassing actions such as issuing suitability notations during Basic Training, removing her previously approved accommodations during Basic Training, being denied the opportunity to telework, which she was previously permitted to do, having her assigned position eliminated, and not being assigned work consistent with her Analyst position and grade level. Because of her protected activities, the FBI launched a pretextual investigation that unreasonably resulted in Ms. Wesley's termination. These actions constitute retaliation in violation of § 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3, and the Rehabilitation Act of 1973, § 29 U.S.C. § 794.

95. Supervisors were acting within the scope of their employment when they retaliated against Ms. Wesley.

96. Defendant had actual and constructive knowledge of the retaliation perpetrated against employees and refused to take remedial action of any kind.

97. Defendant's retaliatory practices described above have caused Ms. Wesley harm, including severe emotional distress and loss of wages.

98. Accordingly, Defendant violated Plaintiff's rights protected by § 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3, and the Rehabilitation Act of 1973, § 29 U.S.C. § 794.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

As to Plaintiff Lee's individual claims:

99. An award of all damages that Plaintiff Lee has sustained as a result of the Federal Bureau of Investigation's conduct, including pain and suffering, medical costs, back pay, front pay, general and special damages for lost compensation and job benefits that she would have received but for the discriminatory practices of the Federal Bureau of Investigation.

100. An award of compensatory damages and injunctive relief, appropriate to the proof at trial;

101. Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

102. Pre-Judgment and Post-Judgment interest, as provided by law; and

103. Such other and further legal and equitable relief as this Court deems necessary, just and proper.

As to Plaintiff Wesley's individual claims:

104. An award of all damages that Plaintiff Wesley has sustained as a result of the Federal Bureau of Investigation's conduct, including pain and suffering, medical costs, back pay, front pay, general and special damages for lost compensation and job benefits that she would have received but for the discriminatory practices of the Federal Bureau of Investigation;

105. An award of compensatory damages and injunctive relief, appropriate to the proof at trial;

106. Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

107. Pre-Judgment and Post-Judgment interest, as provided by law; and

108. Such other and further legal and equitable relief as this Court deems necessary, just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial as to all claims so triable.

February 10, 2025

Respectfully submitted,

*/s/ Christine E. Webber*

Joseph M. Sellers (#318410)
Christine E. Webber (#439368)
Rebecca A. Ojserkis (#1781442)
Dana Busgang (#90006138)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
(202) 408-4600
jsellers@cohenmilstein.com
cwebber@cohenmilstein.com
rojserkis@cohenmilstein.com
dbusgang@cohenmilstein.com

David J. Shaffer (#413484)
David Shaffer Law PLLC
5012 Aurora Dr.
Kensington, MD 20895
(202) 508-1490
david.shaffer@davidshafferlaw.com

*Attorneys for Plaintiffs*